# EXHIBIT 10

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,483 | 03/27/2020 | 8215865 | 184301 | 1057 |

20999          7590          04/22/2020
HAUG PARTNERS LLP
745 FIFTH AVENUE - 10th FLOOR
NEW YORK, NY 10151

| EXAMINER |
|---|
| WEHNER, CARY ELLEN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/22/2020 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Ameristar v RSA IPR2020-01369
RSA Ex. 2010, Page 1



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

CONSTANTINE MARANTIDIS
LEWIS ROCA ROTHGERBER CHRISTIE LLP
P.O. BOX 29001
GLENDALE, CA 91209-9001

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,483* .

PATENT UNDER REEXAMINATION *8215865* .

ART UNIT *3993* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

Ameristar v RSA IPR2020-01369
RSA Ex. 2010, Page 2

| ***Order Granting Request For Ex Parte Reexamination*** | Control No. | | Patent Under Reexamination | |
|---|---|---|---|---|
| | 90/014,483 | | 8215865 | |
| | Examiner | | Art Unit | AIA (FITF) Status |
| | CARY E WEHNER | | 3993 | Yes |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 03/27/2020 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐   PTO-892,   b)☑   PTO/SB/08,   c)☐   Other: _____

1. ☑   The request for *ex parte* reexamination is GRANTED.

    RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471G(Rev. 01-13)                    **Office Action in *Ex Parte* Reexamination**                    Part of Paper No. 20200408

Application/Control Number:90/014,483                                                    Page2
Art Unit:3993

### *DECISION ON REQUEST FOR REEXAMINATION*

A substantial new question of patentability affecting claims 1-5 of United States Patent

Number 8,215,865 (hereinafter "the '865 patent") is raised by the request for *ex parte*

reexamination.

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA.

### *Service of Papers*

After filing of a request for *ex parte* reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on the

other party (or parties where two or more third party requester proceedings are merged) in the

reexamination proceeding in the manner provided in 37 CFR 1.248.  The document must reflect

service or the document may be refused consideration by the Office.  See 37 CFR 1.550(f).

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37 CFR 1.530

to file a Patent Owner Statement.  The document needs to contain a statement that Patent

Owner waives the right under 37 CFR 1.530 to file a Patent Owner Statement and proof of

service in the manner provided by 37 CFR 1.248.  If the request for reexamination was made by

a third party requester, see 37 CFR 1.550(f).  The Patent owner may consider using the

following statement in a document waiving the right to file a Patent Owner Statement:

*Patent Owner waives the right under 37 CFR 1.530 to file a Patent Owner Statement.*

### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

### Amendment in Reexamination Proceedings

Patent Owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c).  See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

### Submissions

In order to insure full consideration of any amendments, affidavits, declarations or other documents as evidence of patentability, such documents must be submitted in response to the first Office action on the merits (which does not result in a close of prosecution).  Submissions after the second Office action on the merits, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116 after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

### Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Application/Control Number:90/014,483                                                          Page4
Art Unit:3993

Patent No. 8215865 throughout the course of this reexamination proceeding.  Likewise, if

present, the third party requester is also reminded of the ability to similarly apprise the Office of

any such activity or proceeding throughout the course of this reexamination proceeding.  See

MPEP §§ 2207, 2282 and 2286.


### '865 Patent Priority Claims

U.S. Patent Application Serial No. 12/694,730 was filed on January 27, 2010.  The '730

application claimed priority (as a continuation) to U.S. Patent Application Serial No. 11/191,251,

filed on July 26, 2005, (now U.S. Patent No. 7,699,558).  The '730 application also claimed

priority to provisional applications 60/679,547 filed on May 9, 2005; 60/674,965 filed on April 25,

2005; 60/622,385 filed on October 26, 2004; 60/605,959 filed August 30, 2004; 60/600,955 filed

August 12, 2004 and 60/591,018 filed July 26, 2004.


### Prosecution History

During the prosecution of the application that became the '865 patent, the examiner

rejected original claim 1-4 under 35 USC 102 as being anticipated by Turpin et al

(2004/0033106) and Reale (6,805,515) See non-final Office action, June 28, 2010. In response,

applicant filed an amendment cancelling claims 1-4 and adding claims 5-35.    The examiner

issued a Final Office action on January 26, 2011, rejecting claims 5-19 using Reale and claims

20-35 using Reale and Bruner et al (3,934,540).    After an amendment to the claims on August

24, 2011, the examiner rejected the claims using Fuchs (DE4004851) alone, Fuchs in view of

Hick (1,969,845 or Hernadez (6,409,419) in view of Bruner. The applicant filed a response on

January 24, 2012 and argued that Fuchs did not disclose or suggest the limitation: "wherein the

at least one first structural member or the at least one structural member or both are configured

or tied together to retain within the base supporting media introduced into the base when

the base is mounted in the excavation such, that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards" and pointed out that Fuchs taught away from a base configured to retain supporting material. Remarks, pgs. 2-3. Regarding the rejections of claims 20 and 37, applicant argued that none of the references (Fuchs, Hick, Hernandez, Bruner) did not disclose that the at least one first structural member or the at least one structural member or both were configured to retain within the base supporting media, etc. The examiner issued a Notice of Allowance on March 8, 2012 without a comment about the reason for allowance.  Therefore, it is apparent that applicant's arguments were convincing.

Accordingly, it was determined that the prior art did not teach or fairly suggest the limitation "wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such, that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards"

### *Substantial New Question*

The presence or absence of a "substantial new question of patentability" determines whether or not reexamination is ordered.

For a "substantial new question of patentability" to be present, it is only necessary that:

A) the prior art patents and/or printed publications raise a substantial new question of patentability regarding at least one claim, i.e., the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and

B) the same question of patentability as to the claim has not been decided by the Office in a previous examination of the patent or in a final holding of invalidity by the Federal Courts in a decision on the merits involving the claim.

Application/Control Number:90/014,483                                        Page6
Art Unit:3993

A SNQ may be based solely on old art where the old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation in the request.  (MPEP 2242).

The substantial new question of patentability (SNQP) is based on:

 (1) U.S. Patent No. 5,406,663 to Chen, issued 5,406,663 (hereinafter "Chen"),

(2) U.S. Patent Application Publication No. 2006/0090408 to Darcy, published May 4, 2006 (hereinafter "Darcy"),

(3) U.S. Patent No. 3,934,540 to Bruner, issued January 27, 1976 (hereinafter "Bruner"),

(4) U.S. Patent Application Publication No. 2002/0073876 to Einar, published June 20, 2002 (hereinafter "Einar"),

(5) U.S. Patent No. 5,836,715 to Hendrix et al., issued November 17, 1998 (hereinafter "Hendrix").

The Bruner reference was cited during the prosecution of the application that resulted in the '865 patent but was not used in a rejection against the claims in question.

Chen, Darcy, Einar and Hendrix are new teachings, not previously considered.

The request indicates that the requester considers:

(1) Claims 1-31, 33 and 34 are unpatentable over Chen.

(2) Claims 32 and 35 are unpatentable over Chen and Hendrix.

(3) Claims 1-31, 33 and 34 are unpatentable over Darcy.

Application/Control Number:90/014,483                                    Page7
Art Unit:3993

(4) Claim 32 is unpatentable over Darcy in view of Einar.

(5) Claim 35 is unpatentable over Darcy in view of Brunner and Einar.

### Chen

The request indicates Chen, taken alone or with Hendrix raises a SNQ as to claims 1-35 of the '865 patent.

The Chen reference is a new teaching, not previously considered nor addressed in the prior examination of the patent or a final holding of invalidity by the Federal Courts.

It is agreed that the consideration of Chen raises a substantial new question of patentability in the '865 patent.

Independent claims 1, 16, 33 requires the limitation "wherein the at least one first structural member or the at least one structural member or both are tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards."   Chen discloses a structure comprising a base and vertical support members 3.  The foundation has a plurality of structural members and at least one first support member.  The structural members and the first structural members of the base are tied together to retain within the base supporting media 4 such that the rotation is resisted (by virtue of the structures weight and size) of the support member and the foundation when impacted.  See Request, pgs. 10-16.   As stated above, the examiner found that the prior art did not teach or fairly suggest this limitation.   Further, there is a substantial likelihood that a reasonable examiner would consider the teaching of Chen important in deciding whether or not these claims are patentable.  Accordingly, consideration of Chen alone, or in combination with Hendrix

Application/Control Number:90/014,483                                           Page8
Art Unit:3993

raises a substantial new question of patentability as to claims 1-35, which question has not been

decided in a previous examination of the '865 patent.

### Darcy

The request indicates Darcy alone or taken with Einar or Bruner, raises a SNQ as to

claims 1-35 of the '865 patent.

The Bruner reference was cited during the prosecution of the application that resulted in

the '865 patent but was never used in a rejection against the claims in question. Therefore,

Bruner is being considered "in a new light".

The Darcy and Einar references are new teachings, not previously considered nor

addressed in the prior examination of the patent or a final holding of invalidity by the Federal

Courts.

It is not agreed that the consideration of Darcy raises a substantial new question of

patentability in the '865 patent.

Darcy does not qualify as prior art under 35 USC 102(a),(b) or (e).  The '865 patent

claims domestic priority to U.S. application S.N. 11/191,251 (filed July 26, 2005) and provisional

applications 60/591,018 (filed 7/26/04), 60/600,955 (filed 8/12/04), 60/605,959 (filed 8/30/04),

60/622,385 (filed 10/26/04), 60/374,965 (4/25/05) and 60/679,547 (filed 5/9/05).  The Darcy

reference has an effective filing date of October 22, 2004, which is after the filing of the first

three provisional application.  Requester contends that none of these three provisional

applications provides support for the limitation "such that the rotation is resisted of a bollard or

bollards and the base from an impact against the bollard or bollards."  Upon inspection,

provisional application no. 60/591,018 discloses a bollard system having a shallow base with

bollards attached thereto.  The purpose of the system is to provide a shallow ground mounted

base to support an array of anti-ram features. Specification, pg. 1.  On page 3, Item #11.

Discusses how to *increase resistive forces* with post tensioned cables.  Page 4 discloses that the base is formed of modules wherein the modules anti-ram capacities are provided by the width, length and thickness of the modules and that the modules are filled with concrete on-site. Page 10 states: "[m]odules may be [t]ied with [p]ost-tensioned [c]ables to [p]rovide [g]reater [a]nti-ram [c]apacity."  Although not expressly stated, it is clear that anti-ram capabilities would include a resistance to rotation of the bollard when impacted to some degree since the object of the invention is to resist the forces applied by such an impact.

Accordingly, Darcy does not qualify as prior art because the '865 patent's provisional applications provide support for the limitation that the structural members are tied together to retain the supporting media (concrete) in order to resist rotation of the bollard upon impact.

### Conclusion

For the reasons given above, Chen, taken alone or with Hendrix, cited by the requester, raises a substantial new question of patentability with respect to the subject patent. Accordingly, claims 1-35 of the subject patent will be reexamined.

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed as follows:

By EFS:
        Registered users may submit via the electronic filing system, EFS-Web,
        at: https://efs.uspto.gov/efile/myportal/efs-registered

By **U.S. Postal Service Mail** to:

        Mail Stop *Ex Parte* Reexam
        ATTN:  Central Reexamination Unit
        Commissioner for Patents
        U.S. Patent & Trademark Office

Application/Control Number:90/014,483                                              Page10
Art Unit:3993

      P.O. Box 1450
      Alexandria, VA  22313-1450


By FAX to:     (571) 273-9900
              Central Reexamination Unit


By hand to:    Customer Service Window
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314


For EFS-Web transmissions, 37 CFR 1.8(a)(1) (i)(C) and (ii) states that correspondence (except
for a request for reexamination and a corrected or replacement request for reexamination) will
be considered timely filed if: (a) it is transmitted via the Office's electronic filing system in
accordance with 37 CFR 1.6(a)(4); and, (b) includes a certificate of transmission for each piece
of correspondence stating the date of transmission, which is prior to the expiration of the set
period of time in the Office action.


Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.  The examiner's supervisor is
Eileen Lillis whose phone number is: (571) 272-6928.


Telephone Numbers for reexamination inquiries:

Reexamination and Amendment Practice     (571) 272-7703
Central Reexam Unit (CRU)            (571) 272-7705
Reexamination Facsimile Transmission No.   (571) 273-9900


/CARY E WEHNER/
Primary Examiner, Art Unit 3993
(571) 272-4715

Conferee: /CSW/

Conferee: /E.D.L/
      SPRS, Art Unit 3993

**EXHIBIT 11**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RSA PROTECTIVE TECHNOLOGIES, LLC,<br>    Plaintiff,<br>            v.<br>DELTA SCIENTIFIC CORPORATION,<br>    Defendant. | No.    19-6024 |

**REBUTTAL EXPERT REPORT OF DAVID B. PERAZA, P.E.**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND AND QUALIFICATIONS ............................................................. 1

III.    THE '865 PATENT ..................................................................................................... 2

        A.      Overview of the '865 Patent .......................................................................... 2

        B.      Prosecution History of the '865 Patent ......................................................... 3

        C.      Prior Validity Challenges to the '865 Patent ................................................ 6

                i.       IPR2019-01161 .................................................................................... 6

                ii.      IPR2019-01162 .................................................................................... 7

                iii.     Ex Parte Reexamination ...................................................................... 9

IV.     PERSON HAVING ORDINARY SKILL IN THE ART ........................................... 9

V.      CLAIM CONSTRUCTION ....................................................................................... 9

VI.     APPLICABLE LAW ................................................................................................ 10

        A.      Written Description ...................................................................................... 10

        B.      Indefiniteness .............................................................................................. 10

        C.      Obviousness ................................................................................................. 10

        D.      Anticipation ................................................................................................. 10

        E.      Secondary Considerations of Nonobviousness ........................................... 11

VII.    THE '865 CLAIMS ARE VALID UNDER 35 U.S.C. § 112 .................................. 11

        A.      Written Description ...................................................................................... 11

        B.      Indefiniteness .............................................................................................. 12

VIII.   THE '865 CLAIMS ARE VALID IN LIGHT OF THE PRIOR ART ..................... 14

        A.      The '865 Claims are Valid in Light of Turpin et al., alone and/or in combination with the DSC501 ..................................................................... 14

                i.       Overview of Turpin ........................................................................... 14

i

ii.      Overview of Delta's DSC501 ................................................... 15

iii.     Turpin Does Not Teach, Suggest, or Motivate A PHOSITA .................. 15

iv.     The DSC501 Alone and/or With Turpin Does Not Teach, Suggest, or
Motivate a PHOSITA ............................................................. 15

v.      Independent Claims 1, 16, and 33 ........................................... 16

      a.    or each bollard of the bollard structure at least one first structural
member extending from a first of the opposed ends of the base to a
second of the opposed ends of the base in a first direction
intersecting with the opposed ends, and at least one structural
member extending to intersect with the at least one first structural
member; ...................................................................... 16

      b.    wherein the base is configured to be mounted in a shallow
excavation with the at least one bollard extending above grade... 18

      c.    wherein the at least one first structural member or the at least one
structural member or both are configured or tied together to retain
within the base supporting media introduced into the base when the
base is mounted in the excavation such that the rotation is resisted
of a bollard or bollards and the base from an impact against the
bollard or bollards. ....................................................... 19

vi.     Dependent Claims ..................................................................... 22

      a.    Claim 2: The bollard structure of claim 1, wherein at least one of
the opposed ends is formed by a structural member to which an
end of the at least one first structural member is secured ............. 22

      b.    Claim 17 : The bollard structure of claim 16, wherein at least one
of the opposed ends is formed by a structural member to which an
end of the at least one first structural member is secured ............. 22

      c.    Claim 35: The bollard structure according to claim 33, wherein the
at least one of the plurality of members that extend between a
structural member to which a first bollard is secured and a
structural member to which a second bollard adjacent to the first
bollard is secured comprises a rebar member. .............................. 23

B.    The '865 Claims are Valid in Light of Delta's DSC800RFB .............................. 23

i.      Overview of the DSC800RFB ................................................. 23

ii.     The DSC800RFB Does Not Teach, Suggest, or Motivate a PHOSITA... 24

2167468.v1

iii.  Independent Claims 1, 16, and 33 .............................................................. 24

    a.  a base comprising opposed ends and a plurality of structural members which intersect and are tied together ............................. 24

    b.  for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member; ...................................................................................... 26

    c.  each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base; ....................................................................................... 27

    d.  wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and ............................................................................................... 28

    e.  wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards. ........................................................................ 29

    f.  a plurality of bollards ................................................................. 30

    g.  at least one of the plurality of members that extend parallel to the ends of the base extending between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured .............................. 30

iv.  Dependent Claims ................................................................................. 31

    a.  Claim 3: The bollard structure of claim 1, wherein the intersecting structural members have axes that extend parallel to a plane of the base ............................................................................................. 31

    b.  Claim 4: The bollard structure of claim 1, wherein the base has a height of 3 inches to 14 inches ...................................................... 31

    c.  Claim 19: The bollard structure of claim 16 wherein the intersecting structural members have axes that extend parallel to a plane of the base ............................................................................. 31

2167468.v1

d.      Claim 20: The bollard structure of claim 16 wherein the base has a height of 3 inches to 14 inches ...................................................... 31

e.      Claim 34: The bollard structure according to claim 33, wherein the at least one of the plurality of members that extend between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a structural member ....................... 32

f.      Claim 35: The bollard structure according to claim 33, wherein the at least one of the plurality of members that extend between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a rebar member .............................. 32

C.      The '865 Claims Are Valid in Light of Delta's TT203R ...................................... 33

i.      Overview of the TT203R ......................................................... 33

ii.     The TT203R Does Not Teach, Suggest, or Motivate a PHOSITA ........... 33

a.      a base comprising opposed ends and a plurality of structural members which intersect and are tied together............................. 34

b.      for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member; .................................................................................. 35

c.      each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base; ..................................................................................... 35

d.      wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and ....................................................................................... 36

e.      wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards. ....................................................................... 36

2167468.v1

        iii.    Dependent Claims ...................................................................... 37

                a.      Claim 3: The bollard structure of claim 1, wherein the intersecting
                        structural members have axes that extend parallel to a plane of the
                        base ............................................................................................ 37

                b.      Claim 4: The bollard structure of claim 1, wherein the base has a
                        height of 3 inches to 14 inches ...................................................... 37

    D.  The '865 Claims are Valid in Light of Darcy and the DSC501 ........................... 37

        i.      Overview of Darcy ...................................................................... 38

        ii.     Darcy Alone and/or with the DSC 501 Does not Teach, Suggest, or
                Motivate a PHOSITA .................................................................. 41

        iii.    Independent Claims 1, 16, and 33 .............................................. 41

                a.      wherein the base is configured to be mounted in a shallow
                        excavation with the at least one bollard extending above grade; and
                        .................................................................................................... 41

                b.      wherein the at least one first structural member or the at least one
                        structural member or both are configured or tied together to retain
                        within the base supporting media introduced into the base when the
                        base is mounted in the excavation such that the rotation is resisted
                        of a bollard or bollards and the base from an impact against the
                        bollard or bollards. ...................................................................... 42

        iv.     Dependent Claims ...................................................................... 42

                a.      Claim 4: The bollard structure of claim 1, wherein the base has a
                        height of 3 inches to 14 inches ...................................................... 42

                b.      Claim 20: The bollard structure of claim 16 wherein the base has a
                        height of 3 inches to 14 inches ...................................................... 43

        v.      Darcy In Light of the DSC501 Does not Teach, Suggest, or Motivate a
                PHOSITA .................................................................................... 43

                a.      Claim 32: The bollard structure of claim 16, comprising a rebar
                        grillage comprising intersecting and tied together and tied together
                        rebar members extending coextensively with at least a portion of
                        the base that includes a structural member to which a bollard is
                        secured ........................................................................................ 43

                b.      Claim 35: The bollard structure according to claim 33, wherein the
                        at least one of the plurality of members that extend between a

v

structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a rebar member ............................... 43

IX.    SECONDARY CONSIDERSTIONS OF NONOBVIOUSNESS .................................... 44

    A.    Long-Felt Need ........................................................................................ 44

    B.    Copying .................................................................................................... 44

2167468.v1

## I.      INTRODUCTION

1.      I have been retained by Haug Partners LLP on behalf of RSA Protective Technologies to provide my own expert opinion concerning the validity of claims 1-5, 7, 10, 14-21, 23, 26, and 31-35 of U.S. Patent No. 8,215,865 (the "'865 patent") and the arguments made in the expert report of Dr. Azim Eskandarian regarding these claims.

2.      Included in this report are my qualifications for providing this expert report, including my academic qualification and my professional experience.  My curriculum vitae is attached as Exhibit A, which contains further details.  In forming the expert opinion set forth in this report, I relied on the knowledge, training, and over 40 years of experience in the fields of civil and structural engineering, which has included designing, investigating, teaching, and consulting.  In forming my opinions I considered those materials listed in Exhibit B.

3.      I am being compensated at my standard hourly rate of $385 per hour for my work on this report.  My compensation is not related in any way to the outcome of this proceeding, and I have no other interest in this proceeding.

## II.     BACKGROUND AND QUALIFICATIONS

4.      I am a licensed engineer in 17 states with over 40 years of structural and civil engineering experience, and am currently employed at Exponent, a firm specializing in engineering and scientific consulting services with over 20 offices in the United States and five international offices.  The scope of projects that I have worked on include high-rise buildings, facades, cranes, parking structures, pre-engineered buildings, industrial facilities, scaffolds, formwork, bridges, and waterfront structures.

5.      I also led the engineering response for the City of New York following the 9/11 terrorist attacks on the World Trade Center, where I worked full time for nine months and coordinated 39 engineering sub-consultant firms.  Additionally, I led several high-profile structural collapse investigations including the L'Ambiance Plaza collapse, the Four Times Square hoist collapse, and the Miller Park crane accident.

6.      My professional experience also includes investigations involving design and construction deficiencies, condition assessment, design of remedial and stabilization measures for distressed buildings, design for renovation projects, and the analysis of unusual structures.

7.      Prior to joining Exponent, I was the Vice President of the LZA Technology division of the Thornton-Tomasetti Group, a company headquartered in New York City that operates in over 50 offices worldwide and offers engineering services to optimize the design and performance of structures, materials, and systems.

8.      In 2014, I received the "Forensic Engineer of the Year" Award by the American Society of Civil Engineers, Forensic Engineering Division.

9.      Additionally, my experience extends to academia, where I taught multiple courses on structural engineering at Columbia University in New York.

1

10.     I am listed as an author in five books and textbooks, and have published or presented peer-reviewed works relating to my structural engineering expertise over 80 times in the form of workshops, articles, book chapters, lectures, and panels.

11.     I am also a member of multiple professional engineering organizations, including the American Society of Civil Engineers, American Concrete Institute, and Structural Engineer's Association of New York.

12.     Further, I have served on many professional committees where asked to provide professional opinions and/or contribute to the creation of industry standard practices.  For example, I served on the 2014 Building Code of the City of New York task force, in addition to contributing to American Society of Civil Engineers' standard practices, titled "Design Loads for Structures During Construction" and "Minimum Design Loads for Buildings and Other Structures," respectively.  Moreover, I offered structural engineering recommendations to the NYC Department of Buildings as a member of task forces for the Structural Engineers Association of New York and the Real Estate Board of New York that resulted in building inspection laws such as Local Law 11-98.

13.     With respect to my educational background, in 1977, I received a Bachelor of Science in Civil Engineering from Ohio Northern University, and, in 1986, I received a Master of Science in Civil Engineering from the University of Cincinnati.

## III.    THE '865 PATENT

### A.    Overview of the '865 Patent

14.     The '865 patent is titled "Anti-Ram System And Method Of Installation," and describes an anti-ram system and method of constructing shallow mount security bollards.  I understand that the patent claims priority to provisional patent applications.  The patent states that the earliest provisional patent application was filed July 26, 2004.  The '865 patent issued on July 10, 2012 from U.S. Application Ser. No. 12/694,730, which was filed on January 27, 2010. The  inventors of '865 patent are Messrs. Richard Adler and John Crawford, and I understand that the '865 patent has been assigned to RSA Protective Technologies, LLC, the Plaintiff in this case.

15.     The '865 patent has three independent claims, with independent claim 1 reproduced below:

> **at least one bollard; and**
>
> **a base comprising opposed ends and a plurality of structural members which intersect and are tied together, for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;**

2

> **each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base;**
>
> **wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and**
>
> **wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.**

16.     Independent claim 16 adds the limitation that the bollard structure be comprised of a **"plurality of bollards"** (as opposed to just one).  Independent claim 33 adds a further limitation that:

> **at least one of the plurality of members that extend parallel to the ends of the base extending between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured.**

17.     The independent claims begin by claiming a bollard structure, in which each bollard is secured to a base. The claims further describe the base as being comprised of a plurality of structural members which intersect and are tied together.  Further, the claims require that the members include ***"at least one first structural member"*** and "***at least one structural member.***"  The independent claims have other requirements for these two structural members— one of them must be attached to the bollard; one of them must extend between opposed ends of the base and intersect with the ends; and they must intersect and be tied to each other.  These ***same two structural members*** also must be configured to retain supporting media, such as concrete, which facilitates the bollard structure to ***resist rotation*** upon being rammed by a vehicle.  The independent claims also provide that upon impact, the ramming forces are distributed from the bollard to the base and that the base be configured to be mounted in a ***shallow excavation***.

18.     I understand that these limitations cannot be viewed in a vacuum, but that the base of the '865 shallow mount bollard structure has all of these attributes.

### B.     Prosecution History of the '865 Patent

19.     I understand that the application that matured into the '865 patent was a continuation of a patent application that yielded an earlier patent, U.S. Patent No. 7,699,558. The '865 patent application contained four originally filed claims, two independent and two dependent, directed to a "bollard assembly" in which there was a bollard secured to a base with

considerable mass.  Those claims were rejected by the Examiner as anticipated by the Turpin reference (U.S. App. No. 2004/0033106), which Dr. Ekandarian relies on in his report.  Turpin teaches a self-contained steel vault from which a rotatable rod extends and can rotate between a raised or supine position.  The Examiner also rejected the original claims as anticipated by the Reale patent (U.S. Patent. No. 6,805,515), which taught a removable bollard attached to a base, not unlike the DSC800RFB and TT203R that Dr. Eskandarian relies on.  The Reale structure is illustrated below:



FIG. 5A                              FIG. 2B

20.    In response, the patent holder cancelled the four claims and added new claims directed to a "bollard structure" with a base that had several limitations or characteristics, namely that the 1) base is configured to be mounted in a shallow excavation; 2) the base has opposed ends; and 3) the base is comprised of structural members that intersect and are tied together, and also intersect with the base's opposed ends.  The patent holder also added the limitation that upon impact, the forces striking the bollard are transmitted to the base.  The Examiner rejected the amended claims as anticipated over another Reale patent (U.S. Patent No. 6,702,512), which taught a "vehicle arresting installation" in which rotating, detachable, bollards pivoted to trap a striking vehicle.  This is illustrated in the figures of the Reale patent:



FIG. 6                    FIG. 7                    FIG. 8

4

21.     The Examiner also rejected amended claim 20 and its dependent claims as obvious over Reale 2 in view of the Bruner patent (U.S. Patent No. 3,934,540) because Bruner taught that it was known to anchor a barrier to the ground by embedding the base in rebar-reinforced concrete blocks (again, like the DSC800 and TT203R).

22.     The patent holder then amended the independent claims 5 and 20 to include the limitation that "wherein *the at least one first structural member or the at least one structural member* or both are *configured or tied together to retain within the base supporting media introduced into the base* when the base is mounted in the excavation such that *the rotation is resisted of a bollard* or bollards and the base from an impact against the bollard or bollards." The Reale 2 patent, U.S. Patent No. 6,702,512, disclosed a covered base that was not configured to retain media, as seen in the figure below:



FIG. 1

23.     It also did not resist rotation from impact but was rather designed to rotate.  For these reasons, patent holder distinguished their pending claims.

24.     The patent holder also added a third independent claim that added an additional limitation, also not found in Reale 2, that  a "plurality of members that extend parallel to the ends of the base extending between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured."

25.     In the last PTO office action, the claims were rejected as anticipated by the Fuchs reference (DE Patent No. 4004851), which taught bollards fixed to a baseplate:



26.     The examiner also rejected independent claim 20 over Fuchs in view of Hick (U.S. Patent No. 1,969,845) because Hick taught mounting a plurality of post members to a single concrete base wherein the impact to any post member would be transmitted to the concrete base.  In response, the patent holder explained that unlike his invention, Fuchs did not teach a base configured to retain media, because its base plate prevented the base from retaining media.  The patentee also explained that the '865 invention was patentable over Hick, Bruner, and Hernandez, none of which taught the limitation of a base configured to retain supporting media.  I understand that the Examiner agreed, and, the pending claims were allowed on March 8, 2012.

### C.     Prior Validity Challenges to the '865 Patent

27.     I understand that the '865 patent was issued after being examined by the U.S. Patent & Trademark Office, and is entitled to a presumption of validity in this action.  After the patent was issued, there have been three post-issuance challenges: two Petitions for *inter partes* review ("IPR") filed by Guardiar Solutions, and a request for reexamination by Delta, and that a third IPR challenge has been attempted.  Both Guardiar Petitions were denied, and Delta's *ex parte* reexamination resulted in the patentability of the '865 patent being confirmed.  I summarize each of those failed challenges below.

### i.     IPR2019-01161

28.     IPR2019-01161, filed by Guardiar Solutions Inc. ("Guardiar") on June 6, 2019 argued that the '865 claims were obvious over the Kogyo reference, a Japanese Unexamined Patent Application Publication H11-61746.  Kogyo taught "an energy-absorbing guard block support structure," containing two internal support columns that were designed to bend and deform upon impact to protect passengers form injury.  Kogyo had two bases, first base 21 on to which second base 31 was placed on top:

2167468.v1

【Fig. 1】



29.      The PTAB found that the structural components that made up the base of Kogyo to which the "bollards" or support columns were secured were not configured to retain supporting media in the base, emphasizing that the same members that were attached to the bollard needed to retain media.  The PTAB noted that the Petitioner treated the elements of claim 1 as a list of separate structural requirements and ignored the relationship between the requirements, and that this approach was "fatal."

### ii.      IPR2019-01162

30.      In the IPR2019-01162, the patent challenger argued that the Draht reference (German patent application DE 3412354) and the Rogers reference (U.S. Patent No. 7,040,836) each separately invalidated the '865 claims as obvious.  Draht taught a "drive-through prevention element," that took an L-shape, with collision section (7) and a bottom section (8), and vertical posts 11 and 12, which were analogized to bollard.  The Draht structure was designed for the bottom section to be placed on the ground where it could also be covered with soil.  When impacted, the structure would rotate such that the bottom section lifted and trapped the vehicle.

2167468.v1



31.     The PTAB rejected those arguments because Draht's bottom section 8 was not
configured to retain soil, and merely placing the bottom section in soil or covering it in soil did
not satisfy the claim limitation that "at least one first structural member or the at least one
structural member or both are configured to retain the soil."  The PTAB emphasized that even if
Draht's bottom section were configured to retail soil, this retention would also need to cause the
posts 11 and 12 and bottom section 8 to resist rotation, which they did not since the Draht
structure was designed to rotate.

32.     Rogers taught impact elements mounted on a turntable system to either prevent or
allow cars to pass, like the Turpin reference asserted here.  Its turntable base was made up of
various plates and other members—a frame structure (24), pad layer (28), deck plate (26), and
rotation elements (32), but these members did not intersect with one another.  (*Id*. at 10).  The
base also could not retain media because it was made of various plates, similar to the Fuchs
structure discussed during the prosecution.



FIG. 10

33.     The PTAB rejected this argument as well.  The PTAB found that Rogers did not
have an "at least one first structural member" extending between opposed ends.  The PTAB also
rejected the same argument that Dr. Eskandarian makes now, which is that Rogers' plate could

8

include both the "at least one first structural member and the at least one structural member"
merely because the '865 patent specification stated that "cross pieces are inherent in the
continuous plate."  The PTAB further found that Rogers did not disclose the "secured bollard"
limitation requiring that the bollard be attached to at least one structural member of the base.

### iii.     Ex Parte Reexamination

34.     I also understand that on March 27, 2020, Delta submitted a request for *ex parte*
reexamination citing five pieces of prior art: Chen (U.S. Patent No. 5,406,663), Hendrix (U.S.
Patent No. 5,836,715), the Darcy application (also relied on in Dr. Eskandarian's report, U.S.
Patent Publication No. 2006/0090408), Einar (U.S. Patent Publication No. 2002/0073876), and
Bruner (also discussed during the prosecution history, U.S. Patent No. 3,934,540).  I understand
that this request for reexamination was granted only with respect to a single primary reference,
the Chen reference (U.S. Patent No. 5,406,633).

35.     Chen, like Delta's DSC501, was  not directed to a bollard structure.  Chen taught
a roadway support structure with vertical supports, which Delta argued were like bollards, and a
method for assembling it.  The Chen structure had a frame-like base over which a top piece with
grooves on top was placed.  The vertical support structure extended from this grooved top piece.
The PTO terminated this reexamination on a first office action stating that Chen's vertical
supports were not bollards and that Chen's base, like Turpin and the DSC800 and TT203, was
not configured to retain media.  Simply stated, media was just poured on top of Chen's base and,
even though it entered the grooves, was not retained within the base.  The PTO also rejected
Delta's argument that the claimed structural members were 1) horizontal supporting frame 1, and
2) the combination of a member of horizontal supporting frame 1 and its corresponding
foundation portion 21, because these two components did not intersect with one another.

36.     I understand that my opinion is not bound by these determinations, but I agree
with the reasoning and findings of the PTO and PTAB described above, and have applied similar
logic in my analysis and conclusions set forth in this expert report.

## IV.    PERSON HAVING ORDINARY SKILL IN THE ART

37.     I do not agree with Dr. Eskandarian's proposed level of skill of a person having
ordinary skill in the art ("PHOSITA").  (Op. Rep. at ¶ 53).  While I agree that a PHOSITA would
have either a Bachelor's or Master's degree in the engineering arts, a PHOSITA would not
additionally be expected to have two years of experience designing vehicle barrier systems.
Rather, a PHOSITA would likely have two years of general engineering design experience.
Even if Dr. Eskandarian's proposed level of skill is adopted, however, it would not affect the
opinions included in this report, which would not change.

## V.     CLAIM CONSTRUCTION

38.     I understand that the parties originally disputed the meaning of various claim
terms and phrases in the '865 patent and submitted claim construction briefs to the Court.  I also
understand that the Court issued a tentative order providing its opinion on the parties' arguments,
the meaning of the claim terms, and that it did not believe that many of the claim terms required
construction.  In view of the Court's tentative order, the parties agreed to the meaning of various

2167468.v1

claim terms and that many terms have a plain and ordinary meaning to those in the art and did not require construction.

## VI.   APPLICABLE LAW

### A.   Written Description

39.     I have been informed by counsel that in order to meet the written description requirement, the applicant must describe the invention in the patent specification such that a PHOSITA would appreciate that that the inventor actually invented the invention claimed or, in other words, was in "possession of the invention."  I have been further informed that the determination be made from the perspective of a PHOSITA as of the date of the invention.

### B.   Indefiniteness

40.     I have been informed that a patent is invalid for indefiniteness if its claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### C.   Obviousness

41.     I understand that under patent law, a patent claim is not patentable if the differences between it and the prior art are such that it would have been obvious at the time of the invention to a PHOSITA.

42.     I have been informed that the obviousness standard can be met if the prior art contains a teaching, suggestion, or motivation to arrive at the claimed invention.  Merely picking and choosing limitations found in the different pieces of art is not enough to establish obviousness.

43.     I have also been informed that to show obviousness one must demonstrate that a PHOSITA would be motivated to select and/or combine particular references and that, separately, a PHOSITA would have had a reasonable expectation of success in modifying or combining references.

44.     Finally, I understand from counsel that any combination of the prior art resulting in a product or process that is unsatisfactory for its intended purpose cannot serve as the basis for finding obviousness.

### D.   Anticipation

45.     Counsel has informed me that a patent claim is invalid as "anticipated" if before it was invented,  each and every limitation of the patent claim was either known or used by others in this country, patented, or described in a single printed publication.  An anticipatory reference therefore must include all of the elements described in the claim, either expressly or inherently. If an element is not explicitly described in a reference, the element may nonetheless be present inherently if the product or process described necessarily flows from the description.

2167468.v1

E.     **Secondary Considerations of Nonobviousness**

46.     I have been informed by counsel that an obviousness argument based on prior art may be rebutted by other evidence known as "secondary considerations." Consideration of these mostly economic factors ensures that the obviousness analysis does not impermissibly rely on hindsight bias. These secondary considerations include unexpected results of the patented invention, commercial success of the patented invention, long-felt but unsolved need provided by the patented invention, failure of others to invent the patented invention, copy or praise of the patented invention by others, licensing, and skepticism of experts.

## VII.   THE '865 CLAIMS ARE VALID UNDER 35 U.S.C. § 112

A.     **Written Description**

47.     Delta's expert Dr. Eskandarian argues that the '865 patent specification provides no literal support for the claim limitation that "rotation is resisted of a bollard or bollards **and the base** from an impact against the bollard or bollards"—he argues that the specification of the '865 patent only discloses that the bollards resist rotation, but not the base. (Op. Rep. at ¶ 61). I disagree. A PHOSITA would understand from reading the specification of the '865 patent that its inventors possessed an invention in which neither the bollards nor base would rotate upon impact.

48.     A PHOSITA would also understand that resisting rotation requires satisfying three conditions: 1) that the entire bollard structure as a whole not rotate upon impact, 2) that the bollard not yield, deform, or fail upon impact, 3) that the base not yield, deform, or fail upon impact.

49.     A PHOSITA would understand that the invention described in the '865 specification is a shallow mount "bollard system" or "bollard structure" that is made up of a bollard, or bollards, and a base. (*See* '865 at 2:33-40) ("The bollard system of the invention includes one or more bollards secured to a shallow mounting pad or base."). A PHOSITA would understand that it is this entire system that resists rotation when impacted, and certainly not just the bollard. The specification makes clear that the bollard system or structure has a base with "considerable mass," that is "heavy" and "rigid," and has an "extended base" in order "to support the load from the bollard." (*Id*. at 3:44; *see also id*. at 3:39-54) ("The base or pad in a preferred embodiment or the bollard system of this invention is constructed using a series of structural tubes to form a grillage (i.e. pipes, tubes, channels and sometimes angles) to produce rigidity of the pad or base against upheaval and torsion forces."); (*Id*. at 5:39-41) ("without an extended base or pad, there is not sufficient resistance to stop the rotation of the pipe bollard"); (*Id*. at 2:38-40) ("In all cases, the shallow mounting pad or base is designed to made of heavy materials so as to have considerable mass."); (*Id*. at 8:7-10) (the concrete in the base serves to "add strength and weight to the base or pad"). It is these specific attributes that allow the bollard structure—base and bollard—to resist rotation upon impact.

50.     The specification does discuss the resistance of the base itself, teaching that "it is preferred that the concrete be in contact with the soil or existing concrete at the base of the excavation in order to ***improve the resistance of the lateral motion of the pad***" (*Id*. at 3:48-51)

11

and that the "base or pad … is constructed using a series of structural tube to form a grillage … to *produce rigidity of the pad or base against upheaval and torsion forces*." (*Id*. at 3:39-43).

51.     The specification also evidences that the inventors were in possession of a bollard system in which both the bollard and base resist rotation by describing the physics behind its invention and how it works.  The specification explains that "[t]he bollard system of this invention works as the crash vehicle strikes the bollard near its top edge translating the forces from that impact to the base of the bollard.  The forces at the base of the bollard are transmitted to the foundation pad or base, and from there into the soil or concrete depending on what the unit is seated on.  The resistance force is of the reverse order stated above." (*Id*. at 2:65-3:4).  This transfer of force from the bollard, to the base, to the ground is consistent with a system whose foundation does not rotate.  A PHOSITA would understand from these explanations of how the force is transferred in the system that the invention is one in which both the bollard and base resist rotation.

52.     The specification also makes numerous references to the fact that its invention prevents a vehicle from "breaching the . . . system." (*See e.g. id*. at 2:55-64) ("In the shallow mount bollard system of this invention the resistive forces are all at the base of the bollard (at the top of the trench) and therefore reduce the likelihood of the bollard rotating and vehicle breaching the security system.").  A PHOSITA would know that if the bollard base rotated, the vehicle would undoubtedly "breach the system."

53.     Even without these extensive disclosures in the specification, a PHOSITA would know that a bollard system in which the bollard resists rotation means that the bollard base will also not rotate upon impact.  If the bollard base rotated upon impact, the bollard would also, necessarily, rotate as well.

54.     Dr. Eskandarian states "I have found no express disclosure of resisting rotation of the base in the specification of the '865 patent or in its parent applications."  This is a surprising statement, because Dr. Eskandarian himself cites four clauses from the '865 specification that use the term "base" in association with resisting rotation.  (Op. Rep. at ¶ 61).

55.     It is clear that the inventors of the '865 patent possessed an invention—a shallow mount bollard structure, which includes both the bollard and the base, which both resist rotation upon impact.

### B.     Indefiniteness

56.     Delta's expert argues that he has "found nothing in the '865 patent that describes, or even suggests, how "resistance to rotation" should be determined."  (Op. Rep at ¶ 65).  But, a PHOSITA would know if a bollard structure provides "resistance to rotation," it means that the striking vehicle does not "breach the system."  The patent specification also makes this clear. ('865 at 2:60-64) ("In the shallow mount bollard system of this invention, the resistive forces are all at the base of the bollard (at the top of the trench) and therefore reduce the likelihood of the bollard rotating and vehicle breaching the security system.").  The patent specification also describes in great detail the design of the base of the bollard structure which is configured in such a way that it has the result of not rotating upon impact in order to protect people and

property from a ramming vehicle. (*See e.g. id.* at 2:30-40; 3:39-52; 5:47-9:3). It also describes the physics behind this resistance to rotation. (*See e.g. id.* at 2:41-54; 2:65-3:20; 3:65-4:14; 4:25-29). A PHOSITA reading the specification of the '865 patent would be informed from these descriptions what is meant by the claim term "rotation is resisted."

57.     Dr. Eskandarian poses hypothetical questions, such as "what constitutes insufficient resistance to rotation vs sufficient resistance to rotation?" and "What is the impact force?" and "what are the dimensions of the base that must be extended / How much should it be extended?" and "What degree of rotation (short of complete prevention) is resistance?" (Op. Rep. at ¶ 66). But, a PHOSITA practicing in this space, would certainly know the answer to these questions after reviewing the '865 specification. A PHOSITA considering the '865 patent would clearly understand that the resistance required must be sufficient to prevent a ramming vehicle from breaching the bollard structure.

58.     This understanding by PHOSITAs is further demonstrated in Dr. Eskandarian's report, as he explains the various testing criteria that different government entities and organizations developed over the years specifically for the purpose of demonstrating whether a barrier could resist rotation and therefore pass the test. For instance, Dr. Eskandarian explains that in determining whether a barrier system would withstand ramming the Department of Defense considered "the vehicle weight, speed, and direction of impact, among other variables, determine the loading condition into the barrier" and required that "meet specific stoppage criteria and limit the threat (vehicle) intrusions behind the barrier." (Op. Rep. at ¶ 39). Dr. Eskandarian explains additionally that the Department of State, through The Specification for Vehicle Crash Test of Perimeter Barriers and Gates, also set forth a standard where a test vehicle of a particular weight travelling at various set speeds, would be measured to determine if they met various penetration limits. (Op. Rep. at ¶ 41). Dr. Eskandarian writes that "[t]his standard has been the guiding principle and requirement for the design of security barriers throughout the 1990s and early 2000s." *Id.* Dr. Eskandarian's report also details that the U.S. State Department, Bureau of Diplomatic Security put forth an updated standard in 2003 for testing of perimeter barriers, which provided that barriers satisfy even more stringent requirements with respect to penetration distance. (*Id.* at 44). Dr. Eskandarian explains that the "revised test standard required the use of very specific diesel-powered medium-duty trucks to be uniform in testing and evaluation of the barriers" and that "[l]ater, these changes were adopted with some modifications into the ASTM Standard Test Method for Vehicle Crash Testing of Perimeter Barriers. (*Id.* at ¶¶ 44-5). These rating systems provide the way for establishing whether a bollard system resists rotation upon a crash. A PHOSITA would be familiar with the various crash test standards and criteria, and knows that a bollard system that resists rotation is one that does not allow a vehicle to breach the system and satisfies the aforementioned tests established by various government agencies. The '865 specification even refers to the Department of State's rating system. (*See* 5:50-1) ("The plate would need a minimum depth 5" to qualify as a DOS rated system.").

59.     Importantly, Dr. Eskandarian omits the testimony of Delta's own head of Engineering John Friend. Mr. Friend a 30-year Delta engineer and employee, and a PHOSITA, knew that a bollard that resisted rotation meant that the "device intended to resist the ramming by a vehicle at speed." (Friend Dep. Tr. at 51). He testified that in the industry, an anti-ram system was one that resists penetration of a vehicle trying to harm either persons or property. (*Id.*).

60.      I also understand that in the Court's tentative ruling on claim construction, it stated that it did not believe the claim phrase "rotation is resisted" was indefinite and that Delta had not submitted clear and convincing evidence to support such a conclusion.  Dr. Eskandarian has provided no additional evidence apart from a conclusory statements.  I agree with Mr. Friend, and the Court's position on the definiteness of this claim phrase.

61.      Further, I understand that Delta agreed that the claim term "rotation is resisted" did not need to be construed by the Court because it had a plain and ordinary meaning to a PHOSITA.  If a claim phrase has a plain and ordinary meaning to a PHOSITA, then it is not clear how it could simultaneously fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## VIII.   THE '865 CLAIMS ARE VALID IN LIGHT OF THE PRIOR ART

62.      Dr. Eskandarian argues that various claims of the '865 patent are invalid as either anticipated or obvious, in light of either a single piece of prior art or based on a combination of two pieces of prior art.  His report makes these arguments with respect to all three of the independent claims of the '865 patent, as well as various dependent claims.

### A.      The '865 Claims are Valid in Light of Turpin et al., alone and/or in combination with the DSC501

63.      Dr. Eskandarian argues that the '865 claims are obvious in light of Turpin alone, or Turpin in light of its DSC501 device.  I disagree as set forth below.

### i.      Overview of Turpin

64.      The Turpin prior art reference is titled "Automatic Self-Contained Collapsible Traffic Barrier Bollard System and Method of Installation."  (U.S. Patent Pub. No. 2004/0033106, "Turpin").  It teaches a steel vault that is closed on all six sides.  (Turpin at abstract, ¶¶ 0011, 0025) (emphasis added).  Unlike the '865 invention, the Turpin system is an active system designed to either allow traffic to pass or to prevent its passage, depending on the circumstances.

65.      Tupin's bollards are attached to the "rotating rod" 26, which is inside the steel vault.  When this rod rotates, it raises the bollards to the point where they stop against a solid steel plate, and tilt towards oncoming traffic when in this upright position.  Rotating the rod the other way will lower the bollards to their lowered position, within the steel vault.  (*Id*. at ¶ 0030).  The rotating rod is secured to I-beams via bushing blocks with steel bushings, as well as to an arm with a push lever, which is secured to an electromagmetic worm gear actuator.  (*Id*. at ¶¶ 0028-29).  Unlike the '865 bollard system, the Turpin system works by virtue of these moving parts contained within the steel vault.  These parts require maintenance, such as greasing, and must be accessible.  (*Id*. at ¶¶ 0011, 0026, 0028).

66.      The Turpin system does not resist rotation.  It is actually designed and intended to fail. (See Turpin at ¶ 0031) ("…bollard reach yield and the bollards begin to deform."); (*Id*. at ¶ 0047) ("The bollards 34 will fail in bending, rotating backward over the support structure.").  The damaged bollards can then be removed and replaced.  (*Id*.).

2167468.v1

67.     The Turpin system does not contain any media, such as soil or concrete within the vault that would ballast the system and resist rotation. It does rely on media (concrete) outside of the vault to anchor it, but there is no media within the vault.

### ii.     Overview of Delta's DSC501

68.     Delta's DSC501 is an active system wedge barrier that uses hydraulic cylinders to open and close, allowing traffic to pass over it when closed and blocking traffic when in the raised position.  Rebar, which is later embedded in concrete, is extended through the sides of the wedge and engages the weight of the surrounding soil or concrete.

69.     The DSC501 system does not have bollards.

### iii.    Turpin Does Not Teach, Suggest, or Motivate A PHOSITA

70.     In my opinion, a PHOSITA would not use the Turpin reference to arrive at the '865 invention.  In fact, the two inventions are like comparing apples to oranges.  Turpin teaches a rotating bollard that can either raise or lower depending on whether it is desired for traffic to enter or be restricted, unlike the static '865 bollards.  Additionally, Turpin's bollards are designed to yield, deform and fail upon being impacted, as opposed to the '865 bollard structure that is designed to resist rotation.

71.     Turpin teaches a closed metal vault that is not designed to retain media, unlike the '865 base that is filled with media such that the base becomes heavier.  In fact, the Turpin system could not function as intended if media was put in the base, as it would prevent Turpin's moving parts from moving, thereby preventing the bollard from being extended to its upright position.  It would also make the moving parts inaccessible for greasing or repair, as taught by Turpin.

72.     Not only would a PHOSITA not use Turpin as a starting place in an attempt to reach the '865 invention, but even if it did, Dr. Eskandarian is mistaken that the Turpin reference teaches, motivates, or suggests key limitations required by all claims of the '865 patent.

### iv.    The DSC501 Alone and/or With Turpin Does Not Teach, Suggest, or Motivate a PHOSITA

73.     A PHOSITA would also not consider the DSC501 when trying to arrive at the '865 invention.  The DSC501does not include a stationary bollard, or even a bollard at all, but instead is an active system consisting of a ***moveable wedge*** that rotates up and down.  A PHOSITA would not rely on a non-bollard to arrive at a bollard and a PHOSITA would not rely on a movable, active system to arrive at a stationary, passive system.

74.     A PHOSITA would also not be motivated to combine the Turpin system with the DSC501 wedge device—***both of which are movable systems***—to arrive to arrive at the immovable '865 bollard system.  An active system is more complex, requires more maintenance, and is more costly than a passive system.  A PHOSITA would not combine two active systems to create a passive one.

15

75.     But even if a PHOSITA did consider Turpin and the DSC501, a PHOSITA would not be motivated to add the DSC501's rebar and concrete to Turpin's base. First, any media added to Turpin's would be just ballast, whereas the DSC501's reinforced concrete is structural. Second, as explained above and further below, Turpin becomes useless for its intended purpose if its vault is filled with media.  For this reason, a PHOSITA also would not have had a reasonable expectation of success in combining Turpin with the DSC501. Without Turpin's bollards being able to raise, it could not function as a bollard to be rammed by a vehicle. Further, Turpin's base is full of moving parts, and it is not clear how or where the DSC501's rebar members would fit into this vault.

76.     Dr. Eskandarian tries to avoid this result by arguing that "[t]he locations within the interior of the base would be selected so that the added concrete would not interfere with any of the moving components of the barrier.  (Op. Rep. at ¶ 88).  But as shown below in section VIII(A)(v)(c), Turpin's figures make clear that the full vault needs to be empty otherwise its bollards cannot not fully raise.  There is simply no place where the rebar and concrete as taught by the DSC501 could be added to the Turpin base and still allow it to function.

77.     I conclude that a PHOSITA would not be motivated to combine two devices that *both* contain moving parts such to either lower or raise to create the static '865 anti-ram bollards, especially when Turpin could not work with media in its base.  Dr. Eskandarian has not provided any such motivation or reasonable expectation of success.

   v. **Independent Claims 1, 16, and 33**

     a. **or each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;**

78.     While Turpin's base is comprised of various structural members, the claims are clear that there must be at least two sets of these structural members—"the at least one structural member" and the "at least one first structural member"—that meet additional limitations recited later in the claims (including that they be attached to the bollard and be configured to retain media).  Dr. Eskandarian argues that in Turpin, the rotating rod 26 is the "at least one structural member" and the I-beams 23 are the "at least one first structural member."  (Op. Rep. at ¶ 98).

79.     First, the rotating rod is not a structural member.  It is part of the mechanism system that raises and lowers the bollards.  It also provides a path for the impact force to be delivered to the I-beams, but otherwise does not participate in resisting the forces imparted by impact.

80.     Second, per this claim limitation, the "at least one structural member" and the "first structural member" must intersect and be tied together.  But, the rotating rod (even if it were considered to be a structural member which it is not) and I-beams do not intersect with each

16

other.  In attempting to argue that they do, Dr. Eskandarian shows an image that makes it *appear*
that these members intersect:



(*Id*. at ¶ 97).

81.     However, it is clear from other figures in Turpin that they do not intersect and are
certainly not tied together—the rotating rod passes above the I-beams and do not even touch
them.



(Op. Rep. at ¶ 100).

82.     Therefore, Turpin does not disclose a bollard base comprised of at least two sets
of structural members that intersect and are tied to one another.  And, as explained further below,
these *same two structural members* must also be configured to retain media, which they are not.

17

### b.   wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade

83.     Turpin requires an excavation of two feet, which is not in a shallow excavation as is contemplated by the '865 patent.  Dr. Eskandarian admits that Turpin teaches requiring a "two feet deep pit" and that this excavation is then "filled with one foot of gravel," leaving "a depth of 12 inches from the bottom to the top of the vault for the top to be level with the road surface." (Op. Rep. at ¶ 107).  But Dr. Eskandarian is clearly not appreciating that the independent claims require a shallow *excavation*, which is not measured from the "depth from the bottom to the top of the vault."  (*Id.*).

84.     A PHOSITA would understand a "shallow excavation" to be the pit or cavity that must be excavated in order to install a structure.  "Shallow" is also a relative term.  In the context of the '865 patent, I do not believe this has an exact measurement, but is the excavation necessary for the claimed shallow mount bollard base, which the '865 patent teaches is approximately between 5" to 14" deep, including as shallow as 3".  ('865 at 2:43-45; 3:5-8). Dependent claims 4 and 20 further limit the claimed base of the independent claims by claiming a base with a height of two of 3" to 14".  Therefore, the '865 invention is a bollard structure with a base in approximately this height range, and a shallow excavation slightly greater.  This is consistent with the testimony of Delta's engineer, John Friend, who testified that the industry generally viewed shallow mount bollards as those requiring excavations of 18 inches or less. (Friend Dep. Tr. at 52:15-22).

85.     I understand that when issuing a tentative order on claim construction, the Court rejected Delta's proposed construction of "shallow excavation" as being "three feet or less" as lacking support, and stating that there was no support that a PHOSITA would understand that a "shallow excavation" in the context of the claimed invention must only refer to an excavation of three feet or less.  (Tent. Markman Ord at 4).  The Court found that a PHOSITA would be able to understand the boundaries of this claim phrase and that a proposed construction was not necessary.  I agree with the Court's findings.  A PHOSITA would not understand a shallow excavation to be one of three feet or less, but rather the excavation required to place a base that is roughly 14" inches or less.  A PHOSITA would also understand that an "excavation" refers to the cavity itself before the installation of gravel.

86.     Here, Turpin teaches, and Dr. Eskandarian admits that Turpin's vault requires an excavation of two feet, or 24 inches.  In my opinion, 24 inches is not a shallow excavation within the context of the '865 patent.

87.     Finally, the Turpin system teaches a bollard that extends above grade sometimes, but when in the supine position it does not extend above grade.  This is very different than the '865 bollards, which always extend above grade.

      **c.**    **wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.**

88.    This "wherein clause" provides that the structural members of the bollard base must be configured or tied together to retain media and that this retention of media is what facilitates the bollard and base to resist rotation upon being impacted by a vehicle.

89.    The Turpin disclosure is clear that its base does not retain media, only referring to soil or gravel that is *outside* of the Turpin vault.  (Turpin at ¶ 0049).  And, once the Turpin vault is placed in the excavation, soil and gravel cannot even *accidentally* enter the Turpin base because the vault is closed on all sides.

90.    I have been informed that a PHOSITA would not be motivated to modify a prior art invention if such modification would render the prior art invention as unsatisfactory for its intended purpose.  That is exactly the case here—a PHOSITA would not be motivated to fill Turpin's closed vault with media because the Turpin structure could not work as intended if its base were filled, because the media would envelop the moving parts including the rotating rod and bushing blocks such that they could not move to lower and raise the bollards.  Turpin's bollard extends all the way to the bottom of the vault when in the raised position.  If the bottom of the vault were filled with media, the rod could simply not raise the bollards.

91.    Even Dr. Eskandarian admits that "Turpin does not disclose that the supports 20 and/or I-beams 23 are purposely configured to retain concrete in the interior spaces 22 there between."  (Op. Rep. at ¶ 103).  But, he argues that "nevertheless, Turpin's design allows concrete to be introduced into those interior spaces.  This claim is not a method claim and does not require the presence of cement in the vault to infringe."  (*Id*.).  While I have not been asked to make a legal determination as to whether the claims "require the presence of cement or concrete to infringe," the '865 independent claims are clear that the base must be configured to retain media and that this media enables the bollard structure to resist rotation.  Turpin is clearly not configured to retain media.

92.    Dr. Eskandarian opines that the interior spaces 22 could be filled with media.  In making this argument, Dr. Eskandarian conveniently selects an image where the bollard is in the lowered position to show where this media "could" be placed:

19



93.     But the drawings of the Turpin structure showing the bollard raised demonstrate that should the bottom of the vault be filled with concrete, the bollard could *not* be raised:



94.     While in theory, the very bottom part of the vault that is left of plate 42 could be filled with media without affecting operation, there is no structure in Turpin that would function as a bulkhead and prevent the media from spilling to the right side and impacting the functioning of the bollard.

95.     Even if the base of Turpin *were* configured to retain media, this media would also have to cause the resistance of rotation of the bollards and base.  Turpin does not disclose this limitation.  Turpin already teaches that its structure will withstand impact from a moving vehicle, without media in its base.  Clearly, any resistance to rotation by Turpin would not be caused by media.  Turpin also teaches that its bollards will fail in some circumstances, meaning they would not resist rotation at all.  Turpin clearly does not teach a bollard structure configured to retain media in the base *such that* rotation is resisted.  Even if the entire vault were to be filled with

20

media, which would render the bollards non-movable, it would not prevent rotation of the bollards when impacted, since by design they would still yield, deform, or fail.

96.     Combining Turpin with the DSC501 does not solve these problems.  Even the DSC501 has a mostly empty base, as it too contains moving parts necessary to lower and raise the wedge.  *See* DS00002399 ("The DSC 501 is raised and lowered to and from the guard position via hydraulic cylinders driven by Delta's patent-pending hydraulic power unit").  Unlike the '865 base that is completely filled with concrete, the DSC501 has only minimum areas that can be filled with concrete, as its moving parts take up a large portion of the base:



(DS00002400).

97.     Dr. Eskandarian doesn't even argue that that the whole DSC501 base is filled with media, but rather than "[c]ement is poured in the area of the rebar behind the large square steel tube." (Op. Rep. at ¶ 145).

98.     Therefore, it is my opinion that Turpin does not teach many of the limitations found in the three independent claims, and also does not teach, suggest, or motivate a PHOSITA to arrive at the '865 invention, either alone or combined with the DSC501.

21

### vi.     Dependent Claims

99.     Dr. Eskandarian argues that various dependent claims are also taught by Turpin
and/or the DSC501.  In addressing the dependent claims, I incorporate by reference my opinion
on the independent claims from which these claims depend.  None of the dependent claims are
obvious because none of the independent claims are obvious, as well as for the following
reasons.

> **a.     Claim 2: The bollard structure of claim 1, wherein at least one
> of the opposed ends is formed by a structural member to which
> an end of the at least one first structural member is secured**

100.     Dependent claim 2 is clear that one of the previously claimed structural
members—the at least one first structural member or the at least one structural member—must
be secured to a structural member that makes up one of the opposed ends. But as explained
above, neither the rotating rod or I-beams, which Dr. Askandarian argues are the two sets of
structural members, intersect with each other or are secured to the opposed ends.



> **b.     Claim 17 : The bollard structure of claim 16, wherein at least
> one of the opposed ends is formed by a structural member to
> which an end of the at least one first structural member is
> secured**

101.     *See* claim 2 above.

22

      c.     **Claim 35: The bollard structure according to claim 33, wherein the at least one of the plurality of members that extend between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a rebar member.**

102.    The Turpin bollards are secured to the rotating rod, which is necessary for the bollards to be lowered and raised.  A PHOSITA would not be motivated to replace this rotating rod with a rebar member or reinforced concrete member, since these cannot rotate or function as needed to allow the bollards to be raised or lowered.

103.    Dr. Eskandarian admits that Turpin does not teach the use of rebar within the vault.  (Op. Rep at ¶ 141).  Rather, Dr. Eskandarian argues that rebar is used outside of the closed Turpin vault.  (*Id*. at ¶ 140).  The existence of rebar outside of the vault, however, means that it cannot connect structural members attached to adjacent bollards, as all of the structural members attached to the bollards reside ***inside*** the vault.

104.    As explained above, a PHOSITA would never combine the DSC501 with Turpin.

**B.**    **The '865 Claims are Valid in Light of Delta's DSC800RFB**

105.    Dr. Eskandarian argues that the '865 claims are either anticipated or rendered obvious by Delta's DSC800RFB.  As explained on a limitation by limitation basis below, the DSC800RFB does not teach every element of the independent claims and therefore cannot anticipate the '865 invention.  Further, the DSC800RFB does not teach, suggest, or motivate a PHOSITA to achieve the '865 invention as it is an active removable bollard with an entirely different base from that of the '865 bollards.  Therefore, the DSC800RFB also does not render the '865 claims as obvious.

      i.    **Overview of the DSC800RFB**

106.    The DSC800RFB is a removable bollard that is inserted into a steel sleeve that is embedded in concrete.  The steel sleeve is comprised of a lower plate, an upper plate, and a cylindrical casing.  This steel sleeve is the "base" of the DCS800RFB.  The bollard does not extend below the lower plate, but does extend through the upper plate, which has a circular opening for it to do so.  A removable locking plate is screwed to the upper plate, to prevent the bollard from being removed by unauthorized persons.  No concrete or other media exists between the plates but rather the sleeve is surrounded by rebar and concrete, which exist only outside of the bollard and bollard sleeve.  These rebar members are not attached to the bollard or bollard sleeve.  (Friend Dep. Tr. at 146-147).

2167468.v1



(DS00001030).

### ii.     The DSC800RFB Does Not Teach, Suggest, or Motivate a PHOSITA

107.    Not only does the DSC800RFB not teach the limitations of the '865 claims, as explained on a limitation by limitation basis below, but it is an entirely different bollard system than the '865 invention and would not even be used  as a starting place for a PHOSITA in trying to create the '865 invention.

108.    The bollard system of '865 patent is fundamentally different from that of the DSC800RFB.  The base of the '865 invention is a grillage of intersecting linear structural members, whose axes lie in a horizontal plane.  The base (the sleeve) of DSC800RFB is not a grillage; the plates are not linear elements, and the casing has a vertical axis.  The '865's base is configured to retain media, while the DSC800RFB has a vertical base that does not retain media but is rather encased in a block of reinforced structural concrete.  The '865 bollard structure is designed to be mounted in a shallow excavation, whereas the DSC800RFB is not.  Apart from the fact that both the DSC800RFB and '865 invention use bollards, there are no other similarities.  A PHOSITA would not be motivated to modify the DSC800RFB to arrive at the '865 invention.

109.    The major differences between the DSC800RFB are further described below on a limitation by limitation basis, which also establishes that the '865 claims are not anticipated by the DSC800RFB.

### iii.     Independent Claims 1, 16, and 33

#### a.     a base comprising opposed ends and a plurality of structural members which intersect and are tied together

110.    Dr. Eskandarian argues that the DSC800 has a base with opposed ends, which is made up of a plurality of structural members that include the lower steel plate, the horizontal upper steel plate, the steel foundation tube, and the rebar members.  (Op. Rep. at ¶ 153).

111.    The first problem with Dr. Eskandarian's opinion is that he equivocates with respect to what is the so-called "base" of the DSC800RFB.  The claim language recites "a base comprising opposed ends."  Dr. Eskandarian identifies the lower plate as the element that has the "opposed ends" (¶¶ 154, 156), and by so doing posits that the "base" is confined to the casing/plate area (which I refer to together as the "sleeve", and which Dr. Eskandrian refers to as the "foundation tube assembly"):



112.    But, in another instance, he states that the base also includes the "steel bars (rebar) forming a cage around the foundation tube assembly," which is outside the sleeve area he previously identified as the base with opposed ends.  (Op. Rep at ¶ 153).  Either way, Dr. Eskandarian's arguments fail.

113.    Consider the first case, where the sleeve is the base.  This fails because a POSITA would not consider the DSC800's lower plate, by itself, to be a "structural member," as it does not provide any structural resistance to horizontal impact from vehicles.  It simply prevents fluid concrete from filling the casing and prevents the casing from being lifted out.  Further, the sleeve does not retain media, as required by the claims.  Rather, concrete surrounds this structure but does not enter it.

114.    Further, even if the lower plate is considered a "structural member," a PHOSITA would not consider a "plate" to be two distinct structural members, as Dr. Eskandarian does in paragraph 157, which is further discussed relative to the next claim limitation.

115.    Consider the second case, where the concrete block is considered the base.  Dr Eskandarian posits that the steel bars (rebar) embedded in the concrete are intersecting structural members.  This is not true.  First of all, these members are not intersecting.  The DSC800RFB specification drawings shows that the rebar members run parallel to each other, and therefore do not intersect or touch each other. The drawing shows six bars, all of which are oriented in-and-out of the page. The drawing does not show any intersecting bars, which would be running left-and-right on the page, extending between opposing ends.

25



116.     Additionally, the rebar members also do not intersect with the "opposed ends" as required by the claims, but exist in the area outside of the "opposed ends" as identified by Dr. Eskandarian.

117.     Not only do the rebar members not intersect with each other, but they do not intersect or tie together with any other members he identifies as the structural members of the base, such as the lower plate of the sleeve.  This was confirmed by Delta engineer and employee, John Friend.  (Friend Dep. Tr. at 146-147). The rebar members are clearly outside of the bollard structure entirely, and are added to the concrete to stabilize it.  In fact, Delta itself does not even supply the rebar when selling this bollard product.  (Friend Dep. Tr. at 146-147).  The rebar members simply cannot be considered to be the structural members of the "base" of the DSC800RFB.

> **b.     for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;**

118.     The DSC800 does not have a set of structural members extending in different directions, intersecting with the opposed ends, and also extending to intersect with each other.

119.     Dr. Eskandarian argues that both sets of claimed structural members are inherent in a single plate, the lower plate.  (Op. Re. at ¶¶ 155-156).  In my opinion, a single plate is not inherently made up of two different structural members and those structural members would not

"intersect" with each other and with the opposed ends.  That purely theoretical construct is neither correct nor recognized by PHOSITAs working in the relevant field.  Dr. Eskandarian has not provided any support for his conclusion that a single plate inherently is made up of two intersecting and tied together structural members.

120.    It is my understanding that the same argument was made by Guardiar in IPR2019-01162 and, in response, the PTAB found that the statement in the '865 patent that "cross pieces are inherent in the continuous plate" alone does ***not*** show that a single plate included the "at least one first structural member" and the "at least one structural member" configured as recited in the claims.  The PTAB noted that even if such a conclusion were appropriate, the petitioner had still failed to show that a plate in the Rogers reference taught that one of these cross pieces were also attached to the bollard.  (*Id.*).

121.    Here, Dr. Eskandarian's argument fails for the same reasons.  The two sets of structural members must satisfy many limitations, not just the intersecting and tied together limitation.  One must also extend between and intersect with the opposed ends, one must be secured to a bollard, and most importantly, they must be configured to retain media such that rotation is resisted upon impact.  Even if a single plate were comprised of two separate cross-pieces, these cross-pieces would not intersect with one another.  One of these cross-pieces also could not extend between and intersect with the opposed ends (the entire plate comprises the opposed ends).  As explained below, the lower plate is also not attached to the bollard.  The lower plate also cannot retain media.

> **c.    each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base;**

122.    The DSC800 bollard is not secured to the "at least one first structural member" or the "at least one structural member" identified by Dr. Eskandarian as the lower plate.  He argues that the bollard is secured ("attached" is the term used by Dr. Eskandarian) to the lower plate and to the upper plate, but in actuality it is not attached to either one.  In fact the bollard does not even touch the lower plate—since the drawing below indicates a shim between the bottom of the bollard and the top of the lower plate.  The only portion of the sleeve that secures the bollard is the removable locking plate, which prevents the bollard from being removed by unauthorized persons. The removable locking plate is not a structural member.



123.    If the DSC800RFB bollard were secured to the lower plate, it could not function as a removable bollard, which it is.

> **d.      wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and**

124.    The DSC800RFB does not have a base configured to be mounted in a shallow excavation.  Dr. Eskandarian argues that "the DSC800RFB includes a foundation base assembly that has a height of 16.75."  (Op. Rep. at ¶ 158).  First, the specification drawings of the DSC800 show the height of the base assembly to be 17.75 inches, not 16.75 inches.  Second, the claim language refers to the depth of the **_excavation_**, not the height of the sleeve. The excavation is shown in the specification drawing to be 27 inches.



(DS00001030).

125.     A PHOSITA would understand a "shallow excavation" in the context of the '865 patent to mean the excavation required for a shallow mount bollard base, which the '865 patent teaches is approximately between 5 to 14 inches deep, including as shallow as 3 inches.  ('865 at 2:43-45; 3:5-8).  That excavation should be approximately eighteen inches or so.  Dependent claims 4 and 20 further limit the claimed base of the independent claims by claiming a base with a height of two of 3 inches to 14 inches.  Therefore, the '865 invention is a bollard structure with a base in approximately this height range.

126.     I understand that when issuing a tentative order on claim construction, the Court rejected Delta's proposed construction of "shallow excavation" as being "three feet or less" as lacking support, and stating that there was no support that a person of skill in the art would understand that a "shallow excavation" in the context of the claimed invention must only refer to an excavation of three feet or less.  The Court found that a PHOSITA would be able to understand the boundaries of this claim phrase and that a proposed construction was not necessary.  I agree with the Court's findings.  A PHOSITA would not understand a shallow excavation to be one of three feet or less, but rather the excavation required for a base that is roughly 3" to 14" inches.

127.     The DSC800 requires an ***excavation*** much deeper than the height of the sleeve, as can be seen in my annotated drawing above.  The DSC800 base is approximately 17 inches whereas the excavation it requires extends ten inches deeper into the ground than that.

128.     A PHOSITA would not consider this to be a shallow excavation as set forth in the '865 patent claims, especially when the height of the base itself is already much taller than the shallow mounts described in the '865 patent.

> **e.      wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.**

129.     The DSC800 does not teach a base made up of structural members configured to retain media in the base such that the rotation of the bollards and base are resisted upon impact to the bollards.  The plates and sleeve of the DSC800 do not hold any concrete at all, rather, concrete and rebar fill the area ***outside*** of the DSC800 sleeve assembly.

130.     Here, Dr. Eskandarian argues that the base of the DSC800 is made up of not only upper and lower plates, and tube, but also the "tied-together steel bars (rebar) forming a cage around the foundation tube assembly," thereby equivocating between the "base" being the sleeve or being the concrete block.  (Op. Rep. at ¶ 153).  As I explained above, I disagree that the rebar cage around the outside of the sleeve assembly is part of the DSC800's base.  Per the '865 claims, the base must have opposed ends and be comprised of "the at least first structural member or the at least one structural member."  Dr. Eskandarian has identified the "opposed ends" to be the ends of this lower plate and the two sets of structural members to be inherent in the lower plate.

2167468.v1

131.    The '865 claims further require that these same structural members must be what
retains media.  I understand that the PTAB confirmed this understanding of the independent
claims in IPR2019-01161when refusing the invalidate the '865 claims over the Kogyo reference.
There, the PTAB found that Guardiar had failed to argue that the structural members of the base
that were attached to the bollard were the same structural members that were configured to retain
media and that instead Guardiar "appears to treat the elements of claim 1 as a list of separate
structural requirements and ignores the relationship between the requirements."  The PTAB
emphasized that "the at least first structural member or the at least one structural member" must
be what are attached to the bollard as well as satisfy the "retaining supporting media" limitation.

132.    But, Dr. Eskandarian does not argue that the lower plate—which he represents is
the "the at least first structural member or the at least one structural member"—retains any
media.  Instead he merely points to concrete and rebar *outside but not within the plate or even
the area between the upper and lower plates*.

133.    In my opinion, a single plate cannot be configured to retain concrete.  This is
similar to what the PTO confirmed when allowing the claims to issue over the Fuchs reference
during the prosecution of the '865 patent.  Fuchs, just like the DSC800RFB, had a top plate that
effectively prevented any media from entering the base.

134.    Further, the claims require not only that the base be configured to retain media,
but that this media be what allows the bollard to resist rotation.  Dr. Eskandarian provides no
support for his assertion that any concrete in the base is what allows the bollard to resist rotation.
(Op. Rep. at ¶ 159).

### f.    a plurality of bollards

135.    Independent claims 16 and 33 additionally claim a "plurality of bollards."  Delta's
DSC800RFB is a single bollard structure, and does not contain a plurality of bollards.  It also
does not teach, suggest, or motivate a PHOSITA to create a bollard structure with a plurality of
bollards, as the DSC800 system provides no way for connecting adjacent bollards.

136.    Dr. Eskandarian merely points to individual bollard structures installed side by
side, not a bollard structure with a plurality of bollards, in support of his argument.  (Op. Rep. at
¶ 168).

### g.    at least one of the plurality of members that extend parallel to the ends of the base extending between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured

137.    Independent claim 33 contains the additional limitation that a member extend
between bases of adjacent bollards.  The DSC800RFB does not disclose this.  Nor does the
DSC800RFB teach, suggest, or motivate a PHOSITA to make a bollard structure in which a
member extends parallel to the ends of the base between structural members secured to adjacent
bollards, because the DSC800RFB is intended to be a stand-alone bollard and includes no
members that extend horizontally that could even be modified to extend between adjacent
bollard bases.  Further, the rebar members of the DSC800RFB are not attached to the sleeve

2167468.v1

itself, and therefore could not be modified to satisfy this limitation.  (Friend Dep. Tr. at 146-147).

### iv.    Dependent Claims

138.    Dr. Eskandarian argues that various dependent claims are also invalid in light of the DSC800RFB.  In addressing the dependent claims, I incorporate by reference my opinion on the independent claims from which these claims depend. None of the dependent claims are obvious because none of the independent claims are obvious, as well as for the following reasons.

#### a.    Claim 3: The bollard structure of claim 1, wherein the intersecting structural members have axes that extend parallel to a plane of the base

139.    The DSC800RFB does not have intersecting structural members, nor do these members have axes extending parallel to the ends of the base.  The term axis (axes) is typically used with respect to linear elements, and understood in the art to refer to the "longitudinal axis." The DSC800RFB includes an upper and lower plate.  A plate is not a linear element but a rectangular element.  Plates therefore do not have longitudinal axis.

#### b.    Claim 4: The bollard structure of claim 1, wherein the base has a height of 3 inches to 14 inches

140.    Dr. Eskandarian admits that the height of the DSC800 base assembly is not between 3 and 14 inches but is instead 16.75 inches.  (Op. Rep. at ¶ 161).  The actual drawings he includes in his report show, however, that the height is actually 17.75 inches.  While a PHOSITA may have wanted to modify the DSC800 to have a more shallow base, the DSC800 would unlikely work to stop a vehicle if it were so modified.  Therefore, a PHOSITA would have no reasonable expectation of success in just reducing the height of the base.

141.    Creating a bollard structure with a more shallow base is difficult, as the more shallow the base the less ground surrounding the base to absorb the force and the less weight of media to resist rotation.  It is not as simple as just making the base more shallow and Dr. Eskandarian provides no expert opinion that the DSC800 could work if its base was 14 inches high or less.

#### c.    Claim 19: The bollard structure of claim 16 wherein the intersecting structural members have axes that extend parallel to a plane of the base

142.    *See* claim 3.

#### d.    Claim 20: The bollard structure of claim 16 wherein the base has a height of 3 inches to 14 inches

143.    *See* claim 4.

  e. **Claim 34: The bollard structure according to claim 33, wherein the at least one of the plurality of members that extend between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a structural member**

  144. The DSC800RFB is a single bollard structure and there are no structural members extending between adjacent bollards, because the bollard structure does not contain more than one bollard.  Even if multiple DSC800RFB bollards were installed next to each other, there are no members to connect adjacent bollards.  Certainly the lower plate, which Dr. Eskandrian posits includes the "at least one first structural member" and "at least one structural member" does not extend between adjacent bollards.  Even the images that Dr. Eskandarian relies on in an attempt to argue that the DSC800RFB teaches a plurality of bollards clearly shows that there are no structural members connecting these bollards:



(Op. Rep. at 168).

  145. The DSC800 does not teach, suggest, or motivate a PHOSITA to make a bollard structure in which a member extends parallel between adjacent bases, because the DSC800 is intended to be a stand-alone bollard and includes no members that extend horizontally that could even be modified to extend between adjacent bollard bases.

  f. **Claim 35: The bollard structure according to claim 33, wherein the at least one of the plurality of members that extend between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured comprises a rebar member**

  146. Mr. Friend confirmed what the drawings show—the rebar members used outside the DSC800 base do not connect to the base itself.  (*Supra* at ¶ 137).  They also do not connect adjacent bollards.

### C.      The '865 Claims Are Valid in Light of Delta's TT203R

147.    Dr. Eskandarian argues that Delta's TT203R pneumatic bollard either anticipates or renders obvious the claims of the '865 patent.  I disagree.

### i.      Overview of the TT203R

148.    The TT203R is a removable bollard.  In structure, it is very similar to the DSC800RFB.  Like the DSC800RFB, it has lower and upper plates, connected by a casing into which the bollard is placed, together referred to as the "foundation tube assembly."



149.    Unlike the DSC800RFB, it has a different mechanism for preventing the bollard from being lifted out by unauthorized individuals.  Rather than having a removable plate screwed to the upper plate, like the DSC800RFB, it relies a moveable latch rod inserted into a latch hole in the side of the bollard.

150.    It does not have a base comprised of intersecting and tied together structural members, is not configured to retain media, and cannot be mounted in a shallow excavation.

### ii.      The TT203R Does Not Teach, Suggest, or Motivate a PHOSITA

151.    TT203R does not teach, suggest, or motivate a PHOSITA to arrive at the '865 invention for most of the same reasons as I explained above with respect to the DSC800.  (*Supra* at VIII(B)).  But, the TT203R is even more dissimilar from the '865 system that the DSC800, because not only is the TT203R a removable bollard, but it is also pneumatic.

152.    Active systems are more expensive and difficult to maintain than passive systems.  A PHOSITA would not fashion a passive bollard system from an active system.

153.    Like the DSC800RFB, the TT203R does not include many of the limitations of the '865 patent claims.  These are further explained below, on a limitation by limitation basis, which also establishes that the '865 claims are not anticipated by the TT203R.

33

### a. a base comprising opposed ends and a plurality of structural members which intersect and are tied together

154. Dr. Eskandarian argues that the TT203R contains a base with opposed ends. He identifies the opposed ends as the two edges of the lower plate:



155. Dr. Eskandarian argues that the base of the TT203R also contains a plurality of structural members that "include a generally horizontal lower steel plate, a generally horizontal upper steel plate, a steel foundation tube extending generally vertically between the lower and upper plates and a laterally extending steel access box" as well as "intersecting and tied-together steel bars (rebar) form a cage around the foundation tube assembly." (Op. Rep. at ¶¶ 197-8). In my opinion, the rebar members are not part of the TT203R's base. They are also outside of area that Dr. Eskandarian labels as the opposed ends of the base, meaning they cannot be part of the base. The base of the TT203R is the foundation tube assembly—the two plates with the steel foundation tube.

156. Apart from stating the rebar members intersect with each other (which they likely do not as I will discuss further below), Dr. Eskandarian does not identify which, if any, of the plates, steel tube, or "access box" intersect or are tied to each other. In my opinion, none of these members intersect or are tied together either, as required by the claims. The rebar members also do not intersect or tie to any other members, nor do they intersect and tie to each other.

157. Further, I do not agree that the lower plate is a structural member in the TT203R. It does not provide any support to the structure.

158. Just like with the DSC800RFB, Dr. Eskandarian goes on to argue that both the claimed "at least one first structural member" and "at least one structural member" are inherent in the lower steel plate. None of the other previously identified "plurality of structural members" are designated as the "at least one first structural member" and "at least one structural member" as recited by the claims. Dr. Eskandarian yet again disregards that the same members that intersect and are tied together must be those that satisfy the remaining limitations of the independent claims.

2167468.v1

> **b.**     **for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;**

159.    Dr. Eskandarian states that the "lower plate of the TT203R inherently includes a first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member."  As explained under section III(C)(ii), I, like the PTAB, disagree that a single plate can include more than one structural member, or that these structural members would be considered to "intersect" or be "tied together."

160.    Dr. Eskandarian also does not explain how a single plate can intersect and be tied to together with itself.  Additionally, it is not clear how a single plate can intersect with opposed ends as required by the claim language.

> **c.**     **each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base;**

161.    The TT203R bollard is not secured to the lower plate, which Dr. Eskandarian argues is both the "at least a first structural member" and "at least one structural member."  The TT203R bollard is slipped into the foundation tube, and is not secured to the foundation tube or the lower plate, but simply rests on the lower plate.  Also, the lower plate is not a structural member, since it provides no structural resistance to the impact force delivered by a vehicle.  The lower plate simply prevents fluid concrete from entering the foundation tube and prevents the foundation tube from being lifted out.



162.    The TT203R is a removable bollard structure—if the bollard were secured to the lower plate, the bollard could not be removable.

35

      **d.**     **wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and**

163.    As explained with respect to the DSC800RFB, a PHOSITA would understand a "shallow excavation" in the context of the '865 patent to mean the excavation required for a shallow mount bollard base, which the '865 patent teaches is approximately between 5" to 14" deep, including as shallow as 3." ('865 at 2:43-45; 3:5-8). I also understand that the Court rejected Delta's proposed construction of "shallow excavation" as being "three feet or less." I agree that a PHOSITA would not understand a shallow excavation to be one of three feet or less, but rather the excavation required for a base that is roughly 3" to 14" inches.

164.    This is consistent with the testimony of John Friend who stated that shallow mount bollards are those requiring excavations of 18 inches or less. (Friend Dep. Tr. at 52:15-22).

165.    The TT203R would require an **_excavation_** that is deeper than the height of the base, meaning it would need to be deeper than 17.6 inches.

166.    Dr. Eskandarian admits that the TT203R bollard relies on rebar to "form a cage around the foundation tube assembly. (Op. Rep. at ¶ 198). The excavation for the TT203R would therefore need to be deep enough to accommodate this rebar cage and would necessarily be deeper than the 17.6 inches shown in the drawings as the height of the underground portion of the TT203R system.

167.    In my opinion, the TT203R is not configured to be mounted in a shallow excavation pursuant to the '865 patent claims.

      **e.**     **wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.**

168.    Dr. Eskandarian does not demonstrate that the TT203R contains a base configured to retain media. The PTAB has confirmed that it is the "at least one first structural member" and "at least one structural member" that must be configured to retain media. But Dr. Eskandarian argues that both of these members are inherent in the TT203R's lower plate, which does not and could not retain media.

169.    Nor does Dr. Eskandarian argue that this lower plate retains media, instead arguing that the "foundation tube assembly and rebar cage" are configured to retain media. (Op. Rep. at ¶ 203). I understand that the "claim requires the same structure to satisfy both of these limitations," and that this was confirmed by the PTAB in IPR2019-01161. Because the TT203R's lower plate is not configured to retain media, nor could it accept media, this claim limitation is not met by the TT203R. The concrete is **_outside_** of the foundation tube assembly base, not retained inside of it.

170.     The TT203R does not teach this limitation just as the Fuchs reference at issue during the prosecution of the '865 patent could not teach this limitation—because a mere plate cannot be configured to retain media.  I agree with the PTO that a single plate cannot retain media.

171.     Finally, because the base does not retain media, it cannot cause the rotation of the bollards and base to be resisted.  Dr. Eskandarian does not point to any support for his statement that the media in the base provides for rotation to be resisted.  (Op. Rep. at ¶ 203).

### iii.     Dependent Claims

172.     Dr. Eskandarian argues that various dependent claims are also invalid in light of the TT203R.  In addressing the dependent claims, I incorporate by reference my opinion on the independent claims from which these claims depend.  None of the dependent claims are obvious because none of the independent claims are obvious, as well as for the following reasons.

### a.     Claim 3: The bollard structure of claim 1, wherein the intersecting structural members have axes that extend parallel to a plane of the base

173.     The TT203R bollard does not have intersecting structural members, nor do these members have axes extending parallel to a plane of the base.  The term axis (axes) is typically used with respect to linear elements, and understood in the art to refer to the "longitudinal axis." The TT203R is comprised of stacked plates. Plate are not a linear element but a rectangular element, and plates do not have a longitudinal axis.  In fact, these members do not extend at all, instead they are stacked on top of one another and are perpendicular to a plane of the base.

### b.     Claim 4: The bollard structure of claim 1, wherein the base has a height of 3 inches to 14 inches

174.     The drawings of the TT203R bollard in Dr. Eskandarian's report show that the height of the underground portion of the base is 17.6 inches tall, and Dr. Eskandarian does not dispute this. (Op. Rep. at ¶ 205).  Dr. Eskandarian states, however, that "[i]t would have been obvious to a POSITA to tailor the dimensions of the TT203R based on the needs of a particular installation, including reducing the overall height of the base to a height of 3 inches to 14 inches."  (*Id.*).  There is no indication that the TT203R could work if its base were reduced to even just 14 inches.  As explained above, the DSC800 and TT203R bollard structures work by virtue of the concrete around the entire, vertical length of its underground portion.  A PHOSITA may have been motivated to make the base shorter, but would have no reasonable expectation of success in doing so.

### D.     The '865 Claims are Valid in Light of Darcy and the DSC501

175.     Dr. Eskandarian argues that the Darcy reference, either alone and/or in combination with the DSC501 anticipate or render obvious the '865 claims.  I do not agree with his analysis or findings.

i.      **Overview of Darcy**

176.    I understand that the Darcy U.S. Patent Publication No. 2006/0090408 ("Darcy Application" or "Darcy App.") claims priority from a provisional application filed on October 22, 2004.  The '865 patent claims priority from various provisional applications, three of which were filed prior to October 22, 2004.  These are Provisional Application No. 60/591,019, filed on July 26, 2004, Provisional Application No. 60/600,955, filed on August 12, 2004, and Provisional Application No. 60/605,959, filed on August 30, 3004.  I have reviewed these three provisional applications and it is my opinion that all elements of the '865 patent claims are disclosed and have support in these applications.  I understand that this is what is required for the '865 patent to be entitled to claim priority to these earlier applications.  Therefore, it is my opinion that the Darcy application is ineligible prior art to invalidate the '865 patent claims because the '865 patent is entitled to a priority date before the Darcy provisional application.

177.    The Darcy application, which I understand never issued as a U.S. patent, discloses a modular vehicle barrier system including a reaction mass dependent upon a forward member for confronting and absorbing energy from the impact of a vehicle.  Figure 1 of Darcy shows that at the moment when a vehicle impacts Darcy's barrier 14, the vehicle is also directly on top of the "reaction mass" 12, and that the weight of the vehicle adds resistance against the vehicle impact:



**FIG. 1**

(Darcy App. at Fig. 1).

178.    Reaction mass 12 includes a forward member 16, "for confronting and compressing the surrounding earth and absorbing energy from the impact of the vehicle 18 with post 14."  (*Id*. at 0027).

179.    I understand that the Darcy application was considered by the examiner during the prosecution of the '865 patent but was neither referenced nor relied upon in any of the office actions.  This is likely because Darcy describes a system and structure that is totally different

38

2167468.v1

from the '865 patent invention, and seeks to use the weight of the vehicle to stop the vehicle from continuing past the barrier.

180.    I further understand that Delta included the Darcy application in its request for reexamination to the PTO, but that the PTO refused this request with respect to Darcy.

181.    I also understand that after the Darcy application was filed, a continuation-in-part was filed.  I have been informed that a continuation-in-part is a child application that shares a significant part of the parent application's specification, but adds new subject matter.  I understand that this continuation-in-part application was ultimately issued as U.S. Patent No. 7,775,738.  The Darcy application that Dr. Eskandarian relies on was abandoned, and never issued as a patent.

182.    In U.S. Patent No. 7,775,738, a new and different Darcy system is shown rotating when impacted by a vehicle, as seen in Fig. 3F:



FIG. 3F

('738 at Fig. 3F).

183.    The '738 Darcy patent also contains an embodiment that includes the addition of a claw, depicted as number 21 in the drawings:

39



FIG. 3A

184.    Upon being impacted by a vehicle, Darcy's new system is designed to rotate more than 90 degrees and the new matter discloses the use of a claw (21) to impale the car, trapping it and preventing its passing.  This is illustrated in the patent's figures 3B-3D:



INTENDED DESIGN SEQUENCE OF FUNCTION ON IMPACT – Barrier Fence

185.    Because the Darcy application was ultimately abandoned and the invention in it was altered to become the structure taught by the 7,775,738 patent, I would conclude that the invention disclosed in the Darcy application likely did not work as intended and was changed to become a barrier system that rotated and deformed upon impact, or rotated to trap a vehicle.  The way the '738 invention works is very similar to the Draht and Reale (U.S. Patent No. 6,702,512) prior art references described in the background section above.  (*Supra* at III(B) and (C)).

40

ii.     **Darcy Alone and/or with the DSC 501 Does not Teach, Suggest, or Motivate a PHOSITA**

186.    Darcy does not teach, suggest, or motivate a PHOSITA to make the '865 invention.  And, as described in Section VIII(A)(ii), the DSC501, which Dr. Eskandarian seeks to combine with Darcy, also does not teach, suggest, or motivate a PHOSITA to arrive at the '865 invention.  Unlike the '865 bollards, both will only function as intended if impacted from a single direction.  In my opinion, a PHOSITA would not start with either of these structures in creating the '865 invention.

187.    The main reason why a PHOSITA would not rely on Darcy to make the '865 invention is that the '865 bollard structure works by virtue of its base, which is configured to retain media such that has considerable mass, to stop a ramming vehicle.  Darcy on the other hand seeks to use the ***weight of the vehicle itself*** to stop a vehicle.

188.    Further, it is clear that media added to the Darcy base is not what causes the bollards and base to resist rotation as required by the '865 claims, because Darcy merely says that media ***may*** be added, but is not required.  (Darcy App. at ¶ 0030).

189.    The only rationale Dr. Eskandarian provides for the motivation to consider Darcy, or combine it with the DSC501, is that there was an need in the market for shallow mount bollards and that it was known that adding concrete to "the interior of the base of the barrier between structural members" would increase its weight.  (Op. Rep. at ¶¶ 219-220).  Dr. Eskandarian does not address any of the glaring differences between the '865 system and Darcy, and fails to show why Darcy specifically would inform a PHOSITA to invent the '865 bollards.

190.    These differences between Darcy and the '865 invention, as further explained below on a limitation by limitation basis, also demonstrate that the '865 claims are not anticipated over Darcy.

iii.    **Independent Claims 1, 16, and 33**

a.      **wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and**

191.    Darcy cannot be mounted in a shallow excavation, as it "requires installation to only a depth of 21 inches." (Darcy App. at ¶ 0027).  A 21 inch excavation is much greater than the shallow excavations of the '865 invention, which need only be deep enough to accommodate a base of approximately 3-14 inches tall.

192.    Delta's witness, John Friend, also testified that shallow mount bollards are those requiring excavations of 18 inches or less.  (Friend Dep. Tr. at 52:15-22).  I also incorporate by reference my discussion with respect to the meaning of a shallow excavation above in paragraphs 84-85, 125-126, and 140-141.

b.      **wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.**

193.    The Darcy application does not have base configured to retain media *such that the rotation is resisted of a bollard or bollards and the base* from an impact against the bollard or bollards.

194.    First, the Darcy application does not teach that it resists rotation at all.  Dr. Eskandarian merely states that it does, without support and points to nothing in Darcy for this assertion.  (Op. Rep. at ¶ 230).  In fact, the only mention of resistance in the Darcy application is with respect to the reaction mass 12, not the posts.  (Darcy App. at ¶ 0027)

195.    Further, as the Darcy application was abandoned and a continuation-in-part filed that issued as U.S. Patent No. 7,775,738—a disclosure that clearly *rotates*—it is evident that the structure disclosed in the Darcy application did not work for its intended purposes of stopping a vehicle.  Instead, a new system needed to be designed that could stop a vehicle by rotating and trapping it, instead of resisting rotation.

196.    Additionally, in order to satisfy the language of the independent claims, not only must the bollard and base resist rotation, but the media retained in the base must be what causes it.  This has been confirmed by the PTAB and is consistent with the language of the claims.  The Darcy application is clear that it is the weight of the vehicle on the reaction mass that stops the further penetration of a car (if it even works for that purpose at all, which is doubtful).  This is further evidenced by the fact that Darcy teaches that its invention "may be filled" with concrete, but in no way relies on concrete to resist rotation.  (Darcy App. at ¶ 0030).

197.    The Darcy application clearly does not disclose this claim limitation, nor does it teach, suggest, or motivate a PHOSITA to modify it to create a bollard system that retains media in its base such to resist rotation of the bollard and base upon impact.

iv.     **Dependent Claims**

198.    Dr. Eskandarian argues that various dependent claims are also invalid in light of the Darcy and/or the DSC501.  In addressing the dependent claims, I incorporate by reference my opinion on the independent claims from which these claims depend.  None of the dependent claims are obvious because none of the independent claims are obvious, as well as for the following reasons.

a.      **Claim 4: The bollard structure of claim 1, wherein the base has a height of 3 inches to 14 inches**

199.    Darcy does not teach a base between 3 and 14 inches and Dr. Eskandarian has demonstrate no reasonable expectation of success if Darcy's base were reduced to between 3 and 14 inches. (Darcy App. at ¶ 0027).  (*See also supra* at ¶¶140-141).

    **b.**  **Claim 20: The bollard structure of claim 16 wherein the base
has a height of 3 inches to 14 inches**

200. *See* claim 4.

    **v.**  **Darcy In Light of the DSC501 Does not Teach, Suggest, or Motivate a
PHOSITA**

201. Dr. Eskandarian only relies on the combination of Darcy and the DSC501 for
dependent claims 5, 32, and 35 (claiming members made of tubes or rebar).  But, he fails does
not explain why a PHOSITA would select a barrier system that relies on the weight of the
vehicle with a non-bollard wedge that moves up and down.

    **a.**  **Claim 32: The bollard structure of claim 16, comprising a
rebar grillage comprising intersecting and tied together and
tied together rebar members extending coextensively with at
least a portion of the base that includes a structural member to
which a bollard is secured**

202. As explained above, a PHOSITA would not be motivated to consider either
Darcy's barrier that requires the weight of the vehicle or the DSC501 wedge to create the anti-
ram bollard structure of the '865 patent, which can be rammed in any direction.

203. Further, the DSC501 contains rebar within part of the wedge, but is not a rebar
grillage.  A PHOSITA would consider a "grillage" as having members that cross each other in
perpendicular directions.  Delta's 2002 brochure for the DSC501 includes a photograph that
shows about 10 rebars extending from the side of wedge structure, but all of these rebars are
parallel to each other.  Not a single rebar crosses them, and therefore it is not a grillage.

204. This photograph is the only depiction in the brochure that shows rebar at all.
Delta's drawing for the wedge (DS00002391) does not show an rebar at all, nor does it provide
any instructions as to its placement.

    **b.**  **Claim 35: The bollard structure according to claim 33, wherein
the at least one of the plurality of members that extend
between a structural member to which a first bollard is
secured and a structural member to which a second bollard
adjacent to the first bollard is secured comprises a rebar
member**

205. As explained under Claim 32, a PHOSITA would not be motivated to consider or
combine Darcy or the DSC501.

## IX.     SECONDARY CONSIDERSTIONS OF NONOBVIOUSNESS

### A.     Long-Felt Need

206.     Before the invention of the '865 patent in 2004, there was a long-felt need for a perimeter security system, like security bollards, which could serve as anti-ram obstacles, the Oklahoma City bombings in April 1995 and the September 11, 2001 attacks made clear that terrorists sought to intentionally drive heavy vehicles at high speeds into buildings for the purpose of harming people and property.  ('865 at 1:50-4).  There was a need to prevent injury and damage as a result of these intentional rammings, not merely to prevent cars from accidentally veering off the roads.  Further, the inventors understood that anti-ram systems were needed in areas where utilities and other infrastructure reside in underground systems, especially in urban or commercial areas, where the traditional "deep" excavations would require moving those systems.  (*Id.* at 1:60-2:10).  For this reason, the inventors of the '865 patent designed a shallow mount, anti-ram system that resisted rotation to protect people and buildings in urban or commercial areas.  (*Id.* at 2:11-26).

207.     Dr. Eskandarian does not dispute this long-felt need.  Dr Eskandarian stated in his report "that the market demand for security barriers has existed and magnified since the early 1980s" and that it was "further intensified after the 9/11 attacks."  (Op. Rep. at ¶ 46).  He explained that as a result, "the government developed test procedures for security barriers in 1985; a standard and guidance utilized throughout the 1990s and early 2000s, and later adopted by an ASTM standard."  *Id.*  He also emphasized that there was a need for security barriers to be installed in cities that required shallow excavations as a result of utilities underneath.  *Id.*

### B.     Copying

208.     I understand that evidence of copying of the patented device is also evidence of non-obviousness.  This is because had the '865 invention been obvious to a PHOSITA, they would not need to copy it but would instead have independently developed the claimed invention.  RSA filed its provisional applications covering the '865 shallow mount bollard invention in 2004 and early 2005.  RSA also began commercially manufacturing and selling its shallow mount bollards, nearly identical to the embodiments in the '865 patent, in 2004.  Delta sold the three products discussed in my report—the DSC501, the DSC800RFB, and the TT203R for years before finding that there was demand for a shallow mount bollard system like RSA's.  Dr. Eskandarian states that the DSC501 and DSC800RFB products were first sold in 2002 and that the TT203R was first sold in 1997.  But it was not until 2008, four years after the '865 invention, that Delta rolled out its accused products, which looked nothing like its own earlier bollards, but exactly like RSA's invention.

209.     Simply comparing the structure and design of Delta's accused products with the preferred embodiments in RSA's '865 patent, as well as with RSA's commercial embodiment of the patented product, also provides evidence of copying:

2167468.v1



210.    In my opinion, Delta's shallow mount bollard products are copies of the preferred embodiments of the '865 patent, and RSA's commercial product.  Even Delta's President, Mr. David Dickinson testified that the two design looked "very similar."  (Dickinson Dep. Tr. at 106:20; 112:15; 124:1-6).

211.    Mr. Dickinson also admitted that it was "plausible" that someone at Delta could have identified RSA's competing product, saw the demand for that product, and incorporated

that product into its accused products, the DSC600, DSC650, and DSC675 bollards.  (Dickinson
Dep Tr. at 124:22-125:4).

212.    I also understand that Delta has provided no evidence of any independent development of the DSC 600, DSC 650, or DSC 675 products.  In fact, I understand that no documents of any kind depicting the design of these products exist that pre-date any of RSA's provisional patent applications or the date that RSA began selling its products.  In fact, I was informed that there are no depictions of the designs of the accused products until late 2007/early 2008, when they immediately were put on the market.  The complete lack of evidence of the development of the accused products or even drawings of these products prior to them being sold, is further evidence of copying in my opinion.

213.    My analysis and opinions are based on the information available to me and the information available to date.

214.    I am prepared to testify at deposition and trial as to the opinions expressed herein.

46

Dated: December 7, 2020

By:


_____
DAVID B. PERAZA, P.E.

2167468.v1

# EXHIBIT A

2224685.v2



# E$^x$ponent®
### Engineering & Scientific Consulting

## David B. Peraza, P.E.

Principal Engineer  |  Buildings & Structures
420 Lexington Avenue, Suite 1740 | New York, NY 10170
(212) 895-8103 tel  |  dperaza@exponent.com

## Professional Profile

Mr. Peraza has over 40 years of broad structural and civil engineering experience and is licensed in 17 states. His work has included investigations of major collapses, catastrophe response, diagnosis of design and construction deficiencies, damage caused by adjacent construction, condition assessments, hurricane damage investigations, design of remedial and stabilization measures for distressed buildings, design for renovation projects, and the analysis of unusual structures.  His projects have included high-rise buildings, façades, cranes, parking structures, pre-engineered buildings, industrial facilities, scaffolds, formwork, bridges, and waterfront structures.

Following the 9/11 terrorist attacks on the World Trade Center, Mr. Peraza led the emergency engineering response for the City of New York, which continued around the clock for nearly nine months and included the coordination of 39 engineering sub-consultant firms. He has led several high-profile structural collapse investigations including L'Ambiance Plaza, the Four Times Square Hoist Collapse, and the Miller Park crane accident.

Prior to joining Exponent, Mr. Peraza was Vice President with the LZA Technology division of The Thornton-Tomasetti Group.

## Academic Credentials & Professional Honors

M.S.C.E., University of Cincinnati, 1986

B.S.C.E., Ohio Northern University, 1977

Recipient of the 2014 "Forensic Engineer of the Year" Award, by the American Society of Civil Engineers, Forensic Engineering Division

Guest lecturer, Columbia University, New York, NY. Courses CIEN E4212 Structural Failures: Cases, Causes, Lessons Learned, and CIEN E4210 Forensic Structural Engineering

## Licenses and Certifications

Professional Engineer: New York, #082864; Connecticut, #24771; Ohio, #46862; Florida, #64521; Delaware, #14505; North Carolina, #032227; New Jersey, GE-046372; Rhode Island, #8602; Pennsylvania, #PE074422; Texas, #PE102533; New Hampshire, #13243; Massachusetts, #48872; Maryland #45980; Mississippi #20227; Louisiana #PE.0040963; District of Columbia, #PE909073 (Civil), Tennessee, #120857

## Professional Affiliations

American Society of Civil Engineers

American Concrete Institute

Structural Engineer's Association of New York

**Professional Committees**

Served as member of task force that made recommendations for updating the 2014 Building Code of the City of New York

Served as member of ASCE/SEI 37 standard "Design Loads for Structures During Construction"

Served as member of ASCE/SEI 7 standard "Minimum Design Loads for Buildings and Other Structures"

ASCE Technical Council on Forensic Engineering: Past Chair of Executive Committee

SEAoNY (Structural Engineers Association of New York): participated on Underpinning Task Force, 2004-2006, which provided recommendations to NYC Department of Buildings

Participated on REBNY's (Real Estate Board of New York) task force that made recommendations to NYC Department of Buildings regarding façade inspections, which resulted in Local Law 11-98

## Languages

Spanish

## Publications

**Books and Book Chapters**

Engineering Investigations of Hurricane Damage:  Wind versus Water.  Peraza DB, Coulbourne WL, Griffith M (eds), American Society of Civil Engineers, 2014.

Ratay RT, Peraza DB.  Investigation and Analysis of Structural Collapses.  In: Encyclopedia of Forensic Sciences, Second Edition.  Siegel JA and Saukko PJ (eds), Vol. 2, pp. 461-465. Waltham: Academic Press, 2013.

Peraza DB.  The First Steps After a Failure.  Chapter 5.  In:  Forensic Structural Engineering Handbook, Second Edition, McGraw-Hill, 2009.

Peraza DB, Stovner E.  Buildings.  Chapter 6.  In:  Structural Condition Assessment, Wiley, 2005.

Peraza DB. The First Steps After a Failure. Chapter 4. In: Forensic Structural Engineering Handbook, McGraw-Hill, 2000.

**Publications and Presentations**

Peraza DB, Duntemann J, Pamisan F, Charney S, Forensic Engineering Workshop. Copresenter at 2019 IABSE Congress, New York, NY, September 2019.

Peraza DB, Tropicana Garage Collapse. Presented at 2019 IABSE Congress and published in Proceedings, New York, NY, September 2019.

Peraza DB., Erdem I., Bridge Collapse During Demolition. Presented at Forensic Engineering 8th Congress, and published in Proceedings, American Society of Civil Engineers, Austin, TX, December 2018.

Erdem I., Peraza DB., Investigation of Collapsed Jet Hangars. Published in Proceedings of Forensic Engineering 8th Congress, American Society of Civil Engineers, Austin, TX , December 2018.

Ibrahim Erdem, Rahul Ratakonda, and David B. Peraza.  An Investigation into the Collapse of a Large Scaffold. Paper and presentation at Structures Congress 2018, American Society of Civil Engineers, held in Houston, TX.

Peraza DB., Griffith M., Engineering Investigations of Hurricane Damage: Wind v Water, Webinar presented to the Ohio Association of Civil Trial Attorneys, October 2018.

Panelist at conference, "Deteriorating Buildings: Ticking Time Bombs," AIA Conference on Architecture 2018, June 21, 2018, New York City.

Panelist at conference, Emerging Claim Adjusting Issues in Property Insurance Markets, Claims and Litigation Management Alliance, December 2018 New York, NY.

Peraza DB. Invited speaker at ABA Regional CLE Workshop, "Handling a Construction Failure Case", New York, NY, September 2017.

Peraza DB. Co-presenter at full day pre-conference workshop, "Forensic Engineering: Structural Failures — Cases, Causes, Lessons Learned."  IABSE Symposium, Vancouver, Canada, September, 2017.

Peraza DB, Griffith M. Engineering investigations of hurricane damage: Wind versus water. Webinar, American Society of Civil Engineers, April 15, 2015; February 4, 2016; October 27, 2017, July 11, 2019

Peraza DB. Quality of Hurricane Damage Engineering Reports. Invited presentation to the Engineers Joint Committee of Long Island, Plainview, NY, February 2016.

Peraza DB. The Role of Failure in Engineering Design. Invited speaker at 14th civil engineering symposium at Universidad Panamericana in Guadalajara, Mexico. May 2016,

Peraza DB. Invited speaker at ABA Regional CLE Workshop, "Handling a Construction Failure Case", Philadelphia, PA, June 2016.

Peraza DB. Engineered for Success — Remembering what Katrina and Sandy taught us about wind-versus-water reports. CLM Magazine, Claims and Litigation Management Alliance, November 2016.

Peraza DB, Coulbourne W (Instructors). Short Course: Engineering Investigation of Hurricane Damage: Wind versus Water. Presented at Forensic Engineering 7th Congress, American Society of Civil Engineers, Miami, FL, November 2015.

Erdem I, Peraza DB. A case study on a partial collapse of a building with light gage steel framing system. Presented at Forensic Engineering 7th Congress, American Society of Civil Engineers, Miami, FL, November 2015.

Ratakonda R, Dolhon A, Peraza DB. Failure of a thin limestone façade. Presented at Forensic Engineering 7th Congress, American Society of Civil Engineers, Miami, FL, November 2015.

Erdem I, Peraza D. Case study on construction defects of reinforced concrete walls with insulated concrete forms. Presented at Forensic Engineering 7th Congress, American Society of Civil Engineers,

Miami, FL, November 2015.

Peraza DB. Presentation, at invitation of major insurer of residential properties, to consultant engineering firms. "Professional Engineering Issues — Engineering Damage Investigations," Illinois, June 2015.

Peraza DB, Griffith M. Engineering investigations of hurricane damage: Wind versus water. Webinar, American Society of Civil Engineers, April 15, 2015; February 4, 2016; October 27, 2017.

Morgan T, DeVore C, Peraza D. Collapse of crossed pendulum ceiling systems due to unstable equilibrium. Structures Congress 2015: pp. 1730-1740, American Society of Civil Engineers.

Shrestha PL, James SC, Shaller PJ, Doroudian M, Peraza DB, Morgan TA. Estimating the storm surge recurrence interval for Hurricane Sandy. Proceedings, World Environmental and Water Resources Congress 2014: Water without Borders. Huber WC (ed) Environmental Water Resources Institute of the American Society of Civil Engineers, Portland, OR, pp. 1906-1915, 2014.

Peraza DB. Jet center hangar collapses. Invited Presentation, Design Seminar by Metal Building Manufacturers Association, Cleveland, OH, July 30, 2014.

Peraza DB. Lessons from failures for structural engineers. Invited presentation, Annual Conference of Structural Engineers Association of Ohio, Columbus, OH, September 2014.

Erdem I, Peraza D. Challenges in renovation of vintage buildings. Journal of Performance of Constructed Facilities, American Society of Civil Engineers, 2014. DOI: 10.1061/(ASCE)CF.1943-5509.0000666.

Peraza D. Collapse of jet center hangars under snow load. Presentation at the 6th International Conference on Engineering Failure Analysis, Lisbon Portugal, July 2014.

Peraza DB, Erdem I, Kane WM. Collapse of jet center hangars under snow load. Presentation to the 2014 Structures Congress, American Society of Civil Engineers, Boston, MA, April 2014

Erdem I, Peraza DB. Errors and omissions in the structural renovation of a vintage building. Presentation to the 2013 Structures Congress, American Society of Civil Engineers, Pittsburgh, PA, May 2013.

Peraza DB. Structural engineering lessons: The devil is in the details. Presentation to Boston Society of Civil Engineers, Boston, MA, November 6, 2013.

Peraza DB. Failures of light gage steel structural framing. Paper and presentation, Proceedings of ASCE 6th Forensic Engineering Congress, San Francisco, CA, November 2012.

Dolhon A, Peraza DB, Erdem I, Ratakonda R. Pre-construction surveys: Lessons learned from construction claims. Paper and presentation, Proceedings of ASCE 6th Forensic Engineering Congress, San Francisco, CA, November 2012.

Peraza DB. Distinguishing damage due to wind versus flood — An ASCE Publication. Paper and presentation, Advances in Hurricane Engineering: Learning from Our Past, Applied Technology Council and Structural Engineering Institute of ASCE, Miami, FL, October 2012.

Peraza DB. Presented at Seminar "Mitigation of Damage to Structures Adjacent to Construction Sites in Urban Environments," for Lorman Education Services, Plainview, NY, September 2011 and Garden City, NY, September 2012.

Peraza DB. Engineering issues for post-earthquake damage assessment of residential wood frame structures. Presentation to American Automobile Association, Wilmington, DE, March 28, 2012.

Peraza DB. Lessons from failures for structural engineers. American Society of Civil Engineers, Long Island Section, Levittown, NY, March 15, 2012.

Peraza DB, Ratakonda R, Erdem I. Goliath crane accident. Presentation to the 2011 Structures Congress, American Society of Civil Engineers, Las Vegas, NV, April 2011.

Ratakonda R, Erdem I, Peraza DB. Gantry crane partial collapse. International Cranes and Specialized Transport, October 2011.

Peraza DB. Co-presented seminar titled "The Adjacent Building Challenge to New Construction Projects in New York City." Sponsored by the Real Estate Board of New York, New York, NY, June 29, 2010.

Peraza DB. The case for failures. Presentation to the Forensic Engineering Symposium, Metropolitan Section of the American Society of Civil Engineers, Cooper Union, New York, NY, June 29, 2010.

Peraza DB. Forensic structural engineering: Practices and failures. Seminar presented to the New York City Department of Design and Construction, Long Island City, NY, March 18, 2010.

Peraza DB. Steel framing — Performance lessons from forensic investigations. Symposium Aging Buildings: Designing for Longevity, by Architectural Engineering Institute, New York, NY, December 9, 2009.

Peraza DB. Special problems with composite multiwythe masonry walls. Presentation and paper, Proceedings of ASCE Fifth Forensic Congress, Washington DC, November 2009.

Peraza DB, Travis J. Crane safety — an industry in flux. Presentation and paper, Proceedings of ASCE Fifth Forensic Congress, Washington DC, November 2009.

Peraza DB. Co-presented 1 ½ day seminar and workshop on Structural Forensic Engineering. Organized by ETEK (Cypriot engineering board). Cyprus, May 8-9, 2009.

Peraza DB, Wisniewski B. Evaluation of building with severe impact damage: The Banker's Trust building. Proceedings, ASCE Structures Congress, in Vancouver, BC, April 2008.

Peraza DB. Mechanisms of façade deterioration and failure. Presented at Façade Forensic Workshop as part of Architectural Engineering Institute (ASCE) Conference, Denver, CO, April 2008.

Peraza DB. Undermining and underpinning: Suggestions for minimizing damage to adjacent buildings during construction. Forum Article in Journal of Performance of Constructed Facilities, 2008.

Peraza DB. Avoiding structural failures during construction — Part 2. Structure Magazine, Copper Creek, Reedsburg, WI, February 2008.

Peraza DB. Avoiding structural failures during construction — Part 1. Structure Magazine, Copper Creek, Reedsburg, WI, November 2007.

Peraza DB. Presented the masonry portion of "Sticks and Bricks." ABA Construction Forum, Los Angeles November 2007.

Peraza DB. The first steps after a failure. Proceedings of ASCE Structures Congress, in Long Beach CA. May 2007.

Peraza DB. Structural condition assessments: Challenges and solutions. Speaker at Construction Safety Week, sponsored by NYC Department of Buildings and SEAoNY, May 3, 2007.

Presented two hour seminar "Avoiding failures during construction" at four venues:

- NYC Department of Design and Construction, June 21, 2007
- NYC School Construction Authority, July 17, 2007
- NYC Department of Buildings, October 26, 2007
- ASCE Metropolitan Section meeting, November 29, 2007

Peraza DB. Getting to the bottom of underpinning. Structure Magazine, Copper Creek, Reedsburg, WI, December 2006

Peraza DB. Strategies for structural condition assessments of damaged buildings. Structure Magazine, Copper Creek, Reedsburg, WI, August 2006.

Peraza DB. Raising the playing field-quality in the constructed facility. Catastrophe Risk Management, April 2006, London, UK.

Peraza DB. Condition assessment of buildings. Proceedings, SEI Structures Congress, American Society of Civil Engineers, St. Louis, MO, May 2006.

Peraza DB, Ratay R. Structural condition assessments — The good, the bad, the ugly. Structural Engineers Coalition of Connecticut, New Haven, CT, March 15, 2006.

Peraza DB. Condition assessment of structures following an event. ASCE Met Section Construction Group Winter Seminar, "Engineering for Disasters: Prevention and Recovery," New York, NY, March 6, 2006.

Peraza DB, Mendoca D, Stefan P. Innovation, risk, and reward at ground zero. Proceedings, SEI Structures Congress, New York, NY, American Society of Civil Engineers, April 2005.

Peraza DB. First steps after a failure. Proceedings, SEI Structures Congress, American Society of Civil Engineers, New York, NY, April 2005.

Peraza DB. Evaluation of damaged buildings. Lecture, presented to NYC Department of Buildings, March 2005.

Peraza DB, Zallen RM. Engineering considerations for lift-slab construction. American Society of Civil Engineers, Reston, VA, 2004.

Peraza DB. Preservation of perishable evidence. The Owner's Construction Super Conference, San Francisco, CA, December 12, 2003.

Peraza DB. Engineering response to World Trade Center Disaster. Keynote Speech, presented at AGC-DOT Conference, Saratoga Springs, NY, December 2002.

Peraza DB. Twin Tower performance. Presented at AGC-DOT, Saratoga Springs, NY, December 2002.

Peraza DB. Lessons Learned from Metal Building Collapses. Two half-day presentations, at invitation of Butler Manufacturing Co., Birminham, AL, January 2001

Peraza DB. Lessons from recent collapses of metal buildings. Presented at Cold-formed Steel Structures 2000, 15th International Specialty Conference, St. Louis, MO, October 2000.

Peraza DB. Snow Snow-Related Roof Collapses—Several Case Studies. American Society of Civil

Engineers, 2nd Forensic Congress, San Juan Puerto Rico, May 2000.

Peraza DB. Practical solutions to building envelope problems. Neocon 99 World's Trade Fair, Chicago, IL, June 1999.

Peraza DB. Recycling of historic piers revitalizes Manhattan waterfront. ASCE 1997 Spring Seminar, "Just Structures," New York, NY, May 1997.

Peraza DB. Metal deck collapse: Professional liability during construction. ASCE Annual Convention and Exposition, Minneapolis, MN, October 1997.

Peraza DB. Lift-slab construction: Engineering considerations. ASCE Annual Convention and Exposition, Minneapolis, MN, October 1997.

Peraza DB. Lessons from failures II. ASCE Annual Convention and Exposition, Moderator, 1994.

Peraza DB. Assessment of cinder concrete slab construction. Presented at ACI Spring Convention, San Francisco, CA, 1994.

Peraza DB. Investigation of the L'Ambiance Plaza building collapse. ASCE Journal of Performance of Constructed Facilities, November 1992.

Peraza DB. Hartford Coliseum collapse in retrospect. Presented at ASCE Structural Engineering Congress, Chicago, IL, September 1985.

## Editorships & Editorial Review Boards

Served as reviewer for *Journal of Performance of Constructed Facilities* (American Society of Civil Engineers)

# EXHIBIT B

2224685.v2

## MATERIALS CONSIDERED BY DAVID B. PERAZA, P.E.

### PATENTS
U.S. Patent 8,215,865
U.S. Patent 7,775.738
U.S. Patent. No. 6,805,515
File History U.S. Patent 8,215,865
Provisional Application No. 60/674,965

### COURT FILINGS
Complaint (Dkt 1)
Order regarding Defendant's Motion for Leave to Amend Answer (Dkt 41)
RSA Protective Technologies, LLC's Opening Claim Construction Brief (Dkt 57)
Delta Scientific Corporation's Opening Claim Construction Brief (Dkt 58)
RSA Protective Technologies, LLC's Responsive Claim Construction Brief (Dkt 61)
Delta Scientific Corporation's Responsive Claim Construction Brief  (Dkt 62)
Joint Stipulation regarding Claim Construction (Dkt 69)

### IPR2020-01369:
IPR2020-01369 Patent Owner's Preliminary Response dated November 17, 2020,
Petition Exhibits 1003-1009, 1012, 1022, 1032, 1034

### IPR2019-01162:
IPR2019-01162 Paper No. 7 dated November 21, 2019 and Petition Exhibits 1003-1009, 1012, 1022, 1032, 1034

### IPR2019-01161:
IPR2019-01161 Paper No. 8 dated November 21, 2019, Petition Exhibits 1007, 1008, 1010-1013, 1016, 1017, 1019, 1027, 2001-2003

### 90/014,483
Request for Reexamination dated March 27, 2020
90/014,483 Office Action dated June 30, 2020

### DEPOSITION TRANSCRIPTS
Deposition Transcript of David Dickinson taken September 30, 2020
Deposition Transcript of John Friend taken September 16, 2020

### OTHER MATERIALS
Opening Expert Report of Dr. Azim Eskandarian dated November 9, 2020
National Capital Urban Design and Security Plan, National Capital Planning Commission, October 2002

2224685.v2

**<u>PRODUCTION DOCUMENTS</u>**
DS00000321
DS00000753
DS00000754
DS00001030
DS00001040
DS00001043
DS00001045
DS00001046
DS00001047
DS00001048
DS00002391
DS00002392
DS00002398
DS00002491
DS00002830
DS00002860
DS00006234
DS00006881
RSA-DELTA042852
RSA-DELTA043705
RSA-DELTA043729
RSA-DELTA043752
RSA-DELTA043770
RSA-DELTA043814
RSA-DELTA044050

4

# EXHIBIT 12

1
2                    UNITED STATES DISTRICT COURT
3                   CENTRAL DISTRICT OF CALIFORNIA
4
5    RSA Protective                )
     Technologies, LLC,            )
6                                  )
             Plaintiff,            )
7                                  )
        vs.                        )    Case No. 2:19-cv-06024-
8                                  )             JAK-PLA
     Delta Scientific             )
9    Corporation,                 )
                                   )
10            Defendant.           )
     _____)
11
12      REMOTE VIDEOTAPED DEPOSITION OF DAVID PERAZA, P.E.
13                  Port Washington, New York
14                  Friday, December 18, 2020
15
16
             REPORTED BY:  Dayna Michelle Glaysher
17                         CSR No. 13079; RPR, CRR No.
                           28081
18
19
20
21
22
23
24
25

                                            Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA
 3
 4  RSA Protective          )
    Technologies, LLC,       )
 5                           )
          Plaintiff,    )
 6                           )
      vs.          )  Case No. 2:19-cv-06024-
 7                   )      JAK-PLA
    Delta Scientific      )
 8  Corporation,        )
                         )
 9        Defendant.   )
    _____)
10
11
12
13
14      Remote Videotaped Deposition of DAVID PERAZA,
15  P.E., taken before Dayna Michelle Glaysher, a Certified
16  Shorthand Reporter for the State of California, with
17  principal office in the County of Los Angeles,
18  commencing at 11:02 AM ET, Friday, December 18, 2020.
19  Witness location:  Port Washington, New York.
20
21
22
23
24
25
                                              Page 2
```

```
 1 APPEARANCES (REMOTE):
 2
 3 For Plaintiff:
 4      HAUG PARTNERS LLP
          BY:  JESSICA ZAFONTE, Esq.
 5      BY:  JOSEPH SAPHIA, Esq.
          745 Fifth Avenue, 10th Floor
 6      New York, New York 10151
          TEL: 212.588.0800
 7      EMAIL: Jzafonte@haugpartners.com
            Jsaphia@haugpartners.com
 8
 9 For Defendant:
10      LEWIS ROCA ROTHGERBER CHRISTIE LLP
          BY:  DAVID A. DILLARD, Esq.
11      BY:  GUS CONSTANTINE MARANTIDIS, Esq.
          BY:  SAMI I. SCHILLY, Esq.
12      655 N. Central Avenue, Suite 2300
          Glendale, California 91203-1445
13      TEL:  626.795.9900
          EMAIL:  DDillard@lrrc.com
14
15 Also Present:
16      Drew Dorsey,
          Videographer
17
18
19
20
21
22
23
24
25
                                              Page 3
```

```
 1              I N D E X
 2 WITNESS                    EXAMINATION
 3 DAVID PERAZA, P.E.           7-122
 4                             PAGE
 5    BY MR. DILLARD           7-122
 6    BY MS. ZAFONTE            122
 7
 8
 9          E X H I B I T S
10                            Page
11 Exhibit   Description       Identified
12 Exhibit 134 Final Peraza Report        9
13 Exhibit 135 Prior Testimony           10
14 Exhibit 136 ASTM Standards            47
15 Exhibit 137 Turpin Publication        77
16 Exhibit 138 Order Granting Joint Stipulation  78
17
18
19        P R E V I O U S L Y   M A R K E D:
20
21 Exhibit   Description       Page
22 Exhibit 103 865 Patent                37
23
24
25
                                              Page 4
```

```
 1 Port Washington, New York, Friday, December 18, 2020
 2        11:02 AM ET - 6:50 PM ET
 3
 4            ***
 5                  11:00:52
 6       THE VIDEOGRAPHER:  Good morning.  We are
 7 going on the record at 11:02 AM on December 18th, 2020.
 8 Please note that the microphones are sensitive and may
 9 pick up whispering, private conversations, cellular
10 interference.  Please turn off all cell phones or place   11:03:05
11 them away from the microphones, as they can interfere
12 with the deposition audio.
13        Audio and video recording will continue to
14 take place unless all parties agree to go off the
15 record.  This is media Unit 1 of the videorecorded       11:03:18
16 deposition of David Peraza taken by counsel for
17 defendant in the matter of RSA Protective Technologies
18 versus Delta Scientific Corporation filed in the United
19 States District Court, Central District California,
20 Case Number 2:19-cv-06024-JAK-PLA.                        11:03:40
21        This deposition is being held remotely using
22 Veritext virtual technology.  The witness is located in
23 Port Washington, New York.  My name is Drew Dorsey from
24 the firm Veritext Legal Solutions, and I'm the
25 videographer.  The court reporter is Dayna Glaysher from  11:04:04
                                              Page 5
```

2 (Pages 2 - 5)

1  Q. In those crash tests were there bollards being
2  used?
3  A. Yes.
4  Q. Did the vehicle when it crashed into the bollard
5  wrap around the bollard at all in the ones that you've   02:41:06
6  seen?
7  A. Sometimes the -- the bollard was shall I say
8  embedded in the vehicle so that it stopped the vehicle.
9  But there was a little bit of -- how can I say -- there
10 was small portion of the vehicle that was slightly past   02:41:39
11 the bollard.
12 Q. Okay. Are you familiar with standards for
13 certifying crash resistance provided by the department
14 of state or an ASTM standard regarding crash resistance?
15 A. I have some familiarity with those.   02:42:15
16 Q. Okay. Is it your understanding that one can get
17 certified if a barrier bollard, whatever, performs
18 adequately at different impact levels -- is that fair?
19 A. Yeah.
20     MR. DILLARD: Ms. Schilly -- Ms. Schilly?   02:42:51
21     MS. SCHILLY: Yes.
22     MR. DILLARD: Can you mark the -- I think
23 it's an ASTM standard document.
24     MS. SCHILLY: Yes, yes. This will be marked
25 as Exhibit 136.   02:43:11

Page 46

1     MR. DILLARD: I think 136 is the patent,
2  isn't it?
3     MS. SCHILLY: The patent should be 103.
4     MR. DILLARD: Oh, I'm sorry.
5     MS. SCHILLY: No, no problem. Okay.   02:43:24
6     And the exhibit should now be introduced.
7     (Whereupon, Deposition Exhibit 136 was
8  marked for identification by the Certified Shorthand
9  Reporter, a copy of which is attached hereto.)
10 BY MR. DILLARD:
11 Q. If you could look that document over and see if
12 you understand it.
13 A. I believe this is a summary of ASTM F2656.
14 Q. Okay. Do you see on the first page of -- well,
15 let me start again. There is a chart on the first page,   02:44:44
16 a couple of blue boxes that identify, you know,
17 particular standard. For example the top box is DOD
18 K-Ratings.
19     Can you make that out on your -- your copy?
20 A. Yes.   02:45:13
21 Q. And the -- DOD stands for department of defense?
22 A. Correct.
23 Q. Okay. And they have ratings in the next column
24 identified as K4, K8 and K12.
25     Do you know what those mean?   02:45:30

Page 47

1  A. I believe those are just categories for the --
2  for the resistance of the system.
3  Q. Right. And, you know, on any of these questions
4  you can feel free to scroll through the article.
5     But a K12 rating, is that the highest DOD rating   02:45:58
6  that you're aware of, or at least listed?
7  A. At least listed in this table.
8  Q. Okay. The K-Ratings reflect the speed of the
9  vehicle of 15,000 pounds; is that correct?
10 A. Well, the -- there are several K-Ratings. And   02:46:40
11 they each correspond to a vehicle that weighs 15,000
12 pounds, but that has different speeds.
13 Q. Right. In the final column there is a heading
14 penetration rating. And they have L1, L2 and L3.
15     Are you familiar with those?   02:47:15
16 A. Generally.
17 Q. What is the difference between an L2 -- L1, L2
18 and L3?
19 A. It's the degree of penetration that the vehicle
20 experiences.   02:47:30
21 Q. Okay. Do you know what the penetration -- the
22 level of penetration designated as L1 would be?
23 A. I don't know -- no, I do not.
24 Q. Okay. If I could call your attention to the --
25 the language below the second blue box on the first page   02:48:10

Page 48

1  that's in the red. And it does indicate penetration as
2  measured by three categories. L1 equals 20-50 feet. L2
3  equals 3-20 feet. L3 equals 3 feet or less.
4     Does that comport with your understanding of
5  those levels of penetration?   02:48:46
6  A. It explains, you know, the -- it provides a
7  legend for those penetration ratings, yes.
8  Q. All right. Now when it says L1 equals 20-50
9  feet, do you understand what that means?
10 A. Yes.   02:49:06
11 Q. What does that mean?
12 A. It means that the vehicle is stopped somewhere
13 within that distance from -- from the initial contact
14 with the barrier.
15 Q. Okay. So a vehicle can penetrate up to 50 feet   02:49:18
16 past the barrier and still the barrier would have a --
17 or could have an L1 penetration rating --
18     MS. ZAFONTE: Objection.
19 BY MR. DILLARD:
20 Q. -- is that correct?   02:49:40
21 A. It was between 20 feet and 50 feet.
22 Q. Okay. If you could scroll down to the second
23 page. In the two blue boxes -- well, in the three
24 columns, the first and third being -- or having a blue
25 background, this describes an ASTM crash test system; is   02:50:33

Page 49

13 (Pages 46 - 49)

Page 50

1 that correct?
2    A.  Yes.
3    Q.  And the ASTM system has four different vehicle
4 types; is that correct?
5    A.  Yes, yes.                          02:50:51
6    Q.  Okay.  And one is a passenger car, second is a
7 full size sedan, third is a pickup truck, and the fourth
8 is a heavy goods vehicle, correct?
9    A.  Correct.
10    Q.  And the small passenger car has a vehicle weight   02:51:17
11 of 2,430 pounds, correct?
12    A.  Yes.
13    Q.  And then the full size sedan is 4630 pounds;
14 pickup truck, 5,070 pounds; and heavy goods vehicle is
15 65,000 pounds, correct?                  02:51:48
16    A.  Correct.
17    Q.  So the ASTM has ratings for -- or penetration
18 ratings for four different speeds of those four
19 vehicles.  Providing ultimately -- I was going to say
20 16 different ratings, but the 65,000 pound vehicle       02:52:24
21 appears to have only three.
22       So under the ASTM standards there would be rating
23 levels for 15 different levels; is that correct?
24    A.  Yes, in that particular table there are 15
25 penetration ratings.                     02:52:48

Page 51

1    Q.  Okay.  So does resistance to rotation -- is it --
2 is resistance to rotation influenced by the force of the
3 impact on the bollard?
4    A.  Is the resistance to rotation influenced by the
5 force, no.  It's independent.            02:53:48
6    Q.  Is a determination of resistance to rotation
7 dependent on the impact --
8       MS. ZAFONTE:  Objection.  Vague.
9 BY MR. DILLARD:
10    Q.  How is resistance to rotation measured?    02:54:51
11    A.  Resistance to rotation is -- well, it's -- it's a
12 -- it's a property of the structure itself.  You could
13 determine how much rotation it would experience based on
14 vehicle weight and speed.  You could determine it either
15 by calculation or by test.               02:55:32
16    Q.  So if I understand you, the -- the amount of
17 rotation would be dependent on the collision force?
18       MS. ZAFONTE:  Mischaracterizes.  Yeah.
19 Objection.  Mischaracterizes.
20 BY MR. DILLARD:                          02:56:37
21    Q.  No, I'm asking.
22    A.  I didn't hear.  On the what force?
23    Q.  Oh, I'm sorry.
24       Would it be -- would the amount of rotation be
25 dependent upon the force of impact against the bollard?  02:56:54

Page 52

1    A.  The amount it experiences that -- yes, that is
2 one of the factors that would influence it.
3    Q.  Okay.  And the amount of the force on the bollard
4 -- or excuse me.
5       The amount of the impact force on the bollard      02:57:12
6 would be dependent on the weight of the vehicle, the
7 speed of the vehicle; is that correct?
8    A.  Those and other factors, yes.
9    Q.  What are some of the other factors?
10    A.  Another factor would be the -- the rigidity of    02:57:29
11 the vehicle that's impacting it.
12    Q.  Anything else?
13    A.  Also the angle at which the vehicle is impacting
14 it.
15    Q.  Anything else?                       02:58:03
16    A.  Those are the main ones that I can think of at
17 the moment.
18    Q.  Okay.  Would the weight distribution of the
19 vehicle have an influence on the amount of rotation?
20    A.  It could.                            02:58:32
21    Q.  Would the elevation of the impact of the vehicle
22 against the bollard -- would that have an influence on
23 whether -- or on the amount of rotation?
24    A.  Yes.
25    Q.  Would it be the case that an impact location      02:59:01

Page 53

1 higher up would produce more rotation than one that is
2 lower?
3    A.  All -- all other factors being equal, yes.
4    Q.  Okay.  You know, in this -- oh.
5       MR. DILLARD:  Can we bring up again the 6 --   02:59:43
6 or the 865 patent.
7 BY MR. DILLARD:
8    Q.  The one paragraph that I read at column two,
9 lines 55 through 64 talks -- or uses a phrase "the
10 resistive forces are all at the base of the bollard (at   03:00:10
11 the top of the trench)".
12       Can you describe -- can you describe by perhaps
13 looking at one of the drawings the location, the
14 specific location at the base -- that is reflected by
15 the phrase at the base of the bollard.        03:00:45
16    A.  So you want me to point to one of the figures
17 that's in the patent?
18    Q.  If that would be -- if you could just explain
19 what -- what that means, that would be fine.  But if
20 it's easier to show by reference to a figure.      03:01:07
21    A.  If you look at figure 26 in Exhibit 103, the 865
22 patent.
23    Q.  Have it.
24    A.  Okay.  The resistive forces would be along the
25 very bottom edge where the concrete sits on the soil.    03:01:54

14 (Pages 50 - 53)

Veritext Legal Solutions
866 299-5127

Page 58

1 an impact against the bollard -- bollard.
2     Do you recall that language?
3  A. Yes.
4  Q. Is there a specific impact that is contemplated
5 by the claims in your opinion?                    03:15:56
6  A. There is not a specific one that's mentioned,
7 other than a vehicle.
8  Q. Isn't it true that, you know, a particular
9 bollard structure might be able to resist rotation of
10 some impacts and not others?                      03:16:31
11  A. Yes.
12  Q. Is there a way to determine from the patent or
13 the patent claims how much of an impact force -- I
14 apologize.  These are -- framing questions aren't always
15 my forte.                                         03:17:17
16     Is there some standard by which rotation of the
17 bollards -- or excuse me.
18     Is there some standard for resistance of -- of a
19 bollard or bollards in the base from which someone can
20 determine whether the limitation of -- of resisting    03:17:59
21 rotation is met or not met?
22  A. Yeah, I think so.  I think an engineer would --
23 would interpret that to mean that number one, there is
24 no overall rotation of the entire unit, comes out of the
25 ground for instance.  And number two, there is no      03:18:35

Page 59

1 failure of any component of the unit.
2     Any shall we say permanent deformation, for
3 example, would be a type of failure.  So as long as it
4 doesn't overturn as a unit, and as long as there's no
5 failure of an individual component, the bollard for    03:19:04
6 example, then it has resisted rotation.
7  Q. Okay.  Now do you recall anything from the
8 written description portion of the patent that talked
9 about the overall amount of -- or the overall base
10 rotating?                                         03:19:34
11     MS. ZAFONTE: Objection.  Form.
12     Did you mean the specification?
13     MR. DILLARD: Well --
14     MS. ZAFONTE: Sorry.  I guess object.
15 Vague.  Sorry.                                    03:19:46
16     MR. DILLARD:  I actually did mean the -- the
17 written description.  But let me start over.
18 BY MR. DILLARD:
19  Q. Do you understand what the written description
20 is?                                               03:19:56
21  A. I understand that to mean anything except a
22 claim; is that correct?
23  Q. Right.  I would offer that that's correct.
24     And are you familiar with the term specification?
25  A. I thought that was synonymous with description,    03:20:14

Page 60

1 but maybe I'm not right on that.
2  Q. It's close.  It includes the original -- the
3 original filed claims.  Here where the original --
4 originally filed claims -- I'll make a representation
5 that they were cancelled, and the more current style of    03:20:35
6 claims were substituted for that.
7     MS. ZAFONTE: Objection.  I don't even think
8 that's true.  But okay.
9 BY MR. DILLARD:
10  Q. All right.  The -- in the written description    03:20:50
11 portion as you understood it, is there any description
12 the rotation of the entire base?
13  A. Yes.
14  Q. Okay.  Can you point me to it?
15  A. Well, I remember reading Dr. Eskandarian's    03:21:10
16 reports where he cited I think at least four paragraph
17 that talked about rotation and the base in the same
18 sentence.
19  Q. Can you take a look at Exhibit 103 and find any
20 instance where there is a reference to rotation of the    03:21:49
21 base?
22  A. 103 is the patent, correct?
23  Q. Yes.
24  A. The first instance I see is in column three, at
25 line starting -- paragraph starting with line five.    03:22:44

Page 61

1  Q. That sentence is, "The bollard system of this
2 invention is able to become more shallow (14 inches to
3 6.5 inches to 3 inches) by controlling the compliance
4 supplied by the foundation to resist the rotation at the
5 base of the bollard."                             03:23:21
6     So this is talking about resisting rotation at
7 the base of the bollard.
8     Doesn't that mean rotation of the bollard?
9  A. No.  Well, it means rotation at the base of the
10 bollard.  The only way that the base of the bollard or    03:23:44
11 the bottom of the bollard could rotate is if what it's
12 attached to rotated.
13  Q. Didn't you indicate that the bollard can rotate
14 at the point where it connects to the top surface of the
15 first structural member?                          03:24:12
16     MS. ZAFONTE: Objection.  Vague.
17     THE WITNESS:  If the -- if the bollard snaps
18 off from the base, then it will have rotated about the
19 very bottom of the bollard.
20 BY MR. DILLARD:                                   03:24:33
21  Q. When a bollard is bent back to an angle other
22 than vertical, the bend is at the point where it
23 connects to the base; is that correct?
24  A. No, I would not say that.  If -- if the -- if the
25 base is let me say infinitely rigid, okay, no    03:25:16

16 (Pages 58 - 61)

| | |
|---|---|
| 1 A. Well, a -- an I-beam for example is not as | 1 A. Correct. |
| 2 efficient as a tube. | 2 Q. Okay. I gave you two alternatives. |
| 3 Q. Why is that? | 3 Might it be or would it be? |
| 4 A. It's just structural mechanics. | 4 A. It could be a structural member combined with |
| 5 Q. Are there benefits to using an I-beam over a   03:36:04 | 5 concrete.                   03:40:08 |
| 6 tube? | 6 Q. Number six in this paragraph in column 3 says |
| 7 A. Sometimes. | 7 ability to place bollard in different locations in the |
| 8 Q. In this application of the bollard structure? | 8 base (for example placing the bollard at the back of the |
| 9 A. Not really. | 9 base makes the system weaker). |
| 10 Q. Is there advantages of using a tube over the   03:36:33 | 10 First of all, why would -- why would the ability   03:40:31 |
| 11 I-beam? | 11 to place a bollard at different positions help the more |
| 12 A. It's a more efficient shape than the I-beam. | 12 efficient transfer of impact load? |
| 13 Q. Okay. Number five is a stiffer base. | 13 A. I'm sorry, I didn't quite understand that |
| 14 How does stiffness of the base come into play? | 14 question. |
| 15 A. A stiffer base will reduce the amount of rotation   03:36:56 | 15 Q. Well, these enumerated items are -- are things   03:41:17 |
| 16 that's experienced. | 16 that would enhance the more efficient transfer of the |
| 17 Q. And can you explain why that is? | 17 impact load. |
| 18 A. It's just the nature of the meaning of the word | 18 And I was wondering how does the position of the |
| 19 stiffness. The stiffness member that is more stiff will | 19 bollard provide that enhancement? |
| 20 deflect less than another.          03:37:27 | 20 A. Well, if the bollard is placed on the side that's   03:41:45 |
| 21 Q. And what is the stiffness of the base dependent | 21 closer to the impacting vehicle, it's more efficient. |
| 22 on? | 22 Q. But isn't it -- all right. |
| 23 A. It's dependent on the arrangement of the | 23 Is this -- is this number six item simply saying |
| 24 structural members that comprise it, dependent on the | 24 that the best way of -- or the best placement of the |
| 25 actual shapes that are used for those members. Those   03:37:56 | 25 bollards is exactly what we have shown in the drawings,   03:42:21 |
| Page 66 | Page 68 |

| | |
|---|---|
| 1 are the main -- main items. | 1 for example? |
| 2 Q. Is it dependent on the type of concrete you use? | 2 A. I'm not sure the drawings show the direction of |
| 3 A. Not so much. | 3 impact. |
| 4 Q. Okay. Is it dependent on whether or not you're | 4 Q. I believe you're right. Assume. Always assume. |
| 5 using rebar?                  03:38:20 | 5 All right. All right. So thank you. Let's see.      03:43:10 |
| 6 A. Not so much. | 6 So the -- the number seven is the addition of |
| 7 Q. What is the purpose of the rebar in the -- the | 7 internal stiffeners both inside the tubes forming the |
| 8 bollard structures? | 8 base and inside the pipe forming the bollard. |
| 9 MS. ZAFONTE: Objection. Vague. | 9 And is that just another case where stiffness is |
| 10 THE WITNESS: You mean with respect to the   03:38:42 | 10 better?                    03:43:42 |
| 11 865 system or other systems? | 11 A. No, that's different. |
| 12 BY MR. DILLARD: | 12 Q. Okay. |
| 13 Q. Yes. Thank you. Yes, yes. No, the 865. | 13 A. This is -- the stiffeners are small connecting |
| 14 A. So the 865 system is basically to make the | 14 pieces that are used to -- to connect the structural |
| 15 concrete act as a unit, to stitch it together, shall we   03:39:00 | 15 members to each other. And using them may allow you   03:43:56 |
| 16 say. | 16 to -- to use the more efficient structural member than |
| 17 Q. Does it act like a structural member? | 17 you would be able to otherwise. |
| 18 A. I would not -- I would not say that, no. The -- | 18 Q. Okay. And finally there's a catchall. Number |
| 19 the reinforced concrete for the 865 is basically a | 19 eight is others. |
| 20 ballast. It's not a structural member.       03:39:26 | 20 Are you aware of any other enhancements that   03:44:18 |
| 21 Q. Okay. Is rebar considered a structural member in | 21 might fall under item eight? |
| 22 this application? | 22 A. Not specifically. |
| 23 A. I don't consider rebar to be a structural member | 23 Q. A bit down in column 3 at line 44, it's in the |
| 24 in and of itself when this is combined with concrete. | 24 middle of the paragraph starting at line 39, there is a |
| 25 Q. Okay. Then the combination might be or would be?   03:39:47 | 25 sentence that says, "The base or pad is completed on   03:45:09 |
| Page 67 | Page 69 |

1  site, by filling the shallow excavation and grillage" --
2  oops -- and grillage "with concrete to form a finished
3  foundation unit."
4      So the base is not finished until the concrete is
5  added?                              03:45:42
6      MS. ZAFONTE: Just to instruct the witness
7  obviously to read around anything if he needs to.
8      THE WITNESS: I'm sorry, what was -- what
9  was the question?
10 BY MR. DILLARD:                     03:46:07
11 Q. Well, it appears to say that the grillage is not
12 completed until the concrete has been poured or added to
13 the base.
14 A. It says that -- it doesn't say the grillage is
15 not completed. The grillage is already complete.    03:46:31
16 Q. So I'm -- did I -- oh, I misspoke then.
17    I was talking about the base is not completed
18 until the concrete has been added.
19 A. Yeah, the base or the pad it's called, and it
20 forms a finished foundation unit.    03:46:55
21 Q. You know, Mr. Peraza, you mentioned that there
22 were other instances where bollard and base were in the
23 same sentence -- where the words bollard and base were
24 in the same sentence?
25 A. Correct.                         03:49:10
                                        Page 70

1  structure would look like according to the invention?
2  A. Well, it would have a grillage in the base, which
3  would obviously be fewer members than -- than if there
4  were multiple bollards. That's the main difference.
5  Q. Okay. Does the term grillage denote a certain    03:52:41
6  number of structural members?
7  A. No, not a certain number. But it implies that
8  the members are perpendicular to each other or
9  intersecting each other.
10 Q. Okay. Could it -- could the base look like a --   03:53:13
11 an X or perhaps a T?
12    You know, have a shape of either of those?
13 A. An X or a what?
14 Q. T, as in, you know -- or a cross-like shape.
15 A. Well, I believe that -- I think it was one of the 03:53:54
16 provisional applications showed a depiction or a figure
17 of the single bollard system. And it was -- it was not
18 a plus sign or a T or an X. It was -- it was still a
19 grillage.
20 Q. Okay. Now the sentence says that without an       03:54:25
21 extended base or pad, there is not sufficient resistance
22 to stop the rotation of the pipe bollard, when -- does
23 that sentence mean that there must be an -- a longer or
24 wider pad than what would normally be used?
25    Actually, let me ask it a different way.    03:55:18
                                        Page 72

1  Q. Which is in connection with whether there is a
2  description of the base rotating. You identified one
3  sentence in the column 3 paragraph that we've been
4  discussing.
5     Can you identify the other two?    03:49:32
6  A. I'll look for those now. Column 5.
7  Q. Can you identify that?
8  A. 41. Excuse me?
9  Q. Oh, I'm just asking about the lines.
10    You said 41?                      03:50:49
11 A. Yes, 41.
12 Q. Is it the first sentence?
13 A. Yes.
14 Q. I'm sorry, I didn't catch that.
15 A. Yes, it is the first sentence.    03:51:23
16 Q. All right. Thank you. Let me read it. So at --
17 this would be line 38.
18    "The bollard system of this invention does not
19 lend itself to the installation of a single bollard,
20 since without an extended base or pad, there is not    03:51:44
21 sufficient resistance to stop the rotation of the pipe
22 bollard."
23    Did I read that correctly?
24 A. Yes.
25 Q. Okay. Can you describe what a single bollard    03:51:58
                                        Page 71

1     What is your understanding of the phrase without
2  an extended base or pad?
3  A. I understand that to mean that extended is in a
4  direction that's perpendicular to the direction of
5  impact. So if there's only -- if there are -- there's    03:55:43
6  only one bollard, then your base is going to be not as
7  long as if you had two bollards or three bollards or
8  four bollards.
9  Q. So without the extension, it says there is not
10 sufficient resistance to stop rotation of the pipe's    03:56:26
11 bollard.
12    Can you quantify what -- what not sufficient
13 resistance means?
14 A. I think it means it would be breached.
15 Q. Is it -- okay -- or strike that.    03:56:52
16    You've indicated that breaching the system means
17 the breach is synonymous with penetration. We know
18 there's different levels of penetration, for example as
19 what's identified in the department of defense standard.
20    Is the amount of penetration quantifiable --    03:57:41
21 A. Well, first of all --
22 Q. -- before there's the insufficient rotation?
23 A. Let me back up a minute. Because I said
24 penetration is only one way of breaching the system.
25 The other way is the rotation of the -- of the unit. I    03:58:06
                                        Page 73

Veritext Legal Solutions
866 299-5127

1 guess is penetration, yeah.

2     Okay.  So could you ask that question again?

3 Q. What I'm trying to understand is how much of a --

4 how much of a breach is a breach, which is -- you don't

5 have to answer that.     03:58:57

6     The -- if the breach is by penetration, is there

7 an amount of penetration that would signify that there's

8 not sufficient resistance to rotation?

9     MS. ZAFONTE:  Objection.  Asked and

10 answered.     03:59:26

11     THE WITNESS:  I think a breach is if the

12 vehicle passes the bollards in any -- any significant

13 distance.

14 BY MR. DILLARD:

15 Q. Okay.  Does a vehicle still need to be operable?  03:59:40

16 A. It's irrelevant.

17 Q. This sentence in the column 5 about without an

18 extended base or pad, there is not insufficient

19 resistance to stop the rotation of the pipe bollard,

20 that doesn't provide any information as to the level of  04:00:19

21 impact that the single bollard structure would be --

22 that would be provided or -- let me start over.

23     The -- this -- the sentence doesn't require any

24 particular level of impact, correct?

25 A. Correct.     04:00:58

Page 74

1 one, but a different aspect of this clause.

2 Q. All right.  So actually I'm -- I'm sorry, I was

3 at the wrong paragraph.

4     So is this a -- it would be the sentence starting

5 at line 60?     04:05:41

6 A. Yes.

7 Q. Okay.  So that sentence reads, "In the shallow

8 mount bollard system of this invention, the resistive

9 forces are all at the base of the bollard (at the top of

10 the trench) and therefore reduced the likelihood of the  04:05:58

11 bollard rotating and vehicle breaching the security

12 system."

13     That's the -- the sentence that you were

14 referring to?

15 A. Correct.     04:06:11

16 Q. Okay.  We've been going for a little while.

17 Mind if we take a five, ten minute break?

18 A. That's fine.

19     MR. DILLARD:  All right.

20     THE VIDEOGRAPHER:  This marks the end of  04:06:39

21 Media Number 4.  The time is 4:06 PM.

22     We are off the record.

23     (Recess taken.)

24     This marks the beginning of media Number 5.

25     The time is 4:18 PM.  We are on the record.  04:19:22

Page 76

1 Q. So for some impacts it might be resistant to

2 rotations, correct?

3 A. Well, this says for -- it's going to resist

4 rotation of the impact, whatever the impact is.

5 Q. Does it -- it's not going to be -- it will not  04:01:25

6 have sufficient resistance.

7     So if it was hit by a golf cart you would -- you

8 would expect that to be able to resist rotation, right?

9 A. Possibly.

10 Q. You know, light sedans, Kias, you know, bollards  04:01:45

11 can resist rotation from impacts from lightweight cars,

12 where they may not be able to resist rotation from heavy

13 trucks; is that a fair statement?

14 A. Yes.

15 Q. Okay.  Okay.  So that was your second excerpt in  04:02:13

16 the -- in the patent that referred to resistance or

17 rotation that -- or what other excerpt are you relying

18 on in support that there's a description of the base

19 rotating?

20 A. And you're looking for citations that are other  04:02:51

21 than in the claim?

22 Q. Yes, yes.

23 A. Another one is backing up.  And we may have

24 talked about this one before.  It's in column 2, line --

25 starting at line 60.  And I think we talked about this  04:04:06

Page 75

1     MR. DILLARD:  Ms. Schilly, would you

2 introduce the Turpin published -- or publication as our

3 next exhibit.

4     MS. SCHILLY:  Yes.  This will be 137.

5     (Whereupon, Deposition Exhibit 137 was  04:19:59

6 marked for identification by the Certified Shorthand

7 Reporter, a copy of which is attached hereto.)

8     And excuse me.  For the record, this it

9 Bates stamped with DS00002830.  And it should now be

10 introduced.     04:20:29

11 BY MR. DILLARD:

12 Q. There we go.

13 A. I see it.

14 Q. Mr. Peraza, the claims of the 865 patent don't

15 refer to an active or passive system, do they?  04:21:10

16 A. I don't believe so.

17     MS. ZAFONTE:  And just, David, I'm going to

18 in object to that question because I wasn't sure if you

19 were talking about the claims literally or if the

20 invention as a whole refers to an active versus passive  04:22:17

21 system?  So I'll just object as vague after the fact.

22 BY MR. DILLARD:

23 Q. Mr. Peraza, you have -- or strike that.

24     Have you reviewed the Turpin publication number

25 2004/0033106 A1 -- is that correct?     04:22:58

Page 77

20 (Pages 74 - 77)

1  assumptions made.
2      And it's the case -- is it not -- that under this
3  scenario the -- there was a -- let me -- the bolt that
4  held the bollards to the rotating rod shared.
5      Is that your understanding?          05:08:11
6      Or let me ask it a different way?
7      What is your understanding as to what the end
8  result of this -- this calculation was?
9          MS. ZAFONTE: Objection. Vague.
10         THE WITNESS: I have not reviewed this     05:08:29
11 calculation in detail. So I'm not sure what the end
12 result is.
13 BY MR. DILLARD:
14     Q. Okay. Well, then let me ask you.
15     In paragraph 42 -- well, the last sentence says,     05:08:42
16 "Accordingly, additional security against such a failure
17 of the bollards at the point of rotation, i.e. at the
18 rod 26 and the support bushings 32 therefore, steel
19 traps of one half inch by 16 inch may be secured around
20 the bushings."          05:09:25
21     So is that statement a recommendation for how to
22 avoid the failure that was described in this
23 hypothetical situation, if you know?
24     A. I just want to understand the context here. I'm
25 looking to see what item 26 is that they mention.     05:10:14

Page 94

1      Q. 26 with would be the rotating rod.
2      A. So yes, it looks like this paragraph 42 is
3  talking about a way to strengthen or reinforce the
4  structure so that it doesn't fail, so that the tubes
5  don't fail or the rod doesn't fail.          05:11:12
6      Q. So is it fair to say that this hypothetical
7  calculations provide information for a reader that would
8  be useful in constructing a bollard structure like
9  Turpin?
10         MS. ZAFONTE: Objection. Incomplete     05:11:45
11 hypothetical.
12         THE WITNESS: I don't see it that way. It
13 seems like he's thinking out loud here and not -- not
14 providing a -- a solution.
15 BY MR. DILLARD:          05:12:10
16     Q. If a bollard failed -- well, strike that.
17     The particular embodiment or a particular
18 embodiment described in the Turpin publication has
19 bollards that are constructed four inches by four inches
20 by one half steel posts, that's at the paragraph 27,     05:12:43
21 would a person of ordinary skill in the art under --
22 well, let me ask a preliminary question.
23     Would increasing the size or thickness of the
24 bollards reduce the chance of failure?
25         MS. ZAFONTE: Objection. Incomplete     05:13:26

Page 95

1  hypothetical.
2          THE WITNESS: Would -- would reducing the
3  size of the bollards -- I didn't quite --
4  BY MR. DILLARD:
5      Q. No. Increase -- increasing the size or     05:13:37
6  thickness.
7      A. Okay.
8      Q. Would they make the bollard structure more
9  resistant to failure?
10     A. It depends. It depends on -- on all of the links     05:13:51
11 in the chain.
12     Q. All right. So if one made all the links in this
13 chain stronger, one would expect that there would be
14 less chance of failure.
15     A. Correct.          05:14:16
16     Q. Okay. If a person of ordinary skill in the art
17 had the Turpin publication and read through it, would
18 that person have enough knowledge to improve on the
19 Turpin design by making it stronger or -- or otherwise?
20     In other words, would they have the know-how     05:15:00
21 to -- to do that?
22         MS. ZAFONTE: Objection. Incomplete
23 hypothetical.
24         THE WITNESS: I mean I wouldn't start with a
25 system like the -- like the Turpin system in order to     05:15:13

Page 96

1  get to the system that's described in the 865 patent.
2  They're completely different.
3  BY MR. DILLARD:
4      Q. I'm not asking about whether somebody would take
5  this and wind up with the 865 system.          05:15:33
6      But to -- to improve on Turpin so that the
7  failure that is described here in the hypothetical
8  situation doesn't actually occur.
9      A. Right, I don't think they need Turpin for that
10 purpose. I think that is what an engineer -- an     05:16:02
11 engineer would design against all types of failure or
12 accept some level of failure as acceptable. So for
13 example, like in paragraph 31, they accept that there's
14 going to be yield of the bollards and the bollards
15 deform.          05:16:38
16     Q. Well, let me ask it this way.
17     If a person of ordinary skill in the art wanted
18 to make the system of Turpin stronger such that the
19 bollard didn't yield, would they know how to do that?
20         MS. ZAFONTE: Objection.          05:17:06
21         THE WITNESS: Yes.
22 BY MR. DILLARD:
23     Q. Your report has some descriptions of the DSC501,
24 wedge type barrier, correct?
25     A. Yes.          05:19:06

Page 97

25 (Pages 94 - 97)

1   Q. Are you -- before this -- before our case were
2   you familiar with wedge barriers?
3   A. Yes.
4   Q. Okay. The -- the DSC501 has a height of -- in
5   the image that you included on page 21 of your report      05:19:50
6   would indicate 18.0 inches.
7       Do you consider that to be --
8       MS. ZAFONTE: Sorry, David. Can you just
9   direct us to where in the report you're talking about
10  just so we can follow along in realtime?                    05:20:10
11      MR. DILLARD: You bet. Page 21.
12      MS. ZAFONTE: Thank you.
13      THE WITNESS: Page 21 where?
14  BY MR. DILLARD:
15  Q. In the figure that's -- the image that's shown.   05:20:56
16  A. Right.
17  Q. Do you consider -- okay.
18      Do you consider a 18 inch barrier, 18 inch high
19  barrier as requiring something other than a shallow
20  excavation?                                                 05:21:40
21      MS. ZAFONTE: Objection. Vague.
22      THE WITNESS: The excavation required for
23  the system is going to be more than the 18 inches.
24  BY MR. DILLARD:
25  Q. You understand that the DSC501 when installed    05:22:17
                                                        Page 98

1   will have an area within the interior that's filled with
2   concrete with rebar; is that true?
3   A. Yes.
4   Q. Okay. And what is your understanding as to the
5   purpose of the concrete and rebar?              05:22:51
6   A. It's the -- it's structural concrete, and it
7   extends beyond the boundary of the vault itself to
8   engage the surrounding soil or concrete in order to
9   anchor it down.
10  Q. Okay. What is the purpose of putting concrete    05:23:15
11  within the interior of the bush barrier?
12  A. Well, in this case if you didn't continue it to
13  the interior, then those wings, shall we call them, that
14  extend outside would just break off. So it needs to be
15  continuous through. It does have the -- what are      05:23:43
16  collateral benefit of adding -- of adding mass.
17  Q. All right. If you could go to page 23 of your
18  report.
19  A. Okay.
20  Q. There's a beginning discussion that -- regarding   05:25:35
21  the DSC800RFB.
22  A. I see it.
23  Q. And the -- the -- there's an image of that on the
24  top of page 24; is that correct?
25  A. Yes.                                        05:26:06
                                                        Page 99

1   Q. Okay. In paragraph 106 you say at the end of
2   that paragraph -- or second to -- second sentence to the
3   end, "No concrete or other media exists between the
4   plate but rather the sleeve is surrounded by rebar and
5   concrete."                                    05:26:59
6       This is a structure that has an upper plate and a
7   lower plate and a cylindrical tube between the two, is
8   that how you describe it?
9   A. Correct.
10  Q. The plates are larger than the -- or than the   05:27:19
11  outer circumference of the tube, correct?
12  A. Slightly.
13  Q. When the DSC800RFB is installed, there would be
14  concrete and rebar surrounding the upper plate, lower
15  plate and cylindrical tube, correct?              05:28:19
16  A. No, not initially.
17  Q. When installed?
18  A. When you install that sleeve, at that moment
19  there is no concrete.
20  Q. With respect to the RSA bollards that practice    05:28:32
21  the 865 patents, when they are initially put into the
22  excavation are they already filled with concrete?
23  A. No.
24  Q. So in the context of the RSA bollards, or the --
25  excuse me, the 865 bollards, they're completed by the   05:29:20
                                                        Page 100

1   addition of concrete and rebar if needed; is that
2   correct?
3   A. The foundation is correct.
4   Q. In paragraph 108 you say that, "The bollard
5   system of the 865 patent is fundamentally different from   05:30:39
6   that of the" DC -- "DSC800" -- excuse me -- "RFB. The
7   base of the 865 invention is a grillage of intersecting
8   linear structural members, whose axes lie in a
9   horizontal plane."
10      Now that is -- that is accurate -- let me ask   05:31:04
11  you.
12      Is that an accurate description of the bollard
13  structures that are described in the written description
14  and including the drawings?
15      MS. ZAFONTE: Objection. Vague.         05:31:39
16      In the 865 patent, you mean?
17  BY MR. DILLARD:
18  Q. Yes, yes.
19  A. Yeah.
20  Q. Do you also believe that that's an accurate   05:31:49
21  description for bollard structures that are claimed by
22  the claims in the 865 --
23      MS. ZAFONTE: Objection.
24  BY MR. DILLARD:
25  Q. -- sentence?                                05:32:14
                                                        Page 101

Veritext Legal Solutions
866 299-5127

**EXHIBIT 13**

                                                        Page 1

1                    UNITED STATES DISTRICT COURT
2                   CENTRAL DISTRICT OF CALIFORNIA
3

4

5    RSA PROTECTIVE TECHNOLOGIES,      )
     LLC;                              )
6                                      )
                    Plaintiff,         )
7                                      )  Case No.
         vs.                           )  2:19-cv-06024 JAK
8                                      )  (PLAx)
     DELTA SCIENTIFIC                  )
9    CORPORATION;                      )
                                       )
10                   Defendant.        )
     _____)
11

12

13

14

15        VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF
16                    DR. AZIM ESKANDARIAN
17                    Blacksburg, Virginia
18               Thursday, December 17, 2020
19

20

21

22

23   Reported by:
     Lynda L. Fenn, CSR, RPR
24   CSR No. 12566
25

Page 2

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5  RSA PROTECTIVE TECHNOLOGIES,   )
    LLC;                          )
 6                               )
                                 )
         Plaintiff,   )
 7                   ) Case No.
         vs.          ) 2:19-cv-06024 JAK
 8                   ) (PLAx)
    DELTA SCIENTIFIC        )
 9  CORPORATION;           )
                          )
10       Defendant.   )
    _____)
11
12
13
14
15      VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE
16  of DR. AZIM ESKANDARIAN, taken on behalf of
17  Plaintiff, Blacksburg, California, at 10:58
18  a.m. and ending at 6:11 p.m., Thursday,
19  December 17, 2020, reported by Lynda L. Fenn,
20  CSR No. 12566, Certified Shorthand Reporter
21  within and for the State of California,
22  pursuant to notice.
23
24
25
```

Page 3

```
 1  APPEARANCES (Appearing via Videoconference):
 2  For the Plaintiff:
 3     HAUG PARTNERS, LLP
         BY:  JOSEPH V. SAPHIA, ESQ.
 4          JESSICA ZAFONTE, ESQ.
         745 Fifth Avenue, 10th Floor
 5       New York, New York  10151
         (212) 588-0800
 6       jsaphia@haugpartners.com
         jzafonte@haugpartners.com
 7
       For the Defendants:
 8
         LEWIS ROCA ROTHGERBER CHRISTIE, LLP
 9         BY:  DAVID A. DILLARD, ESQ.
              CONSTANTINE MARANTIDIS, ESQ.
10             SAMI SCHILLY, ESQ.
         655 North Central Avenue, Suite 2300
11       Glendale, California  91203-1445
         (626) 795-9900
12       ddillard@lrrc.com
         cmarantidis@lrrc.com
13       sschilly@lrrc.com
14  Also Connected:
15     Annette McGuire
16     Christian Teare, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             I N D E X
 2  EXAMINATION BY:              PAGE
 3  MR. SAPHIA              8
 4
 5
 6
          E X H I B I T S
 7
    NUMBER      DESCRIPTION        PAGE
 8
    Exhibit 1   A five-page document entitled   35
 9     Mechanical Engineer vs.
          Structural Engineer
10
    Exhibit 2   A two-page document entitled    42
11     Construction Engineering and
          Management, Virginia Tech
12
    Exhibit 3   A two-page document entitled    45
13     Mechanical Engineering,
          Virginia Tech
14
    Exhibit 4   A one-page document entitled    47
15     Tags, Results for Engineering
          Options
16
    Exhibit 5   A 184-page document entitled    49
17     Opening Expert Report of
          Dr. Azim Eskandarian
18
    Exhibit 6   A 12-page document entitled    114
19     United States Parent and
          Trademark Office Ex Parte
20     Re-Examination Communication
          Transmittal Form
21
22
23
24
25
```

Page 5

```
 1     E X H I B I T S (Continued)
 2  NUMBER      DESCRIPTION        PAGE
 3  Exhibit 7   A 138-page document entitled   133
          Department of Defense Handbook
 4        Selection and Application of
          Vehicle Barriers
 5
    Exhibit 8   A 187-page document entitled   178
 6        Defendant Delta Scientific
          Corporation's Preliminary
 7        Invalidity Contentions
 8  Exhibit 9   A ten-page document entitled   185
          United States Patent
 9        Application Publication,
          Turpin, et al., US
10        2004/0033106 A1, February 19,
          2004
11
    Exhibit 10   A 94-page document entitled   206
12        Declaration for Utility of
          Design Patent Application;
13        DS00000139 - DS00000232
14  Exhibit 11   A 44-page document entitled   209
          Provisional Application for
15        Patent Cover Sheet;
          RSA-DELTA043770 -
16        RSA-DELTA043813
17  Exhibit 12   A one-page schematic previously   210
          marked at Exhibit No. 8
18
    Exhibit 13   A 236-page document entitled   213
19        Provisional Application for
          Patent Cover Sheet -
20        RSA-DELTA043814 -
          RSA-DELTA044049
21
    Exhibit 14   A four-page document entitled   233
22        DSC501 9-Foot Top Assembly;
          DS00002392 - DS00002395
23
24
25
```

2 (Pages 2 - 5)

Page 10

1 would expect an honest and forthright answer; is that
2 okay?
3      A   Sure.
4      Q   Okay.  I think the court reporter might
5 caution you that if -- a nod might not be something
6 that she would necessarily hear and then she won't
7 record it.  So an oral answer is probably best.
8          Let me start this way, and I always do this
9 with experts, I always find it fascinating:  When did
10 you start working for -- well, let me ask you this:
11 Are you working for the firm, Lewis Roca, or are you
12 working for Delta Scientific?
13      A   I'm not working for either one.
14      Q   Okay.  Well, who -- who sends you checks?
15      A   It comes through a third-party company that
16 found me.
17      Q   Okay.  Was this -- does this company have a
18 stable of experts that they market to law firms?
19      A   I assume so.  I don't know the companies.
20 This is the first time they contacted me.
21      Q   What is the name of the company?
22      A   Teklicon, I think.  Teklicon.
23      Q   Okay.  So when did Teklicon -- let me say
24 it.
25          How is that spelled, "Teklicon"?

Page 11

1      A   I can tell you in a second.
2      Q   Okay.
3      A   Let me go to my email.
4      Q   Doctor, don't worry it's probably
5 identified on some of the documents on your resume,
6 so don't worry, we'll find it.
7          Before I go any further I should ask you to
8 state your name -- your full name and address for the
9 record.
10      A   My name is Azim Eskandarian.  My address is
11 602 Jefferson Street Blacksburg, Virginia 24060.
12      Q   I would only caution you that if I try to
13 say your name three times, it may come out different
14 each time.  It is not meant to be a slight.  It is an
15 affliction of mine, okay, especially when they become
16 multiple syllabic then it becomes an issue.  Okay.
17 So I apologize in advance.
18          When did you -- when were you approached to
19 work on this case?
20      A   I believe it was October of 2020.  It could
21 be September, October.
22      Q   Okay.  So within the last 60 to 90 days?
23      A   Yes.
24      Q   Okay.  And when you were approached -- and
25 I'm not asking for any privileged information now.  I

Page 12

1 just want to know who approached you and who first
2 made contact with you from, I assume, the Lewis Roca
3 firm?
4      A   From Lewis Roca firm, I think my first
5 contact with Mr. David Dillard and Sami.
6      Q   Okay.  And that was either September or
7 October of 2020; correct?
8      A   Correct.
9      Q   Prior to that had you had any interest in
10 this case or opinions or knowledge of the case
11 between RSA and Delta Scientific?
12      A   No, I didn't.
13      Q   Okay.  So do you have any understanding of
14 why they approached you?
15      A   Because my expertise, I assume.
16      Q   Okay.  So they -- they had already filed
17 various papers in this case, they meaning Lewis Roca,
18 on behalf of Delta Scientific.  You didn't have
19 anything to do with any of those papers; am I
20 correct, prior to your expert reports?
21      A   Correct.
22      Q   Once you were hired what did they ask you
23 to do?
24      A   They presented some of the -- they
25 explained the case and they asked me to read some of

Page 13

1 the materials and review patents.
2      Q   Were you asked to do any prior art research
3 on your own?
4      A   Yes.
5      Q   Okay.  And did you --
6      A   Very little.
7      Q   Could you describe that for me?
8      A   In what sense?  Describe what part of it?
9      Q   Well, I -- I was going to think -- they had
10 filed various papers, which you probably reviewed;
11 right?
12      A   Some of it.  Some of it.
13      Q   And -- yeah.  Let's say, they were -- I'll
14 give you one that you probably remember.  Preliminary
15 invalidity contentions.
16          Does that ring a bell?
17      A   Yes.
18      Q   Okay.  In that paper there were multiple
19 pieces of prior art that are being relied upon by
20 Delta Scientific in their validity challenge to the
21 '865 patent.
22          Is that your understanding?
23      A   Yes.
24      Q   Okay.  So what I was really kind of asking
25 you is if you had added, for the purposes of your

4 (Pages 10 - 13)

Page 14

1  report, any information that was not already
2  described in the papers that Delta Scientific had
3  previously filed in this case?
4      A   Yes, there's plenty of writing in my
5  declaration.
6      Q   Okay.
7      A   I did research review.  I wrote many stuff.
8      Q   Yeah, what I was -- what I was really
9  getting to is if you had independently searched for
10  prior art outside of what was provided to you by
11  Delta Scientific's counsel?
12      A   Yes.
13      Q   Okay.  And did you -- do you have records
14  of those searches?
15      A   When I -- I don't have records of search,
16  but I wrote about it in my declaration.
17      Q   Okay.  So I call it a report.  You're
18  calling it a declaration, which is fine.  That's fine
19  by me.
20          I would say when we get to your report and
21  we start looking at it -- and I don't want to have to
22  repeat it all the time -- could you tell me what was
23  your idea or what information you added personally
24  through this -- your research versus what they gave
25  you?

Page 15

1      A   Well, it's --
2          MR. DILLARD:  Objection as to form.
3          THE WITNESS:  It's -- it's --
4          MR. SAPHIA:  What, I'm sorry?
5          THE WITNESS:  There was an objection.  Am I
6  supposed to wait?
7          MR. DILLARD:  Dr. Eskandarian, yeah, I may
8  from time to time pose -- or interject an objection.
9  But unless I instruct you not to answer, you should
10  provide an answer, if you can.
11          THE WITNESS:  Sure.  I worked on this
12  report with the counsel so -- we collaborated, so
13  there's a lot of material in here, about a
14  hundred-some pages.
15          MR. SAPHIA:  Uh-huh.
16          THE WITNESS:  That we collaboratively
17  produced.  So a lot of it is my idea and my writing.
18          MR. SAPHIA:  Okay.
19          THE WITNESS:  Some of it is theirs.
20          MR. SAPHIA:  Okay.
21  BY MR. SAPHIA:
22      Q   So, I wasn't really asking about how the
23  report was produced.  I was asking about what you did
24  independently from counsel.  So let me give you an
25  example.

Page 16

1          Let's say you know that obviousness is an
2  issue in the case; correct?
3      A   Correct.
4      Q   And you know that some pieces of art are
5  relied upon by counsel prior to you getting on board
6  that were already described; correct?
7      A   Well, no.  I mean, the pieces of art that
8  you are referring -- the patents, I reviewed the
9  patents myself and I formed the opinion on it and I
10  shared it with -- with the counsel.
11      Q   Oh, no, no, I -- I understand.  I'm not
12  saying that you didn't read what they gave you and
13  read the patent.  That's not the question I'm asking
14  you.
15          I'm asking whether you undertook an
16  independent search of the patent literature to look
17  for art, other than what was provided to you by Delta
18  Scientific?
19      A   Yes, I looked and there's some of that I
20  cited in my report and my declaration.
21      Q   Okay.  So I'll get to that in a moment
22  then.
23          All right.  Is there any particular piece
24  of art that's referred to in your report that was
25  not -- that was your find from the research that you

Page 17

1  did?
2      A   There is a number of them.  I believe the
3  references to the state department regulation, to
4  ASTM, various references.
5          I can't -- I have to read through my report
6  to remember everything.
7      Q   Okay.
8      A   But there's a number.
9      Q   Those -- those I put into the category of
10  maybe background documents.
11          Would you agree with that?
12      A   You can call it however you like.
13      Q   Right.  But it's not -- but those documents
14  that you just cited are not being relied upon in your
15  invalidity argument, per se; am I correct?
16      A   Actually, no, they are heavily relied upon
17  because they are the material that described what
18  about it or the anti-ram system to be designed.
19      Q   Okay.  You mentioned the Turpin reference;
20  right, in your report?
21      A   Turpin is one of the references that I
22  reviewed.
23      Q   Right.  There's not -- does that not give
24  you sufficient background or an idea about what was
25  required in the art at the time of the invention?

5 (Pages 14 - 17)

Page 18

1    A   To some degree it did.
2    Q   Okay.  And that means to some degree it
3 didn't?
4    A   You know, I have my knowledge of what was
5 in the -- what's in the requirements for ASTM, DOS
6 and others and I read the Turpin.  You know, it's my
7 interpretation of what it is saying versus what I
8 knew, so it's hard for me to comment at the time on
9 what you ask.
10    Q   Okay.  Was Turpin -- was the inclusion of
11 Turpin a piece of art in your obviousness
12 argument, your idea or Delta Scientific's idea?
13    A   They asked me to review as -- as one of the
14 prior arts, so I have -- you know, I have reviewed it
15 and I considered both my idea and their idea because
16 we collaborated and we produced in the report.
17    Q   Okay.  The only reason why I'm asking is
18 because in -- in the preliminary contentions of Delta
19 Scientific, they set out a number of references that
20 they rely on for their allegations that the '865
21 patent is invalid and it seems to be that coextensive
22 with your report.
23       In other words, your report cites the same
24 art for the same proposition that they cited in a
25 document that was created months before you had even

Page 19

1 joined the team.
2       So that's why I'm asking you if there's
3 anything that you, yourself, came up with in prior
4 art outside of these background documents that --
5 that you brought to their attention rather than them
6 bringing to yours.
7       That's a long-winded question, and
8 Mr. Dillard is about to object to it, but I had to
9 give you a number of assumptions so that I can come
10 to my grand conclusion.
11       So if you understand what I asked you, then
12 you can answer it, and if not Mr. Dillard will make
13 his objection and I'll rephrase it.
14       MR. DILLARD:  Objection as to form.
15       THE WITNESS:  As I said, you know, I looked
16 in the prior art and I looked at what I was given and
17 collaborated with their team and I produced my
18 report.
19       MR. SAPHIA:  Okay.
20 BY MR. SAPHIA:
21    Q   And when you looked in the prior art --
22 when you say you looked in the prior art and you
23 mentioned the Department of Defense document and
24 Department of State documents, that type of thing.
25       Did you look at any patent art?

Page 20

1    A   Of -- I -- I don't have access to searching
2 extensively for the patent.  I looked -- just browsed
3 through what's available on the Internet for patents.
4    Q   Okay.  And how did you do that?
5    A   Just searching Google.  Searches.
6    Q   Okay.  So you searched Google and any
7 particular type of Google?
8    A   No, I mean we do Google -- just regular
9 Google search and we found papers.
10    Q   Okay.  So you did that and you came across
11 some good back -- some good documents that you wanted
12 to reference in your report and you gave them to
13 Mr. Dillard or whomever and you worked on your
14 report; right?
15    A   I finally selected the same stuff that is
16 already -- the same material that is in my report.
17    Q   Okay.
18    So those are the final ones that we
19 discussed.
20    Q   Okay.  But it seems to me that there's no
21 pieces of prior art that's relied upon for your
22 invalidity argument that are new to the case outside
23 of what Delta Scientific has presented previously.
24       Is that your understanding?
25    A   It's my understanding that these prior art

Page 21

1 are most relevant to make a case as for invalidity of
2 the patents-in-suit.
3    Q   Okay.  And how did you come to that
4 understanding?
5    A   By reviewing these arts and browsing
6 through, as I said, prior -- other prior arts and
7 looking at the regulation that was in place at the
8 time and came to that conclusion.
9    Q   Okay.  So I'm getting from this probably
10 overly dramatic conversation that you never searched
11 any patent literature to look for prior art that
12 would be relevant to obviousness outside of what was
13 provided to you by Delta's counsel?
14    A   As I said, I did -- I did.  I just
15 explained I did search in Google.
16    Q   Right.
17    A   That's the media that I have access to.
18    Q   Right.
19    A   And through that I looked at the documents
20 and prior art and finalized what's in my report.
21    Q   Okay.  So, see, the only thing that I find
22 difficult about that is I asked you about patents and
23 you answered me with Google, right.
24       So Google is a great search engine, I would
25 agree with you, and I use it frequently.  But it's

Page 22

1  not a party database.
2      The PTO has a database.  You know what I
3  mean by the PTO?
4      A  I understand.
5      Q  Okay.  The PTO has a database it's called
6  USPTO, dot gov.  You can use Google, but it's Google
7  patents, and it's not Google -- regular Google.
8      A  Right.
9      Q  And if you want to use -- look for
10 scientific articles, sometimes you can use Google
11 scholar.
12     So let me ask you directly then.  Did you
13 search the United States Patent Office database to
14 look for prior art for the purpose of your report?
15     A  I did not.
16     Q  Okay.  Did you search Google patent
17 database for the purposes of preparing your opinion
18 and report?
19     A  I searched Google.  I assume Google patent
20 comes to it.
21     Q  Well, okay.
22     A  Because when you search Google both
23 scientific articles come up and sometimes patents
24 come up too.
25     Q  Okay.

Page 23

1      A  It's how specific you are on your -- on
2  your keywords.
3      Q  Do you recall whether there's any patent
4  that you saw in your searching of Google that is now
5  included in the obviousness argument that's -- that
6  is your report?
7      A  The final ones are the ones that are in my
8  report.
9      Q  Right.
10     A  The two patents that I cited.
11     Q  Right.  So your searching of Google did not
12 uncover any art that was already known to counsel for
13 Delta Scientific; right?
14     A  I can't comment on what was known to them
15 or not known to them --
16     MR. DILLARD:  Objection.
17     THE WITNESS:  -- in terms of their
18 material.
19     MR. SAPHIA:  Okay.
20 BY MR. SAPHIA:
21     Q  They gave you their preliminary invalidity
22 contentions; correct?
23     A  Hard document.
24     Q  Right.  And you looked at that?
25     A  I browsed through it.

Page 24

1      Q  Okay.  And maybe we'll just get to it
2  later.  That might be a better idea.
3      Q  Is there anything else you did outside of
4  communications with counsel that would help you in
5  coming to the opinions that you've expressed?
6      A  The opinions -- my opinions based on my
7  background and my reading -- the reading of the
8  material that I cited.
9      Q  Okay.  How many hours did it take you to
10 produce your report?  Do you have any idea?
11     A  Quite a few days.
12     Q  Okay.
13     A  I don't have specific hours in my mind, but
14 I can look at my time and see.
15     Q  I can understand.
16     Is it more than a week?
17     A  Maybe roughly a week would be -- if you add
18 up the numbers in a week, it depends how many hours
19 you work in a week.
20     Q  Call it -- call it 30 hours maybe?
21     A  That or more probably.
22     Q  Forty?
23     A  Roughly.  I really -- I can't comment on it
24 because I don't remember.  I do many things in a
25 week.

Page 25

1      Q  Okay.  Do you remember the check that you
2  received?
3      A  That was online system, so I don't
4  remember.
5      Q  Because at $500 an hour, it's pretty easy
6  to figure out.  If it's 40 hours, that's 20,000.
7      Is that approximately what you were paid?
8      A  I can -- if you want I can go back.  It
9  will take a while to go back.
10     Q  Just a --
11     A  But it's roughly 40 hours or more.
12 Something around there.
13     Q  Okay.  Very good.  The searching that you
14 did on Google -- I'm sorry to ask back about that.
15     The searching that you -- that you did on
16 Google, do you recall how you conducted that?  In
17 other words, what search terms that you used?
18     A  I don't remember all the details.
19     Q  Could you give me an example?
20     A  All the terms and -- everything that's
21 related to the -- to the patent-in-suit in terms of
22 anti-ram barriers and things of that nature.
23     Q  Okay.  So those were your search terms?
24     A  This is not -- this is just a sample of my
25 search terms.  I spent quite a bit of time.

7 (Pages 22 - 25)

Page 26

1    Q   Okay.  So in 40 hours you did all of that
2  searching, you reviewed all of the documents that
3  they gave you and you worked with counsel --
4    A   I have not reviewed all the documents they
5  gave me.  It's a lot of documents that is listed.
6        Possibly -- nobody could possibly review
7  all the documents in the prior art that was listed in
8  several other documents.
9    Q   Oh, okay.
10   A   I perused through some of it.
11   Q   All right.  Okay.  So that's -- that's --
12  thank you for telling me that because when -- when I
13  receive a report that has what's called an Exhibit B
14  on it -- and we'll talk about that -- I assume that
15  the person who wrote the report has reviewed all of
16  those and has used those to come to the conclusions
17  that they -- that they come to.
18   A   Right.  You mentioned several reports.  I'm
19  not sure which report you are talking about.
20   Q   Okay.
21   A   Some of them I looked at that.  Some of
22  them I browsed through.
23   Q   Fair enough.  Fair enough.  And we'll to --
24  we're going to talk about each one, so it's fine.
25  We'll figure it out.

Page 27

1        So in this 40 hours, just to go back to
2  what I was saying, and there's 40 --
3    A   Saying, quote, 40, I -- I never said it's
4  exactly 40 hours.  I really don't know.
5    Q   Okay.
6    A   I have to go back and find out what -- what
7  is what.
8    Q   All right.
9    A   It was in specifics.
10   Q   In your -- in your approximate 40 hours --
11  we won't hold to you a number -- you -- you reviewed
12  materials that you were provided, you did some
13  searching -- Google searching and then you
14  participated in the drafting of your report; is that
15  correct?
16   A   Sure.
17   Q   Okay.  Did -- when you started drafting
18  your report -- don't take this the wrong way -- did
19  you draft it or did they?
20   A   Parts of it I drafted.
21   Q   So the way I normally work with
22  experts is -- it's an iterative process, right, it
23  goes back and forth and, you know, the attorneys give
24  you a shell that you need, right, because you don't
25  do this everyday.

Page 28

1        But then you kind of fill it in in parts
2  with your thoughts; right?
3    A   It's -- it was a mixture going back and
4  forth and sharing documents, my writing and their
5  writing and discussing it through the meetings.
6    Q   Okay.  But suffice it to say, that anything
7  that's in your report today, right, is the result of
8  both your consideration of what they gave you, their
9  input and it came to a final document; am I correct?
10   A   The final document is my final say.
11   Q   Okay.  When you say your final say, would
12  you say that you have agreed with many of the
13  positions that they took prior to you coming on board
14  or of your -- your final say independent of what they
15  did prior to?
16   A   I can't assume what -- everything that they
17  did prior to contacting me, so I would say it is my
18  opinion.
19        My opinion is formed independently of their
20  position.  I believe that in this document, we agree
21  on the position that I had forth.
22   Q   Okay.
23   A   For the opinion that I have forth.
24   Q   Okay.  All right.  I was thinking about
25  something over the weekend and -- and I probably

Page 29

1  didn't bill for it, but I should have, but I was
2  thinking about it, right, and I was thinking about
3  your position in Blacksburg and at the -- and at
4  Virginia Tech, and I was thinking about how big that
5  engineering department is.
6        You know, I actually -- my son wanted to go
7  to school in the south and he visited your campus.
8  He wound up going somewhere else, but he was very
9  impressed in Blacksburg.  For whatever reason he
10  didn't go there.  Okay.  But I got to thinking about
11  how big your school is and how diverse the
12  engineering field is, right.  And it got me thinking
13  about the difference between structural engineering
14  and mechanical engineering.
15        Do you think there's a difference between
16  those two disciplines?
17   A   I think fundamentally all engineering have
18  basic courses that every engineer has to take.
19  Basically the first two years of the training for
20  mechanical and structural and civil engineering is
21  very similar to each other.
22        Engineering science and mechanics and
23  biomedical engineering is similar.  Aerospace
24  engineering, ocean engineering have similar training.
25  Mechanical engineers know structures.  We design

8 (Pages 26 - 29)

Page 94

1 worked with describe what had to be listed in this
2 exhibit?
3     A   What do you mean by "describe"?
4     Q   Did they tell you what you had to do to
5 have something listed in this exhibit?
6     A   Well, those are the things that I used,
7 partially my writing and things that I discussed.
8     Q   Okay.  So, when you say your writing and
9 things that you discussed, I would just suggest to
10 you that the documents that are listed as
11 considered --
12     A   I am -- I'm looking -- I'm scrolling down
13 to look at everything, so I'm sorry that I haven't
14 seen everything.
15     Q   No, no, take your time.  These are the
16 documents that you are telling the court that you
17 considered in arriving at your opinion?
18     A   Right, right.
19     Q   That's what this exhibit means; right?
20     A   That's correct.
21     Q   Okay.  So I'm going to ask you to look at
22 each -- to go through each one with me, not all of
23 them, but certainly -- so you looked at the complaint
24 for infringement; right, that's the first one?
25     A   Yes.

Page 95

1     Q   Okay.  And did you look at the answer by
2 Delta Scientific?
3     A   I believe so.
4     Q   Okay.  But that's not listed here?
5     A   I am referring to -- which one am I
6 referring to that I have?  In the complaint for
7 infringement -- stipulation.
8         I recall browsing through a document that
9 seemed like explanations.  So maybe I'm referring
10 to -- I'm sorry, I'm referring to the document of
11 your expert that talked about my document.
12     Q   Oh, I was going to ask you about that.
13 But -- so did you look at -- did you look at the
14 rebuttal expert report of David Peraza?
15     A   Yes, I looked at that.
16     Q   Okay.  And do you agree with everything in
17 his report?
18     A   I actually disagreed with it because he
19 disagreed with what I declared.
20     Q   That was -- that was not a real question,
21 but I thought I would break it up with some levity.
22         Okay.  Have you -- have you -- have you
23 made note of the parts of Mr. Peraza's report that
24 you disagree with anywhere?
25     A   No.  I have read through it and one -- page

Page 96

1 after page I disagreed because I'm just surprised at
2 the things that he's saying.
3     Q   Okay.  So let's go back to what you
4 considered.
5         All right.  Did you consider that the
6 patent at issue -- the '865 patent --
7     A   Uh-huh.
8     Q   -- has a prosecution history, did you
9 consider that?
10     A   I browsed through the prosecution history,
11 but there's a lot of material in here.  I did
12 consider it.  I looked at different parts of it.  But
13 whether I studied it at full depth, no.
14     Q   Okay.
15     A   And whether I looked at it and browsed
16 through it and learned something from it, yes.
17     Q   Okay.  Because the full patent -- the full
18 patent prosecution history is not listed here?
19     A   Now, we -- I looked at some documents that
20 looked like the prosecution history.
21     Q   Who prepared Exhibit B?
22     A   I and the attorneys.
23     Q   Are you sure about that?
24     A   What you mean I'm sure about that?
25     Q   Are you sure that you and the attorneys

Page 97

1 prepared Exhibit B?
2     A   Yes.
3     Q   Okay.  So if both you prepared it -- and
4 you checked it before you signed your report?
5     A   Yes.
6     Q   Okay.  So everything you considered should
7 be on this list; correct?
8     A   Correct, if, you know --
9     Q   Right.
10     A   -- I've not made a mistake.
11     Q   Unless -- unless the -- unless the list is
12 wrong; right?
13     A   I mean, it seems like the material that
14 I have -- you know, it seems like -- it seems to be
15 right.
16     Q   Okay.  I'm not saying it's wrong.  I'm just
17 saying I need to know what you considered.  I'm
18 entitled to know what you considered for the basis of
19 your opinion; right?
20     A   You can consider that these documents is
21 the basis of my opinion.
22     Q   Okay.  So, anything that I don't see on
23 this list was not considered by you, that's what it
24 means?
25     A   Well, I mean it is my -- it's history of my

25 (Pages 94 - 97)

Page 98

1  expertise and what I know and what's in my mind
2  is all that's --
3      Q   Right.
4      A   -- you know, my consideration.
5      Q   Right.  But that's not a document -- but,
6  respectively, that's not a document; right?
7      A   Correct.
8      Q   I'm talking about documents.  I'm talking
9  about specifically documents and I need to know
10  whether this list has been put together in a way that
11  accurately reflects the materials that you looked at
12  in coming to the conclusions that you set forth in
13  your report?
14      A   Let me just look to this.  Yes, it is.  I
15  may have looked at other things, but it's not -- you
16  know, I don't remember.
17      Q   What I don't want to happen here, Doctor,
18  is I bring up something that you didn't look at and
19  then all of a sudden you say, oh, yeah, I may have
20  looked at it, I don't know, maybe, who knows.  That's
21  not good enough for this process.  Okay.
22      A   I understand.
23      Q   Okay.
24      A   So you are saying the prosecution history,
25  I did not study at depth the prosecution history.

Page 99

1      Q   What I'm saying to you is that there's only
2  a few documents out of the prosecution history that
3  appear here and that there is a whole lot of the
4  prosecution history that is not on this list.  And if
5  it's not on this list, that means you didn't consider
6  it.  And if you didn't consider it and it's material
7  and it casts doubt on your report, then the court is
8  simply available to weigh that evidence.
9          Okay.  So I need to know that this list is
10  accurate and I don't expect you to later on tell me,
11  And, by the way, I forgot to put it on the list, so
12  they didn't put it on the list, but I really looked
13  at it and I browsed it and I took a look at one page.
14  That's not good enough.
15          So I'm asking you to do the proper job here
16  and make sure that that list is accurate.  And if you
17  say it is, believe me I'm fine.
18          MR. DILLARD:  Objection as to form.
19          THE WITNESS:  To the best of my
20  recollection, this list seems accurate.  I may have
21  looked at other things that I don't remember right
22  now.
23          MR. SAPHIA:  Okay.
24  BY MR. SAPHIA:
25      Q   And this is what I'm asking you about

Page 100

1  process of putting this list together:  Were you
2  instructed that the things that you considered should
3  have been listed in Exhibit B by anyone?
4      A   I was told that I have to list the
5  documents that I considered for my opinion.
6      Q   Okay.  So let me ask you this question.
7          Earlier today you said you did Google
8  searches; right?
9      A   Right.
10      Q   And you looked at documents on Google;
11  right?
12      A   Right.
13      Q   Okay.  Can you determine which -- which
14  documents on this list you found on Google?
15      A   I did not list the stuff that I found on
16  Google.  I just browsed through just learning the
17  history and other materials that may be out there.
18      Q   Okay.  All right.  Okay.  I'm going to
19  assume that this list is accurate until we show that
20  it's not.  Okay?
21      A   Okay.
22      Q   Going through Mr. Peraza's report for a
23  moment.
24          You said you reviewed it; right?
25      A   Yes, sir.

Page 101

1      Q   And you said that you disagreed with much
2  of what Mr. Peraza says; right?
3      A   Almost all.
4      Q   Okay.  Did you ever -- did you -- did you
5  need to consider anything else -- in other words, did
6  Mr. Peraza's report prompt you to go back and look at
7  any other documents?
8      A   I looked at the documents that were in my
9  report and his rebuttal or critique was referenced
10  with what's in my documents, so I just looked at what
11  was in my document, nothing else.
12      Q   Okay.  So anything that was listed in his
13  report, in his Exhibit B and is not in your
14  Exhibit B, you didn't look at?
15      A   I didn't need to because the material that
16  I have in my own report, I have full confidence that
17  I'm correct and he's wrong.
18      Q   Okay.  Very good.
19          Your report has different sections to it.
20  We've just really been talking about the background
21  of your report so far and -- so it starts with an
22  introduction, it goes through a background and
23  qualifications.  And then you have a summary of your
24  opinions.
25          Do you see that on page four?

26 (Pages 98 - 101)

1    A  Yes.
2    Q  Okay.  Your first opinion is that, "The
3 claim term rotation is resisted of the bollard or
4 bollards and the base from an impact against the
5 bollard or bollards appearing in all independent
6 claims of the '865 patent is unsupported by the
7 original specification of the '865 patent."
8       Do you see that?
9    A  Yes.
10    Q  Okay.  What do you mean by that?
11    A  I mean that the -- the explanation really
12 comes through my report, so everything that is in my
13 report is in support of that.
14       But it really means that the '865 patent
15 does not support the idea of resistance to an impact.
16 It's very vague.  It does not consider all the
17 material that it's supposed to consider in terms of
18 the impact, in terms of the angle of impact, the
19 velocity of the vehicle, the mass, the energy that
20 the impacting vehicle introduces into the bearer --
21 excuse me -- the rotation of the bollard and the
22 base, the interaction between the impacting objects
23 and the base.  Everything that is required to design
24 a barrier or show the novelty or the newness or the
25 creativity in the barrier is all missing.

1    Q  Okay.
2    A  So there's no indication whether the
3 barrier is for 15-ton truck, a K level four, a K
4 level 12.  There's no indication that the resisting
5 capacity other than just a design of a barrier.
6    Q  Okay.  So unless -- let me see if I can
7 summarize what you just told me.
8       So unless those things that you just
9 enumerated are somehow described in the specification
10 of the '865 patent, the patent is -- the claim --
11 that claim term is unsupported in your view?
12    A  It's not only just that.  I mean, it's all
13 the whole -- the other hundred pages -- the hundred
14 or so pages of the declaration.
15    Q  Okay.
16    A  So there's a lot of details that are just
17 not included in there.
18    Q  Okay.
19    A  And it is actually obvious from the prior
20 art.
21    Q  Okay.  So, let's just start -- let's just
22 start with paragraph 15 for a moment.
23       All right.  You gave me a very long list of
24 things that you thought would have to be included in
25 the patent specification for the patent claim

1 element, "rotation is resisted of a bollard or
2 bollards and the base from an impact against the
3 bollard or bollards to be supported."
4       That's what you just told me; correct?
5    A  It's -- it's the -- that and everything
6 else.  I just could explain a little bit of it.
7    Q  Okay.
8    A  The rest it is all documented, so I'm sure
9 we'll discuss that.
10    Q  Okay.  I just want to get an
11 understanding -- an overall understanding of your
12 position, right.
13       You say in paragraph 16 that there's no
14 reasonable certainty to inform other people about
15 what is meant or what is covered by "rotation is
16 resisted of a bollard or bollards and the base from
17 an impact against a bollard or bollards."
18       Am I reading that correctly?
19    A  Right, 16.
20    Q  Yes.  What do you mean by "fails to inform
21 with reasonable certainty"?
22    A  It is -- it doesn't have the reasonable
23 certainty to explain to a person of ordinary skill in
24 the art the nature of rotation, the magnitude, the
25 design capability or capacity.  It's just all in

1 uncertain terms.  There's no specificity in this '865
2 that will tell a person of ordinary skill the
3 capacity of this -- the resisting capacity of this
4 design.
5    Q  So, in a way you are saying that the claim
6 doesn't give anyone an idea whether it could be
7 infringed or not; right?
8    A  I don't know what that means.
9       I can just tell you that it is -- the terms
10 in this patent are not clear to a person of ordinary
11 skill in the art to indicate whether this is a design
12 for -- for what.
13       It really doesn't get into sufficient
14 details or specifics to teach that to a person of
15 ordinary skill in the art.
16    Q  Okay.  Do you know what the process is to
17 get a U.S. Patent?  Do you have an understanding?
18    A  Yes, I have a patent myself.
19    Q  Okay.  Do you know what examiners do?
20    A  Yes, they review -- yes, to some degree I
21 know.  I don't know exactly everything that they do,
22 but they review the patent --
23    Q  You are saying --
24    A  -- and the prior art.
25    Q  You are essentially saying that this

27 (Pages 102 - 105)

1 element, right, "rotation is resisted of a bollard or
2 bollards," et cetera --
3      A   Right.
4      Q   -- doesn't teach anybody anything about
5 that element of the asserted claims.  That's what you
6 are alleging?
7      A   I am saying that it does not have enough
8 specifics, enough details that is required to teach
9 the capacity of this bollard, the rotation of the
10 bollard, the bollard and the base.
11      The capacity to resist to -- what to --
12 there is no specificity that supports this claim that
13 it is resisted -- resists what?  Does it resist a toy
14 vehicle?  Does it resist a 15-ton vehicle?  How much
15 does it rotate.  Does it consider the interaction
16 with the vehicle?
17      So it's lacking the sufficient details that
18 a person with a skill in the art will understand what
19 is this patent for.
20      Q   Okay.  So an anti-ram device -- security
21 device of the nature of the '865, when you read that
22 entire specification and you read the claims, doesn't
23 give you any indication about the type of resistance
24 that it's talking about; correct?
25      A   It doesn't give sufficient information.  It

1 does not give me sufficient information.
2      Q   Okay.  Right.  Yes.  So -- so what would
3 you need in the claims to have reasonable certainty?
4      A   Well, it's not, you know, it's not for me
5 to say what I would need to have reasonable
6 certainty.  There has to be -- it's their
7 responsibility to declare what is -- what is this
8 design good for, they have to disclose the details of
9 the nature of the impact, they have to disclose the
10 details of what's the load that this thing can
11 support.
12      There's a lot of uncertainty about the
13 sizes of the members and they try to claim that
14 they're everything, they cover everything and
15 everything else under the world which is barrier
16 cannot do.
17      So there's no specifics to indicate the
18 capacity of this in rotation, whether capacity of the
19 bollard and the bollards in the case of rotation and
20 in resisting what kind of load, how much would it
21 rotate, what's the deflection.
22      There's not sufficient details and it's
23 their responsibility to disclose it if they want it
24 to be a valid patent.
25      Q   Okay.  So what you are saying is without

1 those details, you cannot have a valid patent, that's
2 what you are saying to me?
3      A   Well, it's not only those details.  It's
4 everything else that is in my declaration.
5      Q   Okay.
6      A   It's just not -- I'm trying to answer your
7 question as --
8      Q   So, in addition -- so, in addition to what
9 you just told me, there were more details that are
10 necessary to have a valid patent?
11      MR. DILLARD:  Objection; calls for a legal
12 conclusion.
13      THE WITNESS:  Yeah, I can -- I cannot
14 declare what is a valid patent and not a valid patent
15 in general.  I'm just commenting on the specifics of
16 this particular patent and it's --
17      MR. SAPHIA:  Well, wait, wait.  Hold on.
18 BY MR. SAPHIA:
19      Q   Doctor, in all -- with due respect, you are
20 saying that the patent claims do not give anybody
21 reasonable certainty, right.  And you do say that the
22 patent claim -- that the patents are unsupported,
23 right.
24      Are you saying that both things don't have
25 legal significance?

1      A   For '865 patent I'm explaining that it does
2 not have sufficient specificity about the
3 capabilities in terms of rotation, resisted of a
4 bollard and a bollard and the base from an impact
5 against the bollard or bollards because there's many
6 things in here that is totally missing in this
7 particular patent and those are the things that I
8 just described.
9      If you want I'll repeat them.
10      Q   No, no, you don't have to repeat them.  You
11 know what?  We're going to address that in a couple
12 minutes.
13      But are you aware -- you say you're
14 aware -- you say you are aware -- maybe you're not
15 aware.
16      MR. SAPHIA:  Can we show the ex parte.  Let
17 me give you the number, Jess.  Oh, you know it
18 already.  The one with -- that describes the -- the
19 bollard that's sufficient to Darcy, right, so that's
20 the reexamine decision, 10A.
21 BY MR. SAPHIA:
22      Q   Doctor, do you know that the '865 patent
23 was challenged by Delta Scientific in a previous
24 procedure?  Did you know that?
25      A   I don't know what previous procedure is,

28 (Pages 106 - 109)

Page 110

1 but I know it was challenged by Delta Scientific.
2    Q   By Delta Scientific.
3        So this is -- so Delta Scientific filed a
4 paper with the United States Patent and Trademark
5 Office.
6        Were you aware of that, challenging the
7 patent?
8    A   Yes.
9    Q   Okay.  Were you aware that they made the
10 argument that you're just now making, essentially
11 that the -- that the specification of the '865 patent
12 did not describe the resistance required, did you
13 know that?
14    A   I didn't know exactly what they -- you
15 know, how they presented it, but this is my opinion
16 that this does -- this patent --
17    Q   Well, Doctor, I'm just asking you -- I know
18 it's your opinion because you wrote it -- you say you
19 wrote it.
20        But I'm asking you whether you were aware
21 that the United States Patent and Trademark Office
22 decided a very, very similar issue.
23        Are you aware of that?
24    A   I am aware that they have contested it
25 and -- I don't know the details of it.

Page 111

1    Q   Okay.  So you are not aware that Delta
2 Scientific made this same type of argument to the
3 United States Patent and Trademark Office, you're not
4 aware of that?
5    A   I don't know if it's the same kind of
6 argument.  I don't know the details of their
7 arguments.
8        So, I know they argued against it in the
9 past.
10    Q   I'm going to show you something now and I'm
11 going to have you read it, right, and I want to
12 tell -- I want to ask you a couple of questions about
13 it.  Okay.
14        MR. SAPHIA:  Is it up?
15        MS. ZAFONTE:  Yeah.
16        MR. SAPHIA:  Okay.  So that was number,
17 what?  That was number ten?
18        MS. ZAFONTE:  Uh-huh.  Yes.
19        MR. SAPHIA:  The decision is eleven.  Hold
20 on.  Yeah, let's do this one first.  Okay.
21 BY MR. SAPHIA:
22    Q   So if you upload you should have ES -- ESK
23 six?
24    A   It says Exhibit No. 6.
25    Q   Yes.

Page 112

1        MR. SAPHIA:  Are you still using that?
2 Okay.
3        THE WITNESS:  All right.
4 BY MR. SAPHIA:
5    Q   Have you ever seen this document before?
6    A   I believe so.  I'm not a hundred percent
7 sure.
8    Q   Here we go.
9    A   These are the things that I looked at.
10 There's a long list of things that I looked at.
11    Q   Is it on your list of Exhibit B?
12    A   It's -- it's not, no.
13    Q   Okay.  So can I assume you didn't look at
14 it?
15    A   Sure.
16    Q   Okay.  So if you take a look at the first
17 page, you'll notice a few things.  You'll notice that
18 it's directed to the '865 patent, you'll notice that
19 there's an issue date of the patent and you'll notice
20 that it's a request for a reexamination of that
21 patent and the last line is the request is made by
22 Delta Scientific Corporation.
23        Do you see that?
24    A   I am looking at the first -- the first page
25 is a cover page, ex parte reexamination communication

Page 113

1 transmittal form.
2    Q   Yes.
3    A   Okay.
4    Q   Yep, that's it.
5    A   Patent '865, enclosed is a copy of latest
6 communication and copy supplied after filing.
7        This doesn't tell me anything about Delta.
8    Q   The last line.
9    A   Which page are you looking at?
10    Q   The first page, page one.  The last -- the
11 last full sentence, "The request is made by Delta
12 Scientific Corporation."
13    A   Are we looking at the same thing because
14 the first page is the United States Patent and
15 Trademark Office cover page.
16    Q   Oh, excuse me, Doctor, I thought I
17 presented something else to you.
18    A   Okay.
19    Q   I presented -- I presented the decision.  I
20 apologize.
21        MS. ZAFONTE:  Hold on.
22        THE WITNESS:  No worries.
23        MR. SAPHIA:  You know what?  It's fine.
24 No, no, it's fine.
25        This is exhibit what, Jess?  Six?  Okay.

29 (Pages 110 - 113)

Page 126

1 answer, sir. I can not answer.
2      MR. SAPHIA: No, no.
3      Lynda? Lynda, could you read that back to
4 the doctor? I'm not getting a legal response to my
5 question. I would like an affirmative or a negative
6 response, not a response for five minutes.
7      THE COURT REPORTER: What would you like me
8 to read, Counsel?
9      MR. SAPHIA: The last question I asked the
10 doctor.
11      THE COURT REPORTER: You got it.
12      (The record was read as follows:
13      "QUESTION: Given what I just showed
14      you, would you have liked to see that
15      before you wrote your report, yes or no?")
16
17      THE WITNESS: I cannot answer that question
18 because it's -- it's out of context of what I'm
19 describing.
20      What I'm describing is that I've been asked
21 to comment on Darcy -- consider Darcy as a prior art
22 and I have commented on that based on that.
23      So what other --
24      MR. SAPHIA: That's not my question,
25 Doctor.

Page 127

1      THE WITNESS: What other elements would
2 have affected my views is really not -- not
3 considered here because I --
4      MR. SAPHIA: That's not what I'm asking,
5 Doctor.
6 BY MR. SAPHIA:
7      Q I'm asking you whether, given what I just
8 said, you would have preferred to see and consider
9 this document before you wrote your expert report? I
10 don't see what's so difficult about it. And then I
11 asked you to say either "yes" I would have or "no" I
12 wouldn't have.
13      What's the answer?
14      A I will answer again.
15      I was asked to consider Darcy as prior art
16 and my opinion is based on Darcy as prior art for
17 that segment of my report.
18      What would have happened prior to that,
19 what information would have been available is really
20 -- not matter in my declaration or my document.
21      Q So you basically are telling me you don't
22 care about anything else but the documents that you
23 specifically considered and you don't care if they --
24 if they conflict with what you said or proved that
25 it's wrong.

Page 128

1      You just don't care?
2      A I have not said that, sir.
3      I care about my opinion as an expert and I
4 care about being truthful and I care about saying
5 what I have considered.
6      I have considered Darcy as a prior art in
7 my document in my declaration.
8      Q All I can tell you, Doctor, is that if I
9 wrote a report and if I didn't see information that
10 was material to that report and someone asked me if I
11 would have wanted to see it, the answer is simply
12 yes. And anything else is simply negligence.
13      Okay. Let's go to paragraph 17 of your
14 report.
15      A Okay.
16      Q Okay. In my opinion -- "It is my opinion,"
17 sorry, "that claims one through five, seven, ten, 14
18 through 21, 23" -- Lynda, if I'm going too fast tell
19 me -- "26 and 30 through 35 are rendered obvious over
20 U.S. Patent Publication 2004, dash, 0033106 to Turpin
21 alone, and/or in combination with Delta's DSC501
22 barrier."
23      Do you see that?
24      A Yes, I do.
25      Q Okay. Let me ask you something, Doctor.

Page 129

1      How many times was Turpin -- the Turpin
2 reference before the patent office, do you know?
3      A I don't know.
4      Q Okay. Do you think that's relevant?
5      A Relevant to what?
6      Q To your opinion.
7      A Turpin is relevant to my opinion, yes.
8      Q No, that's not my question. Let me -- let
9 me rephrase it so that it's clear.
10      Would you have wanted to know what the
11 patent office commented about Turpin before you wrote
12 your report?
13      A I write my report based on reviewing the
14 content of Turpin and the design drawings that I have
15 seen.
16      The patent office -- obviously, Turpin has
17 been patented, so it's a valid patent that I
18 reviewed.
19      Q Well, number one, patent -- Turpin
20 wasn't -- what you relied on was not Turpin's patent.
21 It was a Turpin -- it was a patent application.
22      A That's right.
23      Q You understand that, right?
24      A Yeah.
25      Q Okay. I'm going to tell you that Turpin

33 (Pages 126 - 129)

Page 130

1 was cited against the '865 patent no less than -- or
2 mentioned no less than three times and each time the
3 patent office did not agree with you.  They agreed
4 against you.
5       Wouldn't you have wanted to at least see
6 what the patent office said during those proceedings?
7    A  Patent examiners are entitled to their
8 opinions, sir.  So what I -- what I get out of a
9 patent -- of a drawing is my opinion and I formed my
10 opinion based on -- on this.
11       I cannot go back to history of everything
12 that every patent examiner said about every barrier
13 to form my opinion on this particular thing.
14       So this is a -- what -- what is in my
15 report is based on my evaluation of Turpin and DSC
16 regarding this item 17 in my opinion.
17    Q  Okay.  Were you informed that Turpin was
18 considered by the patent office three times prior?
19    A  I am not sure.  We had conversations of
20 different things, so I'm not a hundred percent sure.
21    Q  So you don't remember that.
22       And it wouldn't have been -- and it
23 wouldn't have been relevant to you anyway; right?
24    A  Well, the information that's relevant to me
25 is what's -- what I used in my evaluation.

Page 131

1       So Turpin and the design drawing DSC501 is
2 what is relevant to my report.
3    Q  Okay.  And the rationale and the findings
4 of three prior proceedings are irrelevant to you;
5 correct?
6    A  Those are their opinions.  I mean, the
7 proceeding -- the prior ones are their opinions.  And
8 I'm asked as an expert to express my opinion so -- as
9 an independent expert.
10    Q  Did you ever hear the expression -- I hope
11 I get it right, I may not.  I think it goes something
12 like this:  That 10,000 Frenchmen can't be wrong.
13       Did you ever hear that expression?
14    A  No, sir.
15    Q  Okay.  Did you ever raise your hand in
16 class and you had one answer and the rest of the
17 class had another answer?  Has that ever happened to
18 you?
19    A  I don't recall the specifics.
20    Q  Okay.
21    A  I haven't been in a class myself for a long
22 time.
23    Q  Neither have I.  Okay.  So -- okay.  So I
24 guess we're saying that no matter what happened, no
25 matter who said what about Turpin in prior

Page 132

1 proceedings, it doesn't matter because you don't even
2 care what they would say; correct?
3    A  I did not say that, sir.  I said I based my
4 opinion on Turpin and this is my expert opinion based
5 on what I reviewed.  That's all I'm saying.
6    Q  Okay.
7    A  I am not saying I don't care.  I'm not
8 saying either opinions are not respected.  They're
9 their opinions and that's it.
10    Q  I'll ask you the same question again.
11       If you had it to do over again and you know
12 that people -- the patent office had said something
13 about Turpin and considered it, would you want to
14 have seen that before you wrote your report?
15    A  The other patent examiners' reviews does
16 not -- does not shape my report.  My report is based
17 on my understanding and my interpretation of this --
18 of this.
19    Q  So it's irrelevant?
20    A  I -- I did not say that, sir.  All I said,
21 I have reviewed Turpin and DSC501 and this section of
22 my report is based on that.  It's based on my review
23 as an independent expert.
24    Q  Okay.  I'm going to change gears and I'd
25 like to discuss with you a document that you cited in

Page 133

1 your report and I think the name of it is "Selection
2 and Application of Vehicle Barriers" and I guess this
3 is going to be seven -- Exhibit No. 7.
4       (Plaintiff's Exhibit 7 was marked for
5 identification by the Certified Shorthand Reporter
6 and is attached hereto.)
7       THE WITNESS:  It's opening up, right.
8 BY MR. SAPHIA:
9    Q  You got it?
10    A  Right.
11    Q  Are you familiar with ESK seven or Exhibit
12 No. 7?
13    A  Yes.
14    Q  Now, I think you told me that you were
15 doing work for the Department of Defense during this
16 time period; right?
17    A  No, I said Department of State.
18    Q  Oh, I'm sorry.  I miss -- I misunderstood.
19       But this was in your report; correct?
20    A  Yes.
21    Q  Is there any part of this that you read and
22 disagreed with?
23    A  This is -- if I'm not mistaken, this is a
24 long report.  You know, I cited based on the
25 relevance to what I declared.

34 (Pages 130 - 133)

Page 134

1    So whether I agree with every single
2 statement or letter in there, I -- you know, I cannot
3 say now.  But this in  -- this is a standard so...
4    Q   So does that mean it's reputable?
5    A   It is in the Department of Defense
6 handbook, so it is what -- what it indicates it is.
7    Q   Okay.  So you would respect the teachings
8 of this, wouldn't you?
9    A   It's the handbook -- it's the guidance for
10 testing and evaluation.
11    Q   Pretty serious document, isn't it?
12    A   Those are your comments, sir.  I can't say
13 something --
14    Q   I thought that was -- I thought that was an
15 easy agreement.  I would have thought you would say,
16 yes, sure, it is.  It is a serious document.  But
17 maybe it's not.
18    Okay.  So there's an introduction on page
19 one of the PDF.
20    A   Page one of --
21    Q   Of the PDF.  So the PDF starts with --
22    A   Can you help me with the -- the title,
23 "Selection and Application of Vehicle Barriers," are
24 we looking at the same thing?
25    Q   I don't know what you are looking at but --

Page 135

1    A   The first page of the document is -- is
2 just the front page of the handbook.
3    Q   Okay.  I'm sorry, I misspoke again.  Then
4 page one of the document.
5    A   Okay.  So then the second page is an
6 abstract.
7    Q   Right.
8    A   Roman numeral two.
9    Q   Yeah.
10    A   The third page is a forward.
11    Q   Right.
12    A   Then there's a blank page and then there is
13 the table of contents.
14    So you want me to move on?
15    Q   Yes, into the part -- into the page that
16 has 1.1, "Scope" and it says, "Introduction."
17    A   Okay.  Okay.
18    Q   Okay.
19    A   I'm on the right page.
20    Q   Okay.  All right.  Very good.  Thank you.
21    I would just ask you to look at the second
22 paragraph -- the second sentence from the bottom of
23 that paragraph and it states, "These systems include
24 both passive, for example, static or non-moveable,
25 perimeter barriers and active, for example,

Page 136

1 operational for access controls, barriers at entrance
2 portal location."
3    Do you see that?
4    A   Yes.
5    Q   When I asked you about these systems, you
6 were very noncommittal about what was a passive
7 system and what was an active system.
8    Do you agree with what's said here?
9    A   First of all, I was not noncommittal about
10 passive and active.  I just said there are two
11 different definitions of it, and I said active
12 includes everything that a passive system has, plus
13 additional capability.
14    Q   Okay.
15    A   This is what I said, so I just want to make
16 sure that that was documented properly.
17    Q   Okay.  I agree.  You did say that and maybe
18 that was a little bit of poetic license.
19    But do you agree with the definition and
20 the description here of a passive and an active
21 barrier?
22    A   This is not a definition, sir.  This says
23 these systems include both passive perimeter barriers
24 and active barriers, so there's no definition here.
25 It's -- it's saying that these systems include both.

Page 137

1    Q   Okay.  Do you agree to the examples that
2 they cite being passive or active?
3    A   I did.  They're proper examples.
4    Q   Okay.  I'm sorry, I'm looking for a
5 specific page.  I'll be right with you.
6    I'm sorry.  Sorry it took so long.  I
7 thought it was in the wrong spot.  I'm in the wrong
8 spot.  But I'm in page 27 of the document.  It's
9 actually section seven.
10    A   Okay.
11    Q   Okay.  I would like to ask you to look at
12 7.1.1 and 7.1.2.
13    A   Okay.
14    Q   Do you see that?
15    A   Correct.  Yes.
16    Q   Could you read those definitions?
17    A   Sure.  7.1.1, "Active Barrier Systems.  An
18 active barrier requires some action, either by
19 personnel, equipment or both to permit entry of a
20 vehicle.  Active barrier systems include barricades,
21 bollards, beams, gates and active tire shredders."
22    Q   Doctor, I didn't hear -- did you hit mute?
23    A   No.
24    Q   Okay.  Now I hear you.  I just missed the
25 last part of it.  Okay.

35 (Pages 134 - 137)

Page 138

1  A  I have read it.
2  Q  No, no, as long as you read 7.1.1
3 accurately, do you agree with that description?
4  A  It does include active barrier explanation,
5 yes.
6  Q  Okay.  Could you look at 7.1.2 for "Passive
7 Barrier Systems"?  You don't have to read it, but do
8 you -- do you agree with that definition?
9  A  Allow me to read it.
10  Q  Sure.  Take your time.
11  A  It is a fair definition of passive barrier.
12  Q  Okay.  So you agree with it in principle?
13  A  Yes, I do.
14  Q  Do you know what a site survey is?
15  A  Yes, I mean you survey the site.
16  Q  Okay.  Have you ever used a site survey to
17 design any perimeter security systems?
18  A  No, I didn't.
19  Q  Okay.  Okay.  On the next page, page 28,
20 there's some talk in these paragraphs, a discussion
21 about different, I guess, attributes.  Do you see
22 that?  It's "Aesthetics," "Safety," and as you go to
23 the next page, "Security," "Reliability,"
24 "Maintainability," "Cost," and as you keep going past
25 that, "Barrier Operations," "Environment,"

Page 139

1 "Installation Requirements."
2      Are these all things that are considered by
3 people seeking to choose different types of barriers
4 for particular sites?
5  A  These are some of the elements they need to
6 consider.
7  Q  So there might be even more than this;
8 right?
9  A  Even more than this.
10  Q  Okay.  Let's talk about a few of them.
11      So, for example, on page 28 it talks about
12 "Safety."  And it says, "An active vehicle barrier is
13 capable of inflicting serious injury."
14      Do you see that?
15  A  Yes.
16  Q  Is that true?
17  A  It really depends.  That's a general
18 statement.
19  Q  As compared to a passive system, which one
20 is more capable of inflicting serious injury?
21  A  If your talking about injury into the
22 intruder, then both of them could do the same thing.
23  Q  Well, this says -- this goes a little
24 further.  "Even when it's used for its intended
25 purpose, it can kill or seriously injure individuals

Page 140

1 when activated inadvertently."
2      Can a passive system be activated
3 inadvertently?
4  A  Again, this is a statement here about
5 active system is -- you have to see what context they
6 are talking about this.
7      The passive system -- any system -- if you
8 are talking about the intruder on the barrier --
9 anti-ram barrier systems are designed to stop a
10 threat or an intruder.
11      So if you are talking about the intruder
12 that is in the vehicle, the intention is to stop the
13 vehicle.  So if you have a vehicle that impacts
14 either a passive or an active system, it could be
15 severe injuries to that -- to that person that is in
16 the vehicle or people that are in the vehicle.
17  Q  Let's talk about active and passive
18 systems, the ones described here, right.
19      Would the '865 patent system qualify as a
20 passive system under the -- under what we just read a
21 moment ago?
22  A  I believe it does.
23  Q  Okay.  So there a some advantages and
24 disadvantages of passive systems; am I correct?
25  A  Every system has advantages and

Page 141

1 disadvantages, sure.
2  Q  Right.  So a passive system can only have
3 some uses; right?  It's stationary.  It tends to be
4 fixed.
5      Doesn't that represent some advantages and
6 disadvantages?
7  A  It does.  It's very -- it's a very general
8 question so -- every system has advantages and
9 disadvantages so...
10  Q  Okay.  How about with respect to
11 reliability?  Do you think passive systems are more
12 reliable than active systems?
13  A  That's a very complicated question.
14 Reliability is a whole field of engineering.  To
15 analyze the reliability of a system, you need a lot
16 more data in -- about what the system is designed
17 for, how it's tested, how it performed throughout the
18 years.
19      So for me to comment on reliability of any
20 system here is just not correct.
21  Q  I'm not -- I'm not asking --
22  A  So from that perspective.  I can't comment
23 about that.
24  Q  Okay.  I'm not necessarily asking you to
25 critique any particular system.  I'm asking for your

36 (Pages 138 - 141)

Page 142

1  expert opinion with respect to the reliability of a
2  system after it's installed.
3       So, for example, if I have a passive system
4  without any moving parts, wouldn't that be more
5  reliable from the standpoint of maintenance and from
6  the standpoint of workability; isn't that true?
7       A  Not necessarily.  I mean, the systems have
8  different characteristics.  It really depends on what
9  the system is.  Everything -- it depends on the
10  reliability.
11       It's a very complex issue.  It has to do
12  with all the environmental factors that go into it.
13       So for me to comment that a passive system
14  is more reliable than active or vice versa is just
15  inappropriate without considering the whole picture.
16       Q  Why wouldn't you choose one over the other
17  then?
18       A  As I said, active systems have additional
19  capabilities over passive system.
20       Q  So would you choose active systems only
21  when you need those extra capability?
22       A  You could do that because they -- at a
23  minimum they provide what a passive system provides
24  as well.  So it's up to the user what they choose.
25       Q  Okay.  So if I'm -- if I'm understanding

Page 143

1  you correctly, if I have the ability to choose for a
2  particular site, either an active system or a passive
3  system, you are saying to me, I think, that you'd
4  have to look at all of these other factors before you
5  decided; right?
6       A  A lot of factors.  It's really -- it's the
7  decision of the people in wanting to install the
8  barrier and they have to decide what served them best
9  in that particular application.
10       Q  Okay.
11       A  Not only in -- there's the whole
12  application of the -- of the system.
13       Q  Well, would things like the availability of
14  backup generators or manual override provisions or
15  power failures or equipment malfunctions or spare
16  parts and supplies, would those be the type of things
17  that you'd worry about with a passive system?
18       A  A passive system would not have generators,
19  so it's not a concern for a passive system.
20       Q  Right.  How about the selection of a
21  pneumatic operating system?  Is that a consideration
22  in a passive device?
23       A  Not for a passive device.
24       Q  Okay.  How about maintenance?  Is that a
25  consideration for a passive device?

Page 144

1       A  Maintenance is considered for every -- for
2  every design.
3       Q  So if it's a jersey block, what's the
4  maintenance on the jersey block?
5       A  I don't know.  You can look.  Maybe it's
6  deteriorating.  It's the humidity effect.  The
7  environmental effect.
8       Q  Okay.
9       A  Bridges are a special group, but they need
10  maintenance.
11       Q  You are not referring very much to this
12  book.  You are kind of -- you are kind of discussing
13  your own thing.
14       You are not looking at the way this
15  description is giving some insight into active versus
16  passive systems.
17       For example, under "Maintainability:  Many
18  manufacturers provide wiring and hydraulic diagrams,
19  maintenance schedules and procedures for their
20  systems."
21       Are you ignoring that?
22       A  No, no, I'm not ignoring that.  These are
23  things that are used for systems.  So they are
24  important for the systems that they are used for.
25       Q  Aren't these complications to a system?  In

Page 145

1  other words, if I can choose a simple system that
2  does what I need it to do versus a more complex
3  system to do it, wouldn't I choose the simple system?
4       A  It's really up to you as the user.  Any
5  user, it depends what their application is, what
6  their site is, what they want to achieve with their
7  barrier and they decide whether to use one form or
8  another.  And all of these other issues are
9  consideration for a design.
10       So this manual is just highlighting all the
11  issues that are a concern of different barrier
12  designs.
13       Q  Right.  And what I'm asking you is a very
14  simple question actually, but you don't seem to want
15  to answer it.
16       If I had a simple answer to a question, to
17  a remedy, to a situation versus a more complex one,
18  wouldn't I choose the more simple one?
19       A  It's really hypothetical because sometimes
20  a complex system could provide more capabilities for
21  you.  It really depends on your application.
22       Q  But, Doctor, you are refusing -- okay.  You
23  are refusing to answer this based on some type of
24  reality.
25       If I'm -- here's the thing --

37 (Pages 142 - 145)

Page 146

1      A   I'm not refusing to answer anything.  I'm
2  just saying that if you have an application, if you
3  are talking about barriers, you decide based on your
4  needs what barrier to use and that's your decision
5  based on your application.
6          So everything enters into your decision and
7  I'm not to comment on what you decide.
8      Q   Okay.
9      A   Or the user decide.
10     Q   Okay.  Well, that's kind of unusual because
11  that's what you are here to do.
12          But you are here giving opinions on things
13  and here I'm asking you have what I consider a pretty
14  simple question is in that -- if I have two products
15  that can do the same thing, why would I want to
16  choose the one that requires maintenance and has
17  reliability issues and has safety issues?  Why would
18  I choose the more complex one all things being equal?
19     A   It depends on what's your decision and your
20  application.
21     Q   Come on, Doctor --
22     A   So you are asking me as an expert, you
23  know, you have two different power plants to produce,
24  two different things for you, you have an expert to
25  weigh everything in this power plant to use one or

Page 147

1  the other.
2          So it is really a hypothetical.
3      Q   I'm only asking you this question, right.
4          All right.  Let's put it differently.
5  Let's take it out of a hypothetical.
6          I want to stop a car from hitting
7  pedestrians and I want to surround a building.  All
8  right.  And I'm not worried about delivering goods
9  and I'm not worried about trucks moving in and out.
10  I'm only worried about that issue.  All right.
11          Why would I require a system that moves up
12  and down?
13     A   Because you may have -- you may have a need
14  for that.
15     Q   No, no, Doctor, I just told you I have no
16  need.
17     A   Well, it really depends on what -- what the
18  need is.
19     Q   Doctor, what else would I -- what else can
20  I tell you about the situation?  I'm on -- I'm
21  planning to put in a perimeter security system around
22  a building in Manhattan.  I don't need to deliver
23  anything and I don't need the security barrier to go
24  up and down.
25          Why would I choose one that could do that?

Page 148

1      A   If you don't want a security barrier that
2  you want to go up and down, then you select a
3  security barrier that doesn't go up and down and you
4  choose a stationary one.
5          If you want one that goes up and down, then
6  you choose that one.  It's very simple.
7      Q   Okay.
8      A   I mean, if I want a design that performs
9  these functions, I select that design.  If I want a
10  design that performs the other functions, choose
11  that.
12     Q   All right.
13     A   So it's your choice.
14     Q   Okay.  So -- so the intended use of the
15  barrier dictates the choose; correct?
16     A   It's one of the dictating factors --
17     Q   Okay.
18     A   -- for barrier design.
19     Q   All right.  Do active barriers have
20  complications that are different from passive
21  barrier?
22     A   Any two different barriers could have
23  different complications than active could have versus
24  another passive, so it really depends on the design.
25     Q   Okay.  Why don't you do this -- why don't

Page 149

1  you tell me, starting on page 28 of this document.
2      A   Okay.
3      Q   And let's start with the "Safety" section
4  7.2.4.
5      A   Okay.
6      Q   Are they referring in that paragraph to an
7  active or a passive system?
8      A   Let me read it and let you know.
9      Q   Sure.
10     A   It's the last sentence.  It says it is
11  the -- the users to identify potential safety issues
12  affecting the selection of an active barrier system
13  so A, B, C, D or part -- part of those sections.
14     Q   So these are issues related to specifically
15  an active system; right?
16     A   It depends if it's a powered section.
17          You got to realize this is a section of a
18  big manual that covers a lot of different things
19  so --
20     Q   Okay.  What about -- right.
21     A   -- it is trying to highlight of several
22  different issues that -- that relate to one kind or
23  the other, so that's why.
24     Q   Okay.  What about --
25     A   For backup power, it refers to a system

38 (Pages 146 - 149)

Page 150

1 that requires power, but not all systems require
2 power.
3    Q   Okay.  What about 7.2.5?  Is that
4 discussing an active or a passive system in your --
5    A   7.2.5?
6    Q   Yes, it's on the next page.
7    A   Okay.  So this is talking about a system --
8 I assume it means active.  It doesn't say it, but I
9 assume because it's talking about controllers and
10 hydraulic systems.
11    Q   Okay.  What about 7.2.6?
12    A   I think that's -- where they talk about
13 backup generators, they are probably referring to an
14 active system.
15    Q   Okay.  How about 7.2.7?
16    A   There is -- I mean I have to clarify that
17 there's other issues in 7.2.6 that apply to both
18 passive and active.
19    Q   Okay.  How about 7.2.7?
20    A   Again, let me read the whole thing.
21        It probably -- it applies to both active
22 and passive systems.  So there's different sentences
23 there that refers to both.
24    Q   Okay.  What sentences apply to the passive?
25    A   "The manufacturer should provide barrier

Page 151

1 maintenance support in the form of training and
2 operations and maintenance manuals."  As far as I
3 know every passive barrier has to have maintenance
4 manuals and training and operations.
5    Q   Okay.  The '865 patent invention, would
6 that require maintenance?
7    A   I can't comment on that, sir.  That's just
8 the invention.
9    Q   Well, do you not -- do you not understand
10 how it works?
11    A   I understand how it works and it's not --
12 it's not an invention that is valid in my opinion
13 so...
14    Q   Well, you are saying it's not a patentable
15 invention; right?
16    A   Yes.
17    Q   What did -- what is -- I'm asking you a
18 different question.
19        I'm asking you what maintenance is involved
20 in that system?
21    A   It may require examining the -- for
22 example, if you pour concrete in it, then you need to
23 examine that.  They need to inquire if there's steel
24 in the structure.  They did mention in several places
25 they need to -- need to look for corrosion, for

Page 152

1 example.
2        So any structure, regardless of its nature
3 of being static or dynamic or active or passive
4 requires some level of checking and maintenance.
5    Q   So, let me ask you something:  Where it
6 says yearly maintenance contracts are usually
7 available from the manufacturer at about $300 to $500
8 per month.
9        Is that something that you would anticipate
10 to be a cost associated with the '865?
11    A   I wouldn't know.  I can't comment.  These
12 numbers are in a manual -- in a very specific
13 paragraph of a manual.
14    Q   Right.
15    A   So I can't do that for any other designs.
16    Q   Right.  So you have no idea?
17    A   I have ideas, but this is not -- you know,
18 this doesn't -- this manual doesn't relate to '865 in
19 the way that you are representing.
20    Q   Well, all I'm asking is a simple question
21 about maintenance.
22        And would you, as an expert, anticipate
23 that there's any maintenance on the '865 bollards to
24 the tune of three to $500 per bollard per month.
25    A   I cannot say that because I'm not in that

Page 153

1 business.  But generally speaking all -- all
2 security -- especially with safety and security
3 system, may require maintenance and upkeep so...
4    Q   Okay.  The maintenance contracts that
5 they're talking about here, if you look at the next
6 sentence, should include inspection, adjustment,
7 cleaning, pressure checks on hydraulic systems and
8 replacement of worn parts.
9    A   Right.
10    Q   Is that something that the '865 would --
11 would require?
12    A   No, the '865 does not have hydraulic
13 systems, so it doesn't.
14    Q   All right.  Let's look at 7.2.8 under the
15 "Costs" and tell me if that's an active or a passive
16 system?
17    A   I mean, again, this could be for both, like
18 the second sentence, "Reducing traffic flow and the
19 number of control point will increase security and
20 lower the overall cost of the system."
21        So it's kind of vague so it can be to any
22 kind of system.
23        Things likes last sentence, "Reliability,
24 availability and maintainability, RAM, requirements
25 on the system this also affect cost."  This is for

39 (Pages 150 - 153)

Page 154

1 any system.
2     Q   All right.  Why don't you go to 7.2.9?
3     A   Okay.  The first sentence applies to
4 anything.  The other sentences are talking about
5 energized part opening or closing, so they refer to
6 active system.
7     Q   Okay.  How about 7.2.11?
8     A   7.2.11?
9     Q   Yes.
10     A   Again, the sentences that have examples of
11 sump pumps, the heaters, the hydraulic fluid are
12 referring to active systems.
13         The other part is generally environmental.
14 It could be applied to anything.
15     Q   Okay.
16     A   Minus where it says, "hinges and
17 hydraulics."  Those are active.
18     Q   Those are active.
19         How about 7.2.12.
20     A   This is talking about the power
21 requirement, therefore, it's probably referring to an
22 active system.
23     Q   Okay.  How about 7.2.13?
24     A   This is -- the opening sentence it says for
25 active barriers, so it's referring to an active

Page 155

1 barrier.
2     Q   Do you see a pattern here, Doctor, on these
3 -- do you see a pattern developing on all of these
4 kind of considerations where most are directed to
5 active systems?
6     A   I believe this section is intended for
7 active system, so it's talking about issues that
8 concerns active system.
9     Q   Okay.  Do you know if this publication,
10 right, has a similar section directed to
11 considerations for passive barriers?
12     A   I think they're trying -- I don't know.  I
13 have to review it again entirely to see, but I think
14 this section is intended to cover, you know, both
15 passive and active as I read in similar of these
16 sentences.
17         So there are -- there are indications of
18 security, reliability, maintainability, the
19 environment that apply to passive as well.
20     Q   And is it your testimony that the
21 considerations that we've just been going through are
22 similar for active and passive systems?
23     A   Well, as I said, active systems have
24 additional parts and additional capabilities,
25 therefore, you have to have additional -- some

Page 156

1 additional considerations for those as well.
2     Q   So I guess I'll ask you a question that I
3 asked you about fifteen minutes ago and that is:  All
4 things being equal, if I could use for its intended
5 purpose a passive system rather than an active system
6 and avoid some of the complications that you just
7 read, wouldn't that you preferable?
8     A   It really depends on your application and
9 the cost and your need and you do the selection on
10 your own.
11         So if you need a moving part --
12     Q   I'm asking -- Doctor, I'm asking you as an
13 expert to make my selection for me.  I'm telling you
14 that the intended purpose is the same, right.
15     A   Right.
16     Q   There's no advantage to using an active
17 system, so why would I incur the potential downsides
18 of an active system?
19     A   It is your call as a user.  It's not an
20 expert opinion that matters here.  This is a user's
21 decision so not -- my opinion is that if you need --
22 have a need for an active system, you are going to
23 use it, it has additional capability.  It does the
24 same as what a passive system can do and that's your
25 decision which one you want to choose.  It really

Page 157

1 depends on your application.
2         So I don't think this is -- you know, is a
3 technical expert opinion.  It's really a user choice.
4     Q   So are you saying that you have never been
5 in a -- are you saying that you are not an expert on
6 designing systems?
7     A   I am an expert in designing systems.  It
8 depends what -- what the system is.
9     Q   Okay.  Are you saying that -- that you are
10 not qualified to make a decision about -- and
11 recommend a type of system to a user?
12     A   I am highly qualified to make a --
13 recommend to a user, but it really depends on the
14 application and what the user wants and that's their
15 choice.
16     Q   But, Doctor, I have given you, I guess
17 maybe the fifth time now -- and I guess you just
18 don't want to answer the question but --
19     A   I want to answer the question.
20     Q   If -- if the intended use is exactly the
21 same, right, and both systems will do what you want
22 it to do, why would a user or why, more
23 appropriately, an expert consulting for a user ever
24 recommend a more complex, costly and unreliable
25 solution?  Why?

40 (Pages 154 - 157)

Page 158

1    A   Well, that's as a presumption that the more
2  complex system is unreliable, which is not the case.
3        The more complex system can provide me more
4  capability, so I look at all of my needs and decide
5  based on the capabilities that I need and it really
6  -- it really is a user preference and application
7  dependent.  This is not an expertise question.
8    Q   Your book that you cited in your report
9  spends page after page of considerations of potential
10  downsides of active systems and it spends no time
11  talking about potential complications with passive
12  systems; correct?
13        MR. DILLARD:  Objection; form.
14        THE WITNESS:  No, that's not correct.
15        MR. SAPHIA:  Okay.  Then show it to me.
16  BY MR. SAPHIA:
17    Q   I want you to show me in this document
18  where it discusses the potential downsides of
19  passive -- I want you to show me, Doctor.  No, no,
20  Doctor, I want you to show me right now.  I want you
21  to look through this and show me.
22    A   I just read several of the statements that
23  I said it applies to both passive and active.  So you
24  can go back to the court reporter and read those that
25  I said.  So if you want me to go back again, I'll go

Page 159

1  read those statements for you.
2    Q   Doctor, you also said to me that it's
3  pretty clear to you, though, all of those sections of
4  dealing with collectively active systems?
5    A   They are already saying most active
6  systems, though this is a manual for --
7    Q   So, please don't -- please don't be
8  disingenuous.  You and I both know that those
9  sections were directed to active systems.
10        And I'm asking you if there is a synonymous
11  section in this book that you have already told me is
12  reputable related to passive systems, and if it is,
13  I'd like you to show it to me.
14    A   I would say almost -- a lot of this
15  document from the beginning to end applies to any
16  system.  It's not just for passive system.  I'm not
17  being -- I'm not being -- you know, as an expert, I'm
18  telling you this document is used for design of
19  passive systems.
20        So the guidance that's in here is for both.
21  It talks about the impacting vehicle.  It talks about
22  the loads.  It talks about friction.  The force of
23  the vehicle.
24        So everything that is in here is for any
25  kind of barrier system for active security system.

Page 160

1    Q   All right.  Let's see if we can --
2    A   So the entirety of this document is for
3  both passive and active system.  And one section is
4  talking about if some requirements for active system
5  were -- you know, we just highlighted them.
6    Q   Right.  And I -- and I -- I guess that's a
7  way to sidestep my question, but I'll ask it again.
8  Okay.
9        This document goes on for a number of pages
10  that we just looked at, that we both agreed are
11  considerations of potential downsides for active
12  systems, would you agree?
13    A   It has -- I wouldn't say the downside, but
14  say the requirements for maintaining an active
15  system.
16    Q   Good.  Okay.  Is there a synonymous section
17  that goes on for pages about potential considerations
18  for a passive system?
19    A   Well, I mean, safety requirements.  Safety
20  is both to passive and active.  The environmental
21  requirement, certain aspects of environmental
22  requirement applies to steel and concrete, so it goes
23  for both of them.
24        Reliability is a big issue.  So it's really
25  what parts or what are you talking about reliability.

Page 161

1  And this manual is not necessarily all inclusive of
2  all the issues that arise in any product design.
3        And all the segments that we read together,
4  some sentences apply to both passive and active
5  system.  This is not intended for one or the other.
6  In fact, if you look at the manual, it's for the
7  whole barrier -- anti-ram barrier systems and
8  guidance for design of barrier systems so...
9        MR. SAPHIA:  Lynda?  Lynda, I'm sorry to
10  disturb you again.  Could you read back my question
11  and we'll disregard the doctor's answer for moment.
12        (The record was read as follows:
13         "QUESTION:  Is there a synonymous
14         section that goes on for pages about
15         potential considerations for a passive
16         system?")
17        THE WITNESS:  I believe the document that
18  we're looking at is document for both passive and
19  active system and all the -- the sections that are in
20  this document are applicable or many sections are
21  applicable equally to passive system as well --
22  BY MR. SAPHIA:
23    Q   Could you show me --
24    A   -- regarding environment, regarding safety,
25  regarding security and there are some additional

41 (Pages 158 - 161)

1 sections or chapters -- paragraphs that highlight the
2 active barrier system requirements.
3     Q   Could you show me the synonymous section in
4 this document that deals with considerations for a
5 passive system like the one that we just reviewed?
6     A   If you look at the section seven it says,
7 "Vehicle barrier design and installation."
8     Q   Right.
9     A   And then it talks about different "Vehicle
10 Barrier Types," it talks about "Passive Barrier
11 Systems," "Fixed Barrier Systems" and it goes on
12 to "Portable, Movable Barrier Systems," 7.1.4.
13       7.2 is "Design Considerations" and it's
14 design considerations for everything.
15     Q   Hold on for a minute, Doctor.
16     A   But just then --
17     Q   Hold on for a minute, Doctor.
18     A   -- there's substance --
19     Q   Hold on for one second.
20     A   Okay.
21     Q   Section seven, right, specifically section
22 7.2.4 and onward you agreed with me are primarily
23 concerned with the considerations for an active
24 system, right.
25       And I asked you if there was a similar

1 section for -- that talked about these types of
2 considerations for a passive system.  Okay.
3       And I asked you to point it -- to point it
4 out to me, right.  And what I would expect is that if
5 there was a synonymous section, you would have a list
6 of different issues that you would have to worry
7 about with a passive system and I don't see it in
8 this document, do you?
9     A   Section 7.2.
10     Q   Yes.
11     A   "Design Considerations.  In addition to
12 calculating the kinetic energy of a threat vehicle,
13 section six, there are other issues that must be
14 considered before selecting an appropriate barrier
15 system."  It does not say in a passive or active
16 system.
17       Then it goes down the list and it includes
18 different matters that matter to barrier systems.
19 And some matters or active system have more
20 capabilities, so therefore there are more mentions of
21 it.  I'm not denying that.  I'm just saying that this
22 -- 7.2 is a design consideration for both passive and
23 active systems.
24     Q   Okay.  So let me go back to my original
25 question.

1       All things being equal, the intended use
2 aside, why would anyone designing a site diagram or
3 choosing between different systems choose a more
4 complex system rather than a simple system?
5     A   Well, it's up to the -- again, this is a
6 user decision.  This is not an expert opinion here.
7       It's whatever your application needs are,
8 you design your system or you select your system
9 based on that.
10     Q   So if I come to you and I say, Doctor, this
11 is one you want to use, what should I use?  And you
12 would say it's up to you.  Use the more complex
13 system.  Use the more costly system.  Use the system
14 that's more difficult to maintain.  Use the one that
15 you can have safety issues with rather than use a
16 plain-old, shallow-mount bollard.
17       Isn't that what you are saying, Doctor?
18     A   That's not what I'm saying.  This is what
19 you are saying.
20     Q   Oh, then what you are really saying is you
21 are incapable to make that decision for me.
22       That's really what you are saying?
23     A   No.
24       MR. DILLARD:  Objection; argumentative.
25       THE WITNESS:  This is -- now what you are

1 presenting is a case that doesn't have specifics.
2 The specifics have to do with your application and
3 you, as a client, whether it's the state department
4 or a building or government or a private building,
5 you decide what you want and you -- you put what
6 serves your purpose.
7       If a passive one serves your purpose, use
8 the passive.  If an active one, use an active one.
9 That's all I'm saying.  I'm not saying anything that
10 you mentioned.
11       MR. SAPHIA:  Okay.
12 BY MR. SAPHIA:
13     Q   So is it -- is it that the '865 patent
14 describes in any way the necessity to use an active
15 system?
16     A   '865 is a design so it's not about the
17 necessity.  It's just a design.
18       So the user decides whether to use this
19 design or not.
20     Q   Okay.  That's fine.  But is this design --
21 is this design, the '865 patent, is that design even
22 capable of doing some of the things that the active
23 systems do?
24     A   '865 is not capable of doing any active
25 parts.

Page 166

1    Q   Right.  So if I needed -- if I needed an
2  active system, you would not tell me to go get the
3  '865 patent, would you?
4    A   '865 is not an active system, therefore, I
5  would not recommend it as active system.
6    Q   Right.  So if -- the '865 is a passive
7  system; correct?
8    A   My understanding, yes.
9    Q   Okay.  And it's a simple system, isn't it?
10  It doesn't involve electricity.  It doesn't involve
11  any type of mechanical movement.  It doesn't involve
12  sophisticated maintenance.  It doesn't involve any of
13  those things, does it, Doctor?
14    A   I don't know about the comment about being
15  simple or not, but it is a system that does not
16  require electricity or power.
17    Q   What I mean by "simple" is there's not a
18  lot of complications to it.  You make it, you put
19  it in the ground and you don't have to worry about
20  it.  You don't have to have an operator.  You don't
21  have to have electricity.  You don't have to go and
22  remove it.  You don't have to maintain it.  It's
23  done.  It's finished.  It stays there.  It's like --
24  isn't that correct?
25      MR. DILLARD:  Objection as to form.

Page 167

1      THE WITNESS:  I don't know.  You said
2  maintain -- maintenance, but it -- you know, it
3  doesn't require power.  It doesn't require wiring,
4  obviously.  But it is -- you know, maintenance or
5  others are required that we just read in this manual
6  that is required for all systems.
7      MR. SAPHIA:  Okay.  David, you were going
8  to mention a break; right?
9      MR. DILLARD:  Yeah, we've been going for a
10  couple more hours.
11      MR. SAPHIA:  I'm also a mind reader, David.
12  How about five minutes.  Okay.
13      MR. DILLARD:  Sure.
14      THE VIDEOGRAPHER:  Are we off the record?
15      MR. DILLARD:  Yes.
16      THE VIDEOGRAPHER:  We are off the record.
17  The time is 2:46 p.m.
18      (Brief interruption in proceedings.)
19      THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 2:56 p.m. Eastern Standard Time.
21      MR. SAPHIA:  Okay.
22  BY MR. SAPHIA:
23    Q   Doctor, let's move to paragraph 62 of your
24  report?
25    A   Go ahead.

Page 168

1    Q   I'm paraphrasing.  I'm saying -- I will ask
2  you.  This is you speaking.  You've reviewed these
3  provisional applications.
4      Let me ask you this:  What is the
5  difference between a provisional application and a
6  utility application?
7    A   I think provisional is where you first come
8  in and apply for the patent and then later it becomes
9  the utility application, I assume.
10    Q   Okay.  Are provisional applications
11  examined at the patent office?
12    A   I assume so.
13    Q   Okay.  You mentioned one, two, three, four,
14  five, six provisional applications.
15      Do you see that?
16    A   Right.
17    Q   And then you comment you found no specific
18  disclosure discussing resisting rotation of the
19  bollard and the base.
20      Do you see that?
21    A   Right.
22    Q   Okay.  Is it your understanding that for
23  written descriptions the patent must give a specific
24  disclosure of the resisting rotation of the bollard
25  and the base?

Page 169

1    A   Well, the patent has to support claims.
2    Q   That's not my question, Doctor.  That's not
3  my question.
4      MR. DILLARD:  Objection.
5  BY MR. SAPHIA:
6    Q   My question is -- my question is:  Is it
7  your understanding that a patent fails for written
8  description if there is no specific disclosure
9  discussing resisting rotation of the bollard and the
10  base?  That's what you wrote.
11    A   It's not -- yeah, it's not in the written
12  description of the patent because it doesn't -- it
13  doesn't explain all the elements that are necessary
14  for resisting rotation.
15    Q   So does the patent fail -- does the patent
16  claim fail as invalid for lack of written description
17  because there is no specific disclosure discussing
18  resisting rotation of the bollard around the base?
19    A   Yeah, I'm talking about the -- all the
20  requirement that when you talk about resisting
21  rotation of the bollard and the base, you have to
22  specify why it is -- how it is resisting.  What are
23  its capabilities.  What is its limit.  What is it
24  resisting.  What level of tests is it resisting.
25      As I explained earlier, there is no

43 (Pages 166 - 169)

Page 170

1 explanation that says this is resisting -- the system
2 is resisting what. It doesn't say what. It doesn't
3 say it's good for this or that. It doesn't -- it has
4 no specificity and there's no sufficient details to
5 support this claim.
6    Q  Okay. Let's go to paragraph 63?
7    A  Okay.
8    Q  You write, "In summary, I have found no
9 express disclosure of resisting rotation of the base
10 in the specification of the '865 patent or its patent
11 applications."
12       Is that the reason why you have written
13 that the patent fails -- the patent claims failed for
14 lack of written description?
15    A  It's not written in the patent that -- what
16 the patent -- how the patent -- how the system is
17 resisting, what load is resisting, what should be the
18 structural member size to resist this load versus
19 that load.
20       It just doesn't have enough details that
21 teaches me or teaches a person of ordinary skill in
22 the art how is this resistance -- how is -- how is
23 the deformation measured. What degree to deformation
24 relates to what kind of loading. So it's not -- it's
25 not written. None of this is written. None of this

Page 171

1 is clearly obvious or described properly in the
2 patent.
3    Q  What if I just said to you that resistance
4 and rotation of the bollard in the base is evidence
5 by the fact of the use of anti-ram language and
6 penetration of the system and vehicles at high speed,
7 would that be enough?
8    A  No.
9    Q  Okay. You require more specificity than
10 that?
11    A  Well, I mean, you have to say what the
12 design is for. You have to specify what this thing
13 is designed for and at least the weight of the
14 vehicle, the speed of the vehicle, the direction of
15 the impact, all of that matters into this thing
16 resisting the rotation and it's not -- none of this
17 is disclosed.
18    Q  So when you hear -- so when you hear this
19 paragraph, the major benefit in the physics of the
20 bollard system of this invention is that the striking
21 forces from the crash vehicle are transmitted from
22 the bollard down to the shallow mount pad in a way
23 that is different from standard deep trench
24 foundation.
25       Does that give you any indication of what

Page 172

1 this invention is used for?
2    A  It's not as specific enough. It's very
3 general and this is -- I'm sorry, it's poorly
4 written.
5    Q  Okay. How about this: In the shallow
6 mount bollard system of this invention, the resistive
7 forces are all at base of the bollard at the top of
8 the trench and, therefore, reduce the likelihood of
9 the bollard rotating and vehicle breaching the
10 security system.
11       Does that give you any idea?
12    A  It's just trying to explain just as a
13 person who's designed bollards before or been
14 involved in the design of bollards before is trying
15 to explain the different type of reaction, which I
16 think it kind of fails in its description of
17 bollards.
18    Q  Okay. How about this, "The pad or base of
19 this invention spreads the forces out while the deep
20 trench footing concentrates the forces which require
21 the trench footing to be massive and deep. The deep
22 trench footing for comparable performance will always
23 have to be more massive than the pad or base of this
24 invention."
25       Does that give you any indication?

Page 173

1    A  Can you please tell me where it is on the
2 patent -- I kind of know where it is, but I can go
3 through it if you tell me what column you just read.
4    Q  Sure. That was from column four. This is
5 lines 15 through 30.
6    A  This is claiming that the pad base of this
7 system is -- is -- transmits the load more
8 efficiently to the foundation than a deep trench
9 design. This is trying to indicate an advantage over
10 deep trench design which is obvious -- has been
11 obvious in the past.
12    Q  What about a deep trench design? Is it
13 useful, a deep trench bollard?
14    A  A deep trench bollard in different
15 applications. You know, there are applications that
16 state department wanted from us was that we do the --
17 you know, the places where they need to comply with
18 utilities, they should be shallower than deep trench.
19 So each one is different application so...
20    Q  But in terms of the efficiency of stopping
21 a RAM, the expectation is that they're very similar
22 by that sentence, isn't it?
23    A  I don't know about this sentence in this
24 patent because it's -- a lot of it is very poorly
25 written. But in general deep trench provides

44 (Pages 170 - 173)

1 resistance, but you need to have specifics of what
2 the design is, what the element size is, what the
3 material is, what the foundation looks like, what the
4 impacting vehicle is, what the -- all the other
5 things that you have to do.
6    Q   Right.
7    A   All the things that are missing in this
8 '865.
9    Q   Okay.  So just going back to what we were
10 talking about, I'll show you column two lines 41
11 through 55.
12    A   It's trying to explain what the shallow
13 mount is versus a deep trench, what the advantage is,
14 but it is that a person of ordinary skill in the art
15 would have known by prior art.
16    Q   Okay.
17    A   There's nothing in here that specifies
18 what's the capacity or capability of this anti-ram
19 system.
20    Q   Yeah.  So you are saying that because it
21 specifically says -- it doesn't say that it's a
22 crashing vehicle of, let's say, 5,000 pounds versus
23 just a crashing vehicle, you don't know that?
24    A   You know, the nature of the resistance.  If
25 you -- if you have something that you put on the

1 surface and you hit it with a hundred pounds is
2 different than if you hit it with a thousand pounds.
3    Q   Right.  Tight.  So what car -- so what car
4 do you know of weighs a hundred pounds and what car
5 do you know of is ten times that?
6    A   I'm just giving you as an example from the
7 physics.
8    Q   I know.  But you understand how -- how an
9 exaggerated stance that is and how it makes no sense,
10 don't you?
11    A   No, no.
12    Q   There aren't cars that vary in ten times
13 the weight, there aren't?
14    A   I -- I respectfully disagree with you as an
15 expert --
16    Q   Okay.
17    A   -- who has worked on barriers.  There's a
18 huge difference between the small car, midsized car,
19 a pickup truck and truck that is loaded with
20 explosives.  There's a huge difference.  We have
21 tested for those.
22       Every tire that is designed has to have the
23 specifics about what's the capability of the barrier
24 and what the design is for.
25    Q   I think that there's a -- are you -- well,

1 let me ask you this:  Are you comparing some type of
2 rating system or are you using some type of rating
3 system as a barometer for the disclosure of the
4 patent?
5       In other words, are you superimposing some
6 restrictions, let's say, to a certain test as to the
7 patentability of the claims?
8    A   No, I'm just talking about that that is one
9 requirement that a design has to meet and there has
10 to be enough explanation about the nature of the
11 design and the size of the design and its intended
12 use and that's part of that explanation and that --
13 that's all I'm saying.
14       So it is -- it is important to say what is
15 the nature of rotation of the bollard and for what
16 forces or what applications and that is the
17 specificity that is missing in this patent.
18    Q   When you say it's important, it's important
19 to you?
20    A   It's important to a person of ordinary
21 skill in the art to realize and you understand the
22 nature of the patent or the nature of the invention.
23    Q   So they can't -- so one of ordinary skill
24 in the art cannot understand the nature of the patent
25 or understand the claims without the specificity that

1 you previously testified to?
2    A   From this patent they could not.  From the
3 written description and what's disclosed in this
4 patent, the person of ordinary skill of the art would
5 not understand what's the benefit of this and what's
6 the nature of this patent or this design.
7    Q   Okay.
8    A   It's vague and unclear.
9    Q   Okay.  Let's move on to -- by the way, did
10 anyone tell you that the level of specificity that
11 you are requiring is a necessity to hold that the
12 patent claims are valid or is this something that you
13 came up with?
14    A   No, it's my opinion.
15    Q   Okay.  So no one said to you -- instructed
16 you as to the law such that you are making this
17 determination; right?
18    A   No, there is -- there is an instruction
19 that I learned from the -- from the attorneys, from
20 the counsel, that is the description of obviousness
21 and anticipation and all of that.  Yes, I got
22 educated by that.
23    Q   Okay.  Let's move to your prior art
24 invalidity theories.  So they begin on page 24 of
25 your report.

45 (Pages 174 - 177)

Page 206

1       (Plaintiff's Exhibit 10 was marked for
2 identification by the Certified Shorthand Reporter
3 and is attached hereto.)
4 BY MR. SAPHIA:
5    Q   Doctor, you are being presented with
6 Exhibit No. 10 which is a declaration for utility or
7 design patent application.
8       Please examine it.  Let me know when you
9 get there, Doctor.
10   A  I have the document in front of me.
11   Q  Okay.  You've probably never seen this
12 before, have you?
13   A  I don't believe so.
14   Q  Okay.  On the first page it describes
15 what's called an oath.
16      Do you see that?
17   A  The first page of the patent or PDF?
18   Q  No, the first page of the document -- of
19 the exhibit.  In fact, why don't we do this and, I'm
20 sorry --
21   A  Page what?
22   Q  Why don't we -- yeah, why don't we refer to
23 them -- do you know what I mean by a Bates number?
24   A  No.
25   Q  Okay.  On the bottom right-hand corner of

Page 207

1 the document there's a number.
2    A  Right.
3    Q  So the first page has DS --
4    A  Correct.
5    Q  -- all of those zeros, 139.
6    A  Right.
7    Q  Let's refer to it that way.  Okay.
8       So we have Exhibit 6 -- no, I'm sorry,
9 Exhibit No. 10 and the page number -- let's call it
10 DS139.  Okay?
11   A  Okay.
12   Q  If you take a look at the first named
13 inventor, do you see who it is?  It's on the
14 right-hand side.
15   A  Hairy D. Dickinson.
16   Q  Right.  Do you see the attorney docket
17 number right above it?
18   A  Yes.
19   Q  Okay.  What does that say?
20   A  DELTAS1.1US.
21   Q  I'll represent to you that's Delta
22 Scientific.  Okay.
23   A  Right.
24   Q  Please go to DS145.
25   A  Okay.

Page 208

1    Q   Okay.  Top right-hand corner --
2 right-hand side it says, "Filing Date."
3       Do you see that?
4    A  19 March 2008 or '9.  I'm not sure.
5    Q  Right.  That's when this patent application
6 was filed.
7    A  Okay.
8    Q  That's nearly four years after the Adler
9 applications were filed; right?
10   A  Right.
11   Q  Okay.  I would like you to go to figure 7A
12 which appears on page 198.
13      Do you see it?
14   A  198, figure 7A.
15   Q  Yes.  Does it look familiar?
16   A  I haven't studied this before, so I'm not
17 sure what -- what I'm looking at.
18   Q  Have you seen anything that looks like
19 that?
20   A  You are implying this is something that
21 I've seen in '865.  It has bollards and things like
22 that so...
23   Q  That's all the similarities you see; right,
24 just bollards?
25   A  Yeah.  I mean, it's a bollard system,

Page 209

1 that's all I see.
2    Q  Right.  It's a lot similar to the '865, is
3 it?
4       MR. DILLARD:  Objection as to form.
5       THE WITNESS:  You are asking me to look at
6 what figure and make a -- make a decision.
7       MR. SAPHIA:  Okay.
8 BY MR. SAPHIA:
9    Q  So you don't remember the '865, as you are
10 sitting here; right?
11   A  I'm sorry, say that again.
12   Q  You don't remember the '865, as you are
13 sitting here you can't make the comparison?
14   A  Well, you know, it's just like a comparison
15 with one figure around the whole document, it's a
16 hard question.
17      So it's not -- you know, you got to be more
18 specific about the question.
19   Q  Okay.  Let me show you something else which
20 is going to be what?  Exhibit No. 11?  And that's
21 going to be Exhibit No. 11.
22      (Plaintiff's Exhibit 11 was marked for
23 identification by the Certified Shorthand Reporter
24 and is attached hereto.)
25      THE WITNESS: Should I get out of this

53 (Pages 206 - 209)

Page 210

1 document?
2      MR. SAPHIA: I don't know if you can screen
3 share it. I don't think you can.
4      THE WITNESS: I can.
5      MR. SAPHIA: Do you want to do me a -- can
6 you print at that page?
7      THE WITNESS: I can try.
8      MR. SAPHIA: Okay.
9      THE WITNESS: The figure seven page?
10      MR. SAPHIA: 7A, yes.
11      THE WITNESS: No, it's -- the print is
12 going to show all the other -- the software and the
13 web stuff so...
14      MR. SAPHIA: I don't care. I'm not going
15 to ask you for it. I'm just going to -- I would like
16 you to be able to look at it.
17      THE WITNESS: Yeah, I'm looking at it.
18      The print is not going to look -- half of
19 it will be covered with the other software stuff.
20      MR. SAPHIA: Okay. It's up to you. We're
21 going to introduce one more exhibit here. Maybe you
22 can keep them both in your mind at the same time.
23      (Plaintiff's Exhibit 12 was marked for
24 identification by the Certified Shorthand Reporter
25 and is attached hereto.)

Page 211

1      MR. SAPHIA: You could refresh now.
2      THE WITNESS: Exhibit No. 12.
3      MR. SAPHIA: Just one page, number 12.
4      THE WITNESS: It's a blank page.
5      MR. DILLARD: Yeah, mine is blank also.
6      MR. SAPHIA: Okay. Hold on, Dave. Let's
7 just go off the record for five minutes, Dave.
8      MR. DILLARD: Sure.
9      MR. SAPHIA: Okay. Thank you.
10      THE VIDEOGRAPHER: We are off the record.
11 The time is 4:04 p.m. Eastern Time.
12      (Brief interruption in proceedings.)
13      THE VIDEOGRAPHER: We are back on the
14 record and the time 4:13 p.m. Eastern Standard Time.
15      MR. SAPHIA: I think -- I think this
16 happened before and Jessica is going to tell you how
17 to view it, Doctor.
18      MS. ZAFONTE: Doctor, so when you go to
19 your marked exhibits folder, instead of -- if you
20 right click on what is marked as ESK 12 and then a
21 menu is going to pop up and if you choose download,
22 it will actually download to the bottom of your
23 screen and then you can open it up that way.
24      THE WITNESS: Okay.
25      MR. SAPHIA: David, I think we went through

Page 212

1 this before.
2      MR. DILLARD: Let's see if it works.
3      MR. SAPHIA: It works.
4      MR. DILLARD: I haven't got there yet.
5      MR. SAPHIA: Okay.
6      MR. DILLARD: Yeah, it's a downloaded PDF.
7      MR. SAPHIA: Okay.
8 BY MR. SAPHIA:
9      Q  Do you see anything on the page?
10      A  Yeah, I see a 90-degree turned --
11      Q  Bollard?
12      A  -- rotated bollard, yes.
13      Q  Okay. I would like you to take a look at
14 that picture.
15      What is it Exhibit No. 12? Exhibit No. 12
16 and tell me if it's similar to 7A, the one that we
17 looked at in the previous exhibit.
18      A  Okay. I've got to open 7A.
19      Q  Okay.
20      A  It's taking it's time to open the file
21 again.
22      Q  Okay.
23      A  Oh, no, this is not -- I'm sorry, the 7A
24 was in which file?
25      Q  7A was DS221.

Page 213

1      A  Oh, okay, it's the exhibit.
2      Q  Yeah, figure 7A of Exhibit No. 11 on page
3 221.
4      A  I have Exhibit No. 12 and 13. There's ESK
5 11.
6      (Plaintiff's Exhibit 13 was marked for
7 identification by the Certified Shorthand Reporter
8 and is attached hereto.)
9 BY MR. SAPHIA:
10      Q  Exhibit No. 13 is what? Okay. So please
11 look at page ten?
12      A  Okay. And what page was it?
13      Q  221.
14      A  It's taking its time to scroll down.
15      Q  Okay.
16      A  Okay.
17      Q  Do you see any similarity between figure
18 seven on Exhibit No. 10 and Exhibit No. 12?
19      A  I'm sorry, Exhibit No. 12 is very vague.
20 It just shows a dark structure with some grille
21 around it and two bollards going up in a rotated
22 fashion.
23      Q  Okay. So you don't see -- I just want to
24 make sure.
25      You don't see any similarity between the

54 (Pages 210 - 213)

1 image on Exhibit No. 12 and the figure 7A of Exhibit
2 No. 10 at DS000221; correct?
3     A   They're both showing bollards.  If that's
4 what you mean.  They are both showing upright
5 bollards with some structure below it.
6        But again, Exhibit No. 12 is very dark.  If
7 you are looking at the same thing I'm looking at,
8 it's hard to see.
9     Q   Okay.  That's your testimony.  There's no
10 similarity; right?
11    A   That's not what I said.  I just said I see
12 two bollards in both of them and some basic structure
13 in both of them.
14    Q   Okay.  But would you say they're similar?
15    A   Again, what I'm seeing is just two bollards
16 with some basic structures on both of them.  They
17 could be different because there's not enough
18 information for me to pass judgment on the two
19 figures on the fly here.
20    Q   So you are saying, no, they're not similar?
21        MR. DILLARD:  Objection; mischaracterizes
22 his testimony.
23 BY MR. SAPHIA:
24    Q   What other information would you need,
25 Doctor?

1     A   I would -- I would need complete drawings
2 and I would need a lot of time to study two things
3 and say what are actual similarities and differences
4 between them.
5     Q   Okay.
6     A   I haven't done any design on the fly in our
7 -- in our conversation.
8     Q   Okay.  So you can't -- you cannot, by
9 looking at these two, determine whether there's any
10 similarity.  Okay.  Correct?
11    A   That's not what I said.  I said I see the
12 two bollards in both of them and there's a base in
13 both of them, but there are differences and
14 similarities.
15        So I cannot pass comment or judgment on the
16 details of two different objects on the screen here.
17    Q   No problem.  Okay.  Going back to your
18 report, let's go to page 27 for a moment.
19        What is a structural member, Doctor?
20    A   A structural member is a member that can
21 resist load and it could be -- it could be concrete.
22 It could be bars.  It could be plates.  It could be a
23 variety of things that supports some kind of loading.
24    Q   Okay.  So the operational rotating rod 26
25 of Turpin, is that a structural member?

1     A   Yes, it is.
2     Q   Okay.  And what role does it play in
3 handling the load?
4     A   The load actually gets transferred through
5 the bushings and the support system that it has
6 through that rod, so it's -- it's a load supporting
7 member but also has additional function.
8     Q   What role does the stop at number 42 play?
9     A   42 is a plate.  It's a steel plate that
10 is -- it has a stoppage for the bollard 34.
11    Q   Okay.  Does that carry any load.  Does that
12 hold -- does that have any role in supporting the
13 bollard against the load?
14    A   It does.  It's a stopper, so any member
15 that is in contact and has sufficient thickness could
16 act as a structural member.
17    Q   Okay.  It says that you say in paragraph 73
18 that Turpin is 24-inch deep or the like; is that
19 true?
20    A   Paragraph -- I'm sorry, what paragraph?
21    Q   73.
22        MR. DILLARD:  Could the reporter repeat the
23 question, please.
24        MR. SAPHIA:  Lynda, you can strike it.
25 I'll ask it again.

1        THE COURT REPORTER:  Okay.  Thank you.
2 BY MR. SAPHIA:
3     Q   In paragraph 73, Doctor, of your report on
4 page 28, you say, "To install the vault 12 of Turpin,
5 an opening approximately 12 feet by nine feet by 24
6 inch deep or the like is created -- is prepared to
7 create a pit."
8     A   Right.  Correct.
9     Q   Is that a shallow excavation, 24 inches?
10    A   It is.
11    Q   Okay.
12    A   It could be considered shallow.
13    Q   By whom?
14    A   By any person with ordinary skill in the
15 art that knows what's required for -- for anti-ram
16 bollard systems.
17    Q   How about 28 inches, is that --
18    A   I believe -- it could be -- anywhere that
19 you are below the utilities could be construed as a
20 shallow mount.
21    Q   Three feet?
22    A   Well, you know, the utilities are different
23 in different places but usually three feet is --
24 below three feet or four feet is where they install
25 the utilities.  So a shallow mount is considered

Page 222

1 excavation?
2   A As I said, it's a relative term so it could
3 be anything that is above the utilities.
4   Q So anybody that would say 18 inches is the
5 benchmark, obviously doesn't understand that it's a
6 relative term; right?
7   A No.
8   MR. DILLARD: Objection as to form.
9   THE WITNESS: No, that's not correct. I
10 mean, what I'm saying is a flexible number and it's a
11 relative number to the places that you are installing
12 your mount. What constitutes a shallow mount depends
13 on your utility application.
14 BY MR. SAPHIA:
15   Q So, let's say I worked for Delta Scientific
16 for 35 years and that's all I did was designed
17 bollards and vehicle systems and I said it was 18
18 inches.
19     What would you say to that person?
20   A I would say this -- first of all, this is a
21 hypothetical question. If that person says 18
22 inches, I would say you need to consider the
23 utilities and you need to consider the design
24 requirements and be above the utilities.
25   Q Do you know why you considered that a

Page 223

1 hypothetical question?
2   A It's not -- there's no one fixed number
3 that you can nail down and say this a shallow and
4 that is not shallow. It's a relative term.
5   Q Do you know why you would consider that a
6 hypothetical question?
7   A Yes, because it's just -- it's just making
8 assumptions and things that are not specific to me or
9 known to me. You said --
10   Q Well --
11   A -- imagine you are a person --
12   Q This is an issue that -- this is an issue
13 that your report suffers from on many different
14 levels. But I will tell you that there has been
15 depositions of Delta Scientific employees who have
16 been operating in this industry for many years. And
17 one of those people said that it is an industry
18 standard of 18 inches for some time for shallow
19 mount.
20     Is he wrong?
21   A He could be wrong. It depends when and how
22 and under what circumstances he made that assumption.
23   Q Okay. Let's talk about DSC501.
24     Could you describe DSC501 to me.
25   A Pardon me.

Page 224

1   Q How would you categorize it, Doctor?
2   A It is an anti-ram system. A barrier system
3 to be more specific.
4   Q Is it an active system?
5   A You know, I personally wouldn't call it
6 active because there is -- you know, there's a
7 potential to open it manually and it really depends
8 how you define active system.
9     It's a barrier that has a movable part that
10 goes down and up.
11   Q Okay. I see a hydraulic cylinder, do you,
12 on page 31 of your report?
13   A Right, right. So that part of it makes it
14 an active part.
15   Q Okay. So it's an active barrier, right.
16     How wide is it?
17   A The width, you have to go back to the
18 design drawing to see the exact width.
19   Q So you don't know how wide it is?
20   A About nine -- nine feet, I believe.
21   Q Nine feet?
22   A Roughly. I'm just referring to the
23 drawings on my report to make sure I remember it
24 correctly.
25   Q Okay.

Page 225

1   A I would say according to drawings, it is --
2 it depends on what part of it you consider. It could
3 be -- it could be nine feet plus.
4   Q Okay.
5   A Yeah, it's nine feet plus 24 inches.
6   Q Okay. Yeah. You wouldn't use DSC501
7 unless you wanted to regulate flow of vehicles; am I
8 correct?
9   A It's a barrier. You can use it for
10 whatever barrier purposes so...
11   Q But why would you use it? Would you use it
12 for any other reason other than that?
13   A If you want to use it -- you use it for a
14 place where you want to stop a vehicle. So you can
15 use it for stopping vehicles.
16   Q Okay. Have you ever seen a DSC used in an
17 area that --
18   A In person?
19   Q Yeah.
20   A In person?
21   Q Yeah.
22   A No.
23   Q You've never seen it?
24   A No.
25   Q Okay. I was going to ask you -- I was

57 (Pages 222 - 225)

Page 254

1    Q   Right.  But that's -- but that's -- that's
2  just the structure itself, right.  That's just the
3  base; right?
4    A   Right.
5    Q   That's not the excavation diagram?
6    A   I'm not sure I have excavation diagram
7  here.
8    Q   Okay.  We just introduced something else.
9  So it's -- refresh and it's Exhibit No. 15.
10       (Plaintiff's Exhibit 15 was marked for
11  identification by the Certified Shorthand Reporter
12  and is attached hereto.)
13  BY MR. SAPHIA:
14    Q   Now, this exhibit was -- you considered
15  this in your report; right?
16    A   It's opening.
17    Q   Okay.
18    A   Right.  Where it shows 18 inches, correct.
19    Q   Right.
20    A   I have this drawing.  Yes, I've looked at
21  it.
22    Q   Okay.  So let me ask you this question:
23  How -- how tall are the bollards in this above grade?
24    A   Two feet.
25    Q   Two feet?

Page 255

1    A   Yeah.  According to this line, yeah.
2    Q   Is that tall enough to stop a car?
3    A   It depends on what's -- you know, all the
4  details in the bollard -- because of the design of
5  the bollard.
6    Q   Right.  Were these -- were these bollards
7  rated at all, do you know?
8    A   I don't know.
9    Q   Okay.  So you don't know if they actually
10  do resist rotation upon impact?
11    A   Well, from the structure -- the way the
12  structure seems and the way that it's constructed
13  from the upper and lower plate and the assembly and
14  other parts that are mentioned in my report, it
15  should resist rotation.
16    Q   So you are assuming that, you don't have
17  any evidence of that?
18    A   I haven't tested it myself.  So I can't say
19  I have evidence of its resistance.
20    Q   And you haven't seen any test data from it,
21  have you?
22    A   I don't recall that there was any test data
23  shared with me, no.
24    Q   Okay.  I just want to show you something
25  that -- because you don't -- you don't know how deep

Page 256

1  the excavation is, do you?
2    A   Well, I believe you mentioned what the --
3  in one of the drawings, yeah, the minimum height that
4  is required for it would be the height of the
5  structure which is -- which was 17.625 minus the
6  thickness of the plate depending how far up you want
7  to go with your excavation.
8    Q   Okay.
9    A   So it should be that plus anything else
10  that you want to add below.
11    Q   Okay.  So let me ask you this then:  Take a
12  look at DS00000751.
13    A   Right.
14    Q   Now there's a diagram in the middle of that
15  page.
16    A   Right, right.
17    Q   Do you see it?
18    A   Right.
19    Q   Now do you see the height of the bollards
20  coming up?
21    A   Right.
22    Q   Do you see the -- do you see the excavation
23  below?
24    A   Right, I do.
25    Q   Right?

Page 257

1    A   Yes.
2    Q   The height of the bollard is less than the
3  depth of the excavation.
4       Do you see that?
5    A   In this schematic it looks like it.
6    Q   Right?
7    A   Right.
8    Q   So it looks to me that the concrete -- and
9  I guess that's rebar too.
10       Is that rebar also, can you tell?
11    A   Right.  It has to say in the notes so...
12    Q   I don't know.  You could take a look.  I
13  don't see it anywhere.
14       But I'm assuming that the bollard is two
15  feet, this -- this, if it's accurate, tells me that
16  the excavation is at least -- well, it's greater than
17  two feet.
18    A   It could be two feet.  It could be --
19    Q   Or more?
20    A   The height is not specifying that, so I
21  can't comment on that.
22    Q   Well, I know.  So it's -- so, at least
23  that's depicted here.  No one -- I don't think
24  anybody could see this and say that it's less than
25  the size of the bollard?

65 (Pages 254 - 257)

**EXHIBIT 14**

1              UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3
     Case No. 2:19-cv-06024 JAK(PLAx)
4    _____
5    RSA PROTECTIVE TECHNOLOGIES, LLC,
6
                          Plaintiff,
7
                 v.
8
     DELTA SCIENTIFIC CORPORATION,
9
                          Defendant.
10   _____
11
12
13
14
          REMOTE VIDEOCONFERENCED AND
15
          VIDEOTAPED DEPOSITION OF
16
               JOHN CRAWFORD
17
18
19
20
21
22
23   DATE TAKEN: NOVEMBER 10, 2020
24   REPORTED BY: PAUL J. FREDERICKSON, CSR
25   JOB NO. 4330741

                                        Page 1

1      UNITED STATES DISTRICT COURT
2      CENTRAL DISTRICT OF CALIFORNIA
3
       Case No. 2:19-cv-06024 JAK(PLAx)
4    _____
5    RSA PROTECTIVE TECHNOLOGIES, LLC,
6
              Plaintiff,
7
           v.
8
     DELTA SCIENTIFIC CORPORATION,
9
              Defendant.
10   _____
11
12
13      Remote Videoconferenced and
14   Videotaped Deposition of JOHN CRAWFORD,
15   the witness herein, at 11:06 a.m. Pacific
16   Time, pursuant to notice, reported by
17   certified court reporter Paul J.
18   Frederickson, CSR.  All parties appeared
19   remotely and the witness was sworn
20   remotely.
21
22
23
24
25

Page 2

1  ON BEHALF OF THE WITNESS:
2    PARKER MILLIKEN CLARK O'HARA & SAMUELIAN
3    555 S. Flower Street
4    30th Floor
5    Los Angeles, CA 90071
6    213.683.6575
7    BY: BRENT CHENEY, ESQ.
8    bcheney@pmcos.com
9
10 ALSO PRESENT:
11   ANNETTE McGUIA
12
13 ALSO PRESENT:
14   CARLOS VELASQUEZ
15   Videographer
16
17   NATALIE SAHIN
18   Veritext
19
20
21
22
23
24
25

Page 4

1         A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFF RSA PROTECTIVE:
4    HAUG PARTNERS LLP
5    745 Fifth Avenue
6    New York, NY 10151
7    212.588.0800
8    BY: JESSICA ZAFONTE, ESQ.
9    JZafonte@haugpartners.com
10   BY: JOSEPH SAPHIA, ESQ.
11   JSaphia@haugpartners.com
12
13 ON BEHALF OF DEFENDANT DELTA SCIENTIFIC:
14   LEWIS ROCA ROTHGERBER CHRISTIE LLP
15   655 N. Central Avenue
16   Suite 2300
17   Glendale, CA 91203-1445
18   626.795.9900
19   BY: DAVID DILLARD, ESQ.
20   ddillard@lrrc.com
21   BY: CONSTANTINE MARANTIDIS, ESQ.
22   cmarantidis@lrrc.com
23   BY: SAMI SCHILLY, ESQ.
24   sschilly@lrrc.com
25

Page 3

1           I N D E X
2
3  JOHN CRAWFORD
4    By Mr. Dillard: 8
5
6  Request for information: None
7  Request for documents: None
8
9       INDEX TO EXHIBITS
10
11 EXHIBIT 128               14
12 Notice of Videotaped Deposition of
13 Karagozian & Case, Inc. with Request
14 for Production of Documents and
15 Tangible Things
16
17 EXHIBIT 129               17
18 Notice of Videotaped Deposition of
19 John Crawford with Request for
20 Production of Documents and
21 Tangible things
22
23 EXHIBIT 130               56
24 Provisional Application for Patent
25 Cover Sheet, RSA-DELTA043770 - 813

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1 | Brent? 13:38:57 |
| 2 | MR. DILLARD: If you can. 13:38:57 |
| 3 | MR. CHENEY: If you understand 13:38:58 |
| 4 | the question, you can answer. 13:38:59 |
| 5 | THE WITNESS: Sure. 13:39:01 |
| 6 | A. The question really is do you 13:39:01 |
| 7 | want the bollard to move more or less? And 13:39:03 |
| 8 | the answer is you want it to move less at 13:39:06 |
| 9 | the top. The tip you want to control as 13:39:09 |
| 10 | much as you can from moving on a horizontal 13:39:12 |
| 11 | plane. 13:39:15 |
| 12 | MR. DILLARD: All right. 13:39:42 |
| 13 | Ms. Schilly, I think we can exit that 13:39:43 |
| 14 | particular -- 13:39:47 |
| 15 | BY MR. DILLARD: 13:40:33 |
| 16 | Q. The -- that last question, or 13:40:33 |
| 17 | the last -- well, strike that. 13:40:36 |
| 18 | MR. CHENEY: I was going to hold 13:40:39 |
| 19 | you to that, David, as your last 13:40:44 |
| 20 | question. I thought we were -- 13:40:46 |
| 21 | MR. DILLARD: No, no, no. I was 13:40:46 |
| 22 | talking about previous. 13:40:48 |
| 23 | [Laughter.] 13:40:49 |
| 24 | BY MR. DILLARD: 13:40:49 |
| 25 | Q. When the bollard -- or strike 13:40:56 |

Page 106

| | |
|---|---|
| 1 | that. 13:40:58 |
| 2 | In a crash test, if a bollard 13:40:59 |
| 3 | rotates, will it -- where would the axis of 13:41:06 |
| 4 | rotation be? 13:41:14 |
| 5 | A. Usually it's -- 13:41:16 |
| 6 | MS. ZAFONTE: Objection, calls 13:41:16 |
| 7 | for a hypothetical, seeking expert 13:41:17 |
| 8 | testimony. 13:41:20 |
| 9 | MR. CHENEY: Right. I was going 13:41:21 |
| 10 | to -- same objections, incomplete 13:41:22 |
| 11 | hypothetical, expert testimony. 13:41:25 |
| 12 | If you understand the question 13:41:27 |
| 13 | and can answer it, Mr. Crawford, you 13:41:28 |
| 14 | can. If you don't, then let him know. 13:41:29 |
| 15 | A. Well, the axis is likely to be 13:41:34 |
| 16 | around where it enters the ground. But the 13:41:36 |
| 17 | pur- -- the rationale for why it rotates 13:41:39 |
| 18 | involves a lot of different factors. If you 13:41:44 |
| 19 | want to talk about the specific system I 13:41:46 |
| 20 | can, or if you want to talk about bollards 13:41:47 |
| 21 | in general I can. But the whole point is 13:41:49 |
| 22 | you don't allow it to rotate more than a 13:41:51 |
| 23 | little bit, you know, and that rotation is 13:41:54 |
| 24 | what you're trying to control with 13:41:56 |
| 25 | everything you're doing. 13:41:58 |

Page 107

| | |
|---|---|
| 1 | I guess in point of fact when 13:42:07 |
| 2 | you see systems that fail it's because the 13:42:09 |
| 3 | bollard rotates too much. 13:42:11 |
| 4 | Q. Okay. 13:42:12 |
| 5 | Does it -- 13:42:13 |
| 6 | A. Or typically why they fail I 13:42:21 |
| 7 | guess. There are other reasons, but that's 13:42:22 |
| 8 | a very typical one. 13:42:24 |
| 9 | Q. With respect to the RSA shallow 13:43:15 |
| 10 | mount bollard that you designed -- just a 13:43:19 |
| 11 | moment. 13:43:45 |
| 12 | With respect to the RSA bollard 13:44:02 |
| 13 | structure that you designed, would it be the 13:44:10 |
| 14 | case that rotation of the bollard in a crash 13:44:27 |
| 15 | scenario would depend at least in part on 13:44:32 |
| 16 | the speed and weight of the vehicle? 13:44:36 |
| 17 | MS. ZAFONTE: Objection, 13:44:40 |
| 18 | incomplete hypothetical. 13:44:41 |
| 19 | MR. CHENEY: Join. 13:44:41 |
| 20 | You can go ahead and answer, 13:44:44 |
| 21 | John. 13:44:46 |
| 22 | A. Yes. I should say usually. You 13:44:52 |
| 23 | can have a crappy design that rotates under 13:44:56 |
| 24 | any impact. 13:45:01 |
| 25 | Q. Well, just a moment. Oh, sorry, 13:45:07 |

Page 108

| | |
|---|---|
| 1 | my screen blanked off for a moment. 13:45:09 |
| 2 | Obviously the -- strike that. 13:45:19 |
| 3 | MR. DILLARD: Tell you what. 13:46:23 |
| 4 | Why don't we take a break for about 13:46:25 |
| 5 | ten minutes to let me get organized? 13:46:28 |
| 6 | THE WITNESS: Is this going to 13:46:34 |
| 7 | be a real ten minutes? 13:46:35 |
| 8 | [Simultaneous speaking.] 13:46:43 |
| 9 | MR. DILLARD: We haven't -- 13:46:46 |
| 10 | there hasn't been built in a lunch 13:46:47 |
| 11 | break. Would you like to take 13:46:49 |
| 12 | 30 minutes? 13:46:53 |
| 13 | THE WITNESS: No, that wasn't my 13:46:54 |
| 14 | question. I just don't want to come 13:46:55 |
| 15 | back in ten and then wait another ten. 13:46:57 |
| 16 | MR. DILLARD: Well, why don't we 13:46:59 |
| 17 | take a short lunch break and come back 13:47:01 |
| 18 | and see if we can't finish this thing 13:47:07 |
| 19 | up? 13:47:10 |
| 20 | THE VIDEOGRAPHER: Is that okay 13:47:18 |
| 21 | with counsel? 13:47:18 |
| 22 | MR. CHENEY: So half hour? Back 13:47:19 |
| 23 | at 2:15? 13:47:20 |
| 24 | MR. DILLARD: Yeah. Yes. 13:47:21 |
| 25 | THE VIDEOGRAPHER: Okay. We are 13:47:23 |

Page 109

28 (Pages 106 - 109)

**EXHIBIT 15**



Page 1

1            UNITED STATED DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    _____

                                    )
5    RSA PROTECTIVE TECHNOLOGIES,  )
     LLC,                           )
6                                   )
              Plaintiff,            )
7                                   )Case No. 19-6024
         vs.                        )
8                                   )
     DELTA SCIENTIFIC CORPORATION,)
9                                   )
              Defendant.            )
10   _____)

11

12

13        VIDEOCONFERENCE DEPOSITION OF JOHN FRIEND

14            Wednesday, September 16, 2020

15                    Volume I

16

17

18

19

20

21

22   Reported by:
     KATHLEEN E. BARNEY
23   CSR No. 5698

24

25

Page 2

```
1          UNITED STATED DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
3
4    _____
                              )
5    RSA PROTECTIVE TECHNOLOGIES, )
     LLC,                       )
6                               )
            Plaintiff,          )
7                               )No. 19-6024
         vs.                    )
8                               )
     DELTA SCIENTIFIC CORPORATION,)
9                               )
            Defendant.          )
10   _____)
11
12       Videoconference deposition of JOHN FRIEND,
13   Volume I, taken on behalf of Plaintiff, beginning at
14   8:08 a.m. and ending at 1:21 p.m. on Wednesday,
15   September 16, 2020, before KATHLEEN E. BARNEY,
16   Certified Shorthand Reporter No. 5698.
17
18
19
20
21
22
23
24
25
```

Page 4

```
1    APPEARANCES (continued):
2
3
4    Also Present:
5
6        ANNETTE MCGUIRE
7
8    Videographer:
9
10       NICHOLAS GLANTZ
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    APPEARANCES:
2
3    For Plaintiff:
4
5        HAUG PARTNERS LLP
6        BY: JOSEPH V. SAPHIA
7           JESSICA ZAFONTE
8           JOHN BALAES
9        Attorneys at Law
10       745 Fifth Avenue
11       New York, New York 10151
12       (212) 588-0800
13       jsaphia@haugpartners.com
14
15   For Defendant:
16
17       LEWIS ROCA ROTHGERBER CHRISTIE
18       BY: DAVID DILLARD
19       Attorney at Law
20       655 North Central Avenue
21       Glendale, California 91203
22       (626) 795-9900
23       ddillard@lrrc.com
24
25
```

Page 5

```
1                INDEX
2    WITNESS                    EXAMINATION
3    JOHN FRIEND
4    Volume I
5
6        BY MR. SAPHIA              8
7
8
9                EXHIBITS
10   NUMBER      DESCRIPTION          PAGE
11   Exhibit 1   Notice of deposition      34
12
13   Exhibit 2   Defendant's Amended Rule 26    43
14               Initial Disclosures
15
16   Exhibit 3   Printout of website pages     63
17
18   Exhibit 4   Responses to Plaintiff's First   118
19               Set of Requests for Production
20
21   Exhibit 5   March 18, 2020 letter       120
22
23   Exhibit 6   March 30, 2020 e-mail       121
24
25   Exhibit 7   Invalidity contentions      129
```

2 (Pages 2 - 5)

Page 50

1    A  I mean, I can read it and I can see what they
2  have.  The legalese is a stumper for an engineer
3  like me.
4    Q  I understand.  And I don't want to catch you
5  off guard and I don't want you to answer using
6  speculation, and that is sometimes what happens.
7  But I would like you -- I would -- you know, patents
8  are written for engineers in your field.  We call
9  them persons of ordinary skill in the art.  Have you
10  ever heard that?
11    A  No.
12    Q  Okay.  Basically what it means is guys like
13  you who are in an area and you pick up something
14  that -- in a related subject and when you read it,
15  you kind of know what it means because you practice
16  in it.
17    I could pick up chemical patents all day long
18  and I could read and understand them, not because
19  I'm a lawyer, but because I have an understanding of
20  what the subject matter is.
21    Given what you just said, I'm not going to
22  bother you about the patent at issue in this case,
23  but I will ask you what some of the -- what some
24  terms mean, if that's okay.
25    A  Okay.

Page 51

1    Q  So do you have an understanding of what an
2  anti-ram system is?
3    A  Correct.
4    Q  And what is that?
5    A  That is a device intended to resist the
6  ramming by a vehicle at speed.
7    Q  So when you say resist it, you mean not allow
8  it to push past whatever this anti-ramming product
9  is designed to do, right?
10    A  Correct.
11    Q  Okay.  So if I -- so if I had a product that
12  allowed, let's say, a vehicle to run right over it,
13  it wouldn't be a very useful anti-ram product, would
14  it?
15    A  It doesn't mean they don't get sold, but
16  correct.
17    Q  Now that you mention that, do you know what I
18  mean by a Hollywood bollard?
19    A  I can imagine.
20    Q  Okay.  All right.  So -- okay.  So just so we
21  understand that, if something is an anti-ram system,
22  in your business, what it means is you have to
23  resist penetration of a vehicle trying to harm
24  either persons or property, correct?
25    A  Correct.

Page 52

1    Q  Okay.  What is -- what is a shallow
2  excavation within the context of your products?  Or,
3  more specifically, a shallow mount bollard product.
4    MR. DILLARD:  Objection.  Calls for a legal
5  conclusion.
6    If you understand the question, you can
7  answer.
8  BY MR. SAPHIA:
9    Q  You can answer.
10    A  About 2000, maybe a little before, people
11  performing the installations on the traditional
12  barriers were finding that -- that items in the
13  roadway below the surface were becoming more and
14  more and more of a problem.  And so somebody took a
15  swing and said, "Let's call 18 inches the maximum we
16  want and we're only going to buy barriers that can
17  be placed in 18 inches or less foundation."  So that
18  kind of caused us to scuttle about and come up with
19  products that met that.
20    Q  And the industry calls that a shallow mount
21  product?
22    A  That would -- that would be it.  The industry
23  calls a lot of things what we call them.  We're kind
24  of the Xerox of the barriers.  They're frequently
25  called Deltas whether they're Deltas or not.

Page 53

1    Q  I understand that Delta was an innovator for
2  certain types of bollards; is that correct?
3    A  Correct.
4    Q  And am I correct that a lot of those bollards
5  were removable bollards and bollards that moved up
6  and down?
7    A  Correct.
8    Q  Okay.  Those were not shallow mount bollards,
9  were they?
10    A  Some were and some weren't.
11    Q  Okay.
12    A  There were always instances where shallow was
13  required.
14    Q  Okay.  But when we were talking about shallow
15  mount bollards before, you mentioned 18 inches.
16  Were those -- were those products that Delta
17  designed early in its history 18 inch -- did they
18  have an 18-inch base or an 18-inch excavation?
19    A  The product we had, we took all 18 inches
20  for the -- for the requirement, for the 18-inch
21  requirement, we specifically came up with a product
22  for that.  But that was not the only instance of
23  people requiring a shallow frame piece of equipment.
24    Q  Okay.  When you say "requirement," was this a
25  requirement by the government or a requirement by

14 (Pages 50 - 53)

Page 142

1    Q   Okay.  Can we go to page 1015.
2    A   Okay.
3    Q   This appears -- this appears to be a purchase
4    order by the Bratton Corporation?
5    A   Correct.
6    Q   And why would they be buying those same
7    bollards?
8    A   They evidently got in there -- maybe Clark
9    Construction -- as a sub to Clark Construction or
10   something for this project.
11   Q   Okay.  So that would mean that Clark
12   Construction was the GC, Bratton was the sub, and
13   Bratton ordered the products from you?
14   A   Could be.  It looks that way.
15   Q   Okay.  Now, this -- now, this is dated
16   7/21/2003 as received.  Now, I don't know what that
17   means.  Do you know what that means?
18   A   No.
19   Q   Can we move to page 1019.  It seems to be the
20   same 4790 on here.
21       Do you see that?
22   A   Okay.  Yeah.
23   Q   And I guess "BRA05," that could be Bratton
24   maybe?
25   A   Yeah.  That would be their customer number.

Page 143

1    Q   Now, there's a drawing on this.  Do you see
2    it above the quotation?
3    A   Uh-huh.
4    Q   Is that drawing supposed to be indicative of
5    something?
6    A   I don't know.  Might be the salesman's
7    doodle.
8    Q   Yeah, looks that way.  But it also looks a
9    little like the bollard that was sold.
10   A   Could be.  It could be doodling the bollard
11   as sold.
12   Q   Okay.  Now, the bollard is described at 1023.
13   A   I'm not seeing the -- oh, there it.  23.
14   Okay.  Yes.
15   Q   Right?
16   A   Yes.
17   Q   Now, this one says:
18       "Fixed bollard array, DSC800 FP."
19   A   FP is fixed post.
20   Q   Fixed post, right?
21   A   Yes.
22   Q   So is this what was sold?
23   A   Might have been what was sold at one time.
24   Q   But, I mean, is this what was sold to the
25   Health Sciences building at UCLA?

Page 144

1    A   It's a drawing in the file.  It wasn't what
2    was eventually shipped.
3    Q   I'm sorry?  I didn't hear.
4    A   It was not necessarily what was eventually
5    shipped.
6    Q   Okay.
7    A   Jobs can evolve.
8    Q   So -- so we don't know if this -- if this was
9    the bollard that was actually shipped?
10   A   Correct.
11   Q   Okay.  If this was the bollard that was
12   shipped, what is the excavation on this bollard, the
13   one that appears on 1023?
14   A   When I expand the page, it collapsed the
15   document.
16   Q   Take your time.  These -- this is not easy.
17   It's 10 -- it's page 1023.
18   A   I can't zoom in enough to see it.
19   Q   Okay.  All right.
20   A   It looks like it says 48 inch --
21   Q   Yeah.
22   A   -- or something.
23   Q   Right.  So it wouldn't be a shallow mount?
24   A   No.
25   Q   Can we turn to page 1030.

Page 145

1        Are you okay?
2    A   Got it.
3    Q   Okay.  And it says J4790.
4        Do you see that?
5    A   Correct.
6    Q   Okay.  What is the excavation on that
7    product?
8    A   It looks like 27 inches -- 27 to -- well,
9    there's a bunch of dimensions.  It looks like 22 is
10   significantly underneath it.  The unit itself is 17
11   inches, 17 and a quarter.
12   Q   Okay.  I see something 27 inches.
13   A   Yeah.  That might be as much as they had to
14   give us.
15   Q   Okay.  So that's how you -- so that would be
16   excavation depth, 27 inches, right?
17   A   Correct.
18   Q   Okay.  There's something here called a
19   locking plate.
20       Do you see it?
21   A   Yes.
22   Q   Okay.  And then there's something else at the
23   bottom of it which looks like another type of plate.
24   So there's like a top plate and a bottom plate.
25       Do you see that?

**37** (Pages 142 - 145)

Page 146

1    A   Correct.
2    Q   I guess the top plate sits on the surface and
3    the bottom plate is put into the excavation; am I
4    correct?
5    A   Yes.
6    Q   Okay.  But the excavation required -- well,
7    that is depicted here is 27 inches, right?
8    A   Uh --
9    Q   Now, is it --
10       THE COURT REPORTER:  I'm sorry.  Was there an
11   answer?
12       THE WITNESS:  No, there was no answer.  I'm
13   waiting for a question.
14   BY MR. SAPHIA:
15   Q   Oh, I'm sorry.
16       The excavation that is indicated here is in
17   total 27 inches; am I correct?
18   A   Yes.  As indicated here, yes.
19   Q   Is that rebar that's around this?
20   A   Yes.
21   Q   Okay.  Is that rebar welded to the external
22   portion of the -- of the bollard structure?
23   A   It wouldn't have been welded by Delta.
24   Q   Okay.  So it doesn't come supplied that way?
25   A   We normally do not supply concrete or rebar

Page 147

1    because it makes it too expensive.
2    Q   Okay.  So as far as you're concerned, what
3    Delta would provide would be what was depicted on
4    Section A-A?  It's the one right next --
5    A   Yes.
6    Q   Okay.  So -- all right.  I just want to --
7    there's another page in here that I wanted you to
8    explain something to me.  And it's on page 1025.
9    Let me know when you get there.
10   A   Okay.
11   Q   So Neil Johnson, did he work for you?
12   A   He was an engineer.  Yes.
13   Q   And Terry Young was a salesman?
14   A   Correct.
15   Q   Okay.  So -- so this is from Neil to you,
16   cc'ing Terry, about the UCLA job; am I right?
17   A   Correct.
18   Q   Okay.  So here:
19       "Please note the following on Job
20       4790, UCLA."
21   Right?
22       And No. 3 says, "Disregard drawing 90469."
23   A   Yes.
24   Q   So 90469, that's the page before.  That's
25   1024, right?

Page 148

1    A   Yes.
2    Q   And that we established is like a 40 -- I
3    don't know what you said -- 48-inch excavation,
4    whatever, right?
5    A   Correct.
6    Q   And then it says:
7        "Build to drawing J4790, except
8        use a standard height DSC800 bollard."
9    Right?
10   A   Correct.
11   Q   Okay.  And that was -- and the date on this
12   is December 30th of 2003.
13       Do you see that?
14   A   Yes.
15   Q   Okay.  So now if we go back to what we just
16   looked at on page 1030 --
17   A   I'm kind of laboring.
18   Q   I know.
19   A   I've only got a very small portion of the
20   screen and I have the stupid thing that says,
21   "Comments, tasks, start collaboration now," that is
22   taking up half my screen.
23   Q   Oh, God.  What is that all about?
24       MS. ZAFONTE:  Just click on the "Comments."
25   ////

Page 149

1    BY MR. SAPHIA:
2    Q   Click on the "Comments."
3        MS. ZAFONTE:  And it will go away.
4    BY MR. SAPHIA:
5    Q   And it will be gone.
6    A   Okay.
7    Q   Better?
8    A   Much better.
9    Q   Okay.
10   A   I didn't click it to open it, so -- okay.
11   I'm back to 1030.
12   Q   Right.  And 1030, if you look at the title
13   block, it says J4790.
14   A   Correct.
15   Q   Do you see that?
16   A   Correct.
17   Q   So somewhere along the line in December of
18   '03, someone is saying, let's change this order and
19   let's disregard one type of bollard, which was the
20   90469, and instead use the installation on J4790?
21   A   Correct.
22   Q   Okay.  So when this order was taken, we don't
23   know -- or it appears that what was contemplated was
24   the bollard that appears on title block 90469 --
25   A   Yes.

38 (Pages 146 - 149)

**EXHIBIT 16**

<u>TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED</u>

**Case Name:**    RSA Protective Technologies, LLC v. Delta Scientific Corporation

**Case No:**    CV 19-06024 JAK (PLAx)

**Hearing:**    July 27, 2020 at 10:30 a.m.

_____

**SUBJECT:    Claim Construction; Defendant's Motion for Leave to Amend Answer**
_____

      **I.    Claim Construction**

          1.    <u>Agreed Claim Terms</u>

The parties have agreed to the following constructions of certain claim terms:

| Term | Agreed Construction |
|---|---|
| "base" (Claims 1, 3, 4, 16, 19, 20, 32, 33) | "structure supporting the bollard" |
| "opposed" (Claims 1, 2, 16, 17, 33) | "opposite" |
| "structural member" (Claims 1-3, 5, 10-15, 16-21, 26-35) | "constituent piece that offers support to a structure" |
| "bollard structure" (Claims 1-35) | "structure that contains one or more bollards" |
| "to retain within the base supporting media introduced into the base"[1] (Claims 1, 16, 33) | "to allow for supporting media to be placed or poured into the base" |
| "intersect" (Claims 1, 3, 16, 19, 32-33) | "pass or lie across" |
| "[tubular, steel, rebar, or plurality of] member[s]"[2] (Claims 1-35) | "[tubular, steel, rebar, or plurality of] constituent piece[s] of a structure" |

_____

[1] The parties proposed that the longer phrase "configured or tied together to retain within the base supporting media introduced into the base" be construed as "allowing for supporting media to be placed or poured into the base." However, the parties dispute the meaning of the term "tied together," and do not account for the meaning of the claim term "tied together" in their proposed construction for this longer claim phrase, which included that term. For purposes of this Order, it is assumed that the parties would be in agreement regarding the meaning of the shorter claim phrase identified in this chart.

[2] The parties agreed to a construction for the term "member." However, the parties also separately agreed to a construction for the term "structural member." The term "member" otherwise appears in the asserted claims in the context of the phrases "tubular member," "steel member," "rebar member," or "plurality of members." To avoid any confusion -- including whether the agreed construction for "member" also applies to the separately-construed term "structural member" -- for purposes of this Order,  it is assumed that the parties would be in agreement regarding the meaning of the larger claim phrases "tubular member," "steel member," "rebar member," and "plurality of members," with no construction of the terms "tubular," "steel," "rebar," or "plurality of."

*See* Dkt. 56 at 2.

### 2. Disputed Claim Terms

#### a) "ends" (Claims 1, 2, 16-18, 33)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "boundaries" | "at or near the farthest points in a lengthwise direction or a widthwise direction" |

Claims 1, 16, and 33 each refers to "a base comprising opposed ends" and further requires

> for each bollard of the bollard structure at least one first structural member ***extending from a first of the <u>opposed ends</u> of the base to a second of the <u>opposed ends</u> of the base in a first direction intersecting with the <u>opposed ends</u>***, and at least one structural member extending to intersect with the at least one first structural member.

'865 Patent at Claims 1, 16, 33 (emphasis added).

Claim 33 further recites:

> at least one of the plurality of members that ***extend parallel to the <u>ends of the base</u>*** extending between a structural member to which a first bollard is secured and a structural member to which a second bollard adjacent to the first bollard is secured.

*Id.* at Claim 33 (emphasis added).

The claim term "ends" generally appears in the context of the phrase "[opposed] ends of the base." The parties have agreed that the claim term "opposed" means "opposite." Dkt. 56 at 2. Although the second cited excerpt from Claim 33 does not expressly refer to the claimed ends of the base being opposed, it does refer to members extending *parallel* to the ends, plural, of the base. This suggests that the referenced ends of the base are also at least opposed in the context of this claim limitation.

*First*, Delta argues that its proposed construction of "at or near the farthest points" explains the basis  for its position that the term "end" covers an "end portion." *See* Dkt. 62 at 1. Delta argues that RSA's proposed construction of "boundary" "denote[s] a line of demarcation" and "does not connote any thickness." Delta's characterizations of the meaning of the term "boundary" as not referring to "any thickness" are unpersuasive. Fences can provide well-known boundaries, and a fence has an inherent width, given that it is a physical structure. However, the claims require "[opposed] ends," not "[opposed] end ***portions***." Whether or not an "end" can have its own thickness, interpreting an "end" as an "end portion" (or as "at or *near* the farthest points") could impermissibly broaden the meaning of the claim. Ultimately, it is not sufficiently clear whether the parties dispute the plain meaning of "end" in this regard, *i.e.* whether it refers to a thickness in the context of the claimed invention. In RSA's responsive claim construction brief, it does not address Delta's assertions about this dispute. It is also not sufficiently clear whether such a dispute is relevant to dispositive issues in the case, including questions of patent infringement or invalidity.

<u>TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED</u>

On the current record, there is not a basis to rewrite the claim term "ends" as either "boundaries" or "at or near the farthest points . . . ," given the potentially different interpretations between the plain meaning of the term "ends" and the meaning of these phrases.

*Second*, the parties dispute whether Delta's proposed requirement that ends be "in a lengthwise direction or a widthwise direction" should be included in a construction for the term. The parties rely on Figure 23 of the '865 Patent to "demonstrate[ ] the differences between the parties' constructions." Dkt. 62 at 2. RSA asserts that Figure 23 shows structures shaped in a manner that not all "ends" are situated perfectly "lengthwise" or "widthwise":



'865 Patent at Fig. 23.

Delta argues that Figure 23 supports its position, and provides an annotated version of the figure with red circles showing where it believes the "opposed ends" are to be located:



*See* Dkt. 62 at 2.

Delta argues that RSA's proposal "turn[s] the term 'ends' into an outer periphery, i.e., each outermost surface along the periphery of a base." *Id.* It is not clear that this is RSA's position. Through Delta's argument, it suggests it is improper for the actual peripheral structures of the base to be considered the base's "[opposed] ends." However, Delta does not adequately explain why this would be improper. *See also* '865 Patent at Claims 2, 17 ("at least one of opposed ends is **formed by** a structural member." (emphasis added)). Delta suggests that its position, which attempts to define by length and width a "footprint" of the base, is supported because a vehicle will "usually" crash into a bollard in "a front to back direction." Dkt. 62 at 2. However, Delta provides no evidentiary support for this assertion about the usual direction of a vehicular crash into a bollard, or that this would, in turn, support Delta's characterization of the "ends" as relating to a rectangularized "footprint" of the base.

<u>TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED</u>

The claims only require a single set of "opposed ends." They do not account for either the entire periphery *or* "footprint" of a base, as both parties' arguments seem to suggest. The claims require instead that the "at least one first structural member" extend from a first opposed end to a second opposed end such that the member "intersect[s]" with the set of two opposed ends. The claims otherwise require that "at least one structural member" "intersect" with the "at least one first structural member." The parties agree that "intersect" means "pass or lie across." Dkt. 56 at 2. They place no requirements on a specific angle of intersection. Thus, neither party has asserted that a member's "intersection" must be perfectly perpendicular to an end or other member.

Nor did the parties place any mathematical requirements on the meaning of the term "opposed." Their agreed construction of "opposed" as "opposite" does not require that two "opposed ends" be perfectly parallel to one another at all times. Thus, as to Claims 1 and 16, so long as there is some intersection between the first structural member and two opposed ends, and some intersection between the first structural member and the structural member, there would not appear to be any other limit on the precise configuration of the two opposed ends or the two members. Regarding Claim 33, the parties have not requested construction of the larger phrase "that extend parallel to the ends of the base." This limitation may implicitly lead to the requirement of a set of two opposed ends of the base that are parallel to one another, but that issue is not addressed on the current record. Ultimately, this limitation in Claim 33 also does not account for the full periphery or footprint of the base. Rather, it only relates to two opposite ends of the base. For these reasons, Delta's argument that the claimed ends necessarily result in a rectangular "footprint" for the base is unpersuasive. *See* Dkt. 62 at 2. Delta's proposal to require ends "in a lengthwise direction or a widthwise direction" would also impermissibly limit the scope of the claims, and is rejected.

For these reasons, the term "ends" is not construed, but shall be understood consistent with the analysis provided in this Order.

b)      "shallow excavation" (Claims 1, 16, 33)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "a hole or cavity sufficient to accommodate a shallow mount bollard base" | "a pit or cavity having a depth of less than 3 feet" |

Claims 1, 16, and 33 require, *inter alia*, "wherein the base is configured to be mounted in a **shallow excavation** with the [at least one] [plurality of] bollard[s] extending above grade [of the excavation]." '865 Patent at Claims 1, 16, 33 (emphasis added). The claims also require that members are configured or tied together "to retain within the base supporting media introduced into the base when the base is mounted in the excavation." *Id.*

Delta argues that its proposed construction of "shallow" as "having a depth of less than 3 feet" is based on disclosure in related art that "consistently . . . describe[s] excavation of 3 feet or less." Dkt. 62 at 4. Delta has not identified language in the patent intrinsic record showing that the patent applicant specifically acted as its own lexicographer to define "shallow excavation" to require three feet or less in the context of the claimed invention. Delta's selective prior art evidence is also insufficient to show that a person of skill in the art would understand that a "shallow excavation" in the context of the claimed invention must only refer to an excavation of three feet or less.

The claim language itself provides limits and requirements relevant to the meaning of the claim phrase "shallow excavation." The claimed bollard structure must be configured so that the one or

TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED

more bollards extend above the shallow excavation. The base must also retain supporting media when mounted in the shallow excavation. Delta suggests that the claims are indefinite if its construction is not adopted, but has not expressly moved for invalidity of the asserted claims as indefinite based on this claim limitation. Delta has failed to show by clear and convincing evidence that a person of ordinary skill in the art would be unable to understand the boundaries of this claim phrase with reasonable certainty.

Although Delta's proposed construction is rejected, given the surrounding claim language itself, RSA has not shown that its proposed construction is necessary, either. Therefore, the term "shallow excavation" is not construed.

c) "to transmit forces applied to the at least one bollard to the base" (Claims 1, 16, 33)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "to transfer forces applied to the at least one bollard to the base" | "to transfer at least some force that is applied to the at least one bollard to at least one member of the base" |

Claims 1, 16, and 33 require, *inter alia*,

> each [of the plurality of] bollard[s] being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base *so as to transmit forces applied to the at least one bollard to the base*.

'865 Patent at Claims 1, 16, 33 (emphasis added).

The parties dispute whether the claimed arrangement of components "[so as to] transmit forces applied to the at least one bollard to the base" requires "*some* forces" transmitted from the bollard to the base upon impact (as Delta argues), or *all* forces transmitted (as RSA argues).

Each party supports its position with references to the laws of physics, but without sufficient evidentiary citations to support those references and characterizations. For example, Delta argues, without support, that

> [i]f the bollard is bent as a result of the collision, then the bollard absorbed some of the forces. In that scenario, not all of the forces applied to the bollard will be transferred to the base. Whether some, most, or all of the forces applied to the bollard will be transferred to the base depends on a myriad of factors.

Dkt. 62 at 7; *see also* Dkt. 58 at 15 (stating, without citation, that "RSA's proposed construction appears to contradict the basic laws of physics by implicitly requiring that <u>all</u> force applied to the bollard be transferred to the base, even though this limitation could never be met in practice." (emphasis in original)).

RSA argues, without supporting evidence, that

> [a]s with any collision, at the initial moment of impact the force on a bollard is equal to the force on the vehicle. (Just like when punching a wall, the forces acting on

### TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED

the wall and the first are equal). If both the bollard and vehicle are completely rigid, then the force remains equal. The force will change, however, as the bollard or the car (or both) start to move or deform, and the force acting on the bollard and the car may no longer remain equal. But, any force that *is* applied to the bollard is transferred to the base, and from the base to the soil. In fact, all structures transfer loads to the structures base and then to the soil.

Dkt. 61 at 4 n.7 (emphasis in original).

The parties' dispute cannot be resolved on the current record. It involves subsidiary questions of fact that must be resolved, but for which the present evidentiary record is inadequate. Delta's reliance on the disclosure in a prior art reference to "Turpin" is not sufficient to support its characterizations of the physics involved in the operation of the claimed invention. RSA's reliance on the '865 Patent specification draws inferences from the disclosure and its use of the word "forces" that are not fully supported by the quoted passages. More information is required, e.g.,. appropriate extrinsic, expert evidence regarding the understanding of a person of skill in the art or citations to accepted textbooks or treatises regarding the laws of physics.

Construction of the term "transmit forces applied to the at least one bollard to the base" is **DEFERRED** pending an opportunity for the parties to present supplemental evidentiary submissions. The parties shall meet and confer and file a joint report within seven days of this Order stating their respective or collective positions regarding a proposed schedule for the following: (1) disclosure of evidence in support of each party's respective proposed claim construction for this term; (2) the filing of opening supplemental briefs, not to exceed five pages, which present the evidence and supplemental argument to explain the evidence for consideration; and (3) the filing of responsive supplemental briefs, not to exceed five pages, that address the evidence presented by the opposing party in its opening supplemental brief.

d)      "rotation is resisted" (Claims 1, 16, 33)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "resists movement away from a central point" | "amount of resistance to rotation is increased by some amount" |

Claims 1, 16, and 33 require, *inter alia*,

wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation *such that the* <u>*rotation is resisted*</u> *of a bollard or bollards and the base from an impact against the bollard or bollards*.

'865 Patent at Claims 1, 16, 33 (emphasis added).

Delta again makes statements about how a person of ordinary skill in the art ("POSITA") would understand the claim limitation "rotation is resisted." For example, Delta states that

[a] POSITA would understand that a base will inherently resist rotation and that providing *any* weight (i.e., media) to the base will result in the base being more resistant to rotation upon any impact. This is simple physics. Thus, for the claim

term 'rotation is resisted' to provide any meaning beyond an inherent property of the system, the supporting media must be provided to *increase* the amount of resistance to rotation of the bollard as compared to an initial baseline.

Dkt. 62 at 5 (emphasis in original).

Once again, Delta has not submitted evidence to support its assertions about how a base without supporting media will react to an impact. Defendant's proposed construction also introduces the concept of "increas[ing]" resistance, but does not provide a particular comparison point in the proposed construction itself from which resistance is "increased." Moreover, Delta's proposal adds the phrase "some amount," but it is not clear that a person of skill in the art would understand the scope of this phrase with reasonable certainty. Nor has Delta otherwise explained the boundaries of the meaning of the phrase.[3]

Delta's proposed construction is also inconsistent with the plain meaning of the claim phrase. The claim phrase provides that the configuration of members permits retention of "supporting media . . . ***such that*** rotation is resisted." Under Delta's proposed construction, any "increased" amount of resistance to rotation, intentional or not, would satisfy this claim phrase. For example, a system that was intended to permit -- not resist -- rotation could satisfy Delta's proposed construction so long as the system involved "some amount" of "increased" resistance to rotation -- compared to some undefined alternative system. The claim language states that the goal or purpose of the arrangement of elements is that "rotation is resisted." Delta's proposal would broaden the meaning of the claim phrase.

RSA has not shown that its proposed construction of the term is warranted. Although RSA's proposal more closely tracks the plain meaning of the phrase, its proposed "movement away from a central point" could also impermissibly broaden the meaning of the phrase. It could be interpreted as including other types of movement away from a center point aside from rotational movement.

==The term "rotation is resisted" is not construed and shall be understood consistent with the analysis provided in this Order.==

> e)   "plate" (Claims 14, 30)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "a flat structural member" | "a flat structural member which may or may not be a part of another structural member" |

The dispute regarding the meaning of the term "plate" is not clear. RSA and Delta both agree that the Turpin prior art reference has a bottom plate labeled "18." *Compare* Dkt. 61 at 9-10 *with* Dkt. 62 at 8-9. Delta contends, however, that under RSA's proposed construction, the bottom 18 of Turpin would not constitute a "plate." Dkt. 62 at 8-9. Delta argues that the phrase in its proposed

---

[3] Delta has not expressly sought a determination that the claim phrase "rotation is resisted" is indefinite. However, even if it had made such a request, its arguments would be unpersuasive. Among other things, Delta has not submitted clear and convincing evidence to support such a position. Delta's suggestion that its proposed construction is otherwise necessary to avoid indefiniteness of this claim term is also unpersuasive.

<u>TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED</u>

construction -- "part of another structural member" -- is necessary to clarify that the bottom 18 of Turpin is a plate. *Id.* RSA disagrees. Dkt. 61 at 9-10.

The parties appear to agree that the term "plate" should be accorded its plain and ordinary meaning in the context of the '865 Patent. They further agree that certain prior art structures discussed in their claim construction briefs include "plates." They otherwise have not shown that a factfinder would be unable to understand the plain meaning of the term "plate" as it is used in the context of the '865 Patent.

Based on the record presented and without further information regarding the nature of the parties' dispute, including whether they disagree, and if so, whether such a dispute is relevant to questions of infringement or invalidity of the '865 Patent, neither party has shown that the term "plate" requires construction at this time.

        f)        "tied together" (Claims 1, 16, 32, 33)

| RSA's Proposed Construction | Delta's Proposed Construction |
|---|---|
| "attached or fastened" | "fixedly connected, directly or indirectly, to each other" |

The parties dispute whether the claim term "tied together" can be interpreted as "members connected indirectly . . . through an endless number of members[ ] would be covered" by this claim phrase. *See* Dkt. 61 at 10. RSA agrees that "two members ***can*** be tied indirectly to one another via a third member [(such as bolting, Dkt. 57 at 23)]," but argues that broadening the meaning of the claim phrase beyond such a scenario is unsupported. *Id.* (emphasis in original). RSA refers to the patent specification and extrinsic evidence, including general-purpose dictionary definitions of "tied," to support its proposal. Delta argues that its broader proposal that any indirect attachment is sufficient is supported by statements RSA made in a previous case, as well as by general-purpose dictionary definitions of "tied" and other extrinsic evidence. *See, e.g.*, Dkt. 58 at 22; Dkt. 62 at 9-10.

Claims 1 and 16, and 33 of the '865 Patent state, *inter alia*,

> a base comprising opposed ends and a plurality of [***structural***] ***members which*** <u>***intersect***</u> ***and are*** <u>***tied together***</u>, for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;

>               *      *      *

> wherein the at least one first structural member ***or*** the at least one structural member ***or*** both are ***configured*** <u>***or***</u> ***tied together*** <u>***to retain***</u> within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.

'865 Patent at Claims 1, 16, 33 (emphasis added). The parties agree that "intersect" means "pass [across] or lie across." *See* Dkt. 56 at 2. By requiring that the "at least one ***first*** structural member"

and "at least one structural member" *intersect*, these claims necessarily require more than a wholly indirect connection between the two members they describe. The phrase "intersect and are tied together" would not have meaning if it were interpreted in a way that no form of attachment or fastening between the two members at issue was required. Thus, there would be no meaning if two members could be understood as "intersecting" and "tied together" even if separated by multiple, intervening members.[4]

The specification otherwise refers to members "tied together" in only the following passage:

> The base or pad in a preferred embodiment . . . is constructed using a series of structural tubes to form a grillage (i.e. pipes, tubes, channels and sometimes angles) to produce rigidity of the pad or base against upheaval and torsion forces. The grillage is a framework for supporting the load imparted by the bollard. *The framework means the tubes (or other structural steel elements) <u>tied together</u> to form the grillage*.

'865 Patent at 3:39-46 (emphasis added); *see also id.* at Figure 4.

This disclosure is consistent with the claim requirements by describing in a similar manner a framework of intersecting steel elements that are "tied together." Thus, the ties between intersecting elements in the preferred embodiment are direct. Moreover, the specification states the purpose of tying the steel elements together is to "produce rigidity." Delta does not explain how wholly indirect attachments would satisfy this purpose.

The patent claims and specification support RSA's position. Although each party cited extrinsic evidence to support its position, none of those citations support departing from the intrinsic record. The term "tied together" is construed as "attached or fastened."

## II.   Defendant's Motion for Leave to Amend

Defendant seeks leave to add an affirmative defense and counterclaim for unenforceability of the '865 Patent due to inequitable conduct. Specifically, Defendant argues that during prosecution of the application that issued as the '865 Patent, the patent applicant "knowingly and with deceptive intent made false material representations about [the Turpin prior art reference] that the Examiner had cited as anticipating the then-pending claims." *See* Dkt. 41-1 at 4. In addition to being a prior art reference that the Examiner specifically identified and raised during patent prosecution, the same prior art reference was also disclosed and discussed by Plaintiff in responding to petitions for *inter partes* review before the Patent Trial and Appeal Board. *See Guardiar Solutions, Inc. v. RSA Protective Technologies, LLC*, IPR2019-01161 and IPR2019-01162, (PTAB Nov. 21, 2019).

The parties dispute whether Turpin is but-for material to the patentability of the asserted claims of the '865 Patent. This issue is one that is presented in connection with a claim of inequitable conduct based on that reference. However, these matters are intertwined with a determination of the appropriate scope of the asserted claims. If Turpin is not but-for material to the patentability of the asserted claims, Delta's request for leave to amend would be futile, and the inquiry regarding Delta's motion would end. Five of the disputed claims are construed by this Order. However, construction of the term "[so as to] transmit forces applied to the at least one bollard to

---

[4] To the extent one or both parties may argue that their agreed construction of "intersect" as, *inter alia*, "pass . . . across" would account for a wholly indirect relationship between two intersecting components, neither has shown that such an interpretation of "intersect" is supported by the patent intrinsic record.

TENTATIVE VIEWS – NOT TO BE COPIED OR REDISTRIBUTED

the base" has been deferred pending the submission of appropriate evidence necessary to resolve the underlying factual disputes. In the interest of judicial efficiency, a determination on the motion is **DEFERRED** until after this disputed claim term is construed.

### III.    Conclusion

For the reasons stated in this Order, the following rulings on construction are adopted:

| Term | Court's Construction |
|---|---|
| "ends" (Claims 1, 2, 16-18, 33) | no construction |
| "shallow excavation" (Claims 1, 16, 33) | no construction |
| "to transmit forces applied to the at least one bollard to the base" (Claims 1, 16, 33) | Construction **DEFERRED**; parties directed to file a joint report regarding supplemental briefing as to this claim term as stated in this Order. |
| "rotation is resisted" (Claims 1, 16, 33) | no construction |
| "plate" (Claims 14, 30) | no construction |
| "tied together" (Claims 1, 16, 32, 33) | "attached or fastened" |

The ruling on Defendant's motion for leave to amend its answer and add a counterclaim is **DEFERRED**.

# EXHIBIT 17

| | |
|---|---|
| **From:** | Dillard, David |
| **To:** | Chubb, Laura A. |
| **Cc:** | Schilly, Sami I.; Saphia, Joseph; Zafonte, Jessica H.; Balaes, John; McGuire, Annette; Goodwin, Stacy-Ann |
| **Subject:** | RE: RSA v. Delta - Luna Materials Considered |
| **Date:** | Wednesday, December 9, 2020 8:02:50 PM |
| **Attachments:** | image001.png |
| | image006.png |

Dear Laura,

As previously stated, these documents are identified in Exhibit 4 to the Beaton Expert Report.  Dr. Luna's staff reviewed the files and determined these very generalized categories to describe the documents but did not make an inventory for each category. We can confirm that Dr. Luna has not reviewed these documents, unless separately identified elsewhere in her report.

Regards,

**David Dillard**
Partner
626.683.4518 office
626.577.8800 fax
ddillard@lrrc.com



Lewis Roca Rothgerber Christie LLP
655 North Central Avenue, Suite 2300
Glendale, CA 91203-1445
lrrc.com

---

**From:** Chubb, Laura A. <LChubb@haugpartners.com>
**Sent:** Tuesday, December 8, 2020 1:52 PM
**To:** Dillard, David <ddillard@lrrc.com>
**Cc:** Schilly, Sami I. <SSchilly@lrrc.com>; Saphia, Joseph <JSaphia@haugpartners.com>; Zafonte, Jessica H. <JZafonte@haugpartners.com>; Balaes, John <JBalaes@haugpartners.com>; McGuire, Annette <AMcGuire@haugpartners.com>; Goodwin, Stacy-Ann <sgoodwin@lrrc.com>
**Subject:** RE: RSA v. Delta - Luna Materials Considered

[EXTERNAL]

---

Dear David,

In view of Ms. Luna's deposition next week, when can we expect to receive a response to my e-mail below?

Sincerely,

Laura

**Exhibit
Luna 5**

**From:** Chubb, Laura A.
**Sent:** Monday, December 7, 2020 9:15 AM
**To:** Dillard, David <ddillard@lrrc.com>
**Cc:** Schilly, Sami I. <SSchilly@lrrc.com>; Saphia, Joseph <JSaphia@haugpartners.com>; Zafonte, Jessica H. <JZafonte@haugpartners.com>; Balaes, John <JBalaes@haugpartners.com>; McGuire, Annette <AMcGuire@haugpartners.com>; Goodwin, Stacy-Ann <sgoodwin@lrrc.com>
**Subject:** RE: RSA v. Delta - Luna Materials Considered

Dear David,

I am writing about the documents Ms. Luna identified on Appendix B of her report as "Recently Received Document Production (To Be Reviewed)." You explain below that "[t]his production is a collection of the documents that Mr. Beaton considered and identified in Exhibit 4 to his report" and that you will not be re-producing them. Whether you reproduce them or not, you are still obligated under Rule 26 to identify them. Please identify by Bates number specifically which documents the following refers to:

- "Delta and RSA Project Quotes"
- "Bollard Purchase and Installation Criteria Documents"
- "Correspondence"
- "Blueprints"
- "Purchase Proposals and Agreements"
- "Notes"
- "RSA UDI Pricing as of July 2009"
- "Invoices and Purchase Orders"
- "Pricing Guidelines"
- "Consultant Agreements"
- "Equipment Manufacture Agreements"
- "Contracts"

Please do so by close of business today.

Sincerely,

Laura

**From:** Dillard, David <ddillard@lrrc.com>
**Sent:** Friday, December 4, 2020 5:07 PM
**To:** Chubb, Laura A. <LChubb@haugpartners.com>
**Cc:** Schilly, Sami I. <SSchilly@lrrc.com>; Saphia, Joseph <JSaphia@haugpartners.com>; Zafonte, Jessica H. <JZafonte@haugpartners.com>; Balaes, John <JBalaes@haugpartners.com>; McGuire, Annette <AMcGuire@haugpartners.com>; Goodwin, Stacy-Ann <sgoodwin@lrrc.com>
**Subject:** RE: RSA v. Delta - Luna Materials Considered

Laura,

Below is a link from which you can download a production of the Correspondence and Research documents identified in your email below.  These have been identified as LUNA00000001-52.  Please note the emails have been designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.

The reference in the Luna Expert Report Appendix B under General Documents to the "Very Large Document Production" refers to the same group of documents described as "Recently Received Document Production (To Be Reviewed)".  This production is a collection of the documents that Mr. Beaton considered and identified in Exhibit 4 to his report. Since you have these documents we will not be re-producing them to you.

Please let me know if you have any further questions.

https://sft.lrrc.com/message/9JeSC8e1pv3xXKry2pZ8bh
Link expires December 18, 2020
Password for the zip file:  Lun@001!

Best,

**David Dillard**
Partner
626.683.4518 office
626.577.8800 fax
ddillard@lrrc.com



Lewis Roca Rothgerber Christie LLP
655 North Central Avenue, Suite 2300
Glendale, CA 91203-1445
lrrc.com

---

**From:** Chubb, Laura A. <LChubb@haugpartners.com>
**Sent:** Friday, December 4, 2020 11:32 AM
**To:** Dillard, David <ddillard@lrrc.com>
**Cc:** Schilly, Sami I. <SSchilly@lrrc.com>; Saphia, Joseph <JSaphia@haugpartners.com>; Zafonte, Jessica H. <JZafonte@haugpartners.com>; Balaes, John <JBalaes@haugpartners.com>; McGuire, Annette <AMcGuire@haugpartners.com>
**Subject:** RE: RSA v. Delta - Luna Materials Considered

**[EXTERNAL]**

---

Dear David,

We have not heard back from you yet.  Please promptly produce the materials outlined in my e-mail below that Dr. Luna relied upon or considered and which Delta did not identify or produce.

Sincerely,

Laura

---

**From:** Chubb, Laura A.
**Sent:** Wednesday, December 2, 2020 1:04 PM
**To:** Dillard, David <ddillard@lrrc.com>
**Cc:** Schilly, Sami I. <SSchilly@lrrc.com>; Saphia, Joseph <JSaphia@haugpartners.com>; Zafonte, Jessica H. <JZafonte@haugpartners.com>; Balaes, John <JBalaes@haugpartners.com>; McGuire, Annette <AMcGuire@haugpartners.com>
**Subject:** RSA v. Delta - Luna Materials Considered

Dear David,

Please promptly produce or identify the Bates number for the following documents cited in footnotes or listed on Appendix B to the Expert Report of Dr. Barbara C. Luna:

- General Documents:
  - "Very Recently Received Large Document Production to be Reviewed (See Below)"
- Delta Documents:
  - "Correspondence, Dated November 3, 2020, from Keith Bobrosky regarding Delta's Top 5 Competitors and Their Estimated Market Shares [No Bates]"
  - "Correspondence, Dated November 4, 2020, from Keith Bobrosky regarding Percentage of Bollard Sales with Covers [No Bates]"
  - "Correspondence, Dated November 8, 2020, from David Dickinson regarding Pre-Existing Shallow Mount Bollard Models and Cost to Design Around '865 Patent and Obtain Certification [No Bates]"
  - Correspondence cited in footnotes 9, 10, 13, 16, 18, and 19
  - "Discussion with attorney" cited in footnote 14
- Research:
  - Articles cited in footnote 20
  - "Article from WFMJ.com regarding 2020 Steel Bollards Market Size [No Bates]"
  - "Article from WICZ.com regarding 2020 Bollards Market Industry Outlook [No Bates]"
  - "Article from WICZ.com regarding 2020 Mooring Bollards Market Research [No Bates]"
  - "Article from MarketWatch.com regarding Bollards Market Size [No Bates]"
  - "Article from Medium.com regarding Global Bollards Market Size [No Bates]"
- "Recently Received Document Production (To Be Reviewed)"
  - "Delta and RSA Project Quotes"
  - "Bollard Purchase and Installation Criteria Documents"
  - "Correspondence"
  - "Blueprints"
  - "Purchase Proposals and Agreements"
  - "Notes"
  - "RSA UDI Pricing as of July 2009"

- "Invoices and Purchase Orders"
- "Pricing Guidelines"
- "Consultant Agreements"
- "Equipment Manufacture Agreements"
- "Contracts"

Sincerely,

Laura

Laura Chubb
Partner

**Haug Partners LLP**
745 Fifth Avenue
New York, NY 10151
+1 212.588.0800 Main
+1 212.863.2029 Direct

lchubb@haugpartners.com
www.haugpartners.com

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

This message and any attachments are intended only for the use of the individual or entity to which they are addressed. If the reader of this message or an attachment is not the intended recipient or the employee or agent responsible for delivering the message or attachment to the intended recipient you are hereby notified that any dissemination, distribution or copying of this message or any attachment is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the sender. The information transmitted in this message and any attachments may be privileged, is intended only for the personal and confidential use of the intended recipients, and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521.

**EXHIBIT 18**

Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**Maynard Cooper & Gale, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415) 704-7433
*Attorney for Plaintiff*
*RSA Protective Technologies, LLC*

Joseph V. Saphia
JSaphia@haugpartners.com
Jessica H. Zafonte
JZafonte@haugpartners.com
**HAUG PARTNERS LLP**
745 Fifth Avenue, New York, NY 10151
Telephone:  (212) 588-0800
Facsimile:  (212) 588-0500
*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RSA PROTECTIVE TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DELTA SCIENTIFIC CORPORATION,<br><br>Defendant. | No.    19-6024<br><br>**DISCLOSURE OF ASSERTED CLAIMS AND FINAL INFRINGEMENT CONTENTIONS** |

Plaintiff RSA Protective Technologies, LLC ("RSA") provides its Final Infringement Contentions pursuant to S.P.R. 4.1, which amend its S.P.R. 2.1 contentions.  RSA reserves the right to supplement these contentions, as fact and expert discovery are not yet complete.  RSA has relied on Delta Scientific Corporation's ("Delta") response to RSA's contention interrogatory No. 1, in which it represented that if the Asserted Claims are found to be valid and enforceable, it would not contest that claims 1-5, 7, 10, 14-21, 23, 26, and 31-35 read on the

DSC600 and DSC650 Accused Products and claims 1-5, 7, 10, 14-15 read on the DSC675 Accused Product.  Additionally, the parties agreed on the Court's tentative claim construction ruling and stipulated to the construction of all disputed terms.  Based on the foregoing, RSA is not serving Rule 26 expert reports on the issue of infringement, but reserves the right to rebut any allegations of non-infringement unrelated to the validity or enforceability of the '865 patent, both through supplementing these contentions as well as through expert reports.

## I.    IDENTIFICATION OF CLAIMS AND ACCUSED INSTRUMENTALITIES

Plaintiff alleges that, Defendant Delta Scientific's ("Delta" or "Defendant") DSC600 and DSC650 shallow mount bollards infringe claims 1-5, 7, 10, 14-21, 23, 26, and 31-35 of the '865 patent and the DSC675 shallow mount bollards infringe claims 1-5, 7, 10, 14-15  of the '865 patent under 35 U.S.C. § 271(a), (b), and (c), both literally as well as under the doctrine of equivalents.

The Delta Scientific DSC600 bollard has the following structure:



The Delta Scientific DSC650 bollard has the following structure:



The Delta Scientific DSC675 bollard has the following structure:



3

Dated:  September 28, 2020

/s/ Jessica H. Zafonte
Joseph V. Saphia
JSaphia@haugpartners.com
Jessica H. Zafonte
JZafonte@haugpartners.com
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500

Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**Maynard Cooper & Gale, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415) 704-7433

*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

    _____

4                                   )

    RSA PROTECTIVE TECHNOLOGIES,    )

5    LLC,                           )

                                    )

6            Plaintiff,             )

                                    )

7        vs.                        )No. 19-6024

                                    )

8    DELTA SCIENTIFIC CORPORATION,  )

                                    )

9            Defendant.             )

    _____)

10

11

12

13           CONFIDENTIAL - ATTORNEYS' EYES ONLY

14     VIDEOTAPED REMOTE DEPOSITION OF DAVID DICKINSON

15      Deponent testifying from Palmdale, California

16            Wednesday, September 30, 2020

17                     Volume I

18

19

20

21

22    Stenographically Reported By:

      Melissa M. Villagran, RPR

23    CSR No. 12543

24    Job No. 4267800

25    PAGES 1 - 165

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1      UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA
 3
        _____
 4                          )
        RSA PROTECTIVE TECHNOLOGIES, )
 5 LLC,                      )
                            )
 6      Plaintiff,          )
                            )
 7      vs.          )No. 19-6024
                            )
 8 DELTA SCIENTIFIC CORPORATION,)
                            )
 9      Defendant.   )
        _____)
10
11
12
13
        *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
14
15
16      Videotaped Remote deposition of DAVID
17 DICKINSON, Volume I, taken on behalf of Plaintiff.
18 Deponent testifying from Palmdale, California,
19 beginning at 9:02 a.m. and ending at 1:46 p.m. on
20 Wednesday, September 30, 2020, before Melissa M.
21 Villagran, RPR, Certified Shorthand Reporter
22 No. 12543.
23
24
25
```

Page 4

```
 1 APPEARANCES (continued):
 2
 3 Videographer:
 4      Dan Bruun
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1 APPEARANCES:
 2 (ALL ATTENDEES APPEARING REMOTELY)
 3
 4 For Plaintiff:
 5      HAUG PARTNERS LLP
 6      BY: LAURA CHUBB
 7      JOSEPH SAPHIA
 8      Attorneys at Law
 9      745 Fifth Avenue
10      New York, New York 10151
11      212.588.0800
12      lchubb@haugpartners.com
13      JSaphia@haugpartners.com
14
15 For Defendant:
16      LEWIS ROCA ROTHGERBER CHRISTIE LLP
17      BY: SAMI SCHILLY
18          DAVID DILLARD
19      Attorneys at Law
20      655 North Central Avenue, Suite 2300
21      Glendale, California 91203
22      626.795.9900
23      Schilly@lrrc.com
24      Ddillard@lrrc.com
25
```

Page 5

```
 1              INDEX
 2
 3 DEPONENT                    EXAMINATION
 4 DAVID DICKINSON
 5 Volume I
 6      BY MR. SAPHIA              10
 7
 8
 9          EXHIBITS
10 DEPOSITION                      PAGE
11 Exhibit 1   Notice of Deposition Pursuant to     36
12      Federal Rule 30(b)(6)
13
14 Exhibit 2   Descriptions of products sold by     71
15      Delta Scientific from their
16      Website
17
18 Exhibit 3   Drawings              53
19
20 Exhibit 4   Drawing               73
21
22
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

1  talking about the financials to the firm, I'd like
2  to make sure that the transcript is identified as
3  attorneys' eyes only.
4      MR. SAPHIA:  Absolutely.  No problem.
5      MR. DILLARD:  So that there's -- there's
6  continuous interruption, to avoid that, should we
7  just designate the -- the entire transcript?
8      MR. SAPHIA:  You can designate the whole
9  thing, David.  Designate the whole thing attorneys'
10 eyes only.  Don't worry about it.
11     MR. DILLARD:  That's fine.  Let's do that.
12     MR. SAPHIA:  Does that make you feel better,
13 Mr. Dickinson?  Basically, what that means is only
14 people associated with this case until it gets to
15 court can see and read your transcript.
16     MR. DILLARD:  Well, it -- it means only
17 lawyers and consultants.
18     MR. SAPHIA:  Right.  Right.  Attorneys.
19     Okay?
20     THE DEPONENT:  Thank you.
21 BY MR. SAPHIA:
22  Q  So let's go back.
23     I understand you have sensitive issues,
24 believe me, but there is a reason why I'm asking.
25     So when you -- got to Palmdale -- when

Page 35

1  Delta Scientific moved to Palmdale in 2004, do you
2  have any idea what the annual revenue was for Delta?
3      A  It would be somewhere in the ██████
4  ████████████
5      Q  Okay.
6      Without asking -- that's what's making me ask
7  about the interval between then and now, right?
8      We're now in 2020, right, 16 years later.
9      Can you give me an approximate, the gross
10 revenue of -- annually of Delta Scientific?
11     A  It's a nominal $███████ per year.
12     Q  When you say the "nominal ███████," what
13 do you mean by that?
14     A  It's an approximation plus or minus
15 ██████████████.
16     Q  Okay.
17     A  I don't know.
18     Q  Okay.
19     A  That's a broad term, okay, so a broad period.
20     Q  I was just not familiar with what you meant
21 by nominal.  Sometimes people when they say nominal
22 mean things that are outside of inflation or --
23 or -- so I'll just restate it, and you could tell me
24 if I'm correct or not.
25     So as we sit here today, the gross revenue

Page 36

1  annually of Delta Scientific is somewhere around ██
2  ███████████; is that right?
3      A  Yes, sir.
4      Q  Okay.
5      MR. SAPHIA:  Annette, do you have that
6  Deposition Notice?  Okay.
7  BY MR. SAPHIA:
8      Q  Now we're going to show you that Deposition
9  Notice just to make sure we're all on the same page.
10     MR. SAPHIA:  No.  That's the 30(b)(6).  Oh.
11 Okay.
12 BY MR. SAPHIA:
13     Q  The way I understand this works,
14 Mr. Dickinson, is you -- is when -- every time you
15 refresh your exhibit page, a new exhibit will
16 appear.  So let me know when you see a Notice of
17 Deposition Pursuant to Federal Rule 30(b)(6).
18     MR. SAPHIA:  And that should be marked as
19 what?
20     Dickinson Exhibit 1.
21     (Exhibit 1 was marked for
22     identification and is attached
23     hereto.)
24 BY MR. SAPHIA:
25     Q  Let me know if you see that exhibit.

Page 37

1      A  I see an exhibit.
2      Q  Okay.
3      Is it marked Dickinson No. 1?  It would be on
4  the first page.
5      A  It is Dickinson Exhibit 1.pdf.
6      Is that what you are referring to?
7  Mr. Saphia.
8      Q  That's perfect.  Thank you.
9      If you would go to Page 5 of that exhibit.
10     A  I'm at Page 5.
11     Q  Okay.
12     The heading should be "SCHEDULE B."
13     Do you see that?
14     A  Yes, I do.
15     Q  Could you look at heading No. 5?  And it
16 states (as read):
17     "Defendant's awareness of RSA and
18     any communications between
19     Defendant's employees or consultants
20     and RSA's employees or consultants."
21     Do you see that?
22     A  Yes, I do.
23     Q  Okay.
24     You have been designated for that category,
25 as well as Category 7, which states, (as read):

10 (Pages 34 - 37)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 38

1      "Defendant's awareness of the
2  Patent-in-Suit, including but not
3  limited to:  A.  The date that
4  Defendant first became aware of the
5  existence of the Patent-in-Suit."
6  And "B.  The identity and location
7  of all persons who were aware of the
8  existence of the Patent-in-Suit; C.
9  Any information derived from the
10  Patent-in-Suit by the Defendant.
11  D.  The existence and nature of any
12  legal or other opinions regarding
13  the Patent-in-Suit, including but
14  not limited to the identity of any
15  lawyers or law firms that provided
16  opinions and the date of such
17  opinions."  And "E.  Any other
18  analysis of the Patent-in-Suit by
19  Defendants."
20      Is it -- is it -- are you prepared to testify
21  to that subject also?
22  A  Yes, I am.
23  Q  Okay.
24      There's a -- there's a little bit of a --
25  of -- it's not a controversy.  I thought you were

Page 39

1  going to sit and also talk about -- and also be
2  prepped for No. 8, and that's (as read):
3      "The inventions disclosed in, and
4  the prosecution of, any patents or
5  patent applications concerning
6  shallow mount bollards filed by or
7  assigned to Defendant."
8  Are you comfortable testifying to that
9  subject matter also?
10  A  I am able.
11  Q  Okay.
12      What is your current position at
13  Delta Scientific, sir?
14  A  I am the president of Delta Scientific
15  Corporation.
16  Q  And how long have you been the president of
17  Delta Scientific?
18  A  Two-and-a-half years.
19  Q  But you have been at Delta Scientific, I
20  guess, for nearly -- almost 35 years.
21      Am I correct?
22  A  I've been physically at the company for
23  30 years.
24  Q  30 years.  Okay.
25      And would you say that you were in management

Page 40

1  of the company for at least the past 20?
2  A  Yes, I have been.
3  Q  Okay.
4      And you have been running the company as the
5  sole CEO for the last two-and-a-half years, correct?
6  A  I've been the president for the last
7  two-and-a-half years.
8  Q  Was there a time before that that you were
9  either running the company with someone else or, I
10  guess, reporting to the owner of the company?
11  A  I have been running the company for the last
12  approximately 20 years, reporting to our former
13  president, Mr. Harry Dickinson.
14  Q  Okay.
15      And when you say "running the company," I
16  think I know what you mean by running the company,
17  but can you describe that function for me?
18  A  Responsibilities were to run all operations,
19  marketing, marketing strategies, manufacturing, sell
20  and produce products for Delta Scientific, hire the
21  people, hire the engineers, hire the salespeople,
22  so...
23  Q  Would you say that you had -- in doing that,
24  in running the business, would you say that you had
25  a good knowledge of all aspects of the business?

Page 41

1  A  Yes, that's true.
2  Q  Okay.
3      So if I asked you, I don't know, I mean, I
4  just asked you gross sales, and you knew that.  If I
5  asked you if any particular product was successful
6  or not, you would be able to tell me?
7  A  In general terms, yes.
8  Q  When you say -- when I say "success," and I
9  think you know what I mean by "success," would that
10  mean to you in your role at Delta Scientific that it
11  made sense to make and sell that product?
12  A  Yes.
13  Q  So even if a product doesn't -- is not
14  profitable in and of itself, there's a reason why
15  Delta Scientific would continue to sell it; is that
16  right?
17  A  That's a rare exception, I believe,
18  Mr. Saphia.
19  Q  Okay.
20      So for the most part, all the products that
21  Delta Scientific sells, it makes money selling,
22  correct?
23  A  Our goal is to make a profit on each and
24  every one of the products that we sell, Mr. Saphia.
25  Q  Okay.

11 (Pages 38 - 41)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1     Is -- you said "a rare exception." Are there
2 any rare exceptions that come to mind as products
3 that you would sell? I'm sorry.
4     A  We ran into some trouble with the bollards,
5 as you're aware, Mr. Saphia.
6     Q  No, I'm not aware.
7     Could you describe the problems with the
8 bollards?
9     A  Okay.
10     Let's talk about -- let me get some
11 definitions. What do you mean by "bollards,"
12 Mr. Saphia?
13     Q  Oh, wait a minute.
14     I guess -- I guess I should be asking you
15 that question.
16     What do you mean by "the bollards," or what
17 does -- what do you -- what do you understand a
18 bollard to be?
19     A  The shallow foundation bollards.
20     Q  Shallow mount -- we call them shallow mount
21 bollards.
22     Is that okay?
23     A  I call them shallow foundation bollards.
24     Q  Okay.
25     So -- but let's start with something even

Page 43

1 more basic. What is a bollard?
2     A  Most common form is a post that is 90 --
3 projects 90 degrees out of the ground.
4     Q  Okay.
5     And that -- and that -- so okay.
6     So there are deep -- are you aware that there
7 are products that are deep foundation bollards?
8     A  Yes, I'm aware of that.
9     Q  Okay.
10     And I think your company still makes some of
11 those, correct?
12     A  Yes, Mr. Saphia.
13     Q  Okay.
14     So you described that there was a problem
15 with your shallow -- shallow foundation bollards.
16     Could you describe that problem?
17     A  In the analysis which we conducted for this
18 suit, we discovered that we were not profitable in
19 many years of our sales of the product.
20     Q  And that's a -- and that's a problem to you?
21     A  Yes, Mr. Saphia.
22     Q  Okay.
23     Is that the first time you ever looked at
24 whether -- whether you were making a profit by
25 selling a particular product?

Page 44

1     A  No.
2     Q  Okay.
3     So does your -- do you regularly look at your
4 profitability as an ongoing concern?
5     A  Yes, I do.
6     Q  Okay.
7     How many products do you sell?
8     A  Are you referring to model numbers or
9 quantities, Mr. Saphia?
10     Q  Oh, that's a good question. I would say
11 model numbers.
12     A  Perhaps 1,000 types of different model
13 numbers that we sell annually, maybe 2,000. I don't
14 really know the number, but it's a fairly large
15 quantity in our -- in our sense, in our terms.
16     Q  Okay.
17     So when you say you sell 2,000 model numbers,
18 are -- are -- is each model number a different type
19 of product?
20     A  Yes. That's why we are giving them different
21 numbers.
22     Q  Okay.
23     Let me show you something that I -- that I
24 happened to come upon.
25     We're going to load up another exhibit for

Page 45

1 you to look at.
2     In the meantime, is Mr. Burnett still with
3 the company?
4     A  Yes, he is.
5     Q  How long has Mr. Burnett been with the
6 company?
7     A  I'm going to estimate 35 years.
8     Q  Okay.
9     So with respect to the DSC600 shallow
10 foundation bollard, do you know when that was
11 designed and -- and first came to market?
12     A  Yes, I do.
13     Q  Would it be the 2007, 2008 time frame?
14     A  Yes.
15     Q  Okay.
16     Would Mr. Burnett have knowledge in your
17 estimation about the design and manufacture of the
18 first couple years of the DSC600?
19     A  Yes, he would.
20     Q  I understand that your dad, that Mr. Harry
21 Dickinson, was a designer of the DSC600; is that
22 correct?
23     A  Yes, that's true.
24     Q  Would he have worked with Mr. Burnett for the
25 design of that product?

12 (Pages 42 - 45)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1   A   I -- he may have, yes.
2   Q   Do you know how your dad came upon the DSC600
3   product?
4   A   No, I do not in detail, no.
5   Q   Okay.
6       In -- in generalities, do you know how he
7   came upon the idea of the DSC600?
8   A   Well, I can only speculate at this point as
9   to how he came up with that, so I guess I don't
10  actually know, so...
11  Q   Is it possible that he came up with that in
12  response to Secretary of State inquiries or
13  Secretary of Defense inquiries?
14  A   Those are plausible possibilities.  I don't
15  know.
16  Q   Okay.
17      Could customers have asked him for something
18  like that, like the DSC600?
19  A   It's possible.
20  Q   But as you sit here today, you really don't
21  know how he came up with the idea of the DSC600?
22  A   That's true.
23  Q   Okay.
24      And is it possible that Mr. Burnett would
25  know?

Page 47

1   A   I -- it's possible, yes.
2   Q   Okay.
3       Ms. Manor, Judy Manor, same type of
4   questions.  You know that there's an issue in this
5   case how your dad -- how Mr. Dickinson -- if you
6   prefer me to call him Mr. Dickinson, I will.
7   A   I would prefer that.
8   Q   Okay.
9       So how Mr. Dickinson conceived of the DSC600,
10  there's an issue in the case.
11      You are aware of that, right?
12  A   Yes, I am, Mr. Saphia.
13  Q   Okay.
14      Do you believe that Ms. Manor would have
15  information relevant to how Mr. Dickinson designed
16  the DSC600?
17  A   I believe she would.
18  Q   We're having -- that exhibit that I mentioned
19  to you, we're having trouble.  It's a very large
20  document, so it's taking a bit longer.  I apologize.
21      Mr. Dickinson, are you familiar with spiral
22  notebooks that were used for the development or, I
23  guess, the memorialization of the design of certain
24  Delta products?
25  A   Yes, I am.

Page 48

1   Q   And I think Mr. Friend told me, and I think
2   he's -- I think he's right, and if he's not right,
3   you can correct him, that your dad -- that
4   Mr. Dickinson maintained a set of these spiral
5   notebooks that he would keep his notes regularly in.
6       Am I correct?
7   A   That is correct.
8   Q   Where are those books located today?
9   A   They are in my office.
10  Q   And is it a complete set that you have,
11  Mr. Dickinson?
12  A   It's fairly complete, yes.
13  Q   Would -- would you be able to locate books
14  that correspond to 2005 through 2008?
15  A   Yes.
16      MR. SAPHIA:  David, I'm going to ask for
17  those books, if you don't mind.
18      THE DEPONENT:  I'm going to object to that.
19      MR. SAPHIA:  Not you, David.  I'm speaking
20  to --
21      THE DEPONENT:  You're speaking David
22  Dickinson.
23      MR. SAPHIA:  I know.  I was mentioning -- I
24  wanted to speak to Mr. Dillard for a second.  Sorry.
25      I'm going to ask for production of those

Page 49

1   books, Mr. Dillard.
2       MR. DILLARD:  Okay.  We'll deal with that.
3       MR. SAPHIA:  Okay.
4   BY MR. SAPHIA:
5   Q   Mr. Dickinson, did you -- did you search
6   those spiral books or have someone search those
7   spiral books for -- for information relevant to
8   Delta's shallow foundation bollards and their
9   design?
10  A   Yes, I did.
11  Q   Okay.
12      So should I assume that I have in my
13  possession all of the pages that are relevant to
14  Delta's shallow foundation bollards in my position
15  now?
16  A   As to the best of my knowledge, yes.
17  Q   We're going to move on temporarily to another
18  exhibit, if that's okay.
19      And what you will be seeing are pages -- are
20  you familiar with what a Bates number is,
21  Mr. Dickinson?
22  A   Yes, I am.
23  Q   Okay.
24      So we have an exhibit that -- okay.
25      You could refresh your exhibit file.

13 (Pages 46 - 49)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    MR. SAPHIA:  And I guess that's Dickinson 2.
2  BY MR. SAPHIA:
3    Q   And you will see a compilation of pages
4  labeled Dickinson 2.
5    Do you see that?
6    A   Yes, I do.
7    Q   Okay.
8    MR. SAPHIA:  So just so the court reporter
9  is -- is referencing these properly, the exhibit is
10  Bates No. DS00000131 through 137.
11    So let's just look at Page 131 for a moment.
12  There's a date on the top.
13    Do you see that?
14    A   I do.
15    Q   Okay.
16    And do you read that like I do, as "July 23rd
17  of 2007, Monday"?
18    A   Yes.
19    Q   Is this Mr. Harry Dickinson's handwriting?
20    A   It is.
21    Q   Do you have an understanding of what he is
22  attempting to sketch out on this page?
23    A   Yes, I do.
24    Q   And what is that?
25    A   He's calculating the force to lift a barrier

Page 51

1  plate.
2    Q   So when you say a "barrier plate," would this
3  be in contemplation of some type of a shallow
4  foundation bollard product?
5    A   This drawing does not represent that, but it
6  does show the hydraulic pressures required, cylinder
7  diameters, and masses of devices and the angles that
8  he's going to move it in.  That's what this document
9  shows.
10    Q   Okay.
11    I thought it might have been dealing with
12  some hydraulics because there's a figure that he
13  drew kind of like in the middle of the page off to
14  the right.
15    Do you see it?  It looks almost like a little
16  hydraulic area.
17    Do you see that?
18    A   I see a drawing of a hydraulic cylinder.
19    Q   Okay.
20    So your shallow -- the shallow foundation
21  bollard products that are accused of infringement in
22  this case do not involve any hydraulics; is that
23  correct?
24    A   That is correct.
25    Q   Let's go to the next page, which is

Page 52

1  Bates No. 132.  And I think that's labeled
2  "July 24th of '07, Tuesday."
3    Do you see that?
4    A   Actually, I don't.  I only have 130 -- Bates
5  131.
6    MR. DILLARD:  Joe?
7    MR. SAPHIA:  Yes.
8    MR. DILLARD:  I've only got a one-page
9  document, which was a page -- page that you just --
10    MR. SAPHIA:  Okay.
11    MR. DILLARD:  -- asked questions about.
12    MR. SAPHIA:  We -- all right.  We had meant
13  to attach 131 through 137.  Let me see if we could
14  pull that up individually, Dave.
15    MR. DILLARD:  Sure.
16    MR. SAPHIA:  Okay.
17    THE DEPONENT:  I'd like to take a break now.
18  It's been about an hour.
19    MR. SAPHIA:  Oh, sure.  Absolutely,
20  Mr. Dickinson.  That's a good idea.  Why don't you
21  take five minutes, and we'll get all these exhibits
22  under control.
23    MR. DILLARD:  David, make -- David, make sure
24  you mute your -- your mic.
25    THE VIDEOGRAPHER:  We are off the record at

Page 53

1  9:57 a.m.
2    (Recess.)
3    THE VIDEOGRAPHER:  We are back on the record
4  at 10:05 a.m.
5  BY MR. SAPHIA:
6    Q   Okay.
7    Mr. Dickinson, you should see two exhibits
8  now if you refresh.
9    MR. SAPHIA:  What is this one?  Which one is
10  this one?
11  BY MR. SAPHIA:
12    Q   So I think if you look at Exhibit 3, that
13  should include Bates range DS0000131 through 137.
14    (Exhibit 3 was marked for
15    identification and is attached
16    hereto.)
17    MR. SAPHIA:  Just check and make sure,
18  please.
19  BY MR. SAPHIA:
20    Q   Am I correct?
21    You might -- you might be muted still.
22    Mr. Dickinson?
23    A   Yes, I can hear you now or you can hear me.
24    Q   Okay.
25    Now I can hear you.

14 (Pages 50 - 53)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 58

1  I'm sorry that you're upset.  In fact, I'm a little
2  surprised.
3     Q  I'm going to tell you something,
4  Mr. Dickinson.  The reason why I'm upset, okay --
5  and I hope that you understand this.  When you
6  didn't want to give me your residence, right, I
7  immediately told Mr. Dillard, "I will keep this
8  thing under wraps."  Okay?  I can't keep things
9  under wraps if I don't know who is listening.
10     Let's go to 132, please, sir, and show some
11  common courtesies.
12
13
14     A
15     Q  Do you see that the top middle part of the
16  page says, (as read):
17
18
19     Do you see that?
20     A  Yes, I do.
21     Q  On the left-hand side, there are three names.
22     Are you familiar with those names?
23     A  No, I'm not.
24     Q  Okay.
25     I -- let me see if I get them right.  It's

Page 59

1
2     Does that look correct to you?
3     A  Could be.  I can't read it completely.
4     Q
5
6     A
7
8     Q  Okay.  All right.
9     Do you know who Mr. Russ Norris is?
10     A  Yes, I do.
11     Q  And who is he?
12     A  He is or was a -- a person in research and
13  development and testing supervision for the
14  Department of State for the United States.
15     Q  Okay.
16     Do you know what his -- what his formal title
17  was?
18     A  No, I do not.
19     Q  Do you know him personally?
20     A  I have met him.  I don't know him personally.
21     Q  Okay.
22     How about Mr. Weber?  Is that Pat Weber?  Is
23  that the way you read that?
24     A  I read that as such.  And Mr. Weber --
25     Q  Do you know him also?

Page 60

1     A  I have known him.  He is also a -- an
2  employee of the U.S. Department of State.
3     Q  Okay.
4     I think there's a -- he -- Mr. Dickinson made
5  a notation.  I think he said, "on phone."
6     Am I correct about that?
7     A  It appears that way.
8     Q  So does that mean that he's speaking -- would
9  you interpret that as Mr. Harry Dickinson speaking
10  to Mr. Norris and Mr. Weber on the phone?
11     A  Yes.
12     Q  Okay.
13     A  It's plausible.
14     Q  Okay.
15     Then I think --
16     A  He also could have made those notes after the
17  phone.
18     Q  Okay.
19     COURT REPORTER:  What's that?  What's what,
20  Mr. Dickinson?
21     THE DEPONENT:  It's -- it's plausible.  And
22  also, he could have made these notes after he was --
23  completed a phone call.
24     MR. SAPHIA:  Okay.
25     COURT REPORTER:  Just a little reminder to

Page 61

1  give him a minute to end his question before you
2  begin your answer.  That way, I can hear you
3  separately and understand what you're saying.  Thank
4  you.
5     MR. SAPHIA:  Thank you, Melissa.
6  BY MR. SAPHIA:
7     Q  Underneath that, it says -- I think, if I
8  have this right, (as read):
9
10
11                        ."
12     Do I have that correct?
13     A  Yes, you do.
14     Q  Okay.
15     And then under that -- under that, it says,
16  (as read):
17
18
19
20
21
22
23     A
24     Q
25     A

16 (Pages 58 - 61)

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 62

1    Q   All right.  Okay.
2
3
4
5    A
6    Q
7
8
9
10
11
12
13
14   Q
15
16
17   A
18   Q
19   A
20
21
22
23
24
25

Page 63

1
2
3
4
5
6    Q
7
8
                                        2007
10
11
12
13
14
15
16
17
18   A
19   Q
20
21
22   A
23   Q   Okay.  Thank you.
24        Is that the city where the test of the DSC600
25   would take place?

Page 64

1    A   Yes.
2    Q   Okay.
3
4        That's Frank Richardson.  Are you familiar
5    with him?
6    A   I have known him.
7    Q   Is he someone associated with the Department
8    of State also?
9    A   No, he is not.
10   Q   So what is Mr. Richardson's occupation?
11   A   I understand he's retired now.
12   Q   And what was he doing in '07?
13   A   I understand he was the co-owner of the
14   testing facility that we ran the test at.
15   Q   Okay.
16        Would you run -- would Delta run tests at
17   multiple facilities?
18   A   We have.
19   Q   Is there any particular reason to use one
20   over the other?
21   A   Type of test we are running, who the clients
22   were for, et cetera.
23   Q   Okay.
24        So I guess that these different facilities
25   have different capabilities, so depending on the

Page 65

1    test that you need, you would choose the appropriate
2    facility.
3        Am I correct?
4    A   We would attempt to do so.
5    Q   Okay.
6
7
8
9                        "
10
11
12   Q
13
14
15
16
17   Q   Mr. Dickinson, are you waiting for me or?
18   A   Yes, sir.
19        Did you ask a question?
20
21
22
23
24   A
25   Q   And what type of -- why would he be doing

17 (Pages 62 - 65)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1    MS. SCHILLY:  Correct.  It's 528 pages.
2    MR. SAPHIA:  Okay.
3    MS. SCHILLY:  It froze my computer, but then
4 it finally downloaded, so it is a big document.
5    MR. SAPHIA:  Yes, I know.
6    THE DEPONENT:  It says 11 seconds left.
7 Let's see how it does.
8    MR. SAPHIA:  Well, that's pretty good.
9    THE DEPONENT:  Okay.  I see a document here.
10 BY MR. SAPHIA:
11   Q   Oh, great.  Okay.
12       So that would be -- is it -- does it comport
13 with what I represented to you, that it is a
14 compilation of your Website pages?
15   A   No, it is not a compilation of
16 Delta Scientific's Website.
17   Q   Okay.
18       I just want to make sure we're viewing the
19 same thing.
20   A   Okay.
21   Q   How would you describe the first page?  Do
22 you see Delta Scientific Corp. at the top?
23   A   I do.
24   Q   And the second page -- well, the pages are
25 actually numbered.

Page 75

1       Okay?
2       So can we go to Page 4?
3   A   Sorry I'm taking some time.  I'm looking for
4 the page numbers.
5   Q   They were on the bottom -- bottom middle of
6 the page.
7   A   Okay.
8       I'm working it towards 4.
9   Q   Okay.
10  A   Okay.
11  Q   All right.
12      So this -- this page has a heading, "Quick
13 Facts About Delta Scientific Corporation."
14      Do you see that?
15  A   I do.
16  Q   Okay.  So good.  We're on the same page.
17      Founded in 1974, correct?
18  A   Yes.
19      Mr. Saphia, I want to put on the record that
20 this is not a true and correct copy of
21 Delta Scientific Corporation's Website.
22  Q   Okay.  Fair enough.
23      I'm not going to use it that way.  I just
24 wanted to use it to cue you for some questions.  So
25 if there's any inaccuracies, you'll tell me.

Page 76

1       Is that okay?
2   A   I'll try.
3   Q   Okay.
4       So founded in 1974, correct?
5   A   Yes.
6   Q   And I guess privately owned, correct?
7   A   Yes, it is.
8   Q   100-plus employees?
9   A   Well, today I told you it was approximately
10 98.
11  Q   Okay.
12      Corporate offices in Palmdale, California,
13 correct?
14  A   Yes, Mr. Saphia.
15  Q   Okay.  (As read):
16      "Systems deployed:  20,000-plus
17      worldwide"; is that correct?
18  A   That would be a good representation,
19 Mr. Saphia.
20  Q   Okay.
21      If you turn to Page 198.  I hope that's a --
22 a lot easier than I made it seem.
23  A   I'm on Page 198.
24  Q   Okay.
25      Page 198 describes -- or at least has a

Page 77

1 tab -- describes a tab for DSC600 and DSC650; is
2 that correct?
3   A   I see photographs with those labels.
4   Q   Okay.
5   A   Are we talking about the side?  I don't know
6 where you are -- where you're at.
7   Q   No.  That's okay.  That's fine.  I -- I don't
8 see DSC675.
9       Is there a reason why that would not be
10 included in this?
11  A   Yes, there is.
12  Q   And why is that?
13  A   That was a custom item that we don't offer
14 for general sale.
15  Q   I understand.  Okay.
16      Can you please turn to Page 228?
17  A   I'm at 228.
18  Q   Okay.
19      Could you describe that page for me?
20  A   It appears to be a drawing of a DSC600.
21 Pretty generic.
22  Q   I think --
23  A   Go ahead.
24  Q   I'm sorry.
25  A   Go ahead.  Go ahead.

20 (Pages 74 - 77)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1    A  I didn't say it in those words, but I did
2  indicate that we lost money on projects with the
3  bollards.
4    Q  Right.
5        And -- and so I'm just thinking you're --
6  you're a businessman, you've been around a long
7  time, you obviously are very successful.  Why did
8  you continue selling something that you would not
9  be -- that was not profitable?
10   A  I have addressed that in a statement,
11  Mr. Saphia.
12   Q  I'm sorry.  In what statement?
13   A  I believe I've answered that question,
14  Mr. Saphia.
15   Q  Okay.
16       Could you remind me?
17   A  Well, I will restate my answer as best I can.
18   Q  Okay.
19   A  That we did sell in -- most likely in a
20  blunder, if you will, is probably the best
21  description of it.
22   Q  When you say "a blunder," does that mean you
23  that you need to adjust the pricing for your shallow
24  mount foundation bollards?
25   A  Yes.

Page 87

1    Q  Okay.
2        Do you have any plans to discontinue selling
3  your shallow mount foundation bollards?
4    A  I haven't reached a decision on that,
5  Mr. Saphia.
6    Q  Okay.
7        Would there be any negative impacts that you
8  would anticipate if you decided not to sell any
9  longer your shallow mount foundation products?
10   A  There would be some negative impact.
11   Q  And what would you anticipate as negative
12  impact?
13   A  We would see a 2 or 3 percent drop in
14  revenue, gross revenue.
15   Q  All right.
16       Is that the only negative effect you would
17  have?
18   A  Oh, I think we can think of a lot of them.
19   Q  Okay.
20       Could you tell me some of them?
21   A  Well, our relationship with our clients.
22   Q  Okay.
23       And how would that happen?
24   A  Well, if we weren't able to do a complete
25  turnkey, that would be a disadvantage.  However,

Page 88

1  we -- we -- that would be an example.
2    Q  So you, as the CEO of Delta, value being able
3  to sell a turnkey solution to your clients for
4  perimeter security.
5        Am I correct?
6    A  When it makes sense, yes.
7    Q  Okay.
8        So that would be a -- a negative of not being
9  able to sell a product that might be required, given
10  a particular job.
11       Am I right?
12   A  True.
13   Q  Okay.
14       Is there any other negative that we haven't
15  touched on?
16   A  Not that can think of at this time,
17  Mr. Saphia, but I'm sure we could generate a whole
18  list if we had a little time on that.
19   Q  Okay.
20       If -- if I were losing money on a product, I
21  might be thinking about it pretty -- pretty
22  seriously, but I can understand that you are still
23  considering it.
24       The -- did your business -- and this is -- I
25  guess, I'm not so sure if you -- well, do you know

Page 89

1  what year you started selling the DSC600?
2    A  I don't know exactly what year, but in 2007,
3  certainly by 2008.
4    Q  Okay.
5        Would you -- would you say that the DSC600
6  and maybe even the DSC650s were welcomed additions
7  to Delta's family of products?
8    A  I wouldn't characterize it in that form,
9  Mr. Saphia.
10   Q  How would you -- how would you characterize
11  it?
12   A  Just gave our clients another option,
13  Mr. Saphia.
14   Q  Okay.
15       So there was nothing special about the
16  DSC600s or DSC650s to your clients.
17       Is that what you mean?
18   A  Well, when we required them, it was
19  beneficial to them.
20   Q  So are they something that your clients were
21  seeking prior to their introduction?
22   A  It's possible.
23   Q  Okay.  So I'd ask to you refresh your exhibit
24  list and look for No. 5.
25       Okay.

23 (Pages 86 - 89)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1 Do you have that one, sir?

2 A No. It's grinding.

3 Q Okay.

4 A I have Exhibit No. 5.

5 Q Okay.

6 I need to do something, but -- anyway, I will

7 direct you to on the bottom of the page, it says,

8 "Scientific Press Release Summary." Well, hold off

9 on that.

10 Can we take a break for five minutes,

11 Mr. Dickinson? I need to correct something.

12 A Yes.

13 Q Thank you.

14 THE VIDEOGRAPHER: We're off the record at

15 10:59 a.m.

16 (Recess.)

17 THE VIDEOGRAPHER: We are back on the record

18 at 11:06 a.m.

19 BY MR. SAPHIA:

20 Q Okay.

21 So, Mr. Dickinson, if you refresh -- so we're

22 going to withdraw Exhibit 5. There's a section in

23 there that reflects -- that is not reflective of

24 what's on your Website.

25 Okay?

Page 91

1 MR. SAPHIA: Sorry, David. Did you hear

2 that?

3 MR. DILLARD: No. In fact, I don't think

4 it's appropriate to start without --

5 MR. SAPHIA: I'm sorry, David. I thought you

6 were all ready. I -- you're correct.

7 MR. DILLARD: Okay.

8 So start over.

9 MR. SAPHIA: I was just saying to

10 Mr. Dickinson that we're going to expunge Exhibit 5

11 because it has material that is not from his

12 Website, okay, and we don't want to do that.

13 And instead I would have him look at

14 Exhibit 7.

15 (Exhibit 7 was marked for

16 identification and is attached

17 hereto.)

18 BY MR. SAPHIA:

19 Q Let me know when you get there,

20 Mr. Dickinson.

21 A I'm just working on that here. I'm

22 struggling here a moment. Excuse me.

23 Okay.

24 I'm in the document, Exhibit 7.

25 Q Okay.

Page 92

1 It should read "Press Release August 14th of

2 2007."

3 Do you see that?

4 A I do.

5 Q And it also says that Delta Scientific has a

6 new crash-resistant fixed bollard module to protect

7 facilities from terrorists and errant vehicles.

8 I -- I didn't say that -- I didn't quote

9 that, but I excerpted it.

10 Do you see that?

11 A I'm -- I'm looking at -- what part of the

12 document are you talking about, Mr. Saphia?

13 Q I'm not -- I'm just talking about the

14 heading. I was just talking about the heading.

15 A Oh, the heading itself?

16 Q Yes.

17 A Yes, I see the -- the heading.

18 Q All right. So could you -- could you read

19 that document? It's only a couple pages. And let

20 me know if there's anything in there that you

21 disagree with?

22 A (Reading document.)

23 Okay.

24 I read it. There are some parts of the upper

25 pages that are cut off, but what I can see I don't

Page 93

1 disagree with or anything that just exists.

2 Q Okay. Okay.

3 So -- so going back to our previous line of

4 questioning, the DSC600 introduction into the

5 marketplace was -- was notable from

6 Delta Scientific's point of view, wasn't it?

7 A We made a press release for it.

8 Q And you don't do that unless something

9 is significant --

10 COURT REPORTER: Can you -- hold on. Hold

11 on.

12 Can you repeat your answer, please.

13 THE DEPONENT: I said something to the effect

14 that we made a press release on it.

15 BY MR. SAPHIA:

16 Q And you wouldn't make a press release on a

17 product unless it was significant to the

18 marketplace.

19 Am I correct?

20 A We make press releases so we can introduce a

21 product to the marketplace.

22 Q And you wouldn't do that unless there was an

23 anticipation that you were meeting a need and there

24 would be a demand for the product.

25 Am I correct?

24 (Pages 90 - 93)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1    A   Our objective is to sell the product.
2    Q   Okay.
3        (Exhibit 6 was marked for
4        identification and is attached
5        hereto.)
6  BY MR. SAPHIA:
7    Q   I'd like -- I'd like you to take a look at
8  what has been marked as Exhibit 6.
9    A   It's thinking about it.
10   Q   Okay.
11       Let me know when you reviewed it.
12       Do you have it?  I'm sorry, Mr. Dickinson.
13   A   I'm working on it.  I'm working on it.
14       I'm reviewing it.  (Reading document.)
15   Q   Okay.  Okay.
16       Just so that I know you are on the same page,
17  does it say, "Declaration For Utility Design Patent
18  Application"?
19   A   Yes, it does.
20   Q   Okay.
21       Take your time.
22   A   Okay.
23   Q   Can I ask a question?
24   A   Go ahead.  I'm -- I'm looking at it still,
25  but go ahead.

Page 95

1    Q   Okay.
2        So let me just make sure.  This is a -- this
3  appears to be a patent application identifying an
4  inventor, Harry D. Dickinson.
5        Am I correct?
6    A   That is -- I guess it's a legal document
7  saying that.
8    Q   Okay.
9        Have you ever seen this document before?
10   A   Well, I can't say I've seen this specific
11  one, but I know we turned in some materials for
12  discovery, and I don't know where -- you know, I've
13  seen something like it to be sure.
14   Q   Okay.
15       Can you turn to -- now, that was Page 139.
16  Can you turn to Page 143?
17   A   I'm on 143.
18   Q   It appears to be a letter from Mr. Peter
19  Ganjian.
20       Do you see that?
21   A   Yes.
22   Q   Does Delta Scientific still use Mr. Ganjian
23  and his firm?
24   A   No.
25   Q   When did they discontinue using Mr. Ganjian?

Page 96

1    A   I -- I don't know the dates or the year that
2  we discontinued using Mr. Ganjian.
3    Q   Okay.
4        Do you still use his firm, Patent Law Agency?
5    A   No, Mr. Saphia.
6    Q   Okay.
7        Could you tell me, when you discontinued
8  using Mr. Ganjian, who did you go to for patent
9  procurement services?
10   A   We went to Lewis Roca et al.
11   Q   Okay.
12       And who do you deal with at Lewis Roca et al?
13   A   I deal with Mr. Constantine Marantidis,
14  Mr. David Dillard, and Sami Schilly.
15   Q   Now, Mr. Dillard doesn't prosecute patents,
16  does he?
17   A   I don't know his scope.
18   Q   Okay.
19       Has he ever prosecuted any patents for you?
20   A   I'm not certain.
21   Q   Has Ms. Schilly?
22   A   I am not certain.
23   Q   Did you ever give anything to Lewis Roca for
24  the procurement of a patent?
25   A   By "give them," what do you mean?

Page 97

1    Q   An inventive disclosure, a new patent.  I'm
2  talking about new patents.
3    A   Oh, new patents.
4        Yes, I have, or we have.
5    Q   Okay.
6        So you are using them as patent procurement
7  firm as well as litigation firm, correct?
8    A   Yes, that's correct.
9    Q   Okay.
10       And you moved from them what year -- and you
11  move from Mr. Ganjian's firm what year?
12   A   I told you I -- I don't know what year we
13  discontinued use with Mr. Ganjian's.  I used to work
14  with him.  I'm sorry.  I just don't know.
15   Q   Anyway -- that's fine.  That's fine.
16       If you look at Page 143, there's a filing
17  date, and the filing date is the 19th of March 2008.
18       Do you see that?
19   A   Yes, I do.
20   Q   Okay.
21       And would you agree with me that this patent
22  application was intended to cover the DSC600 and 650
23  models of Delta Scientific's shallow foundation
24  bollards?
25   A   I think that's a fair representation.

25 (Pages 94 - 97)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1   Q   Okay.
2       And if you could look at Page 189, it's the
3   first figure of the patent.
4       Do you see that?
5   A   I'm heading towards there.
6   Q   Okay.
7   A   Okay.  I'm there.
8   Q   Okay.
9       Figure 1 appears to be an embodiment of this
10  patent application.
11      Would you agree?
12  A   Yes.
13  Q   Okay.
14      Do you recall that I had showed you a
15  document in that large compilation that -- that
16  corresponded to the DSC650?
17      Do you recall that?
18  A   I recall.
19  Q   Okay.
20      And do you recall I pointed you -- I
21  identified for you an area on Page 228 that looks
22  very similar to this?
23  A   At this point, I can go back to 228 to verify
24  that.
25  Q   Okay.

Page 99

1       I think what we were talking about, to
2   refresh your memory, is the difference between 650
3   and the 600.
4   A   I see.
5   Q   We can do that.  We can do that.
6   A   Okay.
7   Q   And if you would like to do that to answer my
8   question, please do.
9   A   Okay.  All right.
10  Q   It's important to me?
11  A   What exhibit would I find Page 228 on?  Is
12  that 5?
13  Q   Okay.
14      So that was Exhibit 2.  That was Exhibit 2,
15  the large one.
16  A   Okay.
17  Q   And that was Page 28.
18  A   Okay.  I'm there.
19  Q   Okay.
20  A   I'm sorry.  So sorry to delay.  What's your
21  question, Mr. Saphia?
22  Q   Well, my question really was to compare
23  the -- the DSC650 and what's described on Page 228.
24      In other words, there's a -- there's an
25  object on -- on the top portion of the page on the

Page 100

1   right-hand side.
2       Do you see it?  There are two bollards and a
3   framework.
4   A   Yes.
5   Q   Do you see that?
6   A   Uh-huh.
7   Q   Okay.
8       And -- and compare that to Exhibit 6, which
9   is the patent application that Harry Dickinson filed
10  that we agreed covers the shallow foundation
11  bollards of Delta.  And that was on Page -- that was
12  on Page 189, Figure 1.
13  A   I'm on Page 19 -- 189, Figure 1.
14  Q   Okay.
15      So would you agree with me there's a
16  substantial similarity between Figure 1 of Exhibit 6
17  and the object on Page 228 of Exhibit 2?
18  A   They're similar.  There are some
19  distinctions.
20  Q   Okay.
21      And could you tell me what the distinctions
22  are?
23  A   I think the one on Page 223 is a bit more
24  detail.  There's a lift-out function, for example.
25  Q   Okay.

Page 101

1   A   And it shows you how to apply the product in
2   corners, for example.
3   Q   Okay.
4   A   It gives you direction and facts that are
5   pertinent to the use of the product.
6   Q   All right.  Okay.
7       There also appears to be some type of a mesh
8   on the product on Page 228 of Exhibit 2 that doesn't
9   appear in Figure 1 of the patent application,
10  correct?
11  A   Okay.  228, Figure 1?
12  Q   Yes.
13  A   Yeah.  I was on Page 223 I believe it is.
14  Q   Oh, okay.  Let's see.  Well, I think that's
15  essentially the same -- that's essentially the same
16  object, right?
17  A   Are we going back to 228 page?
18  Q   You could use either one.  You could use 223,
19  if you like, what you were looking at.
20  A   Oh, I see.  Okay.  Okay.  All right.  Okay.
21      It's the same drawing?  Is that -- okay.
22  Q   Yeah, same drawing.
23  A   All right.
24  Q   And what I was pointing -- pointing to is
25  that Figure 1 in Harry Dickinson's application that

26 (Pages 98 - 101)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1 we were discussing is similar to the objects that
2 appear on Page 223 and 228 of Exhibit 2, except for
3 the fact that there's a mesh, there's some type of a
4 rebar mesh in what you call the more detailed
5 drawing versus the patent on Figure 1.
6     Would you agree?
7  A  And I mentioned the removable bollard.
8  Q  Right.  Right.  In addition the removal
9 bollard.  Okay.
10    So you would agree with that, that there's a
11 mesh that's not -- that doesn't appear in Figure 1?
12  A  That is true.
13  Q  Okay.
14    But if you go to Page 190 of the patent
15 application, which is Exhibit 6, the mesh does
16 appear.
17    Am I correct?
18  A  Page what now?
19  Q  The next page, 190.
20  A  I'm sorry.  So are we working on Exhibit 2 or
21 the patent application?
22  Q  Exhibit 6, the patent application.  Sorry.
23  A  Are we talking, for example, Figure 4 --
24  Q  I was thinking if you could --
25  A  -- on Page 55?  Direct me to the page,

Page 103

1 please.  I'll help you.  I'll try to, anyway.
2  Q  I was going to say Page -- Figure 2 on
3 Page 190.
4  A  190.  This document reports 94 pages.
5  Q  When I say "190," I mean the Bates stamp
6 number on the bottom of it.  Maybe you can't see
7 that.  It's Figure 2.  It's Figure 2 of the patent.
8  A  Okay.
9     MS. SCHILLY:  If it helps, David, it's
10 Page 52 of 94 in the PDF.
11     THE DEPONENT:  Thank you.  That's helpful.
12 I'm there.  Thank you.  Industrial mesh.
13     MR. SAPHIA:  Thank you, Sami.
14 BY MR. SAPHIA:
15  Q  Do you see the mesh is included in that
16 figure, Mr. Dickinson?
17  A  I do, yes.
18  Q  Okay.
19    So Figure 2 looks even more like the two
20 figures from Exhibit 2 on 223 and 228, correct?
21  A  I believe so.
22  Q  Okay.
23    By the way, do you know why this patent
24 application never issued or why Delta Scientific
25 decided not to go forward with the prosecution of

Page 104

1 this patent?
2  A  I believe I do.
3  Q  And why is that?
4  A  And by the way, this is my interpretation of
5 it.  That it was abandoned.
6  Q  Okay.
7     And do you know why it was abandoned?
8  A  My impression is that there was a lot of
9 prior art, and it was going to be a big headache,
10 and I guess it was -- there was an opportunity-cost
11 decision, and I wasn't privy to this whole process,
12 but that's my impression of it.
13  Q  Okay.
14    (Exhibit 8 was marked for
15    identification and is attached
16    hereto.)
17 BY MR. SAPHIA:
18  Q  Okay.
19    If you refresh your exhibit list, you'll see
20 Dickinson Exhibit 8.
21  A  I see a white page.
22  Q  There's no object on it?
23  A  It has a -- stamp on it.
24  Q  Maybe can you enlarge your page?  There's an
25 object on it on the right-hand side.

Page 105

1     MR. DILLARD:  Joe, I've got a white page
2 also, just a blank page.
3     MR. SAPHIA:  Just a blank page?  Hold on for
4 one second.
5     Sami, you don't see it either?
6     MS. SCHILLY:  Correct.  I have the blank
7 page.  I tried downloading it.
8     MR. SAPHIA:  Yeah.
9     MS. SCHILLY:  So in the file preview, it's a
10 blank page.  If you download it, it does have an
11 image.
12     MR. SAPHIA:  Okay.
13     MS. SCHILLY:  But I'm not sure why the
14 preview isn't working.
15     MR. SAPHIA:  Okay.
16 BY MR. SAPHIA:
17  Q  Mr. Dickinson, could you download that?  It's
18 just one page.
19  A  I'll attempt to.
20  Q  Thank you.
21  A  I have it.
22  Q  You have it?  Okay.
23    Can you look at that object, sir?
24  A  I am looking at it.
25  Q  Do you know what it is?

27 (Pages 102 - 105)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 106

1   A  It looks like a shallow foundation bollard.
2   Q  Okay.
3      Does it look like the bollards that are
4  described in Exhibit 6 or Exhibit 2?
5   A  It's not identical.
6   Q  I didn't say if it was identical.  I said
7  does it look like them?
8   A  It looks like a general -- a general image of
9  a shallow foundation bollard.
10  Q  Okay.  And do you have any idea whose shallow
11  mount bollard that is or shallow foundation bollard?
12  A  I do not know.
13  Q  Okay.
14     I will represent to you that that is RSA's
15  shallow mount bollard.
16     And my question is, it looks to me very much
17  like the one described in Exhibit 2 and in Harry
18  Dickinson's patent application, Exhibit 6.
19     Would you agree with that?
20  A  It looks similar.
21  Q  Okay.
22     Let me show you where that came from.
23     Okay.  Okay.
24     We're having -- we're having quite a
25  difficulty with -- with big documents today.

Page 107

1      I'd like to show you where I -- where I took
2  that picture so that you have some context for my
3  question.  Too bad we didn't wait a couple years,
4  Mr. Dickinson.  I could have met you in person.
5  Although maybe you wouldn't have liked that very
6  much, but it might have been easier for a
7  deposition.
8      While we're waiting, there was a time that
9  you became aware of RSA as a competitor.
10     Am I right?
11  A  Yes.
12  Q  Let me rephrase.  Let me strike that, and
13  I'll rephrase it because you may not consider RSA a
14  competitor.
15     But there did come a time that you were aware
16  that RSA was -- was selling its shallow mount
17  bollard system, correct?
18  A  Yes.
19  Q  Okay.
20     And when was that?
21  A  I don't have a recollection of that.
22  Q  Okay.
23     Do you know how you became aware of it?
24  A  No.
25  Q  Who is Mr. Peter Lewellen?

Page 108

1   A  Peter Lewellen is a former employee.
2   Q  Is he -- when you say "a former employee,"
3  when did he leave your employ?
4   A  I don't know the date of his departure.
5   Q  Okay.
6      Was it recent?
7   A  No.
8   Q  Do you have -- do you do exit interviews
9  on -- on employees?
10  A  I'm not sure.  We're not a large company.  I
11  don't know what you mean by an exit interview,
12  Mr. Saphia.
13  Q  Well, sometimes companies will do an
14  interview about why someone is leaving and where
15  they are going and gather that type of information
16  for -- for H.R. purposes.
17     Do you do anything like that?
18  A  I doubt that we have that information on
19  Mr. Lewellen.
20  Q  Okay.
21     Did Mr. Lewellen leave on good terms?
22  A  No.
23     Does he live in California?  Do you know?
24
25  A  Not to my knowledge.

Page 109

1   Q  Okay.
2      Do you know where he lives?
3   A  I believe he lives in the state of Texas.  I
4  don't know the city.
5   Q  Do you know if he works in your industry any
6  longer?
7   A  I believe he does, or at least he -- well, at
8  one point he did.  I don't know what he's doing
9  today.  Okay?  I'm sorry.
10  Q  Okay.
11     Do you know if he started his own company?
12  A  I don't believe he did, but I couldn't be
13  certain on that.
14  Q  Do you know who he was working for?
15  A  Well, I haven't had contact with him in quite
16  a long time, but I believe he was working for -- or
17  at least at some point along the way he was working
18  for Gibraltar barriers or Gibraltar something in
19  Texas.
20  Q  Okay.
21     And they are competitors of yours, aren't
22  they?
23  A  They are.
24  Q  Do they have the same complete perimeter
25  solutions that Delta offers?

28 (Pages 106 - 109)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

1    A  I couldn't answer that question.
2    Q  Okay.
3        Who does you competitive -- do you know what
4  I mean when I say "competitive intelligence"?
5    A  Yes, I do.
6    Q  And who does that for Delta Scientific?
7    A  Well, first of all, we're not particularly
8  aggressive with that, but generally, our salespeople
9  have had the most external exposure to the
10 marketplace.
11   Q  Okay.
12       So you get feedback from your sales force
13 about other companies and competitors, et cetera,
14 right?
15   A  Yes.
16   Q  What was Mr. Lewellen's function at Delta?
17   A  He principally ran service and installation
18 of vehicle barricade systems.
19       (Whereupon, a discussion was held
20       off the record.)
21       (Exhibit 9 was marked for
22       identification and is attached
23       hereto.)
24 BY MR. SAPHIA:
25   Q  Could you open up your -- refresh your

Page 111

1  exhibits?  And please open up Exhibit 9.
2    A  It's working on it.
3    Q  Okay.
4    A  I got it.  Uh-huh.
5    Q  Okay.
6        There's a Bates number on it, 354 on the
7  bottom, and it goes to --
8    A  Yes.  It says Exhibit 9, actually.
9    Q  Okay.  Exhibit 9?  Okay.
10   A  But I see Page -- okay.
11   Q  It should have on top of it David Dickinson,
12 so it came from, I guess, your e-mail collection,
13 and it's from Peterdeltava@aol.com, and there's a
14 signature Peter D. Lewellen.
15       Do you see that?
16   A  I don't see a signature, but I see his name
17 on there, uh-huh.
18   Q  Sorry.
19   A  You are talking about the top of it, the top
20 of it?
21   Q  Yes.
22   A  Okay.
23   Q  And it says -- I'm sorry.  It's "To:
24 HDD@deltascientific.com."
25       Now, HDD, is that Mr. Harry Dickinson?

Page 112

1    A  That would be, yes.
2    Q  Okay.
3        And you just go by D -- well, what is your
4  e-mail address?
5    A  I don't give it out, actually, Mr. Saphia.
6  David@deltascientific.com.
7    Q  Okay.
8        It won't go any further.  I guarantee it.
9        The subject is (as read):
10       "Ten Reasons to Use Surface
11       Mounted Bollards."
12       Do you see that?
13   A  I do.
14   Q  Okay.
15       If you go to the next page -- oh, before we
16 leave this, it's dated June 17th of 2009.
17       Do you see that?
18   A  I do.
19   Q  Okay.
20       If you go to the next page, you should see
21 something with the heading "Modular Surface Mount
22 Bollards."
23       Do you see that?
24   A  I do.
25   Q  And it says, "RSA Protective Technologies."

Page 113

1        Do you see that?
2    A  Yes, I do.
3    Q  And if you go down to the left-hand corner,
4  you will see "Worldwide patent pending."
5        Do you see that?
6    A  In the photograph, yes.
7    Q  Okay.
8        Now, do you know whether anyone from Delta
9  did any investigation on RSA or its patent portfolio
10 as a result of this e-mail?
11   A  No.  And by the way, this is a surface
12 mounted bollard, not a shallow foundation bollard.
13   Q  I understand.  I was just wondering if
14 -- if -- no, I understand.  I was just wondering if,
15 as a result of this, right, that you would look at
16 any RSA patents or patent portfolio.
17       So you would not?
18   A  I don't know.  I don't know what we did.
19   Q  Okay.  Okay.
20       If that happened today and you were
21 the -- and you are the CEO, or president, would you
22 look for patents if you saw that there was a
23 worldwide patent being -- patent pending label on an
24 advertisement?
25   A  Probably we would today.

29 (Pages 110 - 113)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1    Q   Okay.  Okay.
2        But it wasn't your custom back then?
3    A   I can't answer that.  I don't know what our
4    custom was back then.
5    Q   Okay.
6        But it's -- but as far as your understanding,
7    the company never made any effort to identify any
8    RSA patent on receipt of this particular e-mail?
9    A   True.
10   Q   Okay.
11       (Exhibit 10 was marked for
12       identification and is attached
13       hereto.)
14   BY MR. SAPHIA:
15   Q   So let's go to Exhibit 10.  And I will
16   represent to you -- let me know when you get there.
17   A   I got the cover page here.
18   Q   Okay.
19       So let me explain what it is, and then if you
20   disagree or your counsel says it's a
21   misrepresentation, I'll -- I'll continue.
22       But it's -- this is a provisional application
23   that was filed by Mr. Adler and Mr. Crawford.
24       And do you know what a provisional
25   application is?

Page 115

1    A   I do not.
2    Q   Okay.
3        I'll represent to you that it is a filing
4    with the United States Patent and Trademark Office
5    that is essentially a placeholder, and the patent
6    owner has a year to use that as a priority document
7    for the purposes of filing a utility application.
8        Do you understand any of that?
9    A   Yes.
10       THE DEPONENT:  Mr. Dillard, does that track
11   with your -- is that a fair representation of that?
12       MR. DILLARD:  That's a fair representation.
13       THE DEPONENT:  Thank you.
14   BY MR. SAPHIA:
15   Q   I always make fair representations,
16   Mr. Dickinson.
17       Okay.
18   A   I'm sure you do.
19   Q   So on the bottom of the cover page, there's a
20   date, and the date says April 25th of '05.
21       Do you see that?
22   A   I do.
23   Q   Okay.
24       So this document was submitted to the United
25   States Patent and Trademark Office April 25th of

Page 116

1    '05.  Okay.
2        Now, these are Bates numbered, so I would
3    like you to turn to -- and I hope you could see the
4    Bates numbers -- a Bates number that ends with 840.
5    Now, that's about ten or 15 pages into the document.
6        MR. DILLARD:  What was the Bates number
7    again?
8        MR. SAPHIA:  It's actually RSA-DELTA043840.
9        THE DEPONENT:  I have it.
10   BY MR. SAPHIA:
11   Q   You got it?
12   A   Yes.
13   Q   Now, the top of that page says, (as read):
14       "DOS CERTIFIED ANTI-RAM VEHICLE
15       BARRIERS February 4, 2005."
16       Do you see that?
17   A   I do.
18   Q   Would that be an important document for
19   Delta?
20   A   Yes.
21   Q   And why would that be important?
22   A   It lists what products of ours are qualified
23   to be purchased by the U.S. State Department and
24   generally buy in that era by the Department of
25   Defense.

Page 117

1    Q   Okay.
2        And, in fact, on Page 1 of that document,
3    there's a listing for Delta Scientific Corp. from
4    Valencia, California.
5        Do you see that?
6    A   I do.
7    Q   And it lists a whole bunch of bollards,
8    right?  In fact, it lists one, two, three, four,
9    five, if you go to the next page.
10       Do you see that?
11   A   Yes, I do.
12   Q   Okay.
13       If you go to the following page, the page
14   numbered 842.
15   A   I'm there.
16   Q   There's a listing for RSA Protective
17   Technologies.
18       Do you see that?
19   A   I do.
20   Q   And it has certain bollards that are
21   described.  It actually says, (as read):
22       "14-inch shallow mount fixed
23       bollards, 12-inch shallow mount
24       fixed bollards, 6.5 shallow -- inch
25       shallow mount fixed bollards," and

30 (Pages 114 - 117)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

1    another "6.5 shallow mount fixed
2    bollards."
3        Do you see that?
4    A  I do.
5    Q  So if this document was important to Delta,
6    Delta just by reading this document would understand
7    that RSA Protective Technologies had some shallow
8    mount fixed bollards that are approved by the
9    Department of State, correct?
10   A  If we were reading it at the time, we might
11   do that, yes.
12   Q  Okay.
13       So let's take a look at what else is in this
14   document.
15       If you would go to Page 866.
16       Have you got -- let me know when you get
17   there.
18   A  I'm working on it.
19   Q  Okay.
20   A  I'm there.
21   Q  Okay.
22       When you look at Page 866 of Exhibit 10, the
23   right-hand -- the top right-hand image, the double
24   bollard unit, do you see that?
25   A  I do.

Page 119

1    Q  And it says manufactured by RSA Protective
2    Technologies -- or it doesn't say manufactured by,
3    but it says, "RSA Protective Technologies."
4        Do you see that?
5    A  Yes, I do.
6    Q  Okay.
7        So when I showed you Exhibit 8 --
8    A  Excuse me.  I'm sorry.  I'm sorry.  I'm in
9    the right place.  RSA --
10   Q  Take your time.
11   A  (As read):
12       "RSA/K&C Anti-Ram Foundation Pad."
13       Is that what you are referring to?
14   Q  We are -- well, that's the -- that's the
15   image on the bottom of the page, right.
16   A  Okay.  Okay.
17       So you're talking about the top?
18   Q  So just that the record's clear, the image
19   that I was describing is on the top right-hand part
20   of page, and that is the same image that I showed
21   you as Exhibit 8, right, and I think you told me
22   that there was similarity between the image on
23   Exhibit 8 and what was described in Exhibit 2 at
24   Page 223 and 228 and also Exhibit 6 in Figures 1 and
25   2.

Page 120

1        Am I correct?
2    A  I believe so.
3    Q  I want you to put your -- put your -- put
4    yourself in the position of RSA Technologies for one
5    minute, Mr. Dickinson.  And they disclose that
6    shallow mount bollard two years before the earliest
7    document that you have shown me about
8    Mr. Dickinson's design of your DSC600 bollard,
9    correct?
10       MR. DILLARD:  Objection; calls for
11   speculation.
12   BY MR. SAPHIA:
13   Q  You can answer that question.
14   A  I'm not given to speculation.  Thank you,
15   though.
16   Q  Okay.
17       Well, let's take Mr. Dillard's cues out of it
18   for a moment because he's actually not supposed to
19   do that, but we let him do it anyway.  According to
20   the Federal Rules, he can really only object to
21   form, but let's go through his -- let's go through
22   his call for speculation.
23       I showed you in Exhibit 10 that RSA
24   Technologies advertised and the Department of State
25   referenced drawings that you told me were

Page 121

1    substantially similar to what was in a patent
2    application by Delta in 2008, three years later, and
3    your product description of Exhibit 2 on Pages 223
4    and 228.
5        Isn't it reasonable that RSA would assume,
6    given the substantial similarity, that someone
7    copied their product?
8        MR. DILLARD:  Objection; calls -- same
9    objection; calls for speculation.
10       THE DEPONENT:  I'm not sure what the question
11   is, Mr. Saphia.
12   BY MR. SAPHIA:
13   Q  Well, Mr. Dickinson, I'm just trying to
14   appeal to your -- to your fairness for a moment.  I
15   wanted you to put yourself in the position -- you
16   are in a position.  You're a commercial, very
17   successful, businessman, correct?
18       Wouldn't you term yourself that?
19   A  I don't make that statement.
20   Q  Let me make it for you.  Do you disagree with
21   it?
22   A  I don't know where these documents came from,
23   Mr. Saphia.
24   Q  I don't understand what you are saying.
25       Do you think I made them up?

31 (Pages 118 - 121)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1   A  No.  I'm curious what -- the source of them.
2   Q  Okay.
3       Well, I could tell you that Exhibit 10 was
4   filed with the United States Patent and Trademark
5   Office.
6   A  Okay.
7   Q  I can tell you that Exhibit -- I could tell
8   that you Exhibit 6 is a copy out of your files that
9   was filed by Mr. Harry Dickinson with the patent
10  office.
11      And the only other thing I used was a public
12  production of what your DSC600 and 650 looked like.
13  I just put the pieces together.
14  A  I see.  They look very similar, Mr. Saphia.
15  Q  Well, what -- here's -- my question is this.
16  It's a simple question.  If you were -- if you were
17  RSA, and you saw something that was substantially
18  similar in the marketplace, right, what would you
19  think?
20      Isn't it plausible that -- that someone
21  either showed a product to -- to Delta -- I'm not
22  saying that there was -- okay.
23      Isn't it conceivable that someone in Delta
24  took the idea of the RSA product and -- and used it
25  to design a product of its own?

Page 123

1       MR. DILLARD:  Objection; speculation.
2   BY MR. SAPHIA:
3   Q  You can answer it, if you can.
4   A  I'll answer it.  I don't know what the
5   history is on this topic.
6   Q  Okay.
7       It's a plausible -- it's a plausible
8   explanation, isn't it?
9   A  I am going to repeat my answer.  I don't know
10  the history on this product.
11  Q  I'm not asking you if you know the history.
12  I'm asking you if it's plausible, given the facts
13  that I just presented to you?
14  A  I don't see the connection between the
15  drawings that you are showing me and -- and what
16  Delta Scientific's actions are.
17  Q  Well, when you say "the connection," I'm
18  giving you a chronological look.  I showed you
19  something that was created in -- for an
20  advertisement to the Department of State and
21  incorporated in the document to the United States
22  Patent and Trademark Office in 2005.
23      I showed you that, correct?
24  A  You did.
25  Q  And then I showed you another document that

Page 124

1   was created by Delta that described a patent
2   application that you agree with me is substantially
3   similar to what was disclosed in the patent
4   application by RSA.
5       That's correct, right?
6   A  The structure of that is similar, yes.
7   Q  Okay.
8       So I'm asking you:  As a -- as a commercial
9   participant, right, if it is feasible that somehow
10  the idea of the RSA product was incorporated into
11  your DSC600 and 650?
12      MR. DILLARD:  Objection; asked and answered.
13  BY MR. SAPHIA:
14  Q  That's another one he's not supposed to do,
15  but go ahead.
16  A  Well, Mr. Saphia, it -- you make the
17  assumption that we have these documents and drawings
18  in our copy of the patent application.
19  Q  No.  I never made that assumption.
20      You see, Mr. Dickinson, the product was also
21  being sold at the same time, so -- so it could be
22  that what happened was someone at Delta identified a
23  competing product, saw that there was a demand, and
24  basically incorporated that product into their
25  product line under the name of DSC600 and 650.

Page 125

1       Isn't that plausible, given the facts that I
2   presented to you?
3   A  It's plausible, but I don't know if that's
4   factual.
5   Q  Okay.
6       MR. SAPHIA:  Can we take a five-minute break,
7   Mr. Dickinson?
8       THE DEPONENT:  Why don't we take a lunch
9   break here since it's noon down here in California.
10      MR. SAPHIA:  Oh.  Up to you.
11      THE DEPONENT:  All right?
12      MR. SAPHIA:  Sure.
13      How about a half hour?  Does that work?
14      THE DEPONENT:  It's okay with me.
15      How about you, Mr. Dillard and Sami?
16      MR. DILLARD:  That would be fine.
17      MS. SCHILLY:  That's fine with me.
18      MR. SAPHIA:  I'll see you about 20 after 12?
19      COURT REPORTER:  Mr. Saphia, do you know if
20  you're going to be most of the day today?
21      MR. SAPHIA:  I think we are.
22      COURT REPORTER:  If we could take 40 minutes,
23  that would be great.
24      MR. SAPHIA:  Okay.
25      THE VIDEOGRAPHER:  We're off the record at

32 (Pages 122 - 125)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1  11:57 a.m.
2      (Whereupon, at the hour of 11:57
3      a.m., a luncheon recess was taken,
4      the deposition to be resumed at
5      12:40 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1  Palmdale, California; Wednesday, September 30, 2020
2          12:40 p.m.
3
4      THE VIDEOGRAPHER:  Back on the record at
5  12:40 p.m.
6
7          DAVID DICKINSON,
8    having been previously duly sworn,
9    was examined and testified as follows:
10
11      EXAMINATION (RESUMED)
12  BY MR. SAPHIA:
13  Q   So, Mr. Dickinson, I hope you enjoyed your
14  lunch.
15      And did you speak with counsel?
16  A   I enjoyed my lunch, and I did not speak with
17  counsel.
18  Q   And that means Mr. Dillard or Ms. Schilly?
19  A   That's true.
20  Q   Okay.  Thanks.
21      Okay.
22      So before lunch, I had asked you some
23  questions about Delta Scientific's knowledge of RSA
24  as a competitor, and I showed you what was marked as
25  Exhibit 9, which was an advertisement by RSA.

Page 128

1      I'm going to show you something else now, and
2  it should be in your exhibits already.
3      It's Exhibit 11.
4      (Exhibit 11 was marked for
5      identification and is attached
6      hereto.)
7  BY MR. SAPHIA:
8  Q   Let me know when you get there, sir.
9  A   I have the document up.
10  Q   Okay.
11      Could you identify this document for me?
12  A   Yes.  It is an e-mail from Keith Bobrosky to
13  myself, and it's a reference to the patent
14  infringement claim for shallow mount bollards
15  related to New York.
16  Q   So who is Mr. Bobrosky?
17  A   Mr. Bobrosky is the senior vice president at
18  Delta Scientific.
19  Q   And what are his responsibilities as vice
20  president?
21  A   He manages operations.  He does sales.
22  Q   Do you -- when you say "sales," does that
23  include strategy?
24  A   It can.
25  Q   So do you sit in on those meetings with the

Page 129

1  sales group?
2  A   I do at times.
3  Q   Do you lead the group or does Mr. Bobrosky
4  lead the group?
5  A   It depends on the topic, Mr. Saphia.
6  Q   I'm sorry.  I didn't catch that.
7  A   It depends on the topic, Mr. Saphia.
8  Q   Okay.  I understand.
9      So is there a -- let me just -- I didn't ask
10  you anything about the organization of Delta, but so
11  is there a sales group per se?
12  A   Yes, there is a sales group.
13  Q   And Mr. Bobrosky is the head of that group?
14  A   Actually, we have a vice president of sales
15  and marketing that we consider the head of the
16  group.
17  Q   Okay.
18      And who is that?
19  A   Mr. Gregory Hamm.
20  Q   Okay.
21      So I'm going back to August 9th of 2018,
22  which is the date on this e-mail.  Would Mr. Hamm
23  have been the head of the group then also?
24  A   Yes.
25  Q   So do you have an understanding of why

33 (Pages 126 - 129)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 134

1 seeking a DSC600?
2 A  Well, we might recommend it, or they might
3 ask for it.
4 Q  Okay.
5    Internal warning lights, are they also
6 recommended by your sales force to be used with the
7 DSC600?
8 A  I'm not sure what an internal warning light
9 is, but we do put warning lights on our products at
10 times.
11 Q  Okay.
12    How about a rolled bronze plaque?  Is that a
13 product that -- that's recommended by your sales
14 force to be used with the DSC600?
15 A  We would -- if asked, we would quote it.
16 Q  I guess my point is that oftentimes clients
17 buy -- when they are buying a DSC600 or 650, they
18 are also buying related products from Delta; isn't
19 that true?
20 A  I don't know the frequency, Mr. Saphia, but
21 it is plausible.
22 Q  Okay.  Would I be able to determine that from
23 your sales system?
24 A  Yes.
25 Q  Okay.

Page 135

1    MR. SAPHIA:  Mr. Dillard, I -- I would make
2 the request, and we'll do a formal request for
3 documents related to invoices where convoyed sales
4 of corresponding products are also listed on the
5 invoices.
6    Okay?
7    MR. DILLARD:  Understand your request.
8 BY MR. SAPHIA:
9 Q  Okay.
10    Going back to Mr. Bobrosky's e-mail,
11 Exhibit 11, did this -- did this trigger -- did this
12 e-mail to you from Mr. Bobrosky trigger any action
13 on your part?
14 A  Yes, it did.
15 Q  Okay.
16    What action did you take as of August 9th,
17 2018 in response?
18 A  I sent an e-mail with the patent number to
19 Mr. Constantine Marantidis of Lewis and Roca and
20 asked him to look into what this patent was.
21 Q  Okay.
22    And I don't have that e-mail I don't think,
23 and it may be seeking attorney information, so I'm
24 not -- I'm not entitled to it, but I am entitled to
25 understand that you did send it to him.

Page 136

1    Did you send it to him on or about
2 August 10th of 2018?
3 A  Yes, that's true.
4 Q  Okay.
5    And did you receive anything back from your
6 attorney in response to your request?  I don't want
7 the substance.  Did you get anything back?
8    MR. DILLARD:  I'd just like to -- I'd like to
9 caution the witness that you shouldn't disclose
10 any -- the substance of the attorney-client
11 communications.
12    THE DEPONENT:  Thank you.
13    Acknowledged.
14 BY MR. SAPHIA:
15 Q  Okay.
16    So did you receive anything back from your
17 attorney?
18 A  I did.
19 Q  Okay.
20    Was it in written form or oral form?
21    THE DEPONENT:  I'd like to ask Mr. Dillard
22 where this goes.
23    MR. DILLARD:  You're not entitled to do that.
24    THE DEPONENT:  Okay.
25    MR. DILLARD:  I can just caution you just

Page 137

1 don't disclose the substance of communications.
2    THE DEPONENT:  Okay.
3    I received a written communication from
4 Mr. Constantine Marantidis.
5 BY MR. SAPHIA:
6 Q  Okay.
7    There is -- in this litigation, there was a
8 time upon which you have to disclose any opinions of
9 counsel that go toward the substance of the case.
10    Have you -- have you considered whether to
11 disclose the correspondence provided to you by Lewis
12 Roca in response to your request of August 10th?
13 A  I have not considered that point.
14    (Exhibit 13 was marked for
15    identification and is attached
16    hereto.)
17 BY MR. SAPHIA:
18 Q  Okay.
19    I'm going to show -- well, let's go to
20 Exhibit 13, sir.  It should be already in your file.
21 A  I'm refreshing.
22    MR. DILLARD:  Mr. Saphia?
23    MR. SAPHIA:  Yes.
24    MR. DILLARD:  When I pull up that exhibit, I
25 get a notice that says, "This file type cannot be

35 (Pages 134 - 137)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1 previewed," but the download button, when I hit the
2 download button, there is a orange bar at the top
3 that says, "This file does not exist."
4     MR. SAPHIA:  Okay.
5     Thank you, David.
6     Did you refresh your screen?
7     MR. DILLARD:  And after -- yeah.  I've got
8 Exhibit 13 up in the upper bar.  Let me --
9     MR. SAPHIA:  Download it, maybe.
10     MR. DILLARD:  Now I hit "Preview File," and I
11 am getting a -- appears to be a letter of some sort.
12     Okay.  So I have got it.
13     MR. SAPHIA:  Okay.  Okay.
14     MR. DILLARD:  Do you have it, David?
15 BY MR. SAPHIA:
16   Q   Mr. Dickinson, do you have it?
17   A   I do.
18   Q   Okay.
19     So what does this appear -- what is -- what
20 is this exhibit?
21   A   It's a communication to the Adam Baldridge,
22 Esquire, et al organization.  Other than that, I
23 don't know.
24   Q   Okay.
25     And it was written by Mr. Trent Barnes,

Page 139

1 correct?
2   A   Yes.
3   Q   And it was sent by Trent Barnes on June 3rd
4 of 2019, correct?
5   A   Yes.
6   Q   Okay.
7     Do you understand that this document was
8 prepared by Mr. Barnes to be --
9   A   Yes, I understand that.  Excuse me.  I'm
10 sorry.  Just continue.
11   Q   Okay.
12   A   I'm sorry.
13   Q   No.  That's okay.
14     Did you -- did you help Mr. Barnes gather the
15 information that was contained in this letter?
16   A   Yes, I did.
17   Q   Okay.
18     So you were served with a third-party
19 subpoena by Baker, Donelson, which is a law firm,
20 and Mr. Adam Baldridge and Nicole Berkowitz were two
21 attorneys that were serving to defend the company by
22 the name of Guardiar?
23     Are you aware of that?
24   A   Yes.
25   Q   Okay.

Page 140

1     Guardiar was a successor in interest to
2 Secure USA.
3     Are you aware of that?
4   A   I understand that.
5   Q   Secure USA is a manufacturer, and Guardiar
6 subsequently is a manufacturer of shallow mount
7 bollards.
8     Are you aware of that?
9   A   I didn't know what their product line was,
10 but understood.
11   Q   Okay.
12     RSA brought a lawsuit against Guardiar and
13 Secure USA in the Southern District of Florida.
14     You're aware of that?
15   A   Yes.
16   Q   In fact, it was the first lawsuit that RSA
17 brought against any defendant for their use of
18 shallow mount bollard products.
19     Are you aware of that?
20   A   Yes.
21   Q   Okay.
22     Subsequently, RSA brought a suit against
23 court authority, and you're aware of that because
24 that was -- I just showed you that letter that
25 Mr. Bobrosky gave you, right?

Page 141

1   A   Yes.
2   Q   Okay.
3     Mr. Baldridge and Ms. Berkowitz served a
4 subpoena on you, and if you look at the subsequent
5 pages to the -- to this document, and they're
6 actually -- there's some pagination after it.  So
7 Page 1 is on the next page.
8     Do you see that?
9   A   I'm looking.  Thank you.
10   Q   Take your time.
11   A   So we're looking at the second page of the
12 document?  Is that what you are saying?
13   Q   Yeah.  Yes.
14   A   Okay.
15     I'm here, I believe.
16   Q   And -- and what this is is the cover page of
17 the subpoena that they served on you to produce
18 documents, right?
19   A   Yes.
20   Q   And if you go to Page 7, do you see that?
21   A   I do.
22   Q   Is this the -- what happens now in this
23 document is Mr. Barnes responds to the document
24 request by Mr. Baldridge.
25     So, for example, Document Request No. 1

36 (Pages 138 - 141)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1  states, (as read):
2      "Please produce all photographs,
3      videos, and crash test documentation
4      for any passive vehicle barrier
5      existing or designed as of January 1,
6      2005, that was designed to be
7      installed at a depth of less than four
8      feet below the surface of the ground."
9      Do you see that?
10     I just read you Request No. 1.
11  A  I understand.  I'm looking.
12  Q  Okay.
13  A  You say that's on Page 7?
14  Q  Yes, it's on Page 7 of the subpoena, which is
15  Page 8 of the document.
16  A  All right.  Okay.  All right.  I'm with you
17  now.
18  Q  You got it?
19  A  Yes.
20  Q  So -- so do you see that language?
21  A  I do.
22  Q  Okay.
23     Mr. Baldridge made six requests of Delta, and
24  each one of the requests -- and you could -- you
25  could verify this.  Each one of the requests was

Page 143

1  limited in time to January 1st of 2005.
2      Do you understand that?
3  A  I see it.
4  Q  Okay.
5      So let's just go over the answers that you
6  and Mr. Barnes gave to Guardian.
7      The response to Production Request No. 1, you
8  said, (as read):
9      "Plaintiff has no responsive
10     documents or things in its
11     possession, custody, or control,
12     other than those attached as
13     Attachment "2" and "3".'"
14     Do you see that?
15  A  I'm looking for 2 and 3.
16  Q  Okay.
17  A  Okay.
18  Q  Attachment 2 and 3 are -- reflects work done
19  by a Mr. Daniel Darcy.
20     Do you understand that?
21  A  Yes.
22  Q  Do you know Mr. Darcy?
23  A  No, I do not.
24  Q  Okay.
25     How did you become aware of Mr. Darcy's work?

Page 144

1  A  I believe that Mr. Constantine Marantidis
2  communicated this to us.
3  Q  Okay.
4      So this wasn't necessarily in Delta's control
5  prior to hiring Lewis Roca.
6      Am I right?
7  A  I don't know for certain, Mr. Saphia.
8  Q  Okay.
9      Anyway, when you look at all of these
10  document requests -- let me give you another one,
11  Document Request No. 3.  (As read):
12     "Please produce all documents
13     sufficient to show the design,
14     construction, and dates of testing of
15     all passive vehicle barrier existing
16     or designed as of January 1, 2005,
17     that were designed to be installed at
18     a depth of less than four feet below
19     the surface of the ground."
20     Do you see that?
21  A  Which page is that on, please?
22  Q  It's Page 8, sir.  Document Request No. 3.
23  A  Okay.
24  Q  Your response was, (as read):
25     "Plaintiff has no responsive

Page 145

1      documents or things in its
2      possession, custody, or control,
3      other than those attached hereto as
4      Attachment "2" and "3".'"
5      Did I read that correctly?
6  A  That's what the document says.
7  Q  Okay.
8      So when you say "that's what the document
9  says," do you have any independent knowledge that
10  any of the statements made in response to
11  Mr. Baldridge's subpoena were wrong?
12  A  Well, I see statements in this document
13  that -- that object to -- subject to all objections,
14  et cetera, et cetera.  I'm not an attorney,
15  Mr. Saphia, so I think I rely on Mr. -- Mr. Barnes
16  to establish his reasoning.
17  Q  Okay.
18     Do you understand what it -- what it means
19  when I say "subject to all the above objections" and
20  then I make a statement?
21  A  Not clearly.
22  Q  Okay.  All right.
23     But as you sit here today, there's nothing
24  that you have subsequently found out that you think
25  would make any of these statements erroneous.

37 (Pages 142 - 145)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1    Am I right?
2    A  Well, since the date of June 3rd, 2019, we've
3  covered a lot of ground with regard to researching
4  and further additional discovery, Mr. Saphia.
5    Q  Yes, that's true.
6        So are you saying that this -- that this
7  document is not valid for what it -- for what it
8  said as of that date, or is it not valid because
9  you've done subsequent work?
10   A  Delta Scientific has done subsequent work,
11 and the discovery that we supplied you is an
12 indication of that.
13   Q  Okay.
14       There's nothing that I've seen in the
15 discovery that you provided which necessarily calls
16 into question any of the conclusions that you draw
17 in this document.
18       Am I wrong?
19   A  I don't know, Mr. Saphia.  It's a point of
20 law.
21   Q  Okay.
22       Is there anything else that you did when
23 you -- so let me just recap.  I'm sorry.
24       You were presented with an e-mail describing
25 a request for indemnification.  That made it to

Page 147

1  your dad.  That was in, I guess, 2018.  You hired
2  outside counsel at that time.
3        Then you were served with a subpoena from
4  Mr. Baldridge's firm related to an infringement case
5  brought by RSA.  And you obviously had outside
6  counsel -- outside counsel's help in the preparation
7  of your response to Mr. Baldridge's subpoena;
8  correct?
9    A  Yes.
10   Q  Okay.
11       I asked Mr. Barnes this question, and I guess
12 I'll ask the question to you also.  And I think -- I
13 think I overheard you try and correct Mr. Barnes at
14 the end of that deposition.
15       But are you aware that a United States patent
16 has a presumption of validity when it is issued by
17 the patent office?
18   A  I am not aware of that as a rule of law,
19 Mr. Saphia, and I am not an attorney.
20   Q  Okay.
21       I don't expect you -- look, I understand you
22 are not an attorney.  I just want to know whether
23 you are aware as you sit here today as the president
24 of Delta that a U.S. patent is given a presumption
25 of validity when it is issued by the patent office?

Page 148

1    A  That's a point of law which I cannot -- I
2  don't know.  Okay?  I just don't know.  I'm sorry.
3  I don't know.
4    Q  Okay.  That's fine.  Saying "I don't know,"
5  as your counsel has probably told you, is okay at a
6  deposition.  That's fine.  You don't know.
7        Do you know what an inter partes review is?
8    A  I -- I have seen two of them.  I think I'm
9  aware of them, yes.  I don't know the full function
10 of them.
11   Q  Are you aware -- sorry.
12       Are you aware generally that they are
13 challenges to the validity of a patent before a
14 specialized board of the United States Patent and
15 Trademark Office?
16   A  I am aware that they are a form of challenge
17 of validity, and the institution I have to admit I
18 don't -- don't know their credentials.
19   Q  Okay.
20       Well, I -- let me explain this to you, then.
21       Someone drafts a petition.  The challenger
22 drafts a petition.  The petition goes to a
23 specialized panel, right, at the patent board and
24 the patent appeals board and trial.  I don't know if
25 I got that right.  But bottom line is that that

Page 149

1  panel decides whether they should undertake that
2  challenge based on what was presented to it in the
3  petition.  I'll make that representation to you.
4        That has happened twice as against the
5  patent-in-suit before you.  In other words, the '865
6  Patent.
7        Are you aware that there were two petitions
8  filed against the '865 Patent?
9    A  Yes, I'm aware of that.
10   Q  Okay.
11       Are you aware that both of those petitions
12 were denied?
13   A  I believe so.
14   Q  Okay.
15       Are you aware that when this litigation
16 started, counsel for Lewis Roca filed another
17 challenge to the validity of the patent?
18   A  Yes, I'm aware of that.
19   Q  That patent challenge was based on a piece of
20 art called Chen.
21       Are you aware of that?
22   A  I've heard the term.
23   Q  Do you know what happened to that ex parte
24 reexamination petition for the patent?
25   A  Yes, I do.

38 (Pages 146 - 149)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1 Q And what was the result of that?
2 A It was denied.
3 Q Okay.
4    Do you know -- and I asked this of
5 Mr. Barnes, but I will ask it of you also.
6    Do you know what is meant by an exceptional
7 case?
8 A I do not.
9 Q Okay.
10    And do you know what is meant by willful
11 patent infringement?
12 A I do not know the legal implications of that.
13 Q Okay.
14    So you don't know that in a case that the
15 judge decides in its discretion is an exceptional
16 case, that the losing party would be made to pay the
17 other side's counsel costs?
18    Are you aware of that?
19    MR. DILLARD: Could you -- could you repeat
20 the question?
21    MR. SAPHIA: Yes.
22 BY MR. SAPHIA:
23 Q Are you aware that if a case is determined to
24 be exceptional under the patent law, that the losing
25 party can be made to pay the costs of the

Page 151

1 representation of the prevailing party?
2    Do you know that?
3 A I have answered the question.
4 Q I'm sorry? I'm sorry? I didn't hear you.
5 A I've said I have answered the question.
6 Q I don't -- I don't recall.
7    Could you tell me again?
8    THE DEPONENT: Melissa, would you please read
9 back my answer to his question?
10    MR. SAPHIA: I think he means the previous
11 question.
12    (Record was read back by the
13    deposition officer as follows:
14    "QUESTION: And do you know what is
15    meant by wilful patent infringement?
16    "ANSWER: I do not know the legal
17    implications of that.")
18    MR. SAPHIA: That was my previous question.
19    THE DEPONENT: Yeah. And the question and
20 the answer I gave after that?
21    COURT REPORTER: After that, there is an
22 objection by Mr. Dillard, then he -- oh, no.
23 Mr. Dillard asks him to repeat the question, and
24 then you say, "I have answered it."
25    Let me go back up.

Page 152

1    Here it is.
2    (Record was read back by the
3    deposition officer as follows:
4    "QUESTION: Do you know -- and I
5    asked this of Mr. Barnes, but I will
6    ask it of you also.
7    "Do you know what is meant by an
8    exceptional case?
9    "ANSWER: I do not.")
10    THE DEPONENT: Okay.
11    So, Mr. Saphia, have I answered your question
12 to your satisfaction?
13 BY MR. SAPHIA:
14 Q I don't think so. I feel there was a
15 different question.
16 A Okay.
17    Would you please favor me by repeating the
18 question?
19 Q Sure. I will do it all over again, if you
20 like.
21    I asked you -- the first question I asked you
22 is, if you -- are you aware of what's meant by an
23 exceptional case under the patent law, and you said
24 no. Essentially, you said no, correct?
25 A True.

Page 153

1 Q Okay.
2    And then I said to you, are you aware -- are
3 you aware that under the patent law, the losing
4 party in an exceptional case can be made to pay at
5 the discretion of the judge the attorney's fees and
6 costs of the prevailing party?
7    Are you aware of that? Yes or no?
8 A I am not aware of that. Sorry it took so
9 long.
10 Q That's okay.
11    I also asked you about whether you were
12 familiar with the concept or what it means to have a
13 wilful infringement case under the patent law.
14    And I believe you told me you are not,
15 correct?
16 A I am not aware of the legal ramifications of
17 that.
18 Q Okay. Right.
19    And then I asked -- then I will now ask you,
20 are you aware that under -- that if a case is
21 determined to be -- that if a -- if a patent
22 infringement is determined to be wilful, right,
23 damages can be awarded up to three times the amount
24 that was adjudicated?
25    Are you aware of that?

39 (Pages 150 - 153)

# DOCUMENT TO BE FILED UNDER SEAL
# IN ITS ENTIRETY

# EXHIBIT 20

# EXHIBIT 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                              Page 1

1              UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
3

4     _____
                                      )
      RAS PROTECTIVE TECHNOLOGIES,     )
5     LLC,                             )
                                       )
6            Plaintiff,                )
                                       )
7        vs.                           )No. 19-6024
                                       )
8     DELTA SCIENTIFIC CORPORATION,    )
                                       )
9            Defendant.                )
      _____)
10
11
12        *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
13
14     VIDEOTAPED REMOTE DEPOSITION OF 30(b)(6) GINA GILE
15       Deponent testifying from Palmdale, California
16              Thursday, September 17, 2020
17                      Volume I
18
19
20
21     Stenographically Reported By:
       Melissa M. Villagran, RPR
22     CSR No. 12543
23
24
25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1      UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA
 3
        _____
 4                          )
        RAS PROTECTIVE TECHNOLOGIES, )
 5      LLC,                         )
                                     )
 6          Plaintiff,       )
                                     )
 7          vs.           )No. 19-6024
                                     )
 8      DELTA SCIENTIFIC CORPORATION,)
                                     )
 9          Defendant.      )
        _____)
10
11
12
13
14      *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16         Videotaped Remote deposition of 30(b)(6) GINA
17      GILE, Volume I, taken on behalf of Plaintiff.
18      Deponent testifying from Palmdale, California,
19      beginning at 9:00 a.m. and ending at 2:20 p.m. on
20      Thursday, September 17, 2020, before Melissa M.
21      Villagran, RPR, Certified Shorthand Reporter
22      No. 12543.
23
24
25
```

Page 4

```
 1      APPEARANCES (continued):
 2
 3      Videographer:
 4          Dan Bruun
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      APPEARANCES:
 2      (ALL ATTENDEES APPEARING REMOTELY)
 3
 4      For Plaintiff:
 5          HAUG PARTNERS LLP
 6          BY:  LAURA CHUBB
 7          Attorney at Law
 8          745 Fifth Avenue
 9          New York, New York 10151
10          212.588.0800
11          lchubb@haugpartners.com
12
13      For Defendant:
14          LEWIS ROCA ROTHGERBER CHRISTIE LLP
15          BY:  SAMI SCHILLY
16              DAVID DILLARD
17          Attorneys at Law
18          655 North Central Avenue, Suite 2300
19          Glendale, California 91203
20          626.795.9900
21          sSchilly@lrrc.com
22          Ddillard@lrrc.com
23
24
25
```

Page 5

```
 1                  INDEX
 2
 3      DEPONENT                    EXAMINATION
 4      GINA GILE
 5      Volume I
 6          BY MS. CHUBB                10
 7
 8
 9              EXHIBITS
10      DEPOSITION                     PAGE
11      Exhibit 1   List of Delta employee names     20
12
13      Exhibit 2   Second Notice of Deposition      25
14          Pursuant to Federal Rule of
15          Civil Procedure 30(b)(6)
16
17      Exhibit 3   DSC600 Series Sales Flyer        35
18
19      Exhibit 4   Income statement                 49
20
21      Exhibit 5   DSC600 Income Sheet              62
22
23      Exhibit 6   Delta Scientific Corp. Order     108
24          Entry Sales Analysis Report
25
```

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1  A  Yes.
2  Q  And did you generate it from BusinessWorks in
3  the ordinary course of Delta's business?
4  A  For this purpose of this case, yes.  It can
5  be regenerated.
6  Q  Is it an automatic report that comes from
7  BusinessWorks?
8  A  Yes.
9  Q  Okay.
10  (Exhibit 15 was marked for
11  identification and is attached
12  hereto.)
13  THE DEPONENT:  Am I refreshing again?
14  BY MS. CHUBB:
15  Q  Yes.  Sorry.  Let me know when you get it.
16  A  It looks like the same document.  Let me see.
17  Q  Yeah.  Can you see it?
18  A  Is it No. 15?
19  Q  Yes.
20  So I introduced Gile Exhibit 15, which is
21  DS2605 through DS2608.
22  Ms. Gile, is this document the same as
23  Exhibit 14, but including DSC675 model sales?
24  A  It looks to be.  Without going line by line,
25  yeah, it looks to be.

Page 139

1  Q  Okay.
2  And if you look at the last page, DS2608,
3  which relates to DSC675, would the total for all
4  time of DSC675 sales just come from adding up the
5  quantity rows there?
6  A  Yes.
7  Q  Okay.
8  And is this true and accurate information,
9  Ms. Gile?
10  A  To the best of my knowledge, yes.
11  Q  And this is a report that you created from
12  BusinessWorks in the ordinary course of Delta's
13  business?
14  A  Yes.
15  MS. CHUBB:  Annette, can you introduce 24,
16  25, and 26, please.
17  We're going to introduce three exhibits now.
18  A  Okay.
19  (Exhibit 16 was marked for
20  identification and is attached
21  hereto.)
22  (Exhibit 17 was marked for
23  identification and is attached
24  hereto.)
25  ///

Page 140

1  (Exhibit 18 was marked for
2  identification and is attached
3  hereto.)
4  MS. SCHILLY:  And, Ms. Chubb, I just wanted
5  to check.  It's 1:15 here on the West Coast.  Do you
6  anticipate much, much longer to where it would make
7  sense to take a lunch break?
8  MS. CHUBB:  I don't think there's much, much
9  longer.  So I don't know if anybody needs to just
10  take a short break, but if you want to -- why don't
11  we do that because I know Ms. Gile mentioned that
12  she's getting tired.
13  THE DEPONENT:  I'm fine.  Just keep going.
14  I'm good.
15  MS. CHUBB:  Well, okay.  Then I don't know.
16  Melissa, are you okay?
17  COURT REPORTER:  Actually, I would like to
18  take a break.
19  MS. CHUBB:  Okay.
20  MS. SCHILLY:  So are we just doing like a
21  short break?  I -- I guess we can go off the record
22  and the discuss.
23  THE VIDEOGRAPHER:  Okay.  We are off the
24  record at 1:15 p.m.
25  (Whereupon, at the hour of

Page 141

1  1:15 p.m., a luncheon recess was
2  taken, the deposition to be resumed
3  at 1:52 p.m.)

36 (Pages 138 - 141)

**EXHIBIT 22**

1 | **DAVID A. DILLARD, CA Bar No. 97515**
ddillard@lrrc.com
2 | **CONSTANTINE MARANTIDIS, CA Bar No. 173318**
cmarantidis@lrrc.com
3 | **SAMI I. SCHILLY, CA Bar No. 301653**
sschilly@lrrc.com
4 | **LEWIS ROCA ROTHGERBER CHRISTIE LLP**
**655 N. Central Avenue, Suite 2300**
5 | **Glendale, CA 91203-1445**
**Telephone: (626) 795-9900**
6 | **Facsimile: (626) 577-8800**

7 | Attorneys for Defendant
**DELTA SCIENTIFIC CORPORATION**

8

9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| RSA PROTECTIVE | Case No. 2:19-cv-06024 JAK (PLAx) |
| TECHNOLOGIES, LLC, | |
| | **DEFENDANT DELTA** |
| Plaintiffs, | **SCIENTIFIC CORPORATION'S** |
| | **SUPPLEMENTAL RESPONSES** |
| | **TO PLAINTIFF'S FIRST SET OF** |
| vs. | **INTERROGATORIES** |
| DELTA SCIENTIFIC CORPORATION, | **Hon. John A. Kronstadt** |
| Defendant. | |

Defendant Delta Scientific Corporation ("Delta") responds to the First Set of Interrogatories propounded to it by Plaintiff RSA Protective Technologies, LLC ("RSA") as follows:

## GENERAL OBJECTIONS

1.      Delta objects to RSA's instructions, definitions, and requests to the extent that they are inconsistent with or purport to impose a duty of disclosure that is greater than or different from that required under the applicable Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Central District of California.

-1-

111253992.1

2.      Delta objects to the definition of "Defendant" as ambiguous, vague, confusing, and overly broad and responds to each request for itself alone.

3.      Delta objects to the interrogatories to the extent that they seek the information to which the parties have equal access, is already in possession of RSA, or has already been provided to RSA.

4.      Delta objects to RSA's definitions, instructions and interrogatories to the extent that they impose on Delta an unreasonable burden or expense.

5.      Delta objects to the definition of "shallow mount bollard." The definition is not supported by United States Patent No. 8,215,865, which indicates that "shallow excavations" refers to excavations having a depth less than the depth of utility lines such as gas, water, electric, etc., which may vary.

6.      The responses set forth below are true and correct to the best of Delta's knowledge as of this date. Discovery remains ongoing. Delta has not completed its investigation or discovery relating to this case, and has not completed its preparation for trial. The following responses, subject to inadvertent or undiscovered errors, mistakes, or omissions, are based upon and necessarily limited by the records and information still in existence, presently recollected, and thus far discovered in the course of preparing these responses. Delta reserves the right to further investigation and discovery, and thus reserves the right to amend or supplement these responses, and to produce and to refer to at trial or at any other hearing any evidence, facts, documents or information not yet discovered, or the relevance of which has not yet been determined, by Delta or its counsel.

7.      Delta makes these responses solely for purposes of this action. Each response is made subject to all objections as to relevancy, materiality, propriety, and admissibility of any facts or other information identified in these responses. All objections and grounds for objections are expressly reserved by Delta and may be interposed at any later stage of this action, including at the time of trial.

111253992.1

Subject to and without waiving the foregoing objections, each of which is specifically incorporated into each individual response below, Delta responds to RSA's First Set of Interrogatories as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**:

Describe in detail, on an element-by-element basis in the form of a claim chart, all factual and legal bases for Delta Scientific's contention that it does not infringe, directly, or indirectly, literally or under the doctrine of equivalents, any Asserted Claim of the Patent-in-Suit, including but not limited to each limitation in the Patent-in-Suit that Delta Scientific contends is missing, identify all Documents and Things that support Delta Scientific's contentions.

**RESPONSE TO INTERROGATORY NO. 1**:

Delta incorporates its General Objections.   Subject to the foregoing objections, Delta responds as follows:

As described in Delta's Invalidity Contentions, set forth on an element-by-element basis in the form of claim charts, Delta established that the Asserted Claims are anticipated and/or rendered obvious at least by U.S. Patent Application Publication No. 2004/0033106 to Turpin et al. ("Turpin") or rendered obvious to a person of ordinary skill in the art by Turpin in view of the prior art sale and public use of Delta's DSC501 barrier, and separately the Asserted Claims were anticipated or rendered obvious by U.S. Patent No. 5,406,663 to Chen, alone or in combination with U.S. Patent No. 5,836,715 to Hendrix et al.

"A party cannot infringe an invalid claim or the claims of an unenforceable patent." *Novartis Pharm. Corp. v. Roxane Labs. Inc.*, Civil Action No. 08-CV-3853 (DMC)(JAD), 2011 WL 1322271, *3 (D.N.J. Mar. 31, 2011)

Because the Asserted Claims of the Patent-In-Suit are invalid, they cannot be infringed directly, or indirectly, literally or under the doctrine of equivalents.

-3-

In addition, there are claim elements that are not or may not be contained in one or more of the Accused Products, depending how the claim terms are construed. In claims 1, 16 and 33, these elements include: "at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base" and "a plurality of structural members which intersect with each other." "[S]tructural members which intersect with each other" has previously been construed to mean two structural members "which pass or lie across each other". See, *RSA Protective Tech., LLC v. Secure USA, Inc.*, Case No.: 9:18-CV-81124-RLR, Order Construing Disputed Claim Terms. Given that all Asserted Claims have these two limitations, the Asserted Claims do not literally cover the Accused Products, even if the Asserted Claims were valid.

Certain of the dependent claims also have elements that are not or may not be contained in one or more of the Accused Products. Specifically, in claims 2 and 17, the element is "at least one of the opposed ends is formed by a structural member to which an end of the at least one first structural member is secured." In claims 3 and 19, the element is "intersecting structures." In claims 14 and 30, the element is "at least one plate."

Claim construction in the present proceeding is not yet complete. Delta expressly reserves the right to supplement this response following a claim construction order by the Court, which may significantly impact Delta's analysis.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**:

While Delta contends that the Asserted Claims are invalid, Delta states that, if the Asserted Claims are found to be valid and enforceable, it will not contest that the following Asserted Claims read on the indicated Accused Products below:

| Accused Product | Asserted Claims |
|---|---|
| DSC600, DSC650 | 1-5, 7, 10, 14-21, 23, 26, 31-35 |
| DSC675 | 1-5, 7, 10, 14-15 |

-4-

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

   The DSC675 Accused Product is a single bollard structure, and therefore does not include the required "plurality of bollards" required in independent claims 16 and 33.  As such, if the Asserted Claims are found to be valid and enforceable, DSC675 cannot infringe claims 16 or 33, or any claims depending therefrom.

Dated:  May 18, 2020                 Respectfully submitted,

                                     LEWIS ROCA ROTHGERBER
                                     CHRISTIE LLP


                                     By /s/ David A. Dillard
                                     _____
                                          David A. Dillard

                                     Attorneys for Defendant
                                     Delta Scientific Corporation

-5-

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 23

1  Sasha G. Rao
   srao@maynardcooper.com
2  (California Bar Number: 244303)
   **MAYNARD COOPER & GALE, LLP**
3  Transamerica Pyramid Center
   600 Montgomery Street, Suite 2600
4  San Francisco, CA 94111
   Telephone:  (415) 704-7433
5
   *Attorney for Plaintiff*
6  *RSA Protective Technologies, LLC*

7  Joseph V. Saphia
   JSaphia@haugpartners.com
8  (admitted *pro hac vice*)
   Jessica H. Zafonte
9  JZafonte@haugpartners.com
   (admitted *pro hac vice*)
10 **HAUG PARTNERS LLP**
   745 Fifth Avenue, New York, NY 10151
11 Telephone:  (212) 588-0800
   Facsimile:  (212) 588-0500
12
   *Attorneys for Plaintiff*
13 *RSA Protective Technologies, LLC*

14                    **UNITED STATES DISTRICT COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 16  RSA PROTECTIVE TECHNOLOGIES, LLC, | **Case No. 2:19-cv-06024 JAK (PLAx)** |
| 17 | RESPONSE TO DEFENDANT DELTA SCIENTIFIC CORPORATION'S FIRST SET OF INTERROGATORIES |
| 18       Plaintiff, | |
| 19       v. | Judge: Hon. John A. Kronstadt |
| 20  DELTA SCIENTIFIC CORPORATION, | |
| 21       Defendant. | |
| 22 | |

23        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and all

24 applicable Local Rules of the United States District Court for the Central District

25 of California, and the Standing Order for Civil Cases (D.I. 14), Plaintiff RSA

26 Protective Technologies, LLC ("RSA") objects and responds as follows to

27 Defendant Delta Scientific Corporation's ("Delta") First Set of Interrogatories

28 (Nos. 1-18).

1

**INTERROGATORY NO. 7:**

What does RSA contend is a reasonable royalty, including royalty base and royalty rate, for third party products that are covered by one or more claims of the '865 patent, and describe all facts and identify all documents that support your contention.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff objects to this interrogatory as premature to the extent it seeks the opinion of an expert. Nevertheless, Plaintiff will seek a reasonable royalty for the use of its patented technology that includes the bollard structures, components sold together said structures, and fees for engineering and installation. RSA reserves the right to supplement or amend this response pursuant to Rule 26(e), including under Rule 33(d).

**INTERROGATORY NO. 8:**

For each license under the '865 patent, identify the parties (other than RSA) to the license, and describe all terms that RSA considers to be material, including the amount of royalties for past sales and future sales of products covered by the '865 patent.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff has not licensed the '865 patent. However, pursuant to Rule 33(d), RSA will produce relevant settlement agreements.

Plaintiff reserves the right to supplement or amend this response pursuant to Rule 26(e), including under Rule 33(d).

**INTERROGATORY NO. 9**

Describe in detail the factual basis for any claim for lost profits including the identification of each sale that RSA would have made but for Delta's alleged infringement, and for each such sale: a) the date or approximate date of the sale; b)

9

the RSA product that would have been sold; c) the identity of the companies competing for the sale; d) an explanation of why RSA would have made the sale rather than a third party competitor; e) the amount of the sale in terms of the number of product units and the price per unit; f) the amount of gross and net profit RSA would have made.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff will not be seeking a claim for lost profits. Plaintiff reserves the right to supplement or amend this response pursuant to Rule 26(e), including under Rule 33(d).

**INTERROGATORY NO. 10:**

Identify the locations where RSA's shallow mount bollards are manufactured and, for each location, identify the owner of the manufacturing facility at the site and the RSA products that are manufactured at the facility.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff objects to this interrogatory as overly broad and unduly burdensome to the extent it is relevant to any party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b). Notwithstanding, RSA's shallow mount bollards are manufactured by ████████████████████████████, located in ████████████, and ████████████████████ located in ████, ████████████████.

Plaintiff reserves the right to supplement or amend this response pursuant to Rule 26(e), including under Rule 33(d).

**INTERROGATORY NO. 11:**

State to the best of your knowledge the date or approximate date when RSA became aware of Delta.

**INTERROGATORY NO. 18:**

For each request for admission in Defendant Delta Scientific Corporation's First Set of Requests for Admission that RSA denies, state, in detail, the factual basis for such denial.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff objects to this interrogatory as overly broad and unduly burdensome to the extent it is relevant to any party's claim or defense and proportional to the needs of the case.  Fed. R. Civ. P. 26(b).  Notwithstanding, Plaintiff will respond to Delta's First Set of Requests for Admission according to and consistent with the applicable federal and local rules.

Dated:  June 17, 2020

/s/ Sasha G. Rao
Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**Maynard Cooper & Gale, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415) 704-7433
*Attorney for Plaintiff*
*RSA Protective Technologies, LLC*

Joseph V. Saphia
JSaphia@haugpartners.com
Jessica H. Zafonte
JZafonte@haugpartners.com
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500
*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

14

**CERTIFICATE OF SERVICE**

I certify that on June 17, 2020, pursuant to Federal Rules of Civil Procedure, a true and correct copy of the foregoing document described as RESPONSE TO DEFENDANT DELTA SCIENTIFIC CORPORATION'S FIRST  SET OF INTERROGATORIES was served on all counsel of record in this action by electronic mail.

<u>/s/ Jessica H. Zafonte</u>
Jessica H. Zafonte

# VERIFICATION

I have instructed Plaintiff's counsel to ensure the accuracy and completeness of the answers in Plaintiff's "Response to Defendant Delta Scientific Corporation's First Set of Interrogatories." On that basis, I hereby verify under penalty of perjury that the answers to these interrogatories are true and correct.

Executed by _____

Date _____ 6/14/20

**EXHIBIT 24**

Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**MAYNARD COOPER & GALE, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415) 704-7433

*Attorney for Plaintiff*
*RSA Protective Technologies, LLC*

Joseph V. Saphia
JSaphia@haugpartners.com
(admitted *pro hac vice*)
Jessica H. Zafonte
JZafonte@haugpartners.com
(admitted *pro hac vice*)
Laura A. Chubb
LChubb@haugpartners.com
(admitted *pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue, New York, NY 10151
Telephone:  (212) 588-0800
Facsimile:  (212) 588-0500

*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RSA PROTECTIVE TECHNOLOGIES, LLC,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>DELTA SCIENTIFIC CORPORATION,<br><br>　　　Defendant. | **Case No. 2:19-cv-06024 JAK (PLAx)**<br><br>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7 OF DEFENDANT DELTA SCIENTIFIC CORPORATION'S FIRST SET OF INTERROGATORIES<br><br>Judge: Hon. John A. Kronstadt |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and all applicable Local Rules of the United States District Court for the Central District of California, and the Standing Order for Civil Cases, Plaintiff RSA Protective Technologies, LLC ("RSA") supplements its response to Interrogatory No. 7 of

1

## INTERROGATORY NO. 7:

What does RSA contend is a reasonable royalty, including royalty base and royalty rate, for third party products that are covered by one or more claims of the '865 patent, and describe all facts and identify all documents that support your contention.

## RESPONSE TO INTERROGATORY NO. 7:

Plaintiff objects to this interrogatory as premature to the extent it seeks the opinion of an expert.  Nevertheless, Plaintiff will seek a reasonable royalty for the use of its patented technology that includes the bollard structures, components sold together said structures, and fees for engineering and installation.  RSA reserves the right to supplement or amend this response pursuant to Rule 26(e), including under Rule 33(d).

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

Plaintiff incorporates by reference the Expert Report of Neil J. Beaton, dated October 12, 2020, and the Update to the Expert Report of Neil J. Beaton, dated November 25, 2020, including any schedules, exhibits, and appendices thereto.

Dated:  December 11, 2020

/s/ Sasha G. Rao
Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**Maynard Cooper & Gale, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone:  (415) 704-7433
*Attorney for Plaintiff*
*RSA Protective Technologies, LLC*

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joseph V. Saphia
JSaphia@haugpartners.com
Jessica H. Zafonte
JZafonte@haugpartners.com
Laura A. Chubb
LChubb@haugpartners.com
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500
*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

4

**DOCUMENT TO BE FILED UNDER SEAL
IN ITS ENTIRETY**

**EXHIBIT 25**

# DOCUMENT TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 26

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 27



**Alvarez & Marsal Valuation Services, LLC**
1111 Third Avenue – Suite 2450
Seattle, WA 98101
Phone: +1 206 664 9000
Fax: +1 206 664 8901

December 14, 2020

**VIA E-MAIL ONLY**

Mr. Joseph V. Saphia
Ms. Laura Chubb
Haug Partners LLP
745 Fifth Avenue, 10th Floor
New York, NY 10151

>       *Re:       RSA Protective Technologies, LLC v. Delta Scientific Corporation*
>                 *Civil Action No. 19-6024 (C.D. Cal.)*

Dear Mr. Saphia and Ms. Chubb:

While I was reviewing my reports and supporting documents, I noticed two typographical errors that I failed to catch on my final review before issuing. One was in my original report issued on October 12, 2020 and one was in my updated report issued on November 25, 2020. Neither of these typographical errors impact my opinions, but wanted to make you aware in case you would like to inform opposing counsel.

The two typographical errors are as follows: in paragraphs 61 through 63 in my original report, █ ████████████████████████████████████████ ██████████ ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

Please let me know if you have any questions or need additional clarification.

Sincerely,

Neil J. Beaton, CPA/ABV/CFF, CFA, ASA
Managing Director

# DOCUMENT TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 28

# DOCUMENT TO BE FILED UNDER SEAL IN ITS ENTIRETY

# EXHIBIT 29

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 30

```
                                              Page 1

 1           IN THE UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   RSA PROTECTIVE TECHNOLOGIES,  ) Case No. 19-6024
     LLC,                         )
 5                                )  REDACTED
                                  )
          Plaintiff,              )
 6                                )
                                  )
       v.                         )
 7                                )
     DELTA SCIENTIFIC CORPORATION, )
 8                                )
          Defendant.              )
 9   -----------------------------)

10

11

12              WEDNESDAY, DECEMBER 16, 2020

13

14       VIDEOTAPED REMOTE ZOOM Deposition of

15   BARBARA LUNA, PH.D., beginning at 8:04 a.m., before

16   Nancy J. Martin, a Registered Merit Reporter,

17   Certified Shorthand Reporter.

18

19

20

21

22

23

24

25
```

Page 2

1 A P P E A R A N C E S :

2

    HAUG PARTNERS LLP

3   BY:  LAURA A. CHUBB, ATTORNEY AT LAW
    745 Fifth Avenue

4   10th Floor
    New York, New York  10151

5   (212) 588-0800
    lchubb@haugpartners.com

6   Counsel for Plaintiff

7

8   LEWIS ROCA ROTHGERBER CHRISTIE LLP
    BY:  SAMI I. SCHILLY, ATTORNEY AT LAW

9       DAVID DILLARD, ESQ.
    655 North Central Avenue

10  Suite 2300
    Glendale, California  91203

11  (626) 795-9900
    sschilly@lrrc.com

12  Counsel for Defendant

13

14  ALSO PRESENT:

15  CHRISTIAN TEARE, LEGAL VIDEOGRAPHER

16

17

18

19

20

21

22

23

24

25

---

Page 3

1              I N D E X
                        PAGE

2
    TESTIMONY OF BARBARA LUNA, PH.D.

3
    BY MS. CHUBB                        7

4

5        E X H I B I T S

6   NUMBER      DESCRIPTION      PAGE

7   Exhibit 1     Expert Report of Barbara C.  9
              Luna, Ph.D., 83 pages

8

    Exhibit 2     Luna Expert Report, Changed  9
9             Pages, 6 pages

10  Exhibit 3     LinkedIn Profile of Barbara  16
              Luna, 2 pages

11

    Exhibit 4     Expert Report of Barbara C.  39
12            Luna, Ph.D., November 9,
              2020, 82 pages

13
    Exhibit 5     Email string, RE: RSA v.    44
14            Delta - Luna Materials
              Considered, 5 pages

15
    Exhibit 6     Expert Report of Barbara C.  58
16            Luna, Ph.D., November 9,
              2020, 82 pages

17
    Exhibit 7     Email string, 1T2038 and    120
18            DSCBOO, 1 page

19  Exhibit 8     Settlement Agreement,       132
              11 pages

20
    Exhibit 9     Email string, Questions     153
21            from Damages Expert,
              3 pages

22

23

24

25

---

Page 4

1              E X H I B I T S

2   NUMBER      DESCRIPTION      PAGE

3   Exhibit 10    Bollards Market Size Share  167
              Industry/Analysis By Future

4             Demand Top/Players Size
              Share Opportunities/Revenue

5             and Growth Rate
              Through/2025 Research

6             Reports World, 4 pages

7   Exhibit 11    Global Bollards Market      171
              Size/Share 2020 Movements

8             by Key/Findings Industry
              Impact Latest/Trend

9             Analysis Progression/Status
              Revenue Expectation to/2024

10            Research Report by/Industry
              Research Biz, 5 pages

11
    Exhibit 12    Press Release, Steel        171
12            Bollards Market Size 2020 I
              Growth Analysis

13            by/Development Trends
              Business Demand Status

14            and/Global Share Forecast
              to 2025 Industry

15            Researchco, 12 pages

16  Exhibit 13    PRESS RELEASE/Bollards      171
              Market 2020 Industry

17            Outlook by Business/Share
              Industry Price Trend Size

18            Estimation Latest/Analysis
              and Forecast to 2026,

19            13 pages

20  Exhibit 14    PRESS RELEASE/Mooring       171
              Bollards Market 2020

21            Research by Size
              Top/Leading Countries

22            Companies Consumption
              Drivers/Trends Forces

23            Analysis Revenue Challenges
              and Global/Forecast 2026 I

24            COVID19 Impact on Industry,
              12 pages

25

---

Page 5

1              E X H I B I T S

2   NUMBER      DESCRIPTION      PAGE

3   Exhibit 15    Email string, Bollard Sales 177
              With Cover Percentage,

4             2 pages

5   Exhibit 16    UPDATE TO THE EXPERT REPORT 182
              OF NEIL J. BEATON, November

6             25, 2020, 6 pages

7   Exhibit 17    Summary 1 Revised/RSA v.    214
              Delta/Summary of Reasonable

8             Royalty Damages/Scenario 1
              : Based on July 2013 and

9             July 2019 Hypothetical
              Negotiation, 2 pages

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

Page 10

1 there should now be Luna Exhibit 2, which you can take
2 a look at and which should include the pages you
3 submitted as corrected to your report, which is now
4 marked as Luna Exhibit 1.
5     A. I just go back, backspace, I guess? I got
6 it. I got something. All right. Hold on. Let me
7 just double-check.
8     Q. Okay.
9     A. Oh, this is the entire thing. Let me just
10 look at Page --
11     Q. You know what? If you --
12     A. This is not the most recent one. You have
13 one more.
14     Q. I think the same thing happened to me. When
15 I went back and there were two exhibits, logically you
16 would think the bottom one was the newest one. It's
17 really the top one --
18     A. All right. Give me one -- give me one second
19 to go back. I just want to make sure --
20     REPORTER MARTIN: Dr. Luna, would you let the
21 attorney finish her sentences, please. I'm getting a
22 lot of crosstalk, and it's getting difficult for the
23 transcript.
24     THE WITNESS: Sorry.
25     REPORTER MARTIN: That's okay. Thank you.

Page 11

1     (Pause in proceedings.)
2     THE WITNESS: Okay. Yes.
3 BY MS. CHUBB:
4     Q. Okay. So you're saying, "yes," Luna
5 Exhibit 2 contains the pages that you submitted as
6 corrected to your report?
7     A. Yes.
8     Q. Okay. If you can go back and open Luna
9 Exhibit 1.
10     A. Yes.
11     Q. Okay. I'm sorry. It's not like we're in
12 person. It's hard to tell if you're there or not.
13     And if you can -- I'd like to direct you, if
14 you could go down to Page 37 in that PDF.
15     A. This one does not have --
16     Q. Actually, it might be Page 36.
17     A. This one doesn't have page numbers, but I'll
18 use mine.
19     Go ahead. I have Exhibit A.
20     Q. Okay. I think -- I mean if you want to use
21 the on-line version, if you kind of hover over the PDF
22 towards the bottom, it shows you what page you
23 reached.
24     A. I don't see it. I'm sorry. Go ahead. I
25 have my marked version. I'm okay. Oh, I see. All

Page 12

1 right. Fine. Go ahead.
2     Q. So looking at Appendix A, the first page of
3 Appendix A has the header "BARBARA C. LUNA."
4     Do you see that?
5     A. I do.
6     Q. And is this your CV, Dr. Luna?
7     A. It is.
8     Q. And is this a true and accurate copy of your
9 CV?
10     A. It is.
11     Q. So, Dr. Luna, you've been practicing for over
12 40 years; is that right?
13     A. Yes.
14     Q. What -- according to your CV, most of your
15 work concerns business and personal injury litigation
16 and bankruptcy matters; is that right?
17     A. Yes.
18     Q. You also mentioned that you have been
19 involved in matters regarding intellectual property --
20     A. Right.
21     Q. -- is that right?
22     A. Yes.
23     Q. What percentage of your practice would you
24 say has been involved in intellectual property?
25     A. Probably 10 to 15 percent.

Page 13

1     Q. And of that 10 to 15 percent, how does that
2 break up within, you know, the various types of
3 intellectual property?
4     A. Patents, trademarks, trade secrets. A little
5 bit of copyright.
6     Q. And what percentage of the 10 to 15 percent
7 would you say are you involved in patent-related
8 matters?
9     A. Probably 30 to 40 percent.
10     Q. 30 to 40 of the 10 percent?
11     A. Yeah. Probably about a third of it.
12     Q. And how many times have you been acting as an
13 expert witness in a patent matter?
14     A. A number of times.
15     Q. Would you say 10?
16     A. It's probably more than that. 10 to -- I
17 don't know. 10 to 30, in that range. I'd have to go
18 back.
19     Q. And that's over the course of your 40 years;
20 is that right?
21     A. Yes.
22     Q. In how many matters have you been acting as
23 an expert witness in your total 40 years would you
24 say?
25     A. Well, I've testified over 500 times at trial.

4 (Pages 10 - 13)

Page 18

1 biology, and for some reason that is under the arts
2 and science school. So it comes out as a B.A. even
3 though at the majority of the world, it would be a
4 B.S. But, anyway, I understand. It does confuse
5 people though.
6      Okay. So if we can go back to Luna
7 Exhibit 1, which was your report, and I'd like to
8 direct you to a different page within Appendix A.
9      (Pause in proceedings.)
10     THE WITNESS: Okay.
11 BY MS. CHUBB:
12     Q. So if you scroll down, there's a page that's
13 headed "ARTICLES AND PUBLICATIONS," I believe. I
14 think it's Page 78.
15     A. Got it.
16     Q. Yes. Page 78 of the PDF.
17     Okay. Dr. Luna, is this -- does this
18 accurately describe articles and publications that
19 you've authored?
20     A. Yes.
21     Q. And are these all the publications you've
22 authored in the last 10 years? Is that right,
23 Dr. Luna?
24     A. It's more than 10 years ago, but yes.
25     Q. Okay. I see there's some from 1989, for

Page 19

1 example. So are these all your articles and
2 publications throughout your career?
3      A. I believe so.
4      Q. Okay. Within these 11 articles or
5 publications identified here, are any of them
6 specifically about determining patent damages?
7      A. No. It would be included therein.
8      Q. Okay. And which particular articles or
9 publications do you believe would be included therein?
10     A. I probably -- No. 1, I probably mentioned
11 patent damages in that.
12     Q. Uh-huh.
13     A. That's the only one I've mentioned.
14     Q. Okay. I see, for example, the second article
15 you have listed here concerns Proposition 103; is that
16 right?
17     A. Right.
18     Q. And from Googling, which may not be terribly
19 accurate, I understand that that relates to some sort
20 of prior approval regarding insurance company rates;
21 is that right?
22     A. Yes.
23     Q. And how relevant is that to your practice
24 currently, Dr. Luna?
25     A. It's not right now. It used to be a hot

Page 20

1 topic.
2      Q. Okay. What percentage of your work are
3 you -- do you relate to disputes, you know, with
4 insurance companies?
5      A. It's relatively small, 5 percent, but it
6 doesn't deal with Prop 103 --
7      Q. Uh-huh.
8      A. -- at this point.
9      Q. Okay. What would you say is the biggest area
10 of your practice in terms of expert work?
11     A. Calculating damages in --
12     Q. And for --
13     A. -- business litigation cases.
14     Q. And is there a particular type of dispute
15 that, you know, is the bulk of your work?
16     A. Not really.
17     Q. I notice on your list of testimony there
18 seems to be a lot of cases related to lemon law
19 issues. Is that a large part of your practice?
20     A. Not at this point. For about a two-year
21 period of time, it was, but that's essentially over.
22     Q. Okay. What do you think is the largest legal
23 issue that you provide damages expertise for?
24     A. I mean it could be a breach of contract case,
25 a breach of fiduciary duty case, a business

Page 21

1 interruption case, a construction case, a trademark
2 case, patent case. I mean, I'm dealing with lost
3 profits, unjust enrichment, and reasonable royalties.
4 That's the largest part.
5      Q. Uh-huh. Okay. I guess let's look at some of
6 your previous testimony. In Appendix A you've
7 included what was your last five years of trial
8 testimony. I believe it begins on Page 38 of this
9 PDF.
10     A. Yes.
11     Q. You're there?
12     A. I am.
13     Q. So this -- within Appendix A there's a
14 document that is 1 through 11 pages; is that right?
15 That represents your last five years of trial
16 testimony?
17     A. Correct.
18     Q. Okay. And if we go down a little bit in
19 Appendix A, there's another document that's numbered 1
20 to 29 pages. Is that your last five years of
21 deposition testimony? Is that right?
22     A. Yes.
23     Q. So earlier I think you mentioned that you
24 have testified at trial in over 500 matters; is that
25 right?

6 (Pages 18 - 21)

Page 22

1    A. Yes.
2    Q. And that's over the course of the last
3 40 years; right?
4    A. Yes.
5    Q. And is that true for deposition testimony
6 too, the same number of matters?
7    A. It's higher than that, yes.
8    Q. How many times would you say?
9    A. I'd be guessing. I don't know.
10    Q. And in those 500 or so matters in which
11 you've testified at trial, would you say -- what would
12 you say is the type of case that is most -- is most
13 frequent for you?
14    A. In the last couple of years, it has been
15 these lemon law things, but that's primarily over now.
16 Other than that -- and, again, breach of contract
17 cases, breach of fiduciary cases, some personal injury
18 cases. Those would be the most frequent.
19    Q. Okay.
20    A. Wrongful term.
21    REPORTER MARTIN: I'm sorry.
22 BY MS. CHUBB:
23    Q. Wrongful termination. Is that what you said?
24    A. Right.
25    Q. Dr. Luna, I see you have some papers there.

Page 23

1 Can you identify what you have in front of you?
2    A. What I have with me is that same report, only
3 it has page numbers and it's easier for me to use.
4 And then I have my binder in front of me, which is
5 what we provided to you.
6    Q. Okay. And does your binder have markings on
7 it? Like notes from you?
8    A. No, I haven't taken notes.
9    Q. So it's the same binder that you all produced
10 the other day?
11    A. It's the same binder, yes.
12    Q. And you mean that -- I noticed in the corner
13 of that production were little red numbers?
14    A. Right.
15    Q. And that one might have been the Complaint or
16 something. Is that the numbering you're referring to?
17    A. That's the numbering. It's sections.
18    THE WITNESS: Can I just close my door?
19 People are starting to come in right now. Let me just
20 close my door.
21    MS. CHUBB: Okay.
22    (Pause in proceedings.)
23    THE WITNESS: Sorry.
24 BY MS. CHUBB:
25    Q. That's okay. You must not be having a snow

Page 24

1 storm there in California today. Our office is pretty
2 quiet but for the few of us working on this case.
3    Okay. I guess if we can go to the part of
4 the Appendix A that represented your trial testimony
5 in the last five years, that document that's Pages 1
6 to 11.
7    A. Yes.
8    Q. And if we can go to Page 5 within that
9 11-page document, please. I think within the PDF,
10 it's on Page 49.
11    A. It should be 42.
12    Q. I'm sorry. You're right. I was looking at
13 another note to myself about what is in this PDF.
14 You're right. Page 42 of the PDF, yes.
15    A. Okay.
16    Q. If you look up at the first matter that's
17 identified here, the EKO Brands vs. ARM.
18    Do you see that?
19    A. Right.
20    Q. And you have identified this as a patent
21 infringement case. Were you representing -- were you
22 providing expert testimony on behalf of ARM?
23    A. Yes.
24    Q. Okay. Is that what the underlining means on
25 this document, identifying which party you were

Page 25

1 testifying on behalf of?
2    A. Correct.
3    Q. Okay. It looks like you indicate you
4 performed a damage analysis; is that right?
5    A. I did.
6    Q. And were you performing an analysis of a
7 reasonable royalty?
8    A. I don't recall at this point. If it was lost
9 profits and a reasonable royalty, I'd have to look
10 back.
11    Q. Do you recall if it did involve reasonable
12 royalty, though?
13    A. It should have, but I don't specifically
14 recall.
15    Q. Okay. And I think you said earlier if you
16 were analyzing a reasonable royalty, you would have
17 applied the Georgia-Pacific factor. Is that what you
18 did in this instance, do you remember?
19    A. I think I did, but again, I'd have to look
20 back. It's been over a few years.
21    Q. Do you remember if you determined in that
22 case a date upon which a hypothetical negotiation
23 would have taken place?
24    A. I would have. I don't remember specifically,
25 but I likely had.

7 (Pages 22 - 25)

Page 26

1     Q.  And do you know how you -- well, I guess how
2  do you go about determining what date to identify as
3  the date -- a hypothetical negotiation date?
4     A.  Usually we looked at when notification was
5  given to the other side.  We look at the date of
6  filing in a certain number of periods before the date
7  of filing.  But notification has had to be
8  specifically given.  So usually that's the date.
9     Q.  And when you say, "notification," do you mean
10  notification of infringement?
11     A.  Yes.
12     Q.  So you would choose a hypothetical
13  negotiation date based upon when notification of
14  patent infringement was given to a defendant; is that
15  right?
16     A.  I would.  I'd also consider, as I said, the
17  date of filing, the period beforehand as well, and I
18  would discuss that with the attorneys because I would
19  defer to them on that.
20     Q.  And when you say you would also consider the
21  date of filing and a period beforehand, are you
22  referring to if, for example, a demand letter had been
23  sent prior to an actual Complaint being filed and that
24  letter providing notice?  Is that -- is that what you
25  mean?

Page 27

1     A.  Well, there's a maximum limitation prior to
2  date of filing.  That's one thing.  I'd also consider
3  about how they're going to know if they were not
4  specifically notified.  So it could be argued by the
5  attorneys that it should start at the date of specific
6  notification.
7         But you're really getting into a legal issue
8  here, and I'm saying that's why I would defer to the
9  attorneys.
10     Q.  Uh-huh.
11     A.  I discuss it with them --
12     Q.  And --
13     A.  -- but those would be my considerations.
14     Q.  Okay.  And when you say a "maximum
15  limitation" on damages, do you mean on the period of
16  damages which are available to a plaintiff, or what
17  are you referring to?
18     A.  Yes.
19     Q.  Okay.  And how did the period of damages
20  that's available to a plaintiff relate to the date of
21  the hypothetical negotiation?
22     A.  Well, it's not going to be -- let me go back.
23         It's not going to be before the patent was
24  issued.  That's one.  The thing that would be
25  considered -- it would then be considered when was the

Page 28

1  date of the filing of the Complaint.  Okay?  Then
2  there's a period of years before the date of the
3  filing that it would be issued, and then there was a
4  date of notification to the defendant.  All of those
5  things would be considered and could be argued by the
6  attorneys.
7         If the date of patent issuance is before the
8  period, say, six years before the date of filing, it
9  would not go back to the date of issuance.  It would
10  be the latter date is my understanding.  Again, you're
11  really getting into a legal issue.
12         If notification -- specific notification
13  wasn't given, even -- you know, the six years before
14  and it was only given one year before or a shorter
15  period before, that could be argued that that's the
16  date that the hypothetical negotiation would start.
17  And, again, this is a legal issue.
18     Q.  Okay.  Do you recall in the -- going back to
19  the EKO Brand -- or I don't know if it's EKO.  EKO
20  Brands vs. ARM matter that you were involved in, do
21  you recall if you gave an opinion there that a
22  hypothetical negotiation would be thereafter
23  renegotiated at some point?
24     A.  I don't recall.  I think we looked at the
25  economics of it in determining what the economics

Page 29

1  would be given profitability and given pricing.  So we
2  took it into consideration.  I don't know if I just
3  said it would be renegotiated or if it would just be
4  worked around.
5     Q.  Uh-huh.  And in this EKO Brands vs. ARM
6  matter, do you recall if, in assessing a reasonable
7  royalty that would apply, did you look at both the
8  plaintiff and the defendant's sales and profits in
9  reaching your conclusions?
10     A.  I don't recall.  We may not have had all the
11  information at the time.
12     Q.  Okay.  If we can move on in your period of
13  trial testimony during the last five years to the
14  other patent matter, it's on Page 9 out of 11 of that
15  document.
16     A.  Yes.
17     Q.  And I believe, just for the record, that is
18  Page 46 of Luna Exhibit 1.  Here, there is identified,
19  Dr. Luna, a Polara vs. Campbell matter, which was a
20  patent infringement matter you were involved in; is
21  that right?
22     A.  Right.
23     Q.  And in this instance you represented the
24  defendant -- or you testified on behalf of the
25  defendant, Campbell; is that right?

8 (Pages 26 - 29)

Page 42

1    THE WITNESS: That's correct.
2 BY MS. CHUBB:
3    Q. Okay. So for now, if we can go back to using
4 Luna Exhibit 1, I'm not going to be referring at this
5 moment to the corrected -- particular corrected pages.
6 So I think we should go on while Sami sees if she can
7 find the fully incorporated corrections.
8    MS. SCHILLY: Yeah. I don't think I was
9 copied on that, but I'll find that December 10 E-mail.
10 I'll work on that behind the scenes right now.
11    MS. CHUBB: Okay.
12    Q. Dr. Luna, Luna Exhibit 1 and 2 together are a
13 true and accurate copy of your report; is that
14 correct?
15    A. Yes.
16    Q. And Luna Exhibit 1 with the corrections
17 indicated in Exhibit 2 contain all of the opinions
18 that you would express at trial if you were to testify
19 at trial; is that right?
20    A. Yes, unless I'm asked to address additional
21 opinions relating to an opposing expert.
22    Q. Okay. And Luna Exhibit 1 with the
23 corrections in Exhibit 2 provide all of your bases and
24 reasoning for your opinions; correct?
25    A. Yes.

Page 43

1    Q. And Luna Exhibit 1, with corrections in
2 Exhibit 2 provide all the facts and data that you
3 considered in forming your opinions; correct?
4    A. Yes. Again, on one area I can expound on it.
5 We didn't go -- we touched on it, but I didn't go into
6 all the backup on it.
7    Q. Okay. And what area is that?
8    A. A comment on the incremental profits that
9 opposing expert didn't consider. I touched on it.
10    Q. Okay. If you look at Appendix B in Luna
11 Exhibit 1, which begins on Page 80 of that PDF.
12    A. Right.
13    Q. Does this provide all the materials that you
14 considered in forming your opinions, Dr. Luna?
15    A. Yes. Oh, let me just add one other thing, if
16 I might. I'm sure by the time this goes to trial,
17 both plaintiffs' experts and defendant's experts will
18 have to update our equivalent of Exhibit B for
19 additional information that happened in 2020.
20    Q. Yes. You mean sales that would have occurred
21 in 2020. Is that what you're referring to?
22    A. Right.
23    Q. Okay.
24    A. And profit.
25    MS. CHUBB: Yes.

Page 44

1    Okay. We're going to introduce another
2 exhibit. While she does that, let me ask you a few
3 questions about your Appendix B.
4    Q. Dr. Luna, have you reviewed the update that
5 Mr. Beaton provided in this case?
6    A. Yes.
7    Q. Okay. And if you look under "General
8 Documents" that you considered, the last bullet point
9 says, "Very Recently Received Large Document
10 Production to be Reviewed (See Below)."
11    A. Yes.
12    Q. So and I understand that that is referencing
13 Page 2, the documents under the header "Recently
14 Received Document Production (To Be Reviewed)"; is
15 that right?
16    A. Yes.
17    MS. CHUBB: Okay. If you can open your -- go
18 into the Marked Exhibit folder, I'd like to introduce
19 another exhibit.
20    (Deposition Exhibit 5 was marked for
21    identification.)
22 BY MS. CHUBB:
23    Q. Do you see Luna Exhibit 5, Dr. Luna?
24    A. Yes.
25    Q. Can you read -- if you aren't familiar with

Page 45

1 this E-mail, read what David Dillard wrote to me on
2 December 9, please. In the first -- where he says,
3 "Previously stated."
4    THE WITNESS: Hold on.
5    (The witness reviewed Exhibit 5.)
6    THE WITNESS: Yes.
7 BY MS. CHUBB:
8    Q. So it's my understanding that Mr. Dillard is
9 describing to me how you considered the recently
10 received document production to be reviewed that's
11 identified on Appendix B; is that right?
12    A. Right.
13    Q. And so Mr. Dillard's statement accurately
14 reflects how you considered those materials; is that
15 right?
16    A. At that point in time, yes.
17    Q. Okay. And so at that point in time, is it
18 correct that you had not reviewed the documents
19 captured under the recently received docs production?
20    A. We had not.
21    Can I elaborate so we're not confusing? We
22 got another document relating to support for the
23 update in Beaton's analysis that goes to his
24 November 25 report. That's what I had been referring
25 to before. Relating to these additional documents

Page 46

1 of -- a lot of documents, we had not reviewed them at
2 the time.
3       We have since printed out some depos.  I just
4 scanned two of them just quickly.  We hadn't reviewed
5 and have not reviewed the rest of it.
6   Q.  Okay.  And so I guess, since you hadn't
7 reviewed them upon preparing your November 9 report,
8 you did not consider those materials in forming the
9 opinions provided in your report; is that right?
10   A.  Sure.
11   Q.  And I guess my understanding from
12 Mr. Dillard's E-mail is that the general categories of
13 documents you've identified on Appendix B, like "Delta
14 and RSA Project Quotes" or "Bollard Purchase and
15 Installation Criteria Documents," those are categories
16 that you are using to describe documents identified on
17 Mr. Beaton's Exhibit 4; is that right?
18   A.  Yes.
19   Q.  Okay.  I guess looking at your Appendix B,
20 the only RSA documents that you reviewed and
21 considered in forming your opinions are the three
22 settlement agreements and the correspondence dated
23 August 9, 2018; is that right?
24   A.  That is correct.
25   Q.  Okay.  And in your report, I believe you only

Page 47

1 cite to the three RSA settlement agreements; is that
2 right?
3   A.  I cite to that.  We also look at Beaton's
4 report, which has some RSA financial information in
5 it.
6   Q.  Uh-huh.  And I guess based on what you just
7 told me, the depositions that are identified under the
8 "Recently Received Document Production (To Be
9 Reviewed)," you haven't considered and relied upon
10 those; is that right?
11   A.  At the time of writing my report, no, we did
12 not.
13   Q.  Okay.  And it sounds like there's just two of
14 them that you've read since then; is that right?
15   A.  I skimmed it.  I didn't have a chance to read
16 it all.
17   Q.  Okay.  So is there anything at this point
18 from the recently received document production to be
19 reviewed chunk of documents that you -- that would
20 change anything in your opinion --
21   A.  No.
22   Q.  Okay.  I guess if you didn't consider those
23 documents, why did you list them on Appendix B?
24   A.  Well, we received them.  So for full
25 disclosure, we listed them.

Page 48

1   Q.  Okay.  I guess I was asking because in
2 Paragraph 9 of your report, you characterized
3 Appendix B as documents on which you rely or otherwise
4 cited in this report.
5   A.  I understand.  I thought I made clear on
6 Page 10.81 that it says, "(To Be Reviewed)," but at
7 the time of writing the report, we had not reviewed
8 that.
9   Q.  Okay.  And when you say, "Page 10.81," that's
10 the second page of Appendix B.  Is that what you're
11 referring to?
12   A.  Correct.
13   Q.  Okay.  And, Dr. Luna, does Exhibit 1 -- Luna
14 Exhibit 1 with the corrections in Exhibit 2, does that
15 provide any exhibits or summaries or schedules that
16 you will use to support the opinions provided in your
17 November 9 report?
18   A.  I assume I would be using the summaries.  I
19 may be using some of the schedules.
20   Q.  Okay.  And aside from the corrections that
21 you provided in Luna Exhibit 2, do you have any other
22 corrections to your November 9 report that you want to
23 inform me of?
24   A.  I have no further corrections at this point.
25 I would be prepared to address Beaton's updated report

Page 49

1 and verbally address some of the additional weaknesses
2 I see in his analysis on incremental profit.
3   Q.  So, Dr. Luna, in preparing your
4 November 9 expert report, what were you asked to do?
5   A.  Analyze damages and rebut the report of
6 Mr. Beaton.
7   Q.  You weren't asked to provide an opinion
8 regarding liability in the patent infringement matter;
9 right?
10   A.  Correct.
11   Q.  Okay.  You weren't asked to provide an
12 infringement opinion or opinion of validity of the
13 patent; is that right?
14   A.  I was not asked to do so.
15   Q.  Or invalidity of the patent either; correct?
16   A.  Again, I was not asked to do so.
17   Q.  Okay.  Is any information that counsel
18 provided you or assumptions counsel provided you that
19 you considered in forming your opinions noted in your
20 report, Dr. Luna?
21   A.  I don't know if it's noted.  We talked about
22 the start date for damages, but I addressed all the
23 quantification of it.  But I did not address the
24 legalese of it.  That, I leave to the attorneys.
25   Q.  Okay.  And you agree, Dr. Luna, that if there

13 (Pages 46 - 49)

Page 62

1 understand the differences of your scenarios, is it
2 right that the difference between Scenarios 1 and 2 on
3 the one hand and Scenario 1A on the other hand is the
4 date of the hypothetical negotiation that you used?
5      A. It's a starting point for determining of the
6 damages is -- is the difference.  In 1, the
7 hypothetical negotiation would have occurred in 2013.
8 In -- but the damage period would have started in July
9 of 2019 on the file.
10         In 1A, the hypothetical negotiation would
11 have happened in '19 and would have started in July of
12 2019.
13         In 2, the hypothetical negotiation would have
14 started in -- would have happened in July of 2013, and
15 the damages would have started at that point in time.
16      Q. Okay.  And so it's correct that your opinion
17 is that the reasonable royalty hypothetically
18 negotiated by RSA and Delta would be ▮▮ per unit if
19 the hypothetical negotiation was in July of 2013 and
20 ▮▮ per unit if the hypothetical negotiation was July
21 of 2019; is that right?
22      A. That's true.
23      Q. And when you are talking about a dollar per
24 unit reasonable royalty, are you using a unit as
25 equivalent to a bollard; is that right?

Page 63

1      A. Yes.
2      Q. And I think you might have just answered
3 this, but I just want to make sure I'm clear.  For the
4 difference between Scenarios 1 and 2, that's the
5 damages period that you used; is that right?
6      A. Correct.  Start date of the damages.
7      Q. Okay.  So changing the damages period doesn't
8 affect your conclusion about the reasonable royalty
9 per unit; is that right?
10      A. I'm not sure I understand your commentary.
11 If the hypothetical negotiation would have started in
12 '19, it would have been ▮▮ as opposed to ▮▮.
13      Q. So that difference of ▮▮ per unit as your
14 opinion of a reasonable royalty versus ▮▮ per unit
15 is based on when you're believing the hypothetical
16 negotiation took place; is that right?
17      A. Would have taken place, yes.
18      Q. Okay.  In reaching your conclusions about the
19 reasonable royalty that would apply in Scenarios 1,
20 1A, and 2, did you arrive at that -- those opinions
21 using the Georgia-Pacific factors and hypothetical
22 negotiation method?
23      A. Yes, I did.  And I told you which ones I
24 thought were the most important.
25      Q. Uh-huh.  So what -- I guess, would you agree

Page 64

1 with me that under Georgia-Pacific, the amount that a
2 licensor, such as the patentee, and a licensee, such
3 as the infringer, would have agreed upon at the time
4 the infringement began if both had been reasonably and
5 voluntarily trying to reach an agreement?  That is the
6 amount which a prudent licensee who desired, as a
7 business proposition, to obtain a license to
8 manufacture and sell a particular article embodying
9 the patented invention would have been willing to pay
10 as a royalty, and yet, being able to make a reasonable
11 profit and which amount would have been acceptable by
12 a prudent patentee who was willing to grant a license?
13      A. What you're asking me is a legal conclusion,
14 and I'm not attorney.  So I'll leave that to the
15 attorneys to address.  It's an assumption on my part,
16 yes.  But as a business person and economics person, I
17 think if you -- well, we did the calculation.  If you
18 used a ▮▮ reasonable royalty at the time, it would
19 have shortly broken down when profitability, sales per
20 unit, and incremental profit per unit dropped
21 dramatically, and you likely would have resulted in a
22 work-around a lot sooner than what may be happening at
23 this point in time because from an economics
24 standpoint, business standpoint, it would not
25 necessarily make business sense to keep it going for a

Page 65

1 six-year period of time.
2         But this is an argument that the attorneys
3 will deal with.
4      Q. Okay.  I guess with what I read to you, I'll
5 just represent to you that that comes directly from
6 the Georgia-Pacific case, and understanding that
7 that's the method you used in arriving at your
8 scenarios, is that -- is what I read to you your
9 understanding of what the hypothetical negotiation
10 looks like?
11      A. My answer is yes, but again, I'm not an
12 attorney.  So I'm not going to give you any kind of
13 legal opinion.  We did the mathematics of it.
14      Q. Uh-huh.  So I guess if what I read to you is
15 your understanding from an economic standpoint of what
16 the hypothetical negotiation looks like, I guess why
17 then, did you -- do you also have alternative
18 Scenarios 3 and 4?
19      A. Because it wouldn't make sense for the
20 royalty, be it ▮▮ -, to be higher than the
21 total royalty of ▮▮ - or so by 2019.  You're not going
22 to give away all of your profit plus some.  It doesn't
23 make sense to keep going.
24         So I wanted to find an alternative that made
25 economic sense at the time of negotiation, and that's

17 (Pages 62 - 65)

Page 66

1 how we wound up with the 8 percent of sales, or as it
2 continues to be followed through the current period of
3 time.  And I explained the referencing about how we
4 got there.
5     Q.  Uh-huh.  I guess focusing a little bit more
6 on your Scenarios 3 and 4, where you use -- both of
7 those use an 8 percent reasonable royalty rate of
8 sales; is that right?
9     A.  That's right.
10     Q.  Okay.  And just trying to understand the
11 difference between Scenarios 3 and 4, is the
12 difference the damages period that you applied?  Is
13 that right?
14     A.  That's right.
15     Q.  Okay.  So for Scenario 3, the damages period
16 started in July 2019, and then Scenario 4 you started
17 the damages period in July of 2013; is that right?
18     A.  Correct.
19     Q.  Okay.  In reaching your conclusions in
20 Scenarios 3 and 4, did you apply the Georgia-Pacific
21 factors to reach those conclusions?
22     A.  Yes, I did.
23     Q.  Okay.  I guess looking at your report in
24 Paragraph 18 --
25     A.  Yes.

Page 67

1     Q.  -- what do you mean, then, where you say, "In
2 determining a reasonable royalty per accused unit, I
3 considered the relevant Georgia-Pacific Factors
4 typically considered in a patent infringement matter"?
5     A.  There are other 16 factors.  I considered
6 those factors, and I told you which I weighted more
7 heavily.
8     Q.  Okay.  And you seem to be, by saying, "In
9 determining a reasonable royalty per accused unit,"
10 differentiating with your determination of a
11 reasonable royalty as a percentage of sales.  Is that
12 what this sentence is doing?
13     A.  No.  It's just saying I considered the
14 Georgia-Pacific factors.
15     Q.  Okay.  So in determining any of your five
16 scenarios, you considered the Georgia-Pacific factors;
17 is that right?
18     A.  I did.
19     Q.  Okay.
20     A.  And at the end, when you get to
21 profitability, that's why 3 and 4 enter the picture.
22     Q.  Uh-huh.  So under Georgia-Pacific, there's a
23 hypothetical negotiation that takes place; correct?
24     A.  Yes.
25     Q.  For Scenarios 3 and 4, what is the date of

Page 68

1 the hypothetical negotiation that you use to arrive at
2 those opinions?
3     A.  I started again in 2013 as the hypothetical
4 date.  The question then is when would damages start,
5 in July of '19 or July of '13.
6     Q.  Okay.  So in reaching your conclusions in
7 Scenarios 3 and 4, you use the hypothetical
8 negotiation date of July 2013?
9     A.  I did.
10     Q.  Okay.  Where, Dr. Luna, in your report do you
11 provide your basis for the parties agreeing to a
12 percentage of sales versus a reasonable royalty as a
13 dollar-per-unit rate?
14     A.  I think I started it in Paragraph 17, where I
15 told you it doesn't make sense to me.  Well, I give
16 you what the calculation is in Paragraph 17 as the
17 alternative.  I then talk about the 111 percent --
18 yeah.  I give you the quantification in Paragraph 17.
19     Q.  Okay.  So Paragraph 17, you believe,
20 summarizes your basis --
21     A.  Hold on one second.  Paragraph 3.a. starting
22 on Page 2 talks about how a royalty dollars, if it was
23 going to be ▮ gets out of hand, compared to the
24 incremental profitability.  So that while dollars of
25 ▮ may have made sense in 2013, it would be over 111

Page 69

1 percent of the incremental profit by 2019, which
2 doesn't make economic sense to me.  It would be a deal
3 breaker by that point in time.
4     Again, I'm not going to give you a legal
5 conclusion.
6     Q.  Okay.
7     A.  So I was trying to figure out another
8 methodology other than a dollar per unit because the
9 profitability of Delta dropped dramatically.  The
10 sales dropped dramatically, and even if I look at RSA,
11 RSA sales and profits per unit, if you look at 13
12 compared to 19, are vastly different as well.
13     So because the pricing and the profitability
14 dropped, I'm not sure that a fixed dollar figure per
15 unit makes economic and business sense over this
16 extended period of time.  So I was trying to find
17 something that would work.
18     Q.  Right.  And I guess do you find that applying
19 reasonable royalty in the form of a percentage of
20 sales allows for an infringer to manipulate sales?
21 So, for example, if you're pricing a project that
22 you've now entered the license pursuant to the
23 hypothetical negotiation and you know that some of
24 your products are accused but others aren't, you may
25 discount those that are accused but price the others

18 (Pages 66 - 69)

Page 74

1  used in your five scenarios, your one period of July
2  2019 to December 31, 2019 and the second period of
3  July 13, 2013 to December 31, 2019?
4      A.  In 3.a. I talk about what the scenarios are,
5  on Page 1, Page 10.3.
6      Q.  Right.  But how did -- why are you applying
7  two different scenarios of damages periods?
8      A.  Because I think the attorneys will be
9  making -- the defense attorneys will be making
10  arguments for the damage period starting either six
11  years before the filing date or as of the filing date
12  of the two dates, and we know that the date of
13  issuance was like a year before that but would fall
14  outside the limitation of six years before the filing
15  date of the Complaint.
16      Q.  I guess kind of related to that, if you look
17  at the Paragraph 3.k., your, I guess, second sentence
18  there says, "Additionally, the time period for
19  claiming damages and the hypothetical reasonable
20  royalty per unit negotiated would be reduced
21  substantially, if the trier of fact considers that RSA
22  did not file a complaint against Delta for
23  infringement of the '865 patent until July 12, 2019."
24      A.  Correct.
25      Q.  What did you mean by that?

Page 75

1      A.  I think ultimately the judge will have to
2  make the decision of when the damage period would
3  start and when the hypothetical negotiation would have
4  started because if, hypothetically, Delta had been
5  notified in July of 2013 that they wanted, be it ▮▮▮▮
6  or ▮▮▮▮ a unit, chances are if they could work around
7  this for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  why would they pay millions?  It
9  just doesn't make economic sense.
10      So I think it's going to be up to the judge
11  to ultimately decide when this hypothetical reasonable
12  royalty would occur.
13      Q.  Yeah.  In what you just said, you said it
14  would be up to the judge to --
15      A.  Ultimately.
16      Q.  -- to decide when the hypothetical
17  negotiation would have started?
18      A.  Yes.
19      Q.  Is it your view that the hypothetical
20  negotiation is an ongoing process?
21      A.  No.  It would have started at a point in
22  time.  It seems that a lot of time had elapsed between
23  six years of before the filing date and the date that
24  Delta claims it was notified as of the filing date in
25  July of 2019.  So it will be up to the judge to make

Page 76

1  the ultimate decision.
2      Q.  Okay.  But -- so you agree that the
3  hypothetical negotiation takes place at one point in
4  time; is that right?
5      A.  That's true.
6      Q.  Okay.  I guess, let's -- you provide some
7  summaries of the scenarios we've just been talking
8  about in Exhibit 1 to your report.  Can we turn to
9  those just so I can try to understand them, please.
10      So the first --
11      A.  All right.  Go ahead.  Yes.
12      Q.  So the first page of Exhibit 1 is your
13  Summary 1.  Are you there?
14      A.  Yes, I'm there.
15      Q.  Okay.  You have at the top "Scenario 1:
16  Based on July 2013 and July 2019 Hypothetical
17  Negotiation."
18      A.  Right.
19      Q.  What does that mean?
20      A.  Well, I'm starting damages in July of '19.
21  I'm using, though, the July 2013 royalty that would
22  have occurred in 2013 if it was going to be on a
23  price-per-unit basis, and considering the -- and
24  considering the -- the other settlement agreements
25  that I'm aware of.

Page 77

1      Q.  Okay.  So what -- I think we covered this
2  before, but this summary confused me.  What is the
3  hypothetical negotiation date that you're using for
4  Scenario 1?
5      A.  I guess -- well, I'll let the attorneys deal
6  with it is what I'm trying to say to you.  I'm using
7  the damages starting in July of '19 for this scenario,
8  and I'm using -- ultimately, I guess, I'm looking at
9  the hypothetical negotiation starting in July of '13
10  but damages starting in July of '19.
11      Q.  Okay.  So I guess when you say, "I'll let the
12  attorneys handle it," I'm not asking you to make a
13  legal conclusion, but don't you agree that to apply
14  the Georgia-Pacific factors, you needed to be looking
15  at them through the lens of a particular hypothetical
16  negotiation date?
17      A.  Again, you're really getting to a legal
18  point, and I'm really -- I'm not an attorney.
19      Q.  Okay.  Are you aware of others in your field
20  that apply the Georgia-Pacific factors without using a
21  hypothetical negotiation date?
22      A.  No.  I'm just using it as a hypothetical
23  negotiation date.  I'm not saying it doesn't.
24      Q.  Okay.  Looking at Summary 1, you have total
25  unit sales for the six-month period of July '19 to

20 (Pages 74 - 77)

Page 94

1  incremental profit per unit does not include
2  historical fixed expenses?
3      A.  True.  And we didn't do --
4      Q.  Sorry.  What did you say?
5      A.  And we didn't do that.  We didn't include
6  historical fixed expenses.
7      Q.  Okay.  And would you agree that determining
8  incremental profit per unit, only variable expense and
9  some semi-variable expense are deducted from
10 incremental revenue?
11     A.  True.  When you calculate it correctly, yes.
12     Q.  Okay.  In your calculation -- well, let's
13 look at No. 1 again.  You categorize costs as either
14 variable with a "V," semi-variable with "SV," or fixed
15 with "F"; is that correct?
16     A.  True.
17     Q.  And in comparison to the analysis that
18 Ms. Gile performed and that you outlined in Schedule 3
19 and 4, you've excluded the costs that you
20 characterized as fixed; is that right?
21     A.  Correct.
22     Q.  And so you would agree with Mr. Beaton that,
23 in some regards, the Gile analysis was not proper in
24 calculating incremental profit?
25     A.  She was getting to more of an operating

Page 95

1  profit as opposed to an incremental profit, and the
2  measure of damage would be on incremental profit.
3      Q.  Okay.
4      A.  You would consider the operating profit as
5  well, but you're not going to give away the store.
6  The measure of damages is primarily not incremental.
7      Q.  And so you -- there were some
8  additional operating expenses that you considered that
9  Mr. Beaton did not; is that right?
10     A.  Right.  And I also considered -- I also
11 correctly calculated things, such as supplies, by
12 considering hours as well.  He just used square
13 footage for some of those items.
14     Q.  Okay.  So and supplies is one of those
15 expenses that you considered differently than
16 Mr. Beaton; right?
17     A.  Yeah.  If you could please turn to
18 Page 10.33, Schedule 4.
19     Q.  Okay.
20     A.  And let's use '19, if we could.
21     Q.  Okay.
22     A.  Mr. Beaton, in his supplies, considered only
23 the ████ for the product area.  He forgot about --
24 he conveniently forgot about the ████ for the hours
25 in shop.  I don't know if that was intentional or not.

Page 96

1  But he did not use the ████.  So his number is a
2  fraction, like 1/11 of my number, for the supplies
3  figure.
4      Q.  Right.  And all these inputs are coming from
5  what Ms. Gile analyzed; correct?
6      A.  True.
7      Q.  Did you read the deposition of Ms. Gile?
8      A.  No.  That's one thing that I may do before
9  time of trial, but I did not -- we didn't have the
10 time to do it.  We got the additional documents that I
11 had mentioned extremely late compared to when my
12 report was due.
13     Q.  Okay.  Well, I mean I think now is the time
14 for me to know what opinions you're going to express
15 at trial.  So you haven't read the deposition
16 transcript of Ms. Gile; is that correct?
17     A.  Not at this point, no.
18     Q.  So you don't have an understanding of how she
19 went about calculating her input for those supply
20 costs?
21     A.  I looked at it.  I understood her analysis
22 completely.  It's in my binder under "Giles" in
23 Section -- hold on.  Let me get it -- in Section 50 is
24 her analysis.  You can see the same thing on
25 Page 50.2, which is DS000000330.

Page 97

1      Q.  Uh-huh.
2      A.  But, yeah, I understand how she did it.  I
3  don't think -- let me just state I don't think her
4  deposition is going to provide me any additional
5  information because we spent the time to understand
6  her analysis.
7      Q.  Okay.  Well, one of the other expenses that
8  you include that Mr. Beaton didn't were the warranty
9  costs; is that right?
10     A.  Yeah.  He completely didn't include the
11 warranty costs.  Your selling unit has a warranty, or
12 the servicing on it, that's a variable expense.  That,
13 I think, is a mistake on his part.
14     Q.  Right.  But you didn't read Ms. Gile's
15 explanation of how she arrived at that or
16 Mr. Bobrosky; correct?
17     A.  I didn't, but a 2 percent warranty, and I've
18 been around the block.  I've been doing this for quite
19 a while, makes sense to me that a warranty in post
20 sales and service would be about 2 percent of the
21 sales figure.
22     Q.  Right.  Well, I understand that Mr. Beaton
23 reviewed the transcripts of Ms. Gile and
24 Mr. Bobrosky's depositions and how he arrived at how
25 it was appropriate to handle the warranty costs.  So

25 (Pages 94 - 97)

Page 98

1 do you think that would have helped to inform you how
2 to handle the warranty costs?
3     A. I don't think so. I think I respectfully
4 disagree with him.
5     Q. Without having read Ms. Gile or
6 Mr. Bobrosky's deposition; is that right?
7     A. Almost any product you're going to have
8 certain warranty expenses, and ███ is
9 reasonable. Again, I've seen a lot of companies.
10 I've done a lot of work in construction as well.
11 2 percent is not unreasonable.
12     Q. Did you consider why the supplies that were
13 included, the costs of those per unit in a lot of
14 cases were more than the materials? Did you consider
15 that in arriving at whether Ms. Gile's supplies
16 analysis was appropriate?
17     A. It happens quite frequently. Labor is
18 expensive. Again, I did not read her deposition as of
19 now. It made sense to me. If you look at the overall
20 total cost, though, you're looking at supplies,
21 expenses, per unit being ███ -. You're -- let me just
22 see where it is. Hold on one second. The
23 materials...
24     The materials per unit overall being -- let
25 me see. ███ per unit. So it didn't seem

Page 99

1 unreasonable to me.
2     Q. Okay. And I guess you said labor is
3 expensive. Isn't labor directly related to --
4     A. Let --
5     Q. Can I finish my question, please.
6     A. Sure. Go ahead. Sorry.
7     Q. That's okay.
8     Isn't labor that's directly related to the
9 products at issue already included as a cost in the
10 direct labor category?
11     A. There is as well supervisory labor, which
12 usually is not in the labor, and there is indirect
13 labor as well, and that's usually not in the direct
14 labor. And if I could just correct myself from the
15 last question. Rather than the ███ - for 2019, the
16 figure would be ███ in comparison to ███. So it's
17 about ███ difference.
18     Q. Okay. Just to round this out, the last cost
19 that you included but Mr. Beaton did not was the
20 ███ of the utilities; is that right?
21     A. Right.
22     Q. And what is your basis for assessing the
23 5 percent as related to the accused product?
24     A. Because the utilities are not completely
25 fixed. There may have been -- over time, the lights

Page 100

1 had to be on. The light might not have been on as
2 much. You have a telephone in there. There's some
3 utility portion, although telephone -- I'm not sure if
4 telephone is going to be communications or not. But
5 you have certain of the utilities, gas, electric,
6 et cetera, that's going to be a variable component.
7 We decided on ███.
8     Q. You mentioned "communication," that that was
9 an expense that you deemed fixed; right?
10     A. I did. And I could have said ███ of
11 communications as well. This was a lot smaller item
12 than the utilities were. The utilities for 2019 wound
13 up being -- hold on a second. I'm just using '19 as
14 an example. ███ for the utilities compared to
15 communication is ███ So it's less than 10 percent of
16 communications compared to utilities.
17     Q. Okay. And have you ever categorized
18 utilities, supplies, and warranties as fixed expenses
19 in calculating incremental profits?
20     A. Typically not. I usually have a smaller
21 percentage for utilities, and supplies would be a
22 variable type of expense.
23     Q. So you're saying you usually apply less than
24 25 percent -- is that right? -- for utilities?
25     A. No. That misstates my testimony. I said I

Page 101

1 usually apply like ███. I apologize if I
2 misstated something.
3     Q. Okay. I guess in Paragraph 3.a. you say that
4 you -- "Defendant's operating profit per unit, which
5 is lower than its incremental profit per unit, would
6 also be considered before negotiating a reasonable
7 royalty." Where did you consider defendant's
8 operating profit per unit? Can you point me to that?
9     A. Well, the operating profit per unit would be
10 on Schedule -- hold on. The Schedule 3. You'll see
11 the profit per unit. So, for example, overall, the
12 DSC600 plus ███ in 2019, it would have made ███ on
13 the incremental profit per unit.
14     Q. Schedule 3 was what Ms. Gile -- the source
15 for that is Ms. Gile's analysis; is that right?
16     A. Right.
17     Q. And, again, you did not review, consider her
18 deposition in which she was questioned about her
19 analysis; correct?
20     A. I did not read the deposition.
21     MS. CHUBB: Right. I think we've been going
22 for a little while. Do you want to take a break?
23     THE WITNESS: Sure.
24     MS. SCHILLY: Yes, please.
25     MS. CHUBB: Okay.

26 (Pages 98 - 101)

Page 102

1    Can we go off the record, please.
2        THE VIDEOGRAPHER:  We're off the record.  The
3    time is 11:05 a.m.
4        (A recess was taken from 11:05 a.m.
5        to 11:21 a.m.)
6        THE VIDEOGRAPHER:  We are back on the record.
7    The time is 11:21 a.m.
8        THE WITNESS:  Laura, can I just give you the
9    answer to the question before?  I'm just having it
10   redone so you have it.  On Summary 1, Page 10.19,
11   the ▮ times ▮ , and you said, "Hey, that's ▮ ?
12        The answer is, when we did it on a prorated
13   basis of the number of months, it winds up
14   being ▮ That's what's causing the difference on
15   the prorated number of months.  It's rounded, so it
16   gets it to ▮ .
17   BY MS. CHUBB:
18        Q.  Okay.
19        A.  When you just prorate on the number of
20   months, that's what it turns into, ▮ but we'll
21   get to the updated number.  It's just affecting
22   Summary 1 and Summary 1A.
23        Q.  Okay.
24        A.  It's not material by any stretch of the
25   imagination.

Page 103

1        REPORTER MARTIN:  I'm sorry.  I didn't hear
2    what you just said.
3        THE WITNESS:  It's not material.
4    BY MS. CHUBB:
5        Q.  Okay.  I see.  So you've taken ▮ divided
6    by ▮ and times ▮ , and that's ▮ something, and that
7    was what you used rather than the rounded ▮ Is that
8    a correct understanding?
9        A.  Correct.
10       Q.  Okay.  And did you speak with someone during
11   the break to understand that, or how did you arrive
12   at --
13       A.  I spoke to my partner, Dave Turner, who is --
14   I asked him to also give me a revised schedule for the
15   Summary 1 and Summary 1A so you'd have the figures if
16   you wanted them.  But that's how it was done.
17       Q.  Okay.
18       A.  That's just from the number of months is
19   what's doing it.
20       Q.  Okay.  If we can turn to Paragraph 20 of your
21   report, Dr. Luna.  This seems to be a high-level
22   summary of your conclusion of the reasonable royalties
23   under your five scenarios; is that right?
24       A.  I'm getting there.
25       Q.  Okay.  Sorry.  I --

Page 104

1        A.  No.  That's fine.  Go ahead.
2        Q.  So do you agree that that was a high-level
3    summary of your conclusion of the reasonable royalties
4    under your five scenarios?
5        A.  Correct.
6        Q.  Okay.  Looking at Scenario 1, I think we
7    covered this when we were looking at the summary of
8    Scenario 1.  Your hypothetical negotiation date for
9    Scenario 1 is July 2013; right?
10       A.  Yes.
11       Q.  Because it says here, "Based on July 2013 and
12   July 2019 hypothetical negotiation."
13       A.  The hypothetical negotiation effectively is
14   July of 2013, damages that would start in July of
15   2019.
16       Q.  Okay.  And then if you look at Scenarios 3
17   and 4, Scenario 3 has a July 2019 hypothetical
18   negotiation, and Scenario 4 is identified as a July
19   2013 hypothetical negotiation.  I thought we discussed
20   earlier that both Scenarios 3 and 4 were looked at
21   under a July 2013 hypothetical negotiation.
22       A.  The hypothetical negotiation effectively
23   would be July of 2013, and damages would start in July
24   of 2019 with the 8 percent.
25       And in Summary 4 -- or Scenario 4 it would

Page 105

1    start in July of 2013.  So I apologize for any
2    mislabeling.  That's really when the damages would
3    start.
4        Q.  Okay.  Okay.  So I guess, setting aside the
5    different time frames that the damages period may run,
6    Dr. Luna, which of the five scenarios, 1, 1A, 2, 3, or
7    4, that we have been discussing and that are discussed
8    in your report is your opinion of the reasonable
9    royalty that RSA and Delta would have hypothetically
10   negotiated?
11       A.  I give you different quantifications.  I
12   think at maximum, they would have negotiated ▮ if
13   they were doing it based upon 2013.
14       If the hypothetical negotiation was in 2019,
15   it would have been 1 ▮ per unit.  And if you wanted
16   to make it applicable for the entire period of time,
17   it would have either been in 2019, starting in July of
18   ▮ of sales, or in July of 2013, the ▮
19   of sales is something that would work over time.
20       I do not think that the hypothetical in
21   Scenario 2, that it would have worked for the entire
22   period of time at ▮ a unit.  I think that there
23   would have been a work-around with a work-around
24   having a maximum of ▮ If damages had to be --
25   at some point they may have paid the ▮ a unit for a

27 (Pages 102 - 105)

Page 106

1  small period of time, and then quickly worked around
2  it after that.  That's my commentary.
3        But I provide you with the numbers.  And as
4  far as the period of July of 2019 versus July of 2013,
5  I will follow what the judge decides is the
6  appropriate time period.
7     Q.  Okay.  So I guess if the judge said the
8  hypothetical negotiation would have occurred in July
9  of 2013 and it's improper to renegotiate that
10  hypothetical negotiation, is it your opinion that the
11  reasonable royalty would have been ▉▉▉ per unit?
12     A.  At that point in time, yes.  But I think what
13  would have happened would have been a work-around a
14  lot sooner than 2020 is my commentary to you.  So how
15  long that figure would have applied, I don't think --
16  let me come back.  And this is a lawyer thing.
17        If sufficient notification was not given
18  until July of 2019, would the hypothetical negotiation
19  in July of 2013 have been appropriate, and I leave
20  that to the judge and the attorneys to argue, and I
21  will follow accordingly.
22     Q.  Okay.  Are you aware, Dr. Luna, of others in
23  your field that have concluded a reasonable royalty
24  based upon a hypothetical negotiation date at one
25  point in time and then concluded that that would

Page 107

1  thereafter be renegotiated?
2     A.  I don't know if it could be renegotiated.
3  Let me put it that way.  I don't know if people have
4  done it.  Usually what would happen is it would break
5  down and there would be a work-around with a maximum
6  being, in this case, the ▉▉▉▉▉
7     Q.  Okay.  And what are you basing the ▉▉▉▉▉
8  on?
9     A.  That was David Dickinson's estimate to the
10  cost to develop and to get certification given the
11  fact that, in the 1990's, he had the TT203R and the
12  DSC800 that he thought would be a reasonable
13  alternative, not infringing the substitute that Delta
14  could quickly modify.
15     Q.  Uh-huh.  Would your opinion of -- well,
16  strike that.
17        I'm just trying to understand your basis for
18  your hypothetical negotiation date.  So, Dr. Luna,
19  would you agree that when we're talking about a
20  reasonable royalty, we're talking about two parties
21  who sat down in a room to negotiate, back at the time
22  when infringement began, and they cut a deal at that
23  point in time?
24     A.  Yes, that's the theory behind it.
25     Q.  Okay.  And so there would be two parties, you

Page 108

1  agree?
2     A.  Yes.
3     Q.  Okay.  And in this instance, you agree with
4  Mr. Beaton that the two parties would be RSA and
5  Delta; right?
6     A.  Yes.
7     Q.  Okay.  So we're in agreement that you need to
8  establish a date by which the hypothetical negotiation
9  would take place for purposes of reaching a reasonable
10  royalty; right?
11     A.  Yes.  But also considering that you need
12  sufficient notification, of the plaintiff providing
13  the defendant the sufficient notification, and did
14  they have sufficient notification as of July of 2013.
15  They may not have.
16     Q.  So -- okay.  But I guess when I just asked
17  you if the negotiation takes place back at the time
18  when infringement started, you agreed.  And so
19  wouldn't this hypothetical negotiation between RSA and
20  Delta take place at the time when infringement began?
21     A.  You're asking a legal question here.  It's
22  six years before the date of the filing.  Okay?  But
23  was there sufficient notification prior thereto?  My
24  understanding is there wasn't.  Again, I'm not going
25  to give you a legal opinion.  So I don't know that

Page 109

1  July of 2013 would be the appropriate date or not.
2     Q.  Okay.  Do you have an understanding of when
3  infringement by Delta began of the '865 patent?
4     A.  What's being alleged is not so much in July
5  of 2013, but when would infringement happen.  It's
6  really getting into a legal aspect.  I feel
7  uncomfortable.  I'm not going to give you an opinion.
8  But my understanding is notification was not given
9  until July of 2019.  So did infringement happen before
10  notification was given?  I leave that to the attorneys
11  and the judge.
12     Q.  Okay.  I guess if it came to be, based on
13  what the judge finds, that the hypothetical
14  negotiation took place in July of 2012 because that is
15  when infringement was determined to have begun by
16  Delta, you do not provide an opinion of the reasonable
17  royalty that would have been agreed to by RSA and
18  Delta in July of 2012; right?
19     A.  I don't in 2012 because my understanding is
20  the maximum you can go back is six years prior to the
21  date of filing.  And, yes, I know that 2000 -- July of
22  2012 is the date of issuance.  But, again, no
23  notification at that point in time.  And, again --
24     Q.  Is it your understanding that Delta was
25  selling the DSC600 and 650 product prior to July of

28 (Pages 106 - 109)

Page 110

1 2012?
2   A. Yes.
3   Q. And in fact --
4   A. Well, of the 600 and 650, yeah, like 2007 or
5 so.
6   Q. Okay. And it's your understanding that the
7 '865 patent issued in July of 2012; right?
8   A. Right.
9   Q. Okay. And I think you just answered this,
10 but none of your opinions provide a reasonable royalty
11 based on a hypothetical negotiation that happens in
12 the July of 2012 time frame; correct?
13   A. Correct.
14   Q. If you're looking at your incremental profit
15 calculation, the closest in time to July 2012 is July
16 2013; correct?
17   A. Yes.
18   Q. And for both the DSC600 and 650, in July of
19 2013 the highest incremental profit per unit occurred
20 for both those products; correct?
21   A. Yeah. Then it went downhill by 2014, yes.
22   Q. Right. But in July of 2013, that was the
23 highest; correct?
24   A. Yes.
25   Q. Okay. And we already discussed the DSC675

Page 111

1 hadn't been sold at that point, in July of 2012;
2 right?
3   A. That's true.
4   Q. So that's your understanding?
5   A. Yes. It didn't happen until '15.
6   Q. If you had used a July 2012 hypothetical
7 negotiation date to reach a conclusion as to a
8 reasonable royalty, would that have changed your
9 analysis of the Georgia-Pacific factors and the
10 resulting reasonable royalties?
11   A. I didn't have the information to do it, but
12 yeah, it would. Same methodology, but I would have to
13 include what was the incremental profitability as of
14 2012 and include those additional units.
15   Q. Okay. Dr. Luna, where in your report do you
16 provide your basis for why you have two different
17 hypothetical negotiation dates and why they are not
18 the point in time when infringement began of the
19 '865 patent?
20   A. I think I say up front that it's up to six
21 years prior to the date of filing, and then the other
22 was when notification was given to defendant.
23   Q. Okay. So your understanding of -- I thought
24 we just agreed, though, that your understanding of the
25 hypothetical negotiation date would be when the

Page 112

1 infringement began, but your basis for your two dates
2 is, 1, when the Complaint was filed, and, 2, six years
3 back from that date.
4   Is that an accurate understanding?
5   A. Well, my understanding in the first one on
6 July of 2019 is when first notification -- first
7 sufficient notification was given to the defendant.
8   Q. Uh-huh.
9   A. In July of 2013, the six years prior to the
10 date of filing of the Complaint.
11   Q. Okay. Are you, Dr. Luna, aware of others in
12 your field that have not identified a single
13 hypothetical negotiation in their analysis of the
14 Georgia-Pacific factors?
15   A. I don't know. I'm confused by your question
16 because I didn't identify a hypothetical negotiation.
17 So --
18   Q. Okay. Well, you identified two separate
19 ones; correct? Two separate hypothetical negotiation
20 dates?
21   A. Right, because I think it's going to be a
22 legal issue.
23   Q. Okay. Let's look at Factor 8 that you
24 considered. You agree, Dr. Luna, that both RSA and
25 Delta realized profits on the sale of shallow mount

Page 113

1 bollards; correct?
2   A. Yeah. Except for the 675, it didn't.
3   Q. Okay. Well, if you look at Paragraph 18.h.,
4 your first sentence says, "Both RSA and Delta realized
5 profits on the sale of shallow mount bollards"?
6   A. Yes. Overall, yes.
7   Q. Okay. And I think in your discussion in
8 Factor 15 you conclude that Factor 8, which relates to
9 profitability of the product, is the second most
10 important factor; is that right?
11   A. True.
12   Q. For your understanding of RSA's product --
13 profits, excuse me, are you relying on Mr. Beaton's
14 analysis?
15   A. As far as the figures are concerned, yes. I
16 didn't try to figure out an incremental profitability
17 on RSA.
18   Q. Okay. You didn't do your own independent
19 incremental profit analysis of RSA's profits for the
20 shallow mount bollards; right?
21   A. I did not.
22   Q. You would agree that, in the hypothetical
23 negotiation, RSA would want to enter a license that
24 still allowed for RSA to make a profit; correct?
25   A. Agreed.

29 (Pages 110 - 113)

Page 114

1    Q.  In the infringement context, which is the
2  context we're in, are you aware of situations where
3  parties have renegotiated a hypothetically negotiated
4  license?
5    A.  I'm not aware.  I don't know if it happened
6  or not, but it would just break down and a work-around
7  would happen.  It would likely happen soon after the
8  hypothetical negotiation, which would have happened
9  considering reasonable, adequate notification.
10    Q.  So going back to Factor 8 in Paragraph 18.h.,
11  is it your opinion, Dr. Luna, that defendant's
12  incremental profit per unit declined substantially
13  beginning in 2014?  So there is a strong possibility
14  that defendant would have renegotiated the
15  hypothetical royalty agreement shortly after 2013 if
16  the royalty per unit was set too high or would have
17  designed around the '865 patent shortly after 2013 if
18  the royalty per unit was set too high?
19    A.  Right.  I don't know whether -- I don't know
20  if they could have changed the royalty rate.  It just
21  would have broken down at that point in time.
22    Q.  And in what I just read of your opinion
23  regarding the profitability of the product, what did
24  you mean by there's a strong possibility that
25  defendant would have renegotiated?

Page 115

1    A.  They would have tried because it doesn't make
2  sense to have to pay more royalty than the incremental
3  profit you're making on the unit.  It just wouldn't --
4  it would just stop and you -- the business aspect of
5  it, you would have designed around, if it was possible
6  to do so, at a cheaper price.  At a cheaper cost, I
7  should say.  And we know that the cost is around
8  ████████
9    Q.  Okay.
10    A.  -- maximum.
11    Q.  Okay.  So you're saying what defendant would
12  have wanted to do, but you do recognize that RSA would
13  have to be a part of that negotiation and agreeable to
14  a renegotiation; correct?
15    A.  Sure.  Otherwise, the defendant would have
16  said, "Okay.  I'm not making units to just keep losing
17  money."
18    Q.  And do you know what Delta's declining
19  profitability was due to?
20    A.  Probably more competition, but I don't know,
21  and alternative non-infringing substitutes.
22    Q.  Okay.  So you would agree that one reason for
23  Delta's declining profits, as well as RSA's, would be
24  increased competition or other infringers of the
25  '865 patent; is that right?

Page 116

1    A.  In part.  Or, again, non-infringing
2  substitutes.
3    Q.  If the parties -- if we -- strike that.  Let
4  me start over.
5       If we looked at the hypothetical negotiation
6  in the July 2012 time frame, when infringement began
7  and the negotiation occurred, and other infringers
8  later in time didn't come on the market, wouldn't you
9  agree that both Delta and RSA would have actually seen
10  increased profits during the time frame you're
11  complaining about the declining profitability?
12    A.  First of all, you're misstating my testimony.
13  I never agreed to July of 2012, although I grant you
14  that was the date of issuance of the patent.  I think
15  there's a statute of limitations from date of filing.
16  But, again, I defer to the attorneys.  I think it's
17  six years, but I defer to the attorneys and the judge
18  prior to date of filing of the Complaint.
19       And, hypothetically, if there were less
20  competitors out there, yeah, the profit would be
21  higher, or the royalty could be higher.
22    Q.  Okay.  If we look back at Ms. Gile's analysis
23  of Delta's profitability in Schedule 3, I believe it
24  was --
25    A.  By the way, again, I'm not condoning July of

Page 117

1  2012 because I think it's outside the statute of
2  limitations, but I'll leave that to the attorneys.
3    Q.  That's okay.
4    A.  You said Schedule 3?
5    Q.  Yes.
6    A.  Go ahead.
7    Q.  Schedule 3, which is Ms. Gile's or Delta's
8  analysis of the incremental profit per unit; correct?
9    A.  Yeah.
10    Q.  Do you agree?
11    A.  We computed this for everything on a
12  cost-per-unit basis.  She didn't do it exactly like
13  this, but yes.
14    Q.  Okay.  If you look at the calculation that
15  results, beginning in July 2013 the profit per unit is
16  ████ -- or focused on the DSC600.  Sorry.  And then in
17  July 2014 it declines to ████████
18  Thereafter, you would agree, though, that the profit
19  per unit increases again; correct?
20    A.  Operating profit basis, but I wasn't
21  suggesting using operating profit.  But, yes, on
22  operating profit, yes.
23    Q.  Okay.  Well, if we look at Schedule 1 with
24  respect to the DSC600, which is your incremental
25  profit-per-unit calculation; correct?

30 (Pages 114 - 117)

Page 118

1    A.  Right.  Right.
2    Q.  You would agree that after 2016 the
3  incremental profit per unit increases again; is that
4  right?  I guess with the exception of 2019.
5    A.  And 2018.  Well, '18 is higher than '16, but
6  '18 is less than '17.
7    Q.  So I guess it's not declining -- continuing
8  to decline from 2014; is that right?
9    A.  That's true.
10    Q.  Okay.
11    A.  Each and every year.
12    Q.  Do you provide, in your discussion of
13  Factor 18 or Factor 15, or anywhere in your report, a
14  basis for why RSA would have agreed to the reasonable
15  royalty being reviewed over time or renegotiated, as
16  you suggest?
17    A.  Well, from a practical standpoint, I think I
18  sufficiently stated that if the alleged infringer
19  says, "I'm not going to produce anymore.  We'll live
20  by the agreement, because I'm not making any money and
21  I'm losing money paying your royalty," then -- "so I'm
22  not making any money.  So it doesn't make sense to
23  lose money and pay you a royalty.  I'm going to stop.
24  I'm going to find a way around it."
25      So, you know, something is better than

Page 119

1  nothing from a practical standpoint.  So I think a
2  royalty would be okay.  Well, what could you live
3  with?  And that's how we -- the 8 percent, if you
4  will, or some number other than 500 might come into
5  play because, otherwise, the infringer would say,
6  "Look, I can work around this for maximum 250,000.
7  Why should I continue to pay you millions."  It
8  doesn't make sense.
9    Q.  Dr. Luna, you mentioned Delta would, at that
10  point, possibly decide to design around.  You would
11  agree, though, that Delta has not done that at this
12  point in time; correct?
13    A.  It hasn't.  My understanding was
14  notification -- sufficient notification was not given
15  until July of 2019, and now Delta is making
16  considerations about designing around.  So, again,
17  that's just my understanding, but the attorneys and
18  the judge will decide upon that.
19    Q.  Is it your understanding that patents are
20  publicly available?
21    A.  Yes.
22    Q.  And it could be that Delta would look at the
23  landscape related to their product?
24    A.  They may look at it, but again, my
25  understanding is sufficient notification has to be

Page 120

1  given by the alleged -- by the patentee to the alleged
2  infringer.  So it's not adequate that you look at the
3  landscape.  I think there has to be sufficient
4  notification.  But, again, I leave that to the
5  attorneys and to the judge to decide.
6      MS. CHUBB:  I'm going to introduce another
7  exhibit, Dr. Luna.
8      (Deposition Exhibit 7 was marked for
9      identification.)
10  BY MS. CHUBB:
11    Q.  If you could refresh your Marked Exhibit
12  folder.  Exhibit Luna 7 should be the first one at the
13  top.
14    A.  Yes.
15      MS. CHUBB:  Okay.  So just for the record,
16  I've marked as Luna Exhibit 7 what's been Bates
17  stamped at LUNA6.
18    Q.  And, Dr. Luna, is this the correspondence
19  from David Dickinson at Delta that you referred to
20  where the cost estimate for designing around the '865
21  patent was given of 100,000 and 150,000; is that
22  right?
23    A.  Yes.
24    Q.  And just so I understand, from what you've
25  said today, is it correct that the $100,000 is Delta's

Page 121

1  estimate of the design-around, and the $150,000 is
2  Delta's estimate of the certification, obtaining a
3  certification; is that right?
4    A.  That's my understanding.
5    Q.  And do you have any further understanding of
6  how Mr. Dickinson at Delta arrived at these figures?
7    A.  They may have had some forecast.  I don't
8  have copies of the forecasts, but that's...
9    Q.  Okay.  In Paragraph 3.a. of your report,
10  Dr. Luna, you say that Delta should be entitled on a
11  substantial return to its own effort to general sales.
12  Are you aware of any support or basis in your field
13  that the accused infringer is entitled to a
14  substantial return?
15    A.  It's just from a business standpoint.  They
16  have to have a working sales force.  They have to buy
17  materials.  They have to make a profit.  They have
18  other operating expenses in management.  They're
19  entitled to a return of that -- of those efforts
20  first, and then they'd say how much is left to give
21  away or to agree to, hypothetically, in a royalty.
22    Q.  Earlier I read to you a paragraph from the
23  Georgia-Pacific case in which it discusses that the
24  defendant would be entitled to a reasonable profit.
25  Why do you believe that Delta should be entitled to a

31 (Pages 118 - 121)

Page 130

1 in the context of the sales of shallow mount bollards;
2 correct?
3    A.  Yes.  For a very limited number of
4 engagements, yes.
5    Q.  And that these settlement agreements relate
6 to the sales of shallow mount bollards; is that right?
7    A.  Yes.  For a very limited number of
8 engagements, yes.
9    Q.  Dr. Luna, you -- I think I know the answer
10 because we talked about Appendix B and what materials
11 you considered.  You did not review the deposition of
12 Mr. Belinski; is that right?
13    A.  True.
14    Q.  And just to confirm, because I know we talked
15 about some of them, you have not reviewed the
16 deposition transcripts of Mr. Bobrosky, Mr. Dickinson,
17 Ms. Gile, Mr. Friend, Mr. Adler, or Mr. Belinski;
18 correct?
19    A.  At the time I wrote this, that's correct.  I
20 have since skimmed over Dickinson and -- I'll say
21 Keith.  It's easier for me.
22    Q.  Right.  But you said you hadn't considered
23 them enough to where you could comment on whether
24 those -- your skimming impacted your opinions;
25 correct?

Page 131

1    A.  From what I -- at this point, it has not
2 influenced me.  Again, at the time that I wrote this,
3 I had not reviewed it.
4    Q.  Uh-huh.
5    A.  It's not influencing me.
6    Q.  Looking at your Paragraph 18.a.ii., which is
7 where you've now corrected your understanding of that
8 agreement, the March 23, 2020 agreement; is that
9 right?
10    A.  Yes.
11    Q.  If you look at -- so is it now correct that
12 you're agreeing that the settlement involved 300 --
13 $256 resulting in a $472 per bollard royalty rate?
14    A.  What I'm saying -- I just said to you just
15 before, this is not clear from that agreement if it's
16 256- or 270- for the extra units.  At 256-, it's
17 472.65.  I think that's the case.  If it happened to
18 be -- hold on a second.  121,000 -- yeah.
19    Q.  Okay.
20    A.  Hold on.  Hold on one second.  If it was
21 270-, the figure would be 448.15.
22    MS. CHUBB:  Okay.  I want to pull that up
23 settlement agreement as an exhibit.
24    (Pause in proceedings.)
25    MS. CHUBB:  We're pulling it up.  Sorry,

Page 132

1 Dr. Luna.
2    THE WITNESS:  No problem.
3    (Pause in proceedings.)
4    (Deposition Exhibit 8 was marked for
5    identification.)
6 BY MS. CHUBB:
7    Q.  Okay.  If you can refresh, it should be
8 there, Dr. Luna.  It's the top one, Exhibit Luna 8.
9    A.  Yes.
10    MS. CHUBB:  And so just for the record, I've
11 introduced Exhibit Luna 8, which is Bates stamped
12 RSA-DELTA046284.
13    Q.  Dr. Luna, I want to direct you to
14 Section 1.9, and it has this term, which I understand
15 is redacted, "shall mean (1) the 372 Shallow Mount
16 Bollards installed at John F. Kennedy, LaGuardia, and
17 Newark Airports that were the subject of the
18 settlement agreement between RSA and" the redacted
19 entity, "and are not included" as "Shallow Mount
20 Bollard under this Agreement."
21    I know I -- does that help you to understand
22 that the 372 are not the included bollards under this
23 agreement and that it's just the 256 bollards?
24    A.  Well, yes, in part.  I understand the 372 was
25 not included.  That's why I changed it.  But in the

Page 133

1 first agreement we were dealing with 386.  So there's
2 a 14-unit difference, and then the following
3 paragraph, which says, "Shallow Mount Bollards under
4 this Agreement, and (2) the 14 Shallow Mount Bollards
5 installed at Journal Square Transportation Center that
6 were the subject of the settlement agreement between
7 RSA and" blank, "and are included as" blank, "Shallow
8 Mount Bollards under this Agreement."
9    So if it's under this agreement, I'm not sure
10 that it should be 270 or 256.  For conservative
11 purposes, I left it at 256.
12    Q.  Okay.  And so -- but you would agree that if
13 it is correct that 256 bollards are being settled
14 under this agreement for $121,000, that that is a $472
15 per bollard rate; correct?
16    A.  Correct.
17    Q.  Okay.  Then I just want to understand, for
18 Schedule 5 of your report, that is just providing a
19 summary of the three settlement agreements and the
20 terms that you were focused on; is that correct?
21    A.  Yes.
22    Q.  Okay.  In weighing the impact that the
23 settlement agreement had on your conclusion of a
24 reasonable royalty, did you consider that the
25 settlement agreement also included identification of

34 (Pages 130 - 133)

Page 146

1 found Factor 3 to have a decreasing impact in a
2 situation of a non-exclusive license?
3     A.  Yeah.  That's what I've seen over the period
4 of years.  I hadn't seen people -- me or other people
5 doing anything different.
6     Q.  Uh-huh.  Let's look at Factor 4, which is in
7 the next paragraph, 18.d.  Here, you seem to be
8 agreeing with Mr. Beaton that RSA does not have a
9 formal licensing policy and that the impact is neutral
10 or possibly increasing; is that right?
11     A.  Yes.
12     Q.  Okay.  Let's look at Factor 7, which you talk
13 about in Paragraph 18.g.
14     Dr. Luna, do you agree that the relevant time
15 frame to consider the life that remains on the patent
16 is from the time of the hypothetical negotiation
17 forward to the expiration of the patent?
18     A.  True.
19     Q.  So I guess based on your opinion, you've
20 looked at how much life remains on the '865 patent if
21 the hypothetical negotiation date was in July of 2013
22 or it was in July of 2019; is that right?
23     A.  True.
24     Q.  And is it your opinion, Dr. Luna, that the
25 '865 patent expires on July 26, 2024?

Page 147

1     A.  That's my understanding, is it's 20 years
2 from the time that the application was filed, yeah.
3     Q.  Okay.  And how did you arrive at that
4 understanding?
5     A.  Discussion with counsel that the filing first
6 occurred in July of 2004, was it?  I may have -- it
7 was mainly discussion with counsel.
8     Q.  Okay.  Dr. Luna, I'm going to represent to
9 you that the -- under the patent law, the '865 patent
10 life ends July 26, 2025.  So with that understanding,
11 if the hypothetical negotiation was in July of 2012
12 and the '865 patent life ends in July 2025, then would
13 you agree that there was 13 years remaining on the
14 '865 patent?
15     A.  Yes, under that hypothetical.
16     Q.  And under that hypothetical, would you agree
17 that Factor 7 would have an increasing impact on the
18 reasonable royalty rates?
19     A.  Yeah.  That's what I had stated also.  For 11
20 years, I'd give it an increasing effect, or 13 years.
21     Q.  Okay.  Looking at Paragraph 10 of your
22 report, you make a comment about the '865 patent
23 application being abandoned for a period and then
24 finally issuing on July 10, 2012.
25     What is your basis for that statement?

Page 148

1     A.  That's from counsel.
2     Q.  I'm sorry.  What did you say?
3     A.  Discussion with counsel.  Where did I put it?
4 I don't remember.
5     Q.  I'm in Paragraph --
6     A.  Okay.  Go ahead.  It was discussion with
7 counsel.
8     Q.  Okay.  And does that statement have an impact
9 on your opinion regarding the reasonable royalty that
10 applies in this case?
11     A.  It's the life.  I started from July -- I took
12 time zero to be July 2004.
13     Q.  Uh-huh.  But the statement about -- that the
14 application was abandoned for a period, that's not
15 impacting your calculation of the term; correct?
16     A.  No, it is not.
17     Q.  Okay.  And, therefore, it's really not
18 impacting your calculation of -- conclusions as to
19 whether Factor 7 is, you know, an increasing or some
20 other impact; correct?
21     A.  Yeah.  It didn't impact it.
22     Q.  Okay.  Do you -- did your attorney inform
23 you that the application that was abandoned was
24 eventually revived?
25     A.  It says so, yes.

Page 149

1     Q.  Okay.  And did you understand that the
2 application that was abandoned was not even the
3 application that resulted in the '865 patent?
4     A.  I don't have an understanding on that.
5     Q.  Okay.  Let's look at Factor 13, which you
6 discuss in Paragraph 18.m.
7     A.  Yes.
8     Q.  And you do agree here with Mr. Beaton that
9 the entire market value rule applies; right?
10     A.  Yes.
11     Q.  You then say, "However, the customer might
12 just want a bollard as a vehicle access control
13 equipment for their property regardless of this
14 shallow mount technology, so it would be difficult to
15 apportion the sales price of the unit to the
16 technology."
17     A.  Right.
18     Q.  What do you mean by that?
19     A.  If a customer needed a bollard, they might
20 not have just needed a shallow mount bollard is what
21 I'm saying.  So how much is due to the shallow mount
22 aspect of the bollard, I don't know.  That's why I put
23 "neutral."
24     Q.  Right.  Okay.  What's -- what's your
25 understanding of what the entire market value rule

38 (Pages 146 - 149)

Page 150

1  discusses?
2      A.  If there are other factors.
3      Q.  Right.  So is it your understanding that that
4  assesses whether the patented technology -- whether
5  the -- let me strike that.
6          Is it your understanding that the entire
7  market rule assesses whether the claims -- claims of
8  the patent cover only a portion or the entirety of the
9  accused product?
10     A.  I assume the entirety of the accused product
11  is what I'm trying to say to you.  But whether or
12  not --
13     Q.  Okay.
14     A.  -- someone will buy it because they need a
15  shallow mount bollard or they -- you know, a gate
16  would do or a fence would do or other factors, or a
17  non-shallow mount bollard would do -- anyway, that is
18  my concern.
19     Q.  Okay.  Let's turn to Factor 5, which you look
20  at in Paragraph 18.e. and relate -- is it your
21  understanding that this factor relates to assessing
22  the commercial relationship between the licensee and
23  licensor?
24     A.  I'm just getting there.  Hold on.
25     Q.  Okay.  Sure.  Sorry.  It's very difficult on

Page 151

1  me to see where you are in the exhibit or not.
2      A.  Right.  Yes, it's the relationship between
3  the licensee and licensor.
4      Q.  Okay.  And we talked about this earlier.  You
5  agree that RSA and Delta are direct competitors for
6  the sale of shallow mount bollards; right?
7      A.  For a limited portion of their sales, yes.
8      Q.  And you reviewed Mr. Beaton's report,
9  obviously, and you're aware that he concluded that
10  Delta and RSA are competitors in part based upon
11  review of certain RSA documents?
12     A.  Right.  But this is another thing that I
13  think I spoke to both Dickinson and Keith -- I hope
14  I'm saying this right -- about, I didn't think -- and
15  I think it's Keith who didn't think that they were
16  really competitors and it was just a very minor
17  limited number of jobs that they were competitors on.
18     Q.  Uh-huh.  Did you review the RSA documents
19  that Mr. Beaton considered in reaching his conclusion
20  that they're competitors?
21     A.  He mentioned certain contracts, I guess, in
22  his.  I did not review the underlying contracts.  I
23  assumed those to be -- I assumed it to be correct, but
24  I did not review the underlying documents.
25     Q.  Okay.  And you don't have a basis for

Page 152

1  disagreeing with Mr. Beaton's conclusion that RSA and
2  Delta are competitors at least as based upon those
3  documents you reviewed?
4      A.  I had a -- an E-mail -- it's in my binder --
5  from Keith that doesn't even list RSA as a competitor.
6  He mentioned who Delta felt was the largest
7  competitors to Delta, and it covered more than just
8  shallow mount bollards.
9      Q.  Okay.  I guess my understanding from what you
10  have told me is you did not review what Mr. Beaton
11  considered; correct?
12     A.  Not the particular engagements or agreements
13  on that.  But I did consider, again, with an E-mail
14  that I got directly from Keith, saying who the biggest
15  competitors were to Delta.
16     Q.  Okay.  I think if we look at Paragraph 14 of
17  your report, and in Footnote 19 you're citing an
18  E-mail from Mr. Bobrowsky.  Is that what you're
19  referring to right now?
20     A.  Bear with me a second.
21     Q.  Sure.
22     A.  That's correct.
23     MS. CHUBB:  Okay.  If you can refresh your
24  Marked Exhibit folder, and open up Exhibit Luna 9,
25  please.

Page 153

1          (Deposition Exhibit 9 was marked for
2          identification.)
3      THE WITNESS:  Yes.
4      MS. CHUBB:  Okay.  So for the record, I've
5  marked what's been marked Exhibit Luna 9.  It's Bates
6  stamped Luna1 through Luna2 -- or actually, through
7  Luna3.
8      Q.  Is this the E-mail that you're referring to,
9  Dr. Luna?
10     A.  Yes.
11     Q.  And I guess, looking back at Paragraph 14,
12  is -- this is -- this is your citation -- I guess is
13  this your citation for providing a specific percentage
14  of market share?
15     A.  Correct.
16     Q.  Okay.  And I guess you're talking about major
17  competitors of Delta in Paragraph 14.  What do you
18  mean by "major"?
19     A.  Largest.
20     Q.  Okay.  If you look back at what's been marked
21  as Luna Exhibit 9, and if you look at the E-mail from
22  Mr. Bobrosky to Mr. Dillard and others, his first
23  sentence says, "Below are Delta's top 5 competitors
24  and anecdotal estimated market share."
25          So did you consider, in reaching your

39 (Pages 150 - 153)

Page 170

1    Q.  Okay.  And beyond those two product numbers,
2  there's not specific products that you're pointing to
3  be non-infringing --
4    A.  There are alternative products out there.
5  Again, we don't necessarily need the shallow mount.
6  The specifics beyond that is what I'm trying to say
7  I'm not the right person on that.  There are other
8  people that would address that issue.
9    Q.  Okay.  And so the other products that are out
10  there that you just referred to, since you said they
11  apply in situations where you don't need the shallow
12  mount, I assume you're referring to products that
13  don't offer that benefit of shallow mounting; correct?
14    A.  Right.  And, again, maybe Keith, maybe it's
15  David or others, would be the appropriate person from
16  Delta to address the alternative shallow mounts out
17  there.
18    Q.  Would it impact your reasonable royalty
19  conclusion if I represented to you that Mr. Friend,
20  the chief engineer from Delta, indicated that he was
21  not aware of non-infringing alternatives?
22    A.  I don't know.  I haven't read his depo.  So I
23  don't know.
24    Q.  But I'm saying if that is the case, what I'm
25  representing, how does that impact your opinion of the

Page 171

1  reasonable royalty?
2    A.  Again, where I've said to you, several times
3  now, that in most instances you don't need the shallow
4  mount is my understanding.  So there are acceptable
5  non-infringing substitutes out there, and it would be
6  a limited number of times that you would need this
7  particular shallow mount.
8      So I have to say in many cases there are
9  different types of bollards, as well as alternative
10  products, to have the vehicle access control
11  limitation.
12    MS. CHUBB:  Okay.  Dr. Luna, I've also marked
13  as exhibits, the other articles that you looked at.
14  They are marked as Luna Exhibit 11, 12, 13, and 14.
15      (Deposition Exhibits 11, 12, 13, and
16      14 were marked for identification.)
17  BY MS. CHUBB:
18    Q.  For any of those articles, did you read the
19  underlying report?
20    A.  No.  I just read the articles.
21    Q.  And so, again, you don't know whether the
22  report included RSA; correct?
23    A.  I don't know.
24    Q.  And for any of those other articles, you
25  didn't see that Delta was identified either; correct?

Page 172

1    A.  I didn't see Delta in it.
2    Q.  And with respect to -- we can open it up.
3  It's marked as Luna Exhibit 14.
4      (The witness reviewed Exhibit 14.)
5    MS. CHUBB:  And just for the record, I've
6  actually introduced Luna Exhibit 11, which is Bates
7  stamped with LUNA11 through -15.
8      Luna Exhibit 12, which is Bates stamped
9  LUNA16 through -27.
10      Luna Exhibit 13, which is Bates stamped
11  LUNA28 to -40.
12      And Luna Exhibit 14, which we're looking at
13  right now, which is Bates stamped LUNA41 -- sorry --
14  to LUNA52.
15      THE WITNESS:  Okay.
16  BY MS. CHUBB:
17    Q.  With respect to Luna Exhibit 14, this one is
18  actually related to mooring bollards; is that right?
19    A.  It is.
20    Q.  Okay.  So none of these were limited to
21  shallow mount bollards; correct?
22    A.  Right.
23    MS. CHUBB:  Okay.  I guess -- I think we've
24  been going about another hour.  I don't know if you're
25  doing okay or if you want to take a short break.

Page 173

1      THE WITNESS:  How much longer do you have to
2  go?
3      MS. CHUBB:  I'm not sure.  I mean it's longer
4  than a break's worth.  That's for sure.
5      THE WITNESS:  Shall we take a 10-minute break
6  or so?
7      MS. CHUBB:  Okay.
8      THE WITNESS:  I'm getting a little tired.
9      MS. CHUBB:  Okay.  If we could go off the
10  record Christian, please.
11      THE VIDEOGRAPHER:  We are off the record.
12  The time is 2:04 p.m.
13      (A recess was taken from 2:04 p.m.
14      to 2:15 p.m.)
15      THE VIDEOGRAPHER:  We are back on the record,
16  and the time is 2:15 p.m.
17  BY MS. CHUBB:
18    Q.  Hi, Dr. Luna.  Let's move to discussing your
19  expert report and your assessment of Factor 11 in the
20  Georgia-Pacific factors, which that's in
21  Paragraph 18.k. of your report.
22      Dr. Luna, if you wanted to know what portion
23  of Delta's sales of shallow mount bollards, of their
24  total sales, in addition to knowing the sales of
25  shallow mount bollards, you would need to know Delta's

44 (Pages 170 - 173)