Sasha G. Rao (SBN 244303)
srao@maynardcooper.com
**MAYNARD COOPER & GALE, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone: (415) 646-4702

Ashe Puri (SBN 297814)
apuri@maynardcooper.com
**MAYNARD COOPER & GALE, LLP**
Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 596-4344

Joseph V. Saphia
JSaphia@haugpartners.com
(admitted pro hac vice)
Jessica H. Zafonte
JZafonte@haugpartners.com
(admitted pro hac vice)
Laura A. Chubb
LChubb@haugpartners.com
(admitted pro hac vice)
**HAUG PARTNERS LLP**
745 Fifth Avenue, New York, NY 10151
Telephone: (212) 588-0800
Facsimile:  (212) 588-0500

*Attorneys for Plaintiff,*
*RSA Protective Technologies, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RSA PROTECTIVE TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DELTA SCIENTIFIC CORPORATION,<br><br>Defendant. | **Case No.** 2:19-cv-06024-JAK-PLA<br><br>**AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO VALIDITY UNDER 35 U.S.C. §§102 AND 103**<br><br>Date: May 17, 2021<br><br>Time: 8:30 A.M.<br><br>Judge: Hon. John A. Kronstadt |

2513217.v1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

I.    Introduction ........................................................................................................ 1

II.    Background ......................................................................................................... 2

    A.    The Prosecution History of the '865 Patent ........................................... 2

    B.    Overview of the '865 Independent Claims ............................................. 4

    C.    Prior Decisions Concerning the Validity of '865 Patent ...................... 5

        1.    IPR2019-01161 ........................................................................... 5

        2.    IPR2019-01162 ........................................................................... 6

        3.    Delta's Reexamination ................................................................. 7

        4.    Delta's Motion to Amend ............................................................. 8

III.    Legal Standard .................................................................................................. 9

IV.    Delta Cannot Show AS A Matter OF Law That the '865 Patent Claims are Anticipated or Obvious ................................................................. 10

    A.    The '865 Claims are Not Obvious Over Turpin Alone or in Combination with the DSC501 ........................................................ 10

        1.    Overview of Turpin and the DSC501 ....................................... 10

        2.    Neither Turpin Nor DSC501 Render The "Wherein Clause" Obvious ......................................................................... 11

    B.    The '865 Claims are Not Obvious or Anticipated by the DSC800 ................................................................................................. 17

        1.    Overview of the DSC800 .......................................................... 17

        2.    The DSC800 Does Not Anticipate or Render Obvious The Wherein Clause ................................................................. 18

    C.    The '865 Claims are Not Obvious or Anticipated by the TT203 .................................................................................................... 20

        1.    Overview of the TT203 ............................................................. 20

        2.    The TT203 Does Not Anticipate or Render Obvious The Wherein Clause ................................................................. 21

    D.    Darcy Is Not Prior Art to the '865 Patent ........................................... 22

V.    Secondary Considerations of Non-Obviousness ............................................ 23

i

2513217.v1

    A.    Copying ................................................................................... 23

    B.    Long Felt Unmet Need ........................................................... 24

VI.   Conclusion ..................................................................................... 25

2513217.v1

# TABLE OF AUTHORITIES

**Cases**

*Biocell Tech. LLC v. Arthro-7*,
    No. SACV 12-00516-JVS, 2013 U.S. Dist. LEXIS 189647
    (C.D. Cal. April 16, 2013)...........................................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .....................................................................................9

*CH2O, Inc. v. Meras Eng'g, Inc.*,
    No. LA CV13-08418-JAK, 2016 U.S. Dist. LEXIS 185565
    (C.D. Cal. May 9, 2016)..........................................................................9, 15

*Continental Can Co. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991)...................................................................10

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009)...................................................................16

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966) ....................................................................................9, 10

*Group One, Ltd. v. Hallmark Cards, Inc.*,
    407 F.3d 1297 (Fed. Cir. 2005)...................................................................17

*Ivera Med. Corp. v. Hospira, Inc.*,
    801 F.3d 1336 (Fed. Cir. 2015)...................................................................10

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) .....................................................................................9

*TriMed, Inc. v. Stryker Corp.*,
    608 F.3d 1333 (Fed. Cir. 2010).....................................................................9

**Statutes**

35 U.S.C. §102..............................................................................................10, 21

35 U.S.C. §103.........................................................................................6, 9, 21

2513217.v1

## I.     INTRODUCTION

The validity of U.S. Patent No. 8,215,865 ("the '865 patent") has been challenged multiple times.  Delta's present challenge does not raise a genuine question of fact, as it merely rehashes facts already determined, and practices classic hindsight reconstruction based on bare conclusory statements, while ignoring the basic tenet that patent claims must be considered as a whole for the purposes of the obviousness analysis.

The '865 patent issued over various references including the lynchpin of Delta's invalidity case, the Turpin reference.  Turpin was before the U.S. Patent & Trademark Office ("PTO") during prosecution of the '865 patent and was relied upon by RSA to defend against two *Inter Partes* Review Petitions (both denied).  In addition, Turpin was the subject of Delta's First Motion to Amend its Answer.  In denying Delta's motion, this Court instructed Delta that the patent claims could not be "met by any configuration where media could possibly be introduced into a base, even when the configuration is not designed for that purpose." (Dkt 74 at 4, n.1).  In other words, the claimed base ***must comprise structural members that are configured to retain media*** such that rotation is resisted.

Delta, aware of the Court's guidance, seeks to "cure" its case with unsupported, conclusory statements by its expert, Dr. Azim Eskandarian.[1]  However, Dr. Eskandarian consistently ignores the patent claims as a whole—he disregards that the independent claims require the ***same*** components to satisfy various limitations.  Rather, he picks and chooses different structural components from different places in the prior art, ignoring that the '865 claims require the same structure to satisfy multiple limitations.  Ultimately, Dr. Eskandarian never states or demonstrates that any of the art relied upon by Delta could, or would, be combined

---

[1] Dr. Eskandarian's opinions are subject of a co-pending Motion to Preclude.

1

2513217.v1

in such a way to result in the claimed base comprising structural members configured to retain media.  Furthermore, Dr. Eskandarian fails to explain entirely why a Person Having Ordinary Skill In The Art ("PHOSITA") would modify any of Delta's prior art references to arrive at the claimed base with any reasonable expectation of success.  Lastly, Dr. Eskandarian has offered no opinion at all on secondary considerations of non-obviousness. There is no issue of fact as to any of Delta's validity challenges.

## II.    BACKGROUND

Fact and expert discovery in this case closed on December 21, 2020.  Delta does not dispute infringement of the claims.

### A.    The Prosecution History of the '865 Patent

The '865 patent matured from Application No. 12/694,730, filed on January 27, 2010.  (Ex. 49, '865 file history at 246; SUF 1).  The originally filed claims were directed to a "bollard assembly" with a "metal bollard" "secured" to a "base member of consideration mass" that "projected rearwardly and forwardly from said bollard." (*Id*. at 227; SUF 1).  These claims were rejected as anticipated on June 28, 2010 over U.S. App. No. 2004/0033106 (Ex. 59, "Turpin," one of Delta's primary references) and U.S. Patent. No. 6,805,515 (Ex. 52, "Reale 1").  (Ex. 49 at 166-168; SUF 2).  As explained further below, Turpin teaches a self-contained collapsible traffic barrier comprised of a sealed vault with rotatable members that raise or lower bollards in response to traffic needs.  (SUF 3).  Reale 1 taught a removable bollard secured into a concrete block, similar to Delta's two other primary references, the DSC800 and TT203R.  (Ex. 52 at Figs 5A and 2B; SUF 3).  In response, on December 28, 2010, the applicant cancelled the original claims and added new claims reciting a "bollard structure": (1) that had a base with opposed ends and comprised of structural members that intersect with both one another and the opposed ends, and are tied together; (2) where forces striking the bollard are transmitted to the base; and (3)

2513217.v1

with the base configured to be mounted in a shallow excavation.  (Ex. 49 at 159-163; SUF 4).  Turpin and Reale 1 were overcome.  (SUF 5).

On January 26, 2011, the PTO issued a final rejection under 102(e) over U.S. Patent No. 6,702,512 (Ex. 53, "Reale 2"), which taught a "vehicle arresting installation" in which pivotable, detachable, bollards would rotate backwards upon a vehicle strike to trap the vehicle.  (Ex. 49 at 110-2, Ex. 53 at Fig. 3; SUF 6).  The applicant then filed a request for continued examination on July 26, 2011, amending the independent claims to include the "wherein clause" limitation:

> wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.

(Ex. 49 at 100; SUF 7).  Patentee argued that the amended claim overcame Reale 2, which neither disclosed nor suggested configuring the structural members of the base such to retain media (Reale 2's base was covered by the upper piece (52) such that it could not retain media).  (*Id.* at 101; SUF 8).  Applicant also successfully argued that Reale 2 taught away from claimed invention because Reale 2 was designed to rotate upon impact.  (*Id.*; SUF 9).

In a final office action on August 24, 2011, the examiner rejected the independent claims as anticipated by DE Patent No. 4004851. (Ex. 49 at 52; 63, "Fuchs"; SUF 10).  Fuchs taught bollards fixed to a baseplate.  (Ex. 49 at 55; SUF 11).  The applicant argued that Fuchs explicitly taught away from a base configured to retain supporting media by teaching base plate screwed into a hard surface layer, preventing any supporting media from entering the base. (*Id.* at 47; SUF 12).  The patentee similarly distinguished his invention from Hick, Bruner, and Hernandez,

which also did not disclose a base configured to retain supporting media.  (*Id*. at 48-9; 13).

On March 8, 2012, the claims were allowed.  (*Id*. at 38; SUF 14).  It is clear that the '865 patent was allowed because its claimed base was comprised of intersecting and tied together structural members ***configured to retain media introduced into the base such that upon impact rotation of the bollards and the base is resisted***.  Bollard structures that were not configured to incorporate media (like Fuchs) such that the bollards resisted rotation (like Reale 2), were distinguished.  (SUF 15).

## B.   Overview of the '865 Independent Claims

Independent claim 1, and its elements, must be considered as a whole.  It reads:

A bollard structure comprising:

at least one bollard; and

a base comprising opposed ends and a plurality of structural members which intersect and are tied together, for each bollard of the bollard structure at least one first structural member extending from a first of the opposed ends of the base to a second of the opposed ends of the base in a first direction intersecting with the opposed ends, and at least one structural member extending to intersect with the at least one first structural member;

each bollard being secured to at least one of the at least one first structural member and the at least one structural member of the base for the respective bollard and extending upwardly from the base so as to transmit forces applied to the at least one bollard to the base;

wherein the base is configured to be mounted in a shallow excavation with the at least one bollard extending above grade; and

wherein the at least one first structural member or the at least one structural member or both are configured or tied together to retain within the base supporting media introduced into the base when the base is mounted in the excavation such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards.

(Ex. 1 at claim 1; SUF 16).  Independent claim 16 has all of the same limitations of claim 1, except it is directed to a "plurality of bollards."  (SUF 17).  Claim 33 is the

2513217.v1

same as claim 16, except that it additionally requires members to extend parallel between bases of adjacent bollards.  (SUF 17).

In brief, the claims describe a bollard structure, in which each bollard is secured to a specific base.  (SUF 18).  This base comprises a plurality of structural members, with an "at least one first structural member" and "at least one structural member" that intersect.  (SUF 19).  The independent claims also require that one of these two structural members must be attached to the bollard and one must extend between opposed ends of the base and intersect with the ends.  (SUF 20).  At least one of these **same two structural members** must also be configured to retain supporting media, such as concrete, when installed into a shallow excavation, such that the bollard structure resists rotation when rammed by a vehicle.[2]  (SUF 21).

## C.    Prior Decisions Concerning the Validity of '865 Patent

### 1.    IPR2019-01161

An IPR petition was filed on June 6, 2019 by Guardiar Solutions Inc. ("Guardiar") alleging that an Unexamined Japanese Patent Application Publication, No. H11-61746 (Ex. 54, "Kogyo"), obviated the '865 patent.  (SUF 22).  Kogyo disclosed "an energy-absorbing guard block support structure" with two bases, first base 21 on to which second base 31 was placed on top.  (Ex. 50, IPR2019-01161, Paper No. 8 at 6-7; Ex. 54 at 4; SUF 23).

In denying institution, the PTAB found that Guardiar failed to show that the structural components that made up the base of Kogyo to which the "bollards" were secured were the same members configured to retain supporting media, **when the claim requires the same structure to satisfy both of these limitations**.  (Ex. 50 at

---

[2] RSA limits the subject matter of this motion to this one claim limitation that is not contained in any of the art relied upon by Delta.  Because this limitation—"the wherein clause"—is found in every independent claim of the '865 patent, Delta also cannot show the invalidity of any dependent claim of the '865 patent.

21; SUF 24).  The PTAB noted that, like Delta, "Petitioner appears to treat the elements of claim 1 *as a list of separate structural requirements and ignores the relationship between the requirements*" and that "*this approach is fatal to Petitioner's position*."  (*Id*.; SUF 25).

## 2.   IPR2019-01162

Guardiar filed a second IPR petition alleging that two primary references each invalidated the '865 patent under 35 U.S.C. §103.  (SUF 26).  The first reference, German patent application DE 3412354 (Ex. 55, "Draht"), disclosed a fence-like structure with a "drive-through prevention element," a collision section (7) and a bottom section (8) attached at right angles.  (SUF 27).  The bottom section (8) was placed on the ground and could be covered with soil.  (Ex. 51, IPR2019-01162, Paper No. 7 at 6; SUF 27).  Upon collision section (7) being impacted by a vehicle, the structure rotated backwards, lifting the bottom section (8), and trapping the vehicle.  (*Id*. at 6-7; SUF 28).

In declining to institute, the PTAB rejected Petitioner's argument that the bottom section (8) being "placed in or covered by soil" satisfied the claim element "at least one first structural member or the at least one structural member or both are *configured to retain* the soil."  (Ex. 51, IPR2019-01162, Paper No. 7 at 17; SUF 29). The PTAB continued that, even if Draht's bottom section (8)were configured to retain soil, this retention of soil would not result in posts 11 and 12 (the alleged bollards) and bottom section (8) resisting rotation, as further required by the claims. (*Id*.; SUF 30).  The PTAB also rejected Petitioner's contention that Draht taught the limitation that the "bollards and base resist rotation," when Draht expressly taught a structure that rotated.  (*Id*. at 17-18; SUF 31).

The second primary reference in IPR2019-01162 was U.S. Patent No. 7,040,836 (Ex. 56, "Rogers"), which disclosed impact elements mounted on a turntable system that prevented or allowed passage of vehicles as needed.  (SUF 32).

2513217.v1

The PTAB noted, inter alia, that Rogers did not invalidate the '865 patent because it did not contain a base comprised of intersecting and tied together structural members.  (Ex. 51, IPR2019-01162, Paper No. 7 at 28-30; SUF 33).  Petitioner had argued that a statement in the '865 specification that "cross pieces are inherent in the continuous plate" supported a conclusion that a single plate of the Rogers base necessarily included the at least two structural members configured as recited in the claims.  (*Id*. at 26, n. 10; 30; SUF 34).  But the PTAB rejected that position, instructing that the quoted statement, without more, did not show the claimed members.  (*Id*. at 30; SUF 35).  Delta nonetheless relies on this same argument in two of its invalidity grounds.  (SUF 36).

### 3.    Delta's Reexamination

On March 27, 2020, Delta filed a request for *ex parte* reexamination with the PTO, citing five pieces of prior art, including the Darcy Application, one of Delta's primary references in this case.  The PTO only granted reexamination with respect to a single primary reference, the Chen reference.  (Ex. 10, April 22, 2020 Office Action granting Reexamination at 9-10; SUF 37).  Importantly, the PTO declined to **consider the Darcy reference because it was not prior art**.  (*Id*. at 10-11; SUF 38).

In rejecting Delta's argument that Darcy was prior art, the PTO found that the '865 patent was entitled to a priority date before Darcy because the '865's earliest provisional application, which pre-dated Darcy, did in fact provide support for the limitation that Delta contended was missing— "such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard or bollards." (SUF 39).  In analyzing Provisional Application No. 60/591,018 (filed 7/26/04), the PTO found that while "not expressly stated," the application disclosed an "anti-ram shallow mount bollard system," and contained numerous disclosures that supported the "rotation is resisted" claim language.  (*Id*. at 11; SUF 40).  These included various descriptions in that provisional of the shallow mount bollard base.  (*Id*; SUF

7

40).

The PTO then granted the request for reexamination as to only the Chen primary reference, which was not directed to a bollard system, but taught a method and structure for quickly assembling road foundation and vertical supports.   (Ex. 57, U.S. Patent No. 5,406,633 at 1:40-64; 2:58-63; Ex. 10, April 22, 2020 Office Action at 9-10; SUF 41).   In the next office action on June 30, 2020, the PTO terminated the reexamination, stating that Chen's "vertical support" was not a bollard and that "the claims require that the at least one first structural member or the at least one structural member or both are configured or tied together to retain in the base, supporting media introduced into the base," and that *the Chen supporting media is "poured on top of the base and is not retained within the base,"* despite entering narrow grooves.   (Ex. 58, June 30, 2020 Office Action at 4; SUF 42) (emphasis added).

### 4.    Delta's Motion to Amend

In rejecting Delta's first motion to amend, this Court considered whether the Turpin reference disclosed the limitation of a base comprised of structural members configured to retain media such that rotation is resisted.   (Dkt. 74; SUF 43).   The Court concluded that Turpin was not "but-for material" to the patentability of the claims, finding that this claim limitation requires that "the structural members are configured or tied together in such a manner that they are designed to allow for supporting media to be placed or poured into the base" and that the configuration and introduction of media must "lead to a resulting benefit to the structure of the system."   (Dkt. 74 at 4; SUF 44).   The Court stated that the "*argument that this limitation would be met by any configuration where media could possibly be introduced into a base, even when the configuration is not designed for that purpose, is not persuasive*" and that this determination was "supported by the prosecution history in this case."   (Dkt. 74 at 4, n.1; SUF 45).

8

### III.   LEGAL STANDARD

A moving party is entitled to a judgment as a matter of law upon a showing of the absence of a genuine issue of material fact or a showing that the non-moving party will be unable to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Unsupported conjecture or conclusory statements are not sufficient to defeat summary judgment." *CH2O, Inc. v. Meras Eng'g, Inc.*, No. LA CV13-08418-JAK, 2016 U.S. Dist. LEXIS 185565, at *9 (C.D. Cal. May 9, 2016).

Obviousness is a question of law based on underlying facts. *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010). A patent is invalid for obviousness only "if the differences between the subject matter sought to be patented and the prior art are such that the ***subject matter as a whole*** would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. §103 (pre-AIA) (emphasis added). "Under §103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). Obviousness is shown if a "skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Ivera Med. Corp. v. Hospira, Inc.*, 801 F.3d 1336, 1344 (Fed. Cir. 2015). "[M]erely by demonstrating that each of [a patent's elements] was, independently, known in the prior art" does not show obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, it is "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does" because most if not all inventions "rely upon building blocks long since uncovered, and

2513217.v1

1

2

3

4

claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* at 418-19.  Objective evidence—secondary considerations—relevant to the issue of obviousness should also be evaluated.  *Graham*, 383 U.S. at 17-18.

5

6

7

A patent is invalid under 35 U.S.C. §102 as anticipated if a single piece of prior art discloses each and every limitation of the claimed invention.  *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

8

9

## IV.   DELTA CANNOT SHOW AS A MATTER OF LAW THAT THE '865 PATENT CLAIMS ARE ANTICIPATED OR OBVIOUS

10

11

12

13

14

None of Delta's references disclose, teach, suggest, or motivate a PHOSITA[3] to achieve a bollard structure in which structural members of the base are configured or tied together to retain within the base supporting media introduced into the base such that the rotation is resisted of a bollard or bollards and the base from an impact against the bollard(s)—"the wherein clause."

15

16

### A.   The '865 Claims are Not Obvious Over Turpin Alone or in Combination with the DSC501

17

#### 1.   Overview of Turpin and the DSC501

18

19

20

21

The Turpin reference, U.S. Patent Pub. No. 2004/0033106, titled "Automatic Self-Contained Collapsible Traffic Barrier Bollard System and Method of Installation," teaches a steel vault that is closed on all six sides.  (Ex. 59 at abstract, ¶¶ 0011, 0025; SUF 46).  The Turpin system is designed to raise and lower its barrier

22

23

24

25

26

27

[3] While the parties dispute the level of skill of a PHOSITA in this case, the adoption of either party's proposed level of skill would not change the analysis. (*See* Ex. 11, Peraza Rebuttal Report at ¶37).

28

2513217.v1

to regulate traffic.  (Ex. 11, Peraza Rebuttal Report at ¶64; SUF 47).[4]  Turpin's bollards are attached to the "rotating rod," which is inside the steel vault.  (Ex. 11, Peraza at ¶65, citing Ex. 59 at ¶¶0028-0030; SUF 48).  When this rod rotates, it raises the bollards to the point where they stop against a solid steel plate, and tilt towards oncoming traffic in an upright position.  (Ex. 11, Peraza at ¶65; citing Ex. 59 at ¶0030; SUF 49).  Rotating the rod the other way lowers the bollards.  (Ex. 11, Peraza at ¶65; SUF 50).

The DSC501, made by Delta, is not a bollard, but a wedge barrier that uses hydraulic cylinders to raise and lower it barrier to regulate traffic.  (Ex. 61; Ex. 11, Peraza at ¶¶68-69; SUF 51).  Both Turpin and the DSC501 contain moving parts and are classified as "active" systems.  (Ex. 11, Peraza at ¶¶73-74; SUF 52).  Rebar, which is later embedded in concrete, is extended through the sides of the wedge to engage the weight of the surrounding soil or concrete.  (*Id.* at ¶68; SUF 53).

### 2.    Neither Turpin Nor DSC501 Render The "Wherein Clause" Obvious

Dr. Eskandarian and Mr. Peraza agree that the Turpin system does not disclose the retention of media in its base.  (Ex. 11, Peraza at ¶90; Ex. 9, Eskandarian Opening Expert Report at ¶103; SUF 54).[5]  Dr. Eskandarian admits that "Turpin does not disclose that the supports 20 and/or I-beams 23 [the structural members identified by Dr. Eskandarian] are purposely configured to retain concrete in the interior spaces 22 there between."  (Ex. 9, Esk. at ¶103; SUF 55).  Dr. Eskandarian's only

---

[4] Citations to the rebuttal report of RSA's expert, David B. Peraza, P.E., will be identified as "Ex. 11, Peraza at ¶__," which is Exhibit 11 to the Zafonte Declaration.

[5] Citations to the opening report of Delta's expert, Azim Eskandarian, will be identified as "Ex. 9, Esk. at ¶__," which is Exhibit 9 to the Zafonte Declaration.

2513217.v1

explanation for why a PHOSITA would modify Turpin to arrive at the "wherein" element of the '865 claims is provided in ¶103 of his expert report, which states:

> Turpin does not disclose that the supports 20 and/or I-beams 23 are purposely configured to retain concrete in the interior spaces 22 there between. Nevertheless, **_Turpin's design allows concrete to be introduced into those interior spaces_**. This claim is not a method claim and does not require the presence of cement in the vault to infringe. Such actual pouring would have been obvious to a POSITA in view of the prior art sale and installation of Delta's DSC501 barrier, discussed below with respect to claim 35. The DSC501 installation includes the introduction of rebar and concrete into a large portion of the interior of the base, which adds weight to the base, thereby increasing the resistance to rotation of the barrier upon an impact against the barrier. **_A POSITA would have been motivated to modify Turpin in view of the DSC501 installation to include rebar and concrete into the base_**, as such modification would yield predictable results (improved performance with a heavier base). In addition, the technique used in the DSC501 installation for arresting vehicles upon impact would provide the same results when used with the structure of Turpin. There was an apparent reason to combine Turpin with the DSC501 as described above, as Turpin teaches the need to have bollards mounted on a shallow foundation for arresting movement of a vehicle, and additional weight in the base of Turpin would allow for a more robust design to arrest such movement. Moreover, it would have been obvious to try to use the rebar and concrete used to fill the base of the DSC501 in combination with the similarly structured vault of Turpin. Any alleged improvement provided in the teachings of the '865 patent is a predictable use of such prior art elements according to their established functions.

(SUF 56). But this is not sufficient for Delta to prove obviousness, for many reasons.

First, this Court has already rejected Dr. Eskandarian's theory that merely allowing concrete to be introduced into a base is sufficient to meet the "wherein clause," which requires that "the structural members are configured or tied together in such a manner that they are designed to allow for supporting media to be placed or poured into the base." (Dkt. 74 at 4; SUF 57). The Court stated that the "argument that this limitation would be met by any configuration where media could possibly

12

be introduced into a base, even when the configuration is not designed for that purpose, is not persuasive." (Dkt. 74 at 4; SUF 58).

Second, as can be seen in ¶103 of his expert report, Dr. Eskandarian does not provide any reason, other than a conclusory statement in pure hindsight, why a PHOSITA would combine these two references to arrive at the '865 patent claims. *See Biocell Tech. LLC v. Arthro-7*, No. SACV 12-00516-JVS, 2013 U.S. Dist. LEXIS 189647, *22 (C.D. Cal. April 16, 2013) (conclusory assertions will not sustain an obviousness defense). (SUF 59). Dr. Eskandarian does not identify *any* teaching, suggestion, or motivation in these two pieces of art that would point a PHOSITA in that direction. Mr. Peraza, on the other hand, explained why a PHOSITA would *not* seek to modify Turpin to achieve the '865 invention. (SUF 60). Mr. Peraza testified that "I wouldn't start with the system like the -- like the Turpin system in order to get to the system that's described in the 865 patent. They're completely different" and opined that comparing the two inventions was "like comparing apples to oranges." (Ex.12, Peraza Dep. Tr. at 96:24-97:2; Ex. 11, Peraza at ¶¶70-77; SUF 60).

A PHOSITA would *not* use Turpin or the DSC501 to achieve the '865 invention (or combine them) because they are both active systems that require moving parts and energy to raise and lower the barrier depending on the traffic needs. That function is irrelevant and a serious complication to the '865 system, which is purely passive. (Ex. 11, Peraza at ¶¶71, 74, 77; SUF 61). PHOSITAs were well aware of the differences between these two types of barrier systems, and literature clearly distinguished between them. The "Department of Defense Handbook, the Selection and Application of Vehicle Barriers," which Dr. Eskandarian testified he considered in reaching his expert opinion, seeks to "provide[] guidance to ensure that appropriate design, operational, environmental, cost, security, and safety considerations are included in the selection process for vehicle barrier systems" and

13

"guides the user through the process of selecting passive and active vehicle barriers that will protect a facility." (Ex. 62 at ii; SUF 62). Section 7 of the handbook divides the various barrier types into "active" and "passive" and "fixed" versus "portable/movable." (*Id*. at vi; SUF 63). It describes "Active Barrier Systems" as those that require "some action, either by personnel, equipment, or both, to permit entry of a vehicle" and "Passive Barrier Systems" which have "no moving parts" and "relies on its ability to absorb energy and transmit the energy to its foundation." (*Id*. at 27; SUF 64). It warns that "[a]n active vehicle barrier system is capable of inflicting serious injury and "can kill or seriously injure individuals when activated inadvertently, either by operator error or equipment malfunction." (*Id*. at 28; SUF 65). Apart from safety, the handbook goes through various other categories that must be considered when choosing a barrier type for a particular site, including reliability, maintainability, cost, barrier operations, and environment. (*Id*. at 28-30; SUF 66). Mr. Peraza opined that active barrier systems are more complex, require more maintenance, and are more costly than passive system. (Ex. 11, Peraza at ¶74; SUF 67). Despite conceding that while both active and passive systems were intended to protect people and property, "active systems have additional capabilities over passive system," Dr. Eskandarian could not explain why a PHOSITA would choose to modify an active system if to arrive at a passive system. (Ex. 13, Esk. Dep. Tr. at 134:4-167:6; SUF 68). A PHOSITA would reject that idea since the active capabilities are not needed and increased risks and costs would be incurred.[6]

---

[6] Interestingly, in the prior *RSA v. Secure USA* litigation, No. 9:18-cv-81124-RLR (S.D. Fla), concerning the same patent-in-suit, the defendant, Secure USA, served a third-party subpoena on Delta seeking prior art. (Ex. 64). In each request, Secure USA sought documents concerning art that were specifically "passive vehicle barriers," not active ones, suggesting that Secure USA did not even consider active systems to be relevant to their invalidity defense. (Ex. 64 at 7-10; SUF 70).

14

(SUF 69).  It is clear in the industry that active and passive barrier systems are very different, and a PHOSITA would not combine two active systems to create a passive one. (Ex. 11, Peraza at ¶¶74, 77; SUF 71).  But, Dr. Eskandarian fails to address this glaring difference between Turpin and the DSC501, and the '865 invention, and therefore fails to show any motivation to combine.  *CH2O, Inc. v. Meras Eng'g, Inc.*, No. LA CV13-08418-JAK, 2016 U.S. Dist. LEXIS 185565, *25-26, 29 (C.D. Cal. May 9, 2016) (refusing to grant summary judgment of invalidity when the two references being combined "describe distinct situations with unique solutions" and "[e]ven if there is an overlap in the objectives, Defendants' argument does not establish that a person of ordinary skill would have been motivated to combine" when "defendants 'motivation statements' are conclusory attorney argument that is not supported with evidence.").

Third, a PHOSITA would not be motivated to modify Turpin and/or combine it with the DSC501 because Turpin could not work if it had concrete in its base.  (Ex. 11, Peraza at ¶¶71, 90, 93-94; SUF 72).  Unlike the '865 bollard system, the Turpin system has moving parts contained within its sealed steel vault—the rotating rod secured to I-beams via bushing blocks with steel bushings, as well as to an arm with a push lever, which is secured to an electromagnetic worm gear actuator.  (Ex. 11, Peraza at ¶65, citing Ex. 59, Turpin at ¶¶ 0028-29; SUF 73).  These parts not only need to be free to move, but also require maintenance, such as greasing, and must be accessible.  (Ex. 11, Peraza at ¶65, citing Turpin at ¶¶ 0011, 0026, 0028; SUF 74).  Adding concrete to the Turpin base would not allow for the parts to move or be maintained.  (Ex. 11, Peraza at ¶¶89-94; SUF 75).  If the Turpin base were filled, the media would also envelop the moving parts including the rotating rod and bushing blocks such that they could not move to lower and raise the bollards.  (Ex. 11, Peraza at ¶¶71, 75-77, 90, 92-93; SUF 76).  Mr. Peraza's report included illustrations from Turpin showing that when in the raised position, its bollards extend all the way to

2513217.v1

the bottom of the vault, demonstrating that if the vault contained any media, the bollards could not raise.  (*Id*. at ¶¶93-94; SUF 77).  A PHOSITA would not be motivated to modify Turpin with DSC501 because the resultant modified structure would be unsatisfactory for its intended purpose.  *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326-1327 (Fed. Cir. 2009).

Fourth, a PHOSITA would not be motivated to combine Turpin with the DSC501 to arrive at the '865 invention because the DSC501 suggests using concrete for a different purpose than the '865 invention.  (Ex. 11, Peraza at ¶67-68; Ex. 12, Peraza Dep. Tr. at 67:7-67:24; 98:25-99:15; SUF 78).  The DSC 501 base contains rebar that projects out of the base into surrounding soil or concrete.  (*Id*.; SUF 79).  The concrete placed in the DSC501 base acts as a structural member to anchor the rebar, not to add weight to the base, like the '865 invention.  (*Id*.; SUF 80).  Dr. Eskandarian ignores this significant design difference in his purely hindsight analysis.  So, not only does Turpin not have a base comprised of structural members configured to retain media such that rotation is resisted, but it does not teach, suggest, or motivate a PHOSITA to design a bollard that does have these attributes.  *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1304 (Fed. Cir. 2005) (expert testimony of a lack of motivation to combine and the use of hindsight by [opposing experts] "constitutes substantial evidence of nonobviousness").

Fifth, even if a PHOSITA tried to modify Turpin to include media in its base, there would be no reasonable expectation of success.  As explained above, Turpin's bollards cannot move to the raised position if its vault were filled with even a small amount of media, meaning that it could not function like the '865 bollards, which are always in an upright position.  (Ex. 11, Peraza at ¶¶71, 76, 90-94; SUF 81).  Dr. Eskandarian provides no opinion as to whether a PHOSITA would have a reasonable expectation of success, apart from his conclusion that, "[i]n addition, the technique used in the DSC501 installation for arresting vehicles upon impact would provide

16

2513217.v1

the same results when used with the structure of Turpin." (Ex. 9, Esk. at ¶103; SUF 82). Mr. Peraza concluded that a PHOSITA would *not* have had a reasonable expectation of success in combining Turpin with the DSC501, because Turpin's figures make clear that its vault needs to be empty otherwise its bollards cannot not raise. (Ex. 11, Peraza at ¶¶77, 90-94; SUF 83). In his opinion, there was not sufficient space in the Turpin base for any media, let alone enough concrete and/or rebar to contribute weight like that of the '865 base, while still allowing Turpin to function like the '865 bollards and be in an upright position. (Ex. 11, Peraza at ¶¶90-94; SUF 84).

Sixth, the independent claims are clear that one of the claims' previously introduced intersecting structural members, must be one of the *same* structural members secured to the bollard, and the ***same structural member configured to retain media***. (SUF 85). Dr. Eskandarian identifies the "at least one first structural member" and the "at least one structural member" as Turpin's I-beams and rotating rod, respectively. (Ex. 9, Esk. at ¶¶96-97; SUF 86). But, he does not recognize that the claimed base requires that ***those same members must also be configured to retain media***—rather he argues that media could be introduced into Turpin's "interior spaces." (Ex. 9, Esk. at ¶103; SUF 87). As the PTAB already noted, this approach is "fatal." (Ex. 50, IPR2019-01161, Paper No. 8 at 21; SUF 88).

## B.   The '865 Claims are Not Obvious or Anticipated by the DSC800

### 1.   Overview of the DSC800

The DSC800 is Delta's own removable bollard system, which it purportedly began selling in 2002. (Ex. 9, Esk. at ¶149; SUF 89). The DSC800 system has a bollard that is inserted into a steel sleeve that is embedded in concrete. (Ex. 11, Peraza at ¶106; Ex. 65, DS00001030; SUF 90). The steel sleeve is comprised of a

17

lower plate, an upper plate, and a cylindrical casing, together referred to as the "foundation tube assembly." (*Id.*; Ex. 65; SUF 91). No concrete or other media exists between the plates, but rather the foundation tube assembly is surrounded by rebar and concrete, which exist only outside of the bollard structure. (Ex. 11, Peraza at ¶106; SUF 92). These rebar members are not attached to the bollard or foundation tube assembly. (Ex. 15, Friend Dep. Tr. at 143:17-147:5; SUF 93).

## 2.     The DSC800 Does Not Anticipate or Render Obvious The Wherein Clause

The DSC800 cannot anticipate the '865 claims because it does not teach a base made up of structural members configured to retain media. In support of his opinion, Dr. Eskandarian only states that:

> The DSC800RFB includes a foundation tube assembly and rebar cage that are configured to retain within the base supporting media introduced into the base, i.e., concrete, when the base is mounted in the excavation. The added weight of the concrete increases resistance to rotation of the bollard and the base from an impact against the bollard.

(Ex. 9, Esk. at ¶159; SUF 94).

The '865 claims describe the base as having "opposed ends," and being comprised of "the at least first structural member" and "the at least one structural member," with one of these two structural members "secured" to the bollard. (Ex. 1, '865 at claims 1, 16, 33; SUF 95). Dr. Eskandarian speculates that in the DSC800, both sets of claimed structural members are "inherent" in the DSC800's lower plate. (Ex. 9, Esk. at ¶¶154-156; SUF 96). Dr. Eskandarian also opines that this lower plate has the claimed "opposed ends," and is "secured to the bollard." (Ex. 9, Esk. at ¶¶153, 157; SUF 97). The '865 claims further require that at least one of these *same structural members that make up the base be what retains media*. (*See also* Ex. 50, IPR2019-01161, Paper No. 8 at 21; SUF 98) (finding that "the at least first structural member or the at least one structural member" must be what are attached

18

to the bollard as well as what satisfy the "retaining supporting media" limitation). Dr. Eskandarian does *not* argue, however, that the DSC800's lower plate, or even the entire foundation tube assembly, retains media as required by the claims. (Ex. 9, Esk. ¶159; SUF 99). The concrete used in the DSC800 *clearly exists outside of the bollard's base*. (Ex. 11, Peraza at ¶106; SUF 92). So, Dr. Eskandarian instead tries to argue that the DSC800 base is not limited to the foundation tube assembly but conveniently also includes the rebar members that surround it, although those rebar members are not the same members that he argues satisfy the other limitations of the claimed base. (Ex. 9, Esk. at ¶¶153-157; 159; SUF 100). But, the '865 independent claims require that the structural members of the base "intersect" and be "tied together." (SUF 101). The rebar members of the DSC800 run in only one direction and do not intersect with or connect to any other members of the DSC800, or each other. (Ex. 11, Peraza at ¶¶115-117; Ex. 15, Friend Dep. Tr. at 143:17-147:5; SUF 102).

Mr. Peraza opines that the foundation tube assembly of the DSC800—the plates and the casing, are its base. (Ex. 11, Peraza at ¶¶129-130; SUF 103). He opines that this base is clearly not configured to retain any concrete. (Ex. 11, Peraza at ¶129; SUF 104). He further opines that specifically the structural members identified by Dr. Eskandarian as the "intersecting and tied together members"—the single, lower plate—is not configured to retain media. (Ex. 11, Peraza at ¶¶132-133; 105).[7]

_____

[7] Because Dr. Eskandarian assigned the lower plate as satisfying all of the remaining limitations of the independent claims, this lower plate must necessarily also satisfy the "retains media" limitation. But the '865 patent's prior history confirms that a single plate cannot be configured to retain concrete, rather a plate could actually work to prevent media from entering the base, like with the Fuchs reference that the patent issued over. (Ex. 49 at 47; *see also* Ex. 11, Peraza at ¶133; SUF 107). During the reexamination, the PTO also noted that pouring

2513217.v1

Further, Dr. Eskandarian's opinion that the DSC800's lower plate inherently contains two separate tied together structural members is contrary to the findings of the PTAB. The PTAB rejected that the statement in the '865 patent specification that "cross pieces are inherent in the continuous plate" (Ex. 1 at 5:52) demonstrates that a single plate included the "at least one first structural member" and the "at least one structural member" configured as recited in the claims. (Ex. 51, IPR2019-01162, Paper No. 7 at 30; SUF 106).

Therefore, the DSC800 does not disclose a base comprised of structural members configured to retain media. Rather, concrete and rebar fill the area **outside** of the DSC800 foundation tube assembly. (Ex. 11, Peraza at ¶¶129; 132; SUF 92). Dr. Eskandarian also provides no support for his assertion that any concrete in the base is what allows the bollard to resist rotation, as further required by the independent claims. (Ex. 9, Esk. at ¶159; SUF 109). Therefore, the DSC800 cannot invalidate the '865 claims under 35 U.S.C. §102. And, despite alleging that the DSC800 also renders obvious the '865 claims, Dr. Eskandarian provides **no basis for his obviousness opinion**. (SUF 110). The DSC800 therefore also cannot invalidate the '865 claims under 35 U.S.C. §103.

### C.   The '865 Claims are Not Obvious or Anticipated by the TT203

#### 1.   Overview of the TT203

The TT203R is also a removable bollard made by Delta, which it claims to have begun selling in 1997. (Ex. 9, Esk. at ¶193-94; SUF 111-112). In structure, it is very similar to the DSC800 as it has lower and upper plates connected by a casing into which the bollard is placed, (again, the two plates and casing are together

---

supporting media "on top of the base" is not the same as retaining media "within the base." (Ex. 58, June 30, 2020 Office Action at 4; SUF 108).

2513217.v1

referred to as the "foundation tube assembly"). (Ex. 11, Peraza at ¶¶148-149; Ex. 60, DS00000321; SUF 113). The main structural difference between the DSC800 and the TT203 is that they have different mechanisms for preventing the bollards from being removed. (Ex. 11, Peraza at ¶149; SUF 114).

### 2. The TT203 Does Not Anticipate or Render Obvious The Wherein Clause

Dr. Eskandarian again assigns the two structural members of the base to be inherent in the TT203's lower plate. (Ex. 9, Esk. at ¶¶199-200; SUF 115). He argues that the "opposed ends" of the TT203 base are the opposed ends of this lower plate (Ex. 9, Esk. at ¶197; SUF 116) and that the bollard is secured to this lower plate (Ex. 9, Esk. at ¶201; SUF 117). But, he does not argue that this lower plate, or even the foundation tube assembly, retains media. (SUF 118). Instead, the only support Dr. Eskandarian provides for his opinion is that the TT203 discloses the "wherein clause" is the conclusory statement that:

> "The TT203 includes a foundation tube assembly and rebar cage that are configured to retain within the base supporting media introduced into the base, i.e., concrete, when the base is mounted in the excavation. The added weight of the concrete increases resistance to rotation of the bollard and the base form an impact against the bollard."

(Ex. 9, Esk. at ¶203; SUF 119). Mr. Peraza provided the opinion that the TT203 is not configured to retain media, nor could it accept media. (Ex. 11, Peraza at ¶¶168-170; SUF 120). Like the DSC800, the concrete and rebar of the TT203 is *outside* of the foundation tube assembly, and the rebar members do not intersect or tie to any other members, nor do they intersect and tie to each other. (Ex. 11, Peraza at ¶¶156; 169; SUF 121). The rebar members are neither part of the base, nor could they be the structural members of the base configured to retain media. (*Id.*; SUF 122). Because the TT203 base is not comprised of structural members configured to retain

21

2513217.v1

media, media cannot cause the bollard structure to resist rotation, and Dr. Eskandarian only makes a conclusory remark about this limitation, without support. (Ex. 11, Peraza at ¶171; Ex. 9, Esk. at ¶203; SUF 123-124).  For the same reasons explained supra at IV(B)(2), the TT203 cannot anticipate the '865 claims because it does not disclose a base comprised of structural members configured to retain media. Dr. Eskandarian also fails to provide any opinion as to obviousness.  (SUF 125).

### D. Darcy Is Not Prior Art to the '865 Patent

Delta's final validity argument is that U.S. Patent Publication No. 2006/0090408 anticipates or renders obvious the '865 claims, either alone or combined with the DSC501 wedge. (Ex. 63, "Darcy App.").[8]  The Darcy App. claims priority from a provisional application filed on October 22, 2004.  (*Id.*; SUF 126). The '865 patent claims priority from various provisional applications, three of which were filed prior to October 22, 2004: Provisional Application No. 60/591,018, filed on July 26, 2004, Provisional Application No. 60/600,955, filed on August 12, 2004, and Provisional Application No. 60/605,959, filed on August 30, 3004.  (Exs. 2-4; SUF 127).  Dr. Eskandarian states in his expert report that "he has not made an independent assessment of whether the '865 patent is entitled to the June 26, 2004 priority date."  (Ex. 9, Esk. at ¶211; SUF 128).  However, as set forth, *supra* at II(D)(3), the PTO already reviewed RSA's July 26, 2004 provisional application during the since terminated reexamination, determined that the '865 patent was entitled to a priority date of July 26, 2004 because the provisional provided support for the wherein clause of the '865 claims, and concluded that ***the Darcy Application was not prior art***.  (Ex. 10 at 10-11; SUF 129).  In its request for reexamination,

---

[8] When responding to the third-party subpoena from the defendant in the *RSA v. Secure USA* case requesting prior art, Delta did not identify any of the art it relies on today apart from the Darcy Application.  (Ex. 64, Delta's Response to Secure USA Subpoena; SUF 132).

22

Delta did not dispute that any limitations of the '865 claims apart from the "wherein clause" were unsupported in the earlier provisional applications. (*Id.*; SUF 130). Mr. Peraza also opined that there was support for all elements of the '865 patent claims in all three of the provisional applications that pre-dated the Darcy application. (Ex. 11, Peraza at ¶176; SUF 131). Therefore, Darcy cannot invalidate the '865 claims as anticipated or obvious because it is not prior art.

## V.   SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

### A.   Copying

Prior to RSA's introduction of its shallow mount bollard products covered by the '865 patent, Delta was selling its TT203 and DSC800 bollard products. (Ex. 9, Esk. at ¶¶149; 193; SUF 133). RSA began selling its shallow mount bollards in 2004, and included photographs and other images of these shallow mount bollards in the provisional applications it filed in 2004 through 2005. (*See, e.g.*, Ex. 4, Provisional App. No. 60/605959 at RSA-DELTA043758; RSA-DELTA043764; Ex. 6, Provisional App. No 60/674965 at RSA-DELTA043838; RSA-DELTA043866; RSA-DELTA043946; RSA-DELTA043878-79; SUF 134). Delta began selling its infringing DSC600, DSC650, and DSC675 shallow mount bollard products in 2008. (Ex. 19, Dickinson Dep. Tr. at 88:24-89:3; SUF 135). Delta's new infringing products looked nothing like its earlier bollard systems, the DSC800 and TT203, but exactly like RSA's invention. (Ex. 69; SUF 139). Mr. Peraza stated that simply a side by side comparison suggests that Delta copied RSA's design and the invention disclosed in the '865 patent. (Ex. 11, Peraza at ¶209; SUF 140). Even Delta's President, Mr. David Dickinson admitted that Delta's accused products and the shallow mount bollards depicted in Delta's patent application were "very similar" to RSA's product (Ex. 19, Dickinson Dep. Tr. at 97:21-103:22; 105:25-107:11; 118:22-124:6; SUF 141) and that it was "plausible" that someone at Delta could have

2513217.v1

identified RSA's competing product, saw the demand for that product, and incorporated that product into its accused products. (Ex. 19, Dickinson Dep Tr. at 124:20-125:4; SUF 142).

There is also no evidence that Delta independently developed its infringing products. The earliest depictions of the accused products are merely a few hand-done sketches dated in late 2007, which do not even show the design of the bollard structure itself. (Ex. 66-68; SUF 136). Mr. Peraza opined that such a lack of evidence of the development of the accused products or even depictions of the designs of these products prior to them being sold strongly suggests that Delta copied the '865 shallow mount bollard design. (Ex. 11, Peraza at ¶212; SUF 143). In fact, at nearly the same time as these sketches, Delta filed a patent application describing its new infringing products. (Ex. 34 at DS00000189; SUF 137). That application was quickly abandoned before a first office action as there was "a lot of prior art, and it was going to be a big headache." (Ex. 19, Dickinson Dep. Tr. at 94:7-95:7; 103:23-104:12; SUF 138).

## B.   Long Felt Unmet Need

Dr. Eskandarian does not address any secondary considerations of non-obviousness, and in fact his report demonstrates that there was, in fact, a long-felt but unmet need for the shallow mount anti-ram bollards that were the subject of the '865 invention. (SUF 144). Dr. Eskandarian opined "that the market demand for security barriers has existed and magnified since the early 1980s" and that it was "further intensified after the 9/11 attacks." (Ex. 9, Esk. at ¶46; SUF 145). He explained that as a result, "the government developed test procedures for security barriers in 1985; a standard and guidance utilized throughout the 1990s and early 2000s, and later adopted by an ASTM standard." (*Id*.; SUF 146). He also emphasized that there was a need specifically for security barriers to be installed in

24

2513217.v1

cities, which required shallow excavations as a result of underground utilities. (*Id*.; SUF 147).

Mr. Peraza also provided an opinion that there was a long-felt need for the '865 invention dating back to the Oklahoma City bombings in April 1995 and the September 11, 2001 attacks, when it became clear that terrorists were seeking to intentionally drive heavy vehicles at high speeds into buildings for the purpose of harming people and property. (Ex. 11, Peraza at ¶206, citing Ex. 1,'865 at 1:50-4; SUF 148). He stated that there was specifically an increased need for these anti-ram systems in areas where utilities and other infrastructure reside in underground systems, especially in urban or commercial areas, where the traditional "deep" excavations would require moving those systems. (*Id*., citing '865 at 1:60-2:10; SUF 149). This long felt need was unmet until the '865 invention.

## VI.    CONCLUSION

As set forth above, Delta does not have any anticipating prior art, and its obviousness allegations suffer from three fatal flaws. First, Dr. Eskandarian's opinions are purely hindsight, fail to consider the "wherein" element as part of the patent claims as a whole, and do not establish that a PHOSITA would have been motivated to modify or combine its prior art references with any reasonable expectation of success. Second, each time Dr. Eskandarian attempts to "reach" the "wherein" element, he fills the prior art gap with merely conclusory statements based on his "general knowledge" to conclude that the prior art renders the patent claims obvious. Those conclusory statements do not raise a genuine issue of fact. Third, Delta, aware of RSA's strong secondary considerations, offers no evidence in rebuttal. Therefore, the Court should grant RSA's Motion for Summary Judgment.

Dated: February 10, 2021

                                        /s/ Ashe Puri

2513217.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sasha G. Rao
srao@maynardcooper.com
(California Bar Number: 244303)
**Maynard Cooper & Gale, LLP**
Transamerica Pyramid Center
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone: (415) 646-4702

Ashe Puri (SBN 297814)
apuri@maynardcooper.com
**Maynard Cooper & Gale, LLP**
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 596-4344

Joseph V. Saphia
JSaphia@haugpartners.com
Jessica H. Zafonte
JZafonte@haugpartners.com
Laura A. Chubb
LChubb@haugpartners.com
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800
Facsimile: (212) 588-0500
*Attorneys for Plaintiff*
*RSA Protective Technologies, LLC*

2513217.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed via CM/ECF on February 10, 2021 and was served upon all counsel of record via CM/ECF.

/s/ Ashe Puri
Ashe Puri

2513217.v1